No. 19-2683

IN THE

# United States Court of Appeals

FOR THE SEVENTH CIRCUIT

BRUCE CARNEIL WEBSTER,

*Petitioner-Appellee,*

v.

T.J. WATSON, WARDEN

*Respondent-Appellant.*

On Appeal from the United States District Court
for the Southern District of Indiana, No. 2:12-CV-086-JPH-MJD
Hon. William T. Lawrence, District Judge

**BRIEF FOR THE RESPONDENT WARDEN**

ERIN NEALY COX
  *United States Attorney*
  *Northern District of Texas*

JOSH J. MINKLER
  *United States Attorney*
  *Southern District of Indiana*

JAY WEIMER
  *Assistant U.S. Attorney*
  *Northern District of Texas*

  *Special Assistant U.S. Attorney*
  *Southern District of Indiana*
  *10 West Market St., Ste. 2100*
  *Indianapolis, Indiana 46204*
  *(817) 252-5273*

**TABLE OF CONTENTS**

Page

TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES..............................iii

JURISDICTIONAL STATEMENT....................................................................... 1

ISSUES PRESENTED FOR REVIEW................................................................. 2

STATEMENT OF THE CASE............................................................................. 3

    A.  Bruce Webster orchestrates the kidnapping, gang-rape, torture, and murder of 16-year-old Lisa Rene in retaliation for a drug debt her brother owed ....................................................................................... 2

    B.  After proceedings lasting almost 30 days, the jury finds Webster guilty and determines that he is not intellectually disabled, and the district court agrees and imposes the death penalty .............................................. 5

    C.  The Fifth Circuit affirms Webster's convictions and sentence, the district court and Fifth Circuit reject his first Section 2255 motion, and the Fifth Circuit denies his request for authorization to file a successive Section 2255 motion................................................................................ 7

    D.  The Fifth Circuit rejects Webster's petition for authorization to file a successive Section 2255 motion .......................................................... 9

    E.  Webster files a Section 2241 motion in the Southern District of Indiana, the district court concludes that it lacks jurisdiction over the motion and a panel of this Court affirms, but the en banc Court reverses .............. 10

    F.  On remand, the district court finds that Webster's trial counsel exercised due diligence in attempting to obtain the SSA records, and it also finds that Webster is intellectually disabled ............................................. 11

i.  In the first phase, the district court finds that trial counsel Larry Moore exercised due diligence despite the fact that Moore's story as to the records became more specific and favorable to Webster over the years and his testimony on the issue was fundamentally unreliable ............................................................................... 11

ii.  In the second phase, the Indiana district court finds—contrary to the 1996 jury, the Fort Worth trial court, and the Fifth Circuit (twice)— that Webster is intellectually disabled to such an extent that he is ineligible for the death penalty, and it vacates the death sentence as a result ......................................................................................... 17

SUMMARY OF THE ARGUMENT ......................................................................... 23

ARGUMENT .......................................................................................................... 25

I.  The district court erred in finding that Webster's Social Security records were unavailable and that his trial attorney, Larry Moore, exercised due diligence in attempting to get the records .......................................................... 25

A.  The standard of review is deferential, but it allows for reversal when a district court makes a finding based on "exceedingly improbable testimony" ....................................................................................... 25

B.  This Court must reverse the district court because its due-diligence finding rested on "exceedingly improbable testimony" ........................... 26

i.  Webster's only evidence as to due diligence was his former attorney's testimony, which conflicted in material fashion with that attorney's prior statements and was therefore internally inconsistent and unreliable ......................................................................................... 27

ii.  The attorney's case file from Webster's trial casts further doubt on the attorney's new claims as to his diligence .................................................. 31

iii.  The Dorsey firm's ease in obtaining the SSA documents belies Moore's claim that he diligently pursued them ......................................... 34

ii

iv. The district court should have found that Moore did not exercise due diligence to get the SSA records because he did not think he needed them......................................................................................................... 38

II. Alternatively, the district court erred in finding that Webster was intellectually disabled and in vacating the death sentence as a result.............. 39

    A. Several standards apply to a finding of intellectual disability ..................... 39

    B. Webster's evidence failed to meet these standards ........................................ 42

        i.   Webster did not prove significant deficits in the conceptual domain ... 42

        ii.  Webster did not prove significant deficits in the social domain............. 44

        iii. Webster did not prove significant deficits in the practical domain ....... 49

        iv. Webster failed to establish adaptive deficits mandating vacatur of his death sentence ................................................................................................ 51

CONCLUSION................................................................................................................ 53

CERTIFICATE OF COMPLIANCE........................................................................... 54

CERTIFICATE OF SERVICE...................................................................................... 54

CIRCUIT RULE 30(d) CERTIFICATION ................................................................. 55

APPENDIX ..................................................................................................................... 56

# TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES

Page(s)

**Cases**

*In re Webster*, 605 F.3d 256 (5th Cir. 2010)...............................................................9, 10

*Noeller v. Wojdylo*, 922 F.3d 797 (7th Cir. 2019) ....................................................25, 48

*Prevatte v. Merlak*, 865 F.3d 894 (7th Cir. 2017) ..................................................1, 48, 50

*United States v. Smith*, 576 F.3d 681 (7th Cir. 2009)................................................25, 28

*United States v. Warner*, 498 F.3d 666 (7th Cir. 2007) ....................................................25

*United States v. Webster*, 392 F.3d 787 (5th Cir. 2004) .....................................................8

*United States v. Webster*, 421 F.3d 308 (5th Cir. 2005) ..........................................8, 9, 23

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) ..........................................6, 7, 23

*Webster v. Caraway*, 761 F.3d 764 (7th Cir. 2014) ..........................................................10

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015)...................................................*passim*

*Webster v. Lockett*, 2013 WL 6007593 (S.D. Ind. Nov. 13, 2013) ...............................10

*Webster v. United States*, 528 U.S. 829 (1999)............................................................7, 48

*Webster v. United States*, 549 U.S. 828 (2006) ...................................................................9

*Webster v. United States*, 2003 WL 23109787 (N.D. Tex. Sept. 30, 2003) .........5, 6, 7, 8

**Statutes**

18 U.S.C. § 1201(a)(1) ...................................................................................................5

28 U.S.C. § 2255(e)........................................................................................................1

28 U.S.C. § 1291 ...........................................................................................................1

28 U.S.C. § 2253(a) .......................................................................................................1

28 U.S.C. § 2241 ...........................................................................................................1

28 U.S.C. § 1331 ...........................................................................................................1

**Rules**

Fed. R. App. P. 4(a)(1)(B) ............................................................................................1

Fed. R. App. P. 4(a)(5) ..................................................................................................1

## JURISDICTIONAL STATEMENT

Warden T.J. Watson, with the approval of the Solicitor General, appeals from the Entry Following Hearing of June 18, 2018 (entered on August 31, 2018), Entry on Intellectual Disability (entered on June 18, 2019), and judgment (also entered on June 18, 2019) of the U.S. District Court for the Southern District of Indiana granting Petitioner Bruce Webster's savings-clause petition for writ of habeas corpus. *See* Attached Appendix (Dkts. 117, 198, 199)[1]; *see also* 28 U.S.C. §§ 2241, 2255(e). The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. *See Prevatte v. Merlak*, 865 F.3d 894, 900-01 (7th Cir. 2017).

The original notice-of-appeal deadline was August 19, 2019. *See* Fed. R. App. P. 4(a)(1)(B). On August 13, 2019, the United States moved for an extension of time in which to file the notice of appeal. Dkt. 202; *see* Fed. R. App. P. 4(a)(5). The district court granted the motion and extended the notice-of-appeal deadline until September 3, 2019. Dkt. 204. The United States timely filed a notice of appeal on August 30, 2019. Dkt. 205. The Seventh Circuit has subject-matter jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).

---

[1] "Dkt." followed by a number refers to a document filed in the district-court record.

1

**ISSUES PRESENTED FOR REVIEW**

I. Did the district court clearly err when it relied on the inconsistent and unreliable testimony of Webster's criminal defense lawyer to find by clear and convincing evidence that Webster exercised due diligence in attempting to obtain Social Security records?

II. Did the district court clearly err when it disregarded overwhelming evidence of Webster's adaptive abilities and found by a preponderance of the evidence that Webster satisfied the diagnostic criteria for intellectual disability?

**STATEMENT OF THE CASE**

The Warden appeals from the district court's August 31, 2018 order finding that Webster's trial attorney exercised due diligence in attempting to obtain Social Security records related to Webster but that they were unavailable, the court's June 18, 2019 order finding Webster intellectually disabled and vacating his death sentence, and the final judgment. *See* Attached Appendix. The relevant facts, proceedings, and dispositions are:

A. Bruce Webster orchestrates the kidnapping, gang-rape, torture, and murder of 16-year-old Lisa Rene in retaliation for a drug debt her brother owed.

During the fall of 1994, Petitioner Bruce Webster, Orlando Hall, and Marvin Holloway operated a marijuana-trafficking business in Pine Bluff, Arkansas.

*Webster v. Daniels*, 784 F.3d 1123, 1125 (7th Cir. 2015) (en banc).[2] With the help of Steven Beckley, the men regularly purchased marijuana from the Dallas/Fort Worth area and transported the drugs back to Arkansas. *Id*. On September 21, 1994, Hall flew to Dallas to purchase marijuana from two local drug dealers, including Neil Rene. *Id*. That same day, Hall and Beckley met with Rene and the other drug dealer at a car wash and gave them $4,700 for the purchase of marijuana, but Rene and the other person never delivered the drugs. *Id*.

After losing the money, Hall told Holloway to have Webster fly to Dallas to help because Webster "knew how to handle things like [that]." *Id*.; Apr. Hr. Ex. 112 at 283.[3] On September 24, 1994, Webster flew to Dallas, where he met with Hall, Hall's brother Demetrius Hall, and Beckley. *Webster*, 784 F.3d at 1125. After they discovered where Neil Rene lived, the four men drove to Rene's apartment and knocked on the door. *Id*. at 1126. Lisa Rene, Neil Rene's 16-year-old sister, was the only person at the apartment. *Id*. She refused to let the men in despite Webster claiming that they were the FBI and instead called the police. *Id*. at 1126, 1144.

---

[2] The United States includes all prior decisions in Webster's case (except for the two decisions from which it is appealing, which are in the attached appendix) in a separate appendix filed concomitantly with this brief.

[3] References to exhibits introduced at the April 2019 hearing are styled simply "Apr. Hr. Ex. #." For that hearing, the parties agreed to number exhibits so as to have unique numbers for each exhibit; accordingly, it is not necessary to designate the sponsoring party to identify the exhibit.

Webster, armed with a handgun, attempted to kick the door in. When that did not work, Demetrius Hall shattered a sliding glass door with a bat. *Id*. Webster went into the apartment, grabbed Lisa, and dragged her to the car. *Id*.

After kidnapping her, Webster and the other men repeatedly raped Lisa and held her captive in an apartment. *Id*. Webster, Demetrius Hall, and Beckley then drove her over 300 miles to Pine Bluff, Arkansas. *Id*. When they arrived, Webster rented a motel room. *Id*.; Apr. Hr. Ex. 110 at 3342-44. The men continued to rape Lisa at the motel. *Webster*, 784 F.3d at 1126.

The next morning, the men determined that Lisa knew too much and decided to kill her. *Id*. Webster and Hall went to a park, selected a remote location, and dug a grave. *Id*. That evening, Webster and his coconspirators took Lisa to the park, but it was too dark to find the grave, so they returned her to the motel. *Id*. In the morning, they moved her to a different motel room. *Id*.

Later that morning, Webster and the two other men took Lisa back to the park. *Id*. Webster and Hall led Beckley and Lisa to the gravesite. *Id*. When they arrived at the grave, Webster and Hall put a sheet over Lisa's head and beat her unconscious with a shovel. *Id*. Webster then gagged her, dragged her to the grave, stripped her, poured gasoline on her, and pushed her into the grave. *Id*. Finally, Webster buried 16-year-old Lisa alive, leaving her to suffocate and die. *Id*.

4

Shortly after the murder, Lisa's brothers spoke to police and gave information that led to Hall's and Beckley's arrests. *Id.* Beckley confessed and implicated Webster, and authorities arrested Webster at the motel shortly thereafter. *Id.* After his arrest, Webster confessed to murdering Lisa and led police to her grave. Apr. Hr. Ex. 110 at 158, 3326, 3335-51.

B. After proceedings lasting almost 30 days, the jury finds Webster guilty and determines that he is not intellectually disabled, and the district court agrees and imposes the death penalty.

In 1996, after 20 days of trial proceedings, a jury found Webster guilty of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) (count one), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) (count two), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count six). *Webster*, 784 F.3d at 1127. The verdict as to count one subjected Webster to a maximum sentence of death. 18 U.S.C. § 1201(a)(1).

During a seven-day sentencing hearing before the same jury that included testimony from over 50 witnesses, Webster's defense team argued that Webster was mentally retarded[4] and thus could not be sentenced to death under 18 U.S.C. § 3596(c). *Webster v. United States*, No. 4:00-CV-1646, 2003 WL 23109787, at *12-14

---

[4]   In earlier stages of this litigation, attorneys and courts referred to intellectual disability as "mental retardation." The two terms are synonymous and can be used interchangeably, though the former has gained a pejorative connotation and is no longer commonly used. This brief will use both terms as necessary to preserve the references the parties made at the time.

(N.D. Tex. Sept. 30, 2003). In support of this argument, defense counsel introduced Webster's IQ scores, testimony from Webster's friends and family, and testimony from four expert witnesses. *See id*. The government countered with evidence from expert witnesses as well as teachers, principals, and others who knew Webster. *See id*.

The district court provided detailed instructions to the jury that allowed each juror to determine, by a preponderance of the evidence, whether he or she believed certain mitigating factors existed, including whether Webster "is or may be mentally retarded." *Webster*, 162 F.3d at 319 & n.2. The jury was also asked to find whether Webster "has low intellectual functioning," whether "as a result of . . . low intellectual functioning [Webster] has a lesser capability to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law than a normal person," and whether Webster was "unduly susceptible to the influence of others." *Id*.

In its special verdict, only four jurors found that Webster was "or may be" mentally retarded, and only four found that he had "low intellectual functioning." *Id*. None of the jurors found that "as a result of . . . low intellectual functioning [Webster] has a lesser capability to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law." *Id*. Likewise, none of the jurors found that Webster was "unduly susceptible to influence by others." *Id*. The

jury unanimously found that the aggravating factors in Webster's case outweighed the mitigating factors and recommended a sentence of death. *Id*.

The district court found that Webster was not mentally retarded and that 18 U.S.C. § 3596(c)'s prohibition against imposing a death sentence upon a "mentally retarded" individual did not apply. *Webster*, 2003 WL 23109787, at *1, *10. Therefore, it sentenced Webster to death. *See id*.

> C. The Fifth Circuit affirms Webster's convictions and sentence, the district court and Fifth Circuit reject his first Section 2255 motion, and the Fifth Circuit denies his request for authorization to file a successive Section 2255 motion.

Webster appealed his convictions and sentence to the Fifth Circuit, arguing, among other things, that his death sentence was unconstitutional because he was, in fact, mentally retarded. In a 41-page opinion, the Fifth Circuit affirmed the convictions and sentence, holding that "[t]he government presented substantial evidence to support the finding [that Webster was not mentally retarded]." *United States v. Webster*, 162 F.3d 308, 353 (5th Cir. 1998). The Supreme Court denied Webster's petition for certiorari. *Webster v. United States*, 528 U.S. 829 (1999).

On September 29, 2000, Webster filed his first 28 U.S.C. § 2255 motion, again arguing that his death sentence was improper because he was mentally retarded. *Webster*, 2003 WL 23109787, at *3-4. He also argued that his counsel was ineffective in failing "to investigate and present additional evidence demonstrating mental

retardation and the extreme abuse Webster suffered as a child." *United States v. Webster*, 392 F.3d 787, 793 (5th Cir. 2004). After an extensive and detailed review of the evidence presented at trial regarding Webster's intellectual functioning, the district court denied his motion, finding that the trial evidence "supports a finding that Webster is not mentally retarded and therefore is not rendered ineligible for the death penalty under either *Atkins* [*v. Virginia*, 536 U.S. 304 (2002),] or 18 U.S.C. § 3596(c)." *Webster*, 2003 WL 23109787, at *14. The district court nevertheless granted a certificate of appealability as to two of Webster's claims: "first, that the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and second, that his alleged retardation renders him ineligible for a death sentence." *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005).

Webster appealed, but the Fifth Circuit again rejected his arguments, reasoning:

> Webster claims he is mentally retarded and thus ineligible for his death sentence, but . . . this claim is reduced, in essence, to nothing more than an attempt to re-litigate the question. . . .

> Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him. The question whether he is mentally retarded was, as the district court observed, "a highly contested one at trial," and Webster failed to convince *either* the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may be* retarded.

*Id*. at 313-14 (citation omitted, emphasis in original). The Supreme Court again denied Webster's petition for a writ of certiorari. *Webster v. United States*, 549 U.S. 828 (2006).

> D. The Fifth Circuit rejects Webster's petition for authorization to file a successive Section 2255 motion.

On October 22, 2009, Webster petitioned the Fifth Circuit for authorization to file a successive 28 U.S.C. § 2255 motion, arguing this time that he had newly discovered evidence "in the form of government and school records and additional testimony" establishing that he was mentally retarded. *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010). Webster's newly discovered evidence included records from the Social Security Administration (SSA) indicating that he was diagnosed with mental retardation months before he kidnapped, raped, and murdered Lisa Rene, and a letter from his school declaring that it had destroyed Webster's special-education records. *See id.* Webster argued that, had his attorney presented this evidence at trial, it would have refuted the government's arguments that he was pretending to be mentally retarded to avoid the death penalty and that he was lying when he said he had attended special-education classes. *See id.*

The Fifth Circuit denied authorization, however, reasoning that a petitioner cannot bring a successive claim under Section 2255(h)(1) if he does not assert that the newly discovered evidence would negate his guilt. *See id.* Because Webster's

9

newly discovered evidence challenged only his sentence and not the finding of guilt, the court reasoned, Section 2255(h)(1) did not authorize his filing of the successive claim. *See id.*

E. Webster files a Section 2241 motion in the Southern District of Indiana, the district court concludes that it lacks jurisdiction over the motion and a panel of this Court affirms, but the en banc Court reverses.

After failing in his attempt to bring a second Section 2255 motion, Webster sought relief from the district court for the Southern District of Indiana (where he was being incarcerated) under 28 U.S.C. §§ 2241 and 2255(e) based on the same SSA records. *See Webster v. Lockett*, No. 2:12-CV-86, 2013 WL 6007593, at *5 (S.D. Ind. Nov. 13, 2013). On November 13, 2013, the district court denied Webster's Section 2241 petition based on reasoning similar to the reasoning the Fifth Circuit had used to deny authorization for his second Section 2255 claim. *See id.* at *5-*8.

Webster appealed, and a panel of this Court affirmed. *See Webster v. Caraway*, 761 F.3d 764, 765-70 (7th Cir. 2014). This Court reheard the case en banc, however, and held that no absolute bar existed to the use of the safety valve found in Section 2255(e) for new evidence that would demonstrate categorical ineligibility for the death penalty. *Webster*, 784 F.3d at 1139. It remanded Webster's petition to the Indiana district court for further proceedings. *See id.* at 1141-46.

The en banc Court explained that, on remand, the district court should address Webster's petition in two phases. *See id.* First, "before the district court can reach

10

the merits of his habeas corpus petition . . . [it] must hold a hearing for the purpose of deciding whether the Social Security records were indeed unavailable to Webster and his counsel at the time of the trial." *Id.* at 1146. It instructed that, "[i]n considering that question, [the district court] must also evaluate trial counsel's diligence." *Id.* "In order to relate to the findings at trial, that evidence cannot be newly created; instead, it must be previously existing evidence of his intellectual disability that counsel did not uncover despite diligent efforts." *Id.* at 1141.

If the district court found that Webster's counsel had been unable to obtain the Social Security records despite exercising due diligence, it should conduct a second hearing to determine whether "Webster [is] so intellectually disabled that he is categorically ineligible for the death penalty under *Atkins* and *Hall* [*v. Florida*, 572 U.S. 701 (2014)]." *Id.* at 1146.

F. On remand, the district court finds that Webster's trial counsel exercised due diligence in attempting to obtain the SSA records, and it also finds that Webster is intellectually disabled.

   i. In the first phase, the district court finds that trial counsel Larry Moore exercised due diligence despite the fact that Moore's story as to the records became more specific and favorable to Webster over the years and his testimony on the issue was fundamentally unreliable.

Consistent with this Court's holding, the district court held an evidentiary hearing on June 18, 2018, to determine whether Webster could prove by a preponderance of the evidence that he exercised due diligence in attempting to

obtain the SSA records. *See* Dkt. Nos. 62; 75; 89; 109; June Hr. Tr. at 3-5.[5] The Court

heard testimony from two witnesses: Webster's trial counsel, Larry Moore, and a

paralegal from Webster's appellate team, Kristen LeRoux.

LeRoux's testimony established the means by which Webster's appellate team

at Dorsey & Whitney obtained his SSA records and demonstrated that little effort

was required to obtain the records. Specifically, on October 27, 2008, LeRoux sent

a letter to the SSA office in Pine Bluff, Arkansas, requesting Webster's records.

June Hr. Tr. at 186. One of her colleagues followed up with a phone call to the SSA

on December 4, 2008. June Hr. Tr. at 186. During the call, an SSA representative

explained that Dorsey needed to submit a specific form in order to obtain the

records. Resp't's Ex. 1 at 2.[6] On December 15, 2008, the law firm sent the required

form to the SSA. *Id.*; June Hr. Tr. at 186. And, on February 9, 2009, less than two

months after submitting the form, the firm received SSA records for Webster as

requested. June Hr. Tr. at 186. Accordingly, after one phone call and two letters,

LeRoux was able to obtain Webster's SSA records. LeRoux also testified that she

tried to obtain additional SSA records for Webster but determined that those

---

[5] The June 18, 2018, hearing was transcribed, but, as of the time of this brief's filing, it is not in the ECF trial-court record. The United States has contacted the court reporter to request that she file it and anticipates that it will be filed as Dkt. 210. The United States will refer to it here as: June Hr. Tr. page #.

[6] Citations to the government's June 2018 hearing exhibits are as follows: Resp't's Ex. #.

records had been destroyed. June Hr. Tr. at 186-87. The SSA provided written correspondence to LeRoux to document the records' destruction. *Id.*

Webster's trial attorney, Moore, presented testimony that conflicted in material ways with earlier statements he had made in the course of the litigation. Moore was appointed to represent Webster in 1994 after Webster's arrest for kidnapping and murdering Lisa Rene. June Hr. Tr. at 15, 60, 102; *see Webster*, 784 F.3d at 1125-27. Moore served as Webster's lead counsel and represented Webster for the guilt and sentencing phases of trial, which occurred in June 1996, and on direct appeal. June Hr. Tr. at 15, 60, 75, 102.

Moore testified that Webster's defense team also consisted of co-counsel Allan Butcher, paralegal Kimberly Whitehead (now Kimberly Moore—she and Moore married in 1996), attorney and mitigation specialist Annette Lamoreaux, investigators L. Michael Connelly and JW Strickland (Strickland has since died; both men were retired FBI special agents at the time of Webster's trial), and possibly another investigator whose name Moore could not recall. *See* Resp't's Exs. 3 at 2; 5 at 1; June Hr. Tr. at 20, 39, 91, 94-96, 123. Other than Moore, however, Webster did not offer testimony from any surviving member of the defense team at the June hearing. *See generally* June Hr. Tr.

Before he testified at the June hearing, Moore had authored several statements about his work on Webster's case. On September 26, 2000, for example, Moore

13

drafted an affidavit discussing his work on the sentencing phrase. Resp't's Ex. 5. Moore declared in that affidavit that he recognized early on that his client "might be mentally retarded" and determined that he "needed the assistance of a mitigation specialist" in order to investigate that possibility. Moore hired attorney Annette Lammoreaux to act as such a specialist. *Id*. at 1. Lammoreaux travelled to Pine Bluff, Arkansas to conduct her investigation, but she and Moore eventually had a dispute over her bills, and she "simply 'disappeared.'" *Id*. Moore was unable to communicate with Lammoreaux about the results of her investigation or her findings regarding "the mental retardation of our client." *Id*. Due to Lammoreaux's disappearance, Moore was "forced to use our 'fact' investigators (who were not skilled in mitigation investigation)" to investigate Webster's claim of intellectual disability. *Id*. Most importantly, in the 2000 affidavit, Moore made no mention of attempting to obtain SSA records, nor did he make any reference to the SSA having evaluated Webster. *Id*. at 1-2.

In 2009, after the Dorsey firm obtained Webster's SSA records, Moore issued another declaration. Resp't's Ex. 3. Dorsey had requested that he make the declaration in support of Webster's Fifth Circuit application for authorization to file a successive Section 2255 motion. *Id*. at ¶ 7; *see also* June Hr. Tr. at 73-74. In that declaration—authored 13 years after Webster's trial—Moore wrote that while representing Webster, he "arranged for our defense investigator to retrieve any

14

records which the Social Security Administration might locate during a trip to Pine Bluff, Arkansas, during March of 1996." Resp't's Ex. 3 at ¶ 4. Moore further wrote that "to the best of my recollection," the SSA never provided him records. *Id.* Additionally, Moore said he had no recollection of receiving any particular response from SSA, either directly or through his investigator, explaining: "I do not currently have any direct recollection of the response which we received." *Id.* He assumed, however, that he must have been told that there were no SSA records, stating: "[I]t is my good faith belief that we must have been told that no records regarding Mr. Webster existed, otherwise we would have continued to pursue them by every means available to us." *Id.*

In April 2018—22 years after Webster's trial—Moore's memory of events in 1996 suddenly and substantially improved, again in Webster's favor. In a declaration authored that month, Moore recalled that he "personally followed-up with the SSA Pine Bluff Office" about his request for records and "was ultimately informed by [that office] that there were no records in existence regarding Mr. Webster's application for benefits." Resp't's Ex. 4 at ¶ 31. Moore ascribed his newfound recollection to a review of his case notes. But during the June hearing, Moore admitted that no notes in his file documented his alleged conversation with SSA or conversations he had with his investigator about attempts to obtain records. June Hr. Tr. at 93-94.

15

At the June 2018 hearing—only two months after authoring the April 2018 declaration—Moore's version of events changed yet again. He testified for the first time that he spoke to an SSA Pine Bluff employee by phone from Texas and not in person in Arkansas; that the conversation occurred during jury selection in March 1996; and that he called SSA Pine Bluff after Strickland orally reported being told that the records did not exist. June Hr. Tr. at 98, 108-15, 127-30. Moore even provided the name of the person he claimed he spoke to at SSA 22 years earlier, despite never having mentioned this very specific and material information in his previous three statements and despite the fact that no such information was in his trial notes. June Hr. Tr. at 93-94, 118.

Despite the obvious inconsistencies in and unreliability of Moore's testimony, the district court found by clear and convincing evidence that "Moore made diligent efforts to obtain any evidence based on the information he had been provided at the time" and that the records were "unavailable for trial." Attached Appendix at 13. This meant that "Webster ha[d] satisfied the savings clause" and that "the Court [would] turn to the merits of the petition and determine whether Webster is so intellectually disabled that he is categorically ineligible for the death penalty." *Id*. at 14.

16

　　ii. In the second phase, the Indiana district court finds—contrary to the 1996 jury, the Fort Worth trial court, and the Fifth Circuit (twice)—that Webster is intellectually disabled to such an extent that he is ineligible for the death penalty, and it vacates the death sentence as a result.

Beginning on April 1, 2019, the district court held a four-day hearing in which it heard testimony from six witnesses to determine whether Webster was intellectually disabled. *See generally* Apr. Hr. Tr.[7] Webster called Dr. Marc Tassé, who testified about the diagnosis of intellectual disability in general. Apr. Hr. Tr. at 20:1-113:24. He also called Dr. Daniel Reschly and John Fabian, who conducted testing on Webster and opined that Webster was intellectually disabled. Apr. Hr. Tr. at 292:9-14; 835:13-14. The government called Dr. Robert Denney, a licensed clinical psychologist board certified in clinical neuropsychology and forensic psychology, who opined that Webster was not intellectual disabled. *See* Apr. Hr. Ex. 101 at 48. Dr. Denney also conducted several tests of malingering and concluded that Webster's IQ test results were "clinically inconsistent with each other and more like simulators [or malingerers] than genuine low IQ individuals." *Id.* at 35.

The government also introduced testimony from two psychologists at the Bureau of Prisons who interacted with Webster regularly: the director of education

---

[7] The transcript is at Dkts. 189-193 of the ECF trial-court record. References to the April 2019 hearing are styled: Apr. Hr. Tr. at page:line.

at the prison where Webster was housed, and a correctional officer who knew Webster well. Apr. Hr. Tr. at 848:15-986:8; Dkt. 166-1 (Blessinger Depo.). Both parties also relied extensively on testimony and exhibits from Webster's original trial. *See generally* Apr. Hr. Tr.

The government raised several issues with Webster's evidence of intellectual disability. First, the government noted that Webster's various IQ-testing results varied widely from one another, with some scores more than a full standard deviation (i.e., more than 15 points) apart—a "statistically significant difference." Apr. Hr. Tr. at 826:11-828:16. Second, the government pointed to scientific testing by both Webster's and the government's experts that showed Webster was malingering—that is, purposefully performing worse than he was capable of doing—during his IQ testing. Apr. Hr. Tr. at 531:5-650:25. Third, the government drew upon expert testimony to establish that Webster's IQ scores were inconsistent with his known intellectual abilities—that is, if Webster truly had an IQ as low as his scores suggested, he would be unable to do even simple daily tasks, much less function at as high a level as he was known to have functioned. Apr. Hr. Tr. at 626:8-630:14; 828:17-830:6.

The government also presented a large volume of evidence showing that Webster had no deficits in adaptive functioning. To the contrary, it showed that Webster was capable of performing normally, or even exceptionally well, in all of

the adaptive functioning domains. *See, e.g.*, Apr. Hr. Tr. at 848:16-980:5. This evidence had a two-fold purpose: first, it demonstrated that Webster's IQ scores were inconsistent with real-world observations of his abilities, leading to the conclusion that Webster malingered during IQ testing. Second, the evidence of Webster's adaptive abilities showed that he did not suffer from the adaptive-functioning impairments necessary for a diagnosis of intellectual disability.

The evidence demonstrated that Webster functioned well in all three domains—conceptual, social, and practical—of adaptive functioning. In the conceptual domain, evidence established that Webster did well on two standardized tests of academic ability that help practitioners assess an individual's capacity in that domain: (i) the MAT6, a nationally-administered achievement test given to grade school students; and (ii) the Adult Basic Learning Exam (ABLE), which Webster took when he began his GED program in prison. Apr. Hr. Ex. 138 at 1146-47; 171 at 2465; Apr. Hr. Tr. at 974:2-23. Indeed, even Webster's own expert conceded that his scores on these tests "would not be consistent overall with a diagnosis of intellectual disability." Apr. Hr. Tr. at 227:17-19.

Additionally, evidence showing the abilities within Webster's conceptual domain demonstrated that, following his arrest for kidnapping and murdering Lisa Rene, Webster displayed an excellent memory for details—reciting hotel room numbers, amounts that he paid for rooms, and the make and model of

19

vehicles involved in the kidnapping and murder. Apr. Hr. Ex. 110 at 3335-51. Critically, Webster also remembered exactly where he buried Lisa. *Id*. at 3326-27. He was able to do so despite the fact that the grave was in an extremely isolated area and was so well concealed that coconspirator Beckley was unable to locate it when he tried to lead investigators to the body. Apr. Hr. Ex. 113 at 566.

Relatedly, evidence demonstrated that Webster played a leadership role in the crimes. Webster barked orders at his codefendants during the kidnapping, instructing his codefendants how and where to drive, what to do with Lisa, and how to clean her and the hotel room in order to eliminate forensic evidence resulting from the repeated rapes Webster and others perpetrated. *See, e.g.*, Apr. Hr. Exs. 113 at 519-31; 112 at 334-35.

Evidence also showed that, after Webster's conviction for murdering Lisa, Webster was clever enough to escape from the men's section of a jail where he was held and enter the women's section. In order to accomplish his escape, Webster used a piece of wire to pick the locks on a food chute and then slipped through the chute into the women's area. Apr. Hr. Ex. 125 at 910-12. Taken together, the evidence strongly showed Webster's superb functioning in the conceptual domain.

The evidence also showed that Webster functioned well in the social domain. Several witnesses, including trained psychologists, noted that he had excellent

20

conversational skills and a very good vocabulary, and he expressed his emotions well. *See, e.g.,* Dkt. 166-1 at 86-87, 100-01 (Blessinger Depo.); Apr. Hr. Tr. at 848:16-860:13. Before going to prison, Webster was able to form ordinary social relationships and had several girlfriends. One of Webster's ex-girlfriends, Sylvia Henry, testified at his trial that Webster had no trouble articulating his thoughts or telling stories. Apr. Hr. Ex. 121 at 848. Leonda Daniels, another of Webster's ex-girlfriends, testified that Webster never had any difficulty communicating with her. Apr. Hr. Ex. 130 at 1020.

Evidence further established that Webster did not meet the profile of a gullible victim typified by people with intellectual disabilities. Instead, Webster was a manipulative predator who took advantage of others. For instance, Dr. Hackett, who examined Webster for the SSA, observed that Webster was "a con man," "a predator," and "a user of others" who "would take advantage of other people." Apr. Hr. Ex. 102 at 50, 52. Health care providers also indicated in the Southeast Arkansas records that Webster was manipulative. Apr. Hr. Ex. 34 at 4315. And even defense trial expert Dr. Robert Fulbright admitted that Webster "could be manipulative at times." *Id*.

Finally, the evidence established that Webster excelled in the practical domain. Webster's expert Dr. Reschly conceded that Webster "certainly mastered the basic fundamental daily living skills of eating, toileting, dressing, [and] things of that

21

nature." Apr. Hr. Tr. at 279:11-13. Webster was an excellent musician; as a youth, he played drums in his church choir, and he was later hired to play drums at gospel concerts. Apr. Hr. Exs. 129 at 998; 101 at 7. Webster even taught himself to play guitar while in prison. Dkt. 166-1 at 108 (Blessinger Depo.); Apr. Hr. Tr. at 878:4-11.

Webster also drove a car regularly. In 1992, Webster passed his driver's license test. Apr. Hr. Ex. 132 at 1068. Dr. Hackett noted that "Webster drove himself to the [Social Security] evaluation." Apr. Hr. Ex. 102 at 51. Dr. Reschly conceded that Webster could and did drive in everyday situations. Apr. Hr. Tr. at 245:5-10. And, of course, it is well-established that Webster drove Lisa Rene to the park where he murdered her. Apr. Hr. Ex. 113 at 543.

The district court, however, gave little to no weight to the government's adaptive-functioning evidence. The court acknowledged that the evidence showed that Webster "exhibit[s] areas of strength, including, but not limited to, his musical ability, excellent hygiene, ability to drive, achievement test scores, and ability to engage in conversation." Attached Appendix at 33. But "in accordance with guidance from the medical community and as instructed by the Supreme Court, the Court has focused its adaptive functioning inquiry on adaptive deficits." *Id*. The court also found that Webster had provided evidence sufficient to satisfy the other prongs of an intellectual-disability diagnosis and had therefore

22

"satisfied his burden of proving his intellectual disability by a preponderance of the evidence and is thus ineligible for the death penalty." *Id.* at 15. It therefore vacated Webster's death sentence—a sentence the Fort Worth district court and jury had imposed 23 years prior after almost 30 days of proceedings, including testimony from over 50 witnesses in the sentencing phrase alone, and which the Fifth Circuit had previously twice affirmed. *See Webster*, 162 F.3d at 353; *Webster*, 421 F.3d at 310.

With the Solicitor General's permission, this appeal follows.

## SUMMARY OF THE ARGUMENT

I.   The district court clearly erred when it relied on the oft-changing testimony of Webster's criminal defense lawyer, Larry Moore, to find by clear and convincing evidence that Webster had exercised due diligence in attempting to find the SSA records. Webster had the burden of proving that he exercised due diligence in attempting to obtain the records. At the 2018 hearing on this matter, he called only one witness who had knowledge about any attempts made to obtain records at that time: Mr. Moore. Moore testified that he contacted the SSA and was told that the records had been destroyed. But his testimony was inconsistent with, and contradicted by, previous written statements he had drafted about these events. Moreover, despite keeping copious notes about Webster's defense in his file, Moore had no notes to support his story, which improved significantly and

23

became markedly more specific and favorable when Webster's current attorneys took over his case. The district court could not reasonably find that Webster had carried his burden based on the unreliable and self-serving testimony of this lone witness, and it clearly erred in doing so.

II. The district court clearly erred in disregarding overwhelming evidence about Webster's adaptive abilities when it found by a preponderance of the evidence that he was intellectually disabled, thereby wiping away the jury's and original district court's findings on this matter from 23 years earlier. A diagnosis of intellectual disability requires that an individual have *both* deficits in intellectual functioning and severe deficiencies in adaptive functioning. As occurred at the original sentencing proceeding, overwhelming evidence demonstrated that Webster functioned normally—even exceptionally well—in all three adaptive-functioning domains. The district court, however, improperly disregarded this evidence. Had it fully considered the evidence of Webster's adaptive abilities, it could not have reasonably concluded that he had severe adaptive-functioning deficits and vacated Webster's death sentence on this basis.

24

## ARGUMENT

I. The district court erred in finding that Webster's Social Security records were unavailable and that his trial attorney, Larry Moore, exercised due diligence in attempting to get the records.

   A. The standard of review is deferential, but it allows for reversal when a district court makes a finding based on "exceedingly improbable testimony."

This Court reviews for clear error the district court's determination that Webster's SSA records were unavailable and that his attorney, Larry Moore, exercised due diligence in attempting to obtain them. *See Noeller v. Wojdylo*, 922 F.3d 797, 804 (7th Cir. 2019) (explaining that, except in limited circumstances not applicable here, "[i]n most domestic habeas corpus cases, we review the factual findings of the district court for clear error and its legal determinations de novo"). A district court's credibility determinations are given great deference on appeal, but this Court will reverse if the district court "has chosen to credit exceedingly improbable testimony." *United States v. Warner*, 498 F.3d 666, 678 (7th Cir. 2007). "[T]estimony will be found exceedingly improbable" if it is "internally inconsistent" or "implausible on its face." *United States v. Smith*, 576 F.3d 681, 687 (7th Cir. 2009).

B.   This Court must reverse the district court because its due-diligence finding rested on "exceedingly improbable testimony."

The district court improperly found that Webster satisfied his burden of proving by clear and convincing evidence that the SSA records were unavailable around the time of Webster's trial in 1996. The court based its finding primarily on his attorney Larry Moore's testimony about a specific conversation Moore said that he had with a named SSA representative in 1996. But Moore's story is more than exceedingly improbable, it is wholly implausible. Despite authoring several statements for Webster during this litigation, Moore had never previously been able to specifically recall this conversation. To the contrary, he swore that he had no direct recollection of his interactions with SSA. Moreover, there is nothing in Moore's case file that would plausibly have refreshed his recollection, and no notation of any phone call between him and SSA. Finally, the ease with which Webster's current counsel was able to obtain the SSA records belies Moore's claim that he exercised due diligence in his attempts to get the records. For these reasons, this Court should reverse the district court's finding that the records were unavailable despite Moore's due diligence.

26

   i. Webster's only evidence as to due diligence was his former attorney's testimony, which conflicted in material fashion with that attorney's prior statements and was therefore internally inconsistent and unreliable.

At the June 2018 hearing, Webster based his case that the SSA records were unavailable and that his counsel exercised due diligence entirely on the testimony of one witness: Larry Moore. In addition to Moore, Webster's original defense team consisted of co-counsel Butcher; paralegal Whitehead; mitigation specialist Lamoreaux; investigators Connelly and now-deceased Strickland; and possibly another investigator whose name Moore could not recall. *See* Resp't's Exs. 3 at 2; 5 at 1; June Hr. Tr. at 20, 39, 91, 94-96, 123. Other than Moore, however, Webster did not offer testimony from any surviving member of the defense team. *See generally* June Hr. Tr.

In 2009, Moore acknowledged, under penalty of perjury, that he had no "direct recollection" of the disputed events of 1996. Resp't's Ex. 3 at 3. Moore admitted this in the declaration despite the fact that he drafted the declaration and provided it to Webster knowing its purpose was to support Webster's 2009 request to file a successive Section 2255 motion based on newly discovered evidence—the SSA records. *See* Resp't's Ex. 3 at 1; *see also* June Hr. Tr. at 74, 100. Moore testified that he gave the matter "serious thought" and "searched [his] memory banks" before

he drafted and signed that declaration and that he "put in the affidavit [sic] what [he] remember[ed]." June Hr. Tr. at 98, 105.

In this undeniably important context—drafting a declaration to support a post-conviction motion for a former client facing a death sentence—Moore acknowledged that he did not "have any direct recollection of the response which [Moore and the defense team] received" from the SSA office in Pine Bluff regarding their pretrial request for Webster's disability-claim records. Resp't's Ex. 3 at 3. Moore allowed only that he had a "good faith belief" of what he "must have been told" in 1996 by SSA Pine Bluff. *Id*. But he admitted that he was unsure of "any response that might have been made to our request" for Webster's records or "any notes which [he] may have made" in that regard. *See id*.

Given Moore's statements in his 2009 affidavit, the en banc dissent criticized Webster's claim in his Section 2241 petition that Moore "was stonewalled when trying to obtain these records." *Webster*, 784 F.3d at 1151 (en banc) (Easterbrook, J., dissenting). Judge Easterbrook continued by noting that "that is not what [Moore] himself said." *Id*. Rather, Moore said in that declaration that he "lack[ed] any memory of a response and therefore *assumes* that he must have been denied access." *Id*. (emphasis in original). The dissent concluded that this "assumption [was] unfounded" because Moore based it entirely on his "lack of recollection" of

28

a response—a "pretty weak" basis that did not exclude the "sensible inference" that Moore or his investigator "simply did not follow through." *Id.*

After this Court issued its en banc opinion that included this criticism of Moore's 2009 statements, Moore's version of events changed dramatically in Webster's favor. He suddenly appeared to recall the pretrial events of 1996 with relative clarity. *Compare* Resp't's Ex. 3 at 3, *with* June Hr. Tr. at 83, 105-06. But even his statements after that were not consistent with one another. Moore drafted another declaration in April 2018 with post-conviction counsel's "extensive" assistance, this time remembering that he had "personally followed-up with the SSA Pine Bluff Office" about his request for records and "was ultimately informed by [that office] that there were no records in existence regarding Mr. Webster's application for benefits." Resp't's Ex. 4 at ¶ 31. Moore ascribed his newfound recollection to a review of his case notes, even though no case notes in his file documented his alleged conversation with SSA or conversations he had with his investigator about attempts to obtain records. June Hr. Tr. at 93-94.

But this declaration also omitted several details: (a) he twice declared that he was "uncertain" and could not "recall" whether he spoke to an employee at SSA Pine Bluff in person or by phone; (b) he failed to indicate when the conversation occurred; and (c) he failed to mention any alleged prior conversation Strickland had with SSA Pine Bluff about Webster's records. Resp't's Ex. 4 at 7-9.

29

Two months later, however, at the June 2018 hearing, Moore provided new details that he had failed to include in the April 2018 declaration, again benefitting Webster's case. For instance, in his June testimony, Moore stated that he spoke to an SSA Pine Bluff employee by phone from Texas and not in person in Arkansas; that the conversation occurred during jury selection in March 1996; and that he called SSA Pine Bluff after his investigator, Strickland, orally reported being told the records did not exist. *Compare* Resp't's Ex. 4 at 7-9, *with* June Hr. Tr. at 98, 108-15, 127-30.

These newly recalled details are material and, yet, Moore did not include them in his April 2018 declaration even though he drafted that declaration after "spen[ding] hours" reviewing his file and the trial transcripts. *See* Resp't's Ex. 4 at ¶ 34. Additionally, he drafted the declaration to address and effectively rebut his lack of memory in the 2009 declaration, though the latter was approximately *nine years* closer in time to the events at issue. The differences between Moore's 2009 and April 2018 declarations and between either of those two and his June 2018 testimony demonstrated that Moore's June 2018 testimony as to his efforts to obtain the SSA records was fundamentally unreliable. Compounded by the fact that Webster offered no other person's testimony to corroborate Moore's new, improved version of events—including from trial co-counsel Butcher, investigator

30

Connelly, or Moore's wife and paralegal Kimberly Whitehead (now Moore)—the

testimony could not support the district court's finding of due diligence.

> ii. The attorney's case file from Webster's trial casts further doubt on the attorney's new claims as to his diligence.

Critically, as the en banc dissent suggested in 2015 and as is still true today,

Moore's testimony on SSA Pine Bluff's alleged response to his records request is

also unreliable considering that his file contains no documentation that he or any

other member of the defense team *ever* received such a response. *Webster*, 784 F.3d

at 1151 (Easterbrook, J., dissenting). Moore was a highly experienced criminal

litigator when he was appointed to represent Webster, having previously served

as a prosecutor and defense attorney. June Hr. Tr. at 12-18. Soon after being

appointed to Webster's case, Moore recognized that the government's guilt-phase

evidence was overwhelming and concluded that an intellectual-disability claim

was the key to the penalty phase—particularly since the federal death-penalty

statute had a newly enacted bar to executing mentally retarded persons. June Hr.

Tr. at 21-22. It was Moore's practice in 1996 to maintain a defense file. June Hr.

at 85-86. Moore testified that when he was compiling the file in 1994 through 1996,

he knew that if Webster received a death sentence, appellate and post-conviction

proceedings would follow, and he predicted that Webster's post-conviction

allegations would include that Moore provided ineffective assistance by

31

performing an insufficient investigation. June Hr. Tr. at 92-93. As a result, Moore said that in the file, he would have "documented critical investigative steps regarding [Webster's] mental retardation," and he "would have documented what [the defense team] did and what [the team] learned" in that regard. *Id*. Moore made clear that it was his sole responsibility to document these events and not the responsibility of any other member of the defense team. June Hr. Tr. at 85-86.

Despite all of these facts, although Moore's case file is replete with documentation of his written request for Webster's disability-claim records from SSA Pine Bluff, it contains absolutely no evidence that he or anyone else on the defense team received a response from SSA or performed any follow-up on the request. June Hr. Tr. at 6-7, 51-53, 58, 60-63, 107. Nor does it contain any evidence to support Moore's claim at the June 2018 hearing that he made a phone call to an SSA Pine Bluff employee or that Strickland reported being told that the records did not exist. Considering Moore's practice of documenting the results of his investigative efforts into Webster's mental retardation, the absence of such documentation is powerful circumstantial evidence proving that no follow-up was done and no response was received.

For the first time ever, Moore said at the June 2018 hearing that there were notes he made at the time of trial that are no longer in the file. June Hr. Tr. at 87-88, 93-94.  But he did not testify, or state in his two prior declarations made closer in time

32

to the events, that he could recall noting or otherwise documenting the alleged response from SSA Pine Bluff; he could only speculate whether he had done so, either on his own or by requesting written proof from SSA Pine Bluff. *See* Resp't's Exs. 3 at 3; 4 at 8-9; June Hr. Tr. at 87-88, 93-94, 116.

Finally, although the district court found that Moore's file lacked notes and other important items, *see* Attached Appendix at 11 n.3, the record does not support that finding. In fact, LeRoux testified that Dorsey went to great lengths to preserve Moore's case file, implementing strict procedures to ensure that no documents were lost or separated from the file. June Hr. Tr. at 143-48. In light of these strict controls, the other evidence in Moore's file, and Moore's speculative testimony on the missing portions of his file, the district court clearly erred in finding that any records relevant to the disputed issues were missing from the file.

Webster suggests, in an alternative explanation for the absence of notes, that the rigors of jury selection and trial prevented Moore from documenting the alleged conversation with SSA Pine Bluff or pursuing the disability-claim records. *See* June Hr. Tr. at 123-24. Jury selection was complete by April 4, 1996, *see* Trial Tr. Vol. 16,[8] and the trial began on June 3, 1996, *see* Trial Tr. Vol. 17. Moore had a robust defense team, including co-counsel Butcher, paralegal Whitehead, and

---

[8] The district court incorporated the original trial transcript into the intellectual-disability hearing. *See* June Hr. Tr. at 6-7.

investigators Connelly and Strickland—retired FBI special agents. Moore testified that he trusted the investigators and agreed that FBI special agents generally document their investigative efforts, even when the results were negative. *See* June Hr. Tr. at 95. Because none of these individuals documented any investigative efforts or results regarding Webster's disability-claim records at SSA Pine Bluff, one ought to conclude that there was nothing to document.

> iii. The Dorsey firm's ease in obtaining the SSA documents belies Moore's claim that he diligently pursued them.

Finally, Dorsey's demonstrated ability to obtain the records rapidly and with ease from SSA Pine Bluff in 2008 and 2009 provides reliable and compelling evidence that the records were available in 1996 had Moore exercised any due diligence. On October 27, 2008, Dorsey made its first request for Webster's disability-claim records by sending a letter to SSA Pine Bluff. Resp't's Ex. 2 at 2; June Hr. Tr. at 186. Having received no response, Dorsey followed up with a phone call to SSA Pine Bluff on December 4, 2008. *Id*. During the call, an SSA representative explained that Dorsey needed to submit a specific form in order to obtain the records, which Dorsey sent on December 15, 2008. *Id*. On February 9, 2009, Dorsey received the SSA evidence. *Id*. In sum, with just two letters and an intervening follow-up phone call, Dorsey obtained Webster's claim records from the same field office where Moore had requested the records in 1996.

34

In contrast to Dorsey's diligent efforts, Moore testified that his follow-up efforts with SSA Pine Bluff consisted of one phone call and that, upon being told that no records existed, he took them at their word and did nothing more. June Hr. Tr. at 64, 120. Moore testified that although these records could have made the difference between life and death, he did not personally inquire further with SSA Pine Bluff, nor did he instruct any other member of the defense team to do so. June Hr. Tr. at 120-21. Nor did Moore attempt to contact agency counsel or research SSA's claim-file retention policies despite the fact that he was surprised to hear about the purported destruction of these "relatively recent" records. June Hr. Tr. at 36-38, 120-21. Moore acknowledged in testimony that, had he learned the files should have been maintained under SSA policy, he "perhaps" could have requested a subpoena from the district court, but he took no action in that regard. June Hr. Tr. at 120-21.

Moreover, had Moore believed at the time of Webster's trial that crucial records had been destroyed, he surely would have raised the issue at trial, either to document the records' unavailability or to ask that a favorable inference be drawn from their absence. Indeed, during this litigation, Webster's current attorneys sought spoliation sanctions because a portion of the SSA records they obtained in 2009 were missing. Dkt. No. 95. Moreover, Moore would have sought to prove through the testimony of Webster's family members their knowledge of the Social

Security claim and evaluations. The absence of such efforts suggests that Moore had lost interest in the SSA records and had strategically chosen to focus on other areas of inquiry. This conclusion is buttressed by Moore's confidence at the time that his expert testimony regarding Webster's intellectual disability was overwhelming. *See* Resp't's Exs. 3; 4; 5; *see also Webster*, 784 F.3d at 1127-31.

Dorsey's interactions with SSA Pine Bluff also demonstrate that SSA was responsive to Webster's follow-up inquiries. On October 8, 2009, eight months after Dorsey received the SSA evidence, LeRoux sent a letter to SSA Pine Bluff requesting certain records that had not been produced in February. Resp't's Ex. 2 at 2-3; June Hr. Tr. at 186. On October 15, 2009, LeRoux spoke on the phone with an SSA representative who advised her that her request was not in the proper format and should be directed to the office in Indiana, where Webster lived. *Id*. On October 22, 2009, SSA sent a letter to Dorsey documenting the telephone conversation and explaining the proper procedures for making the request. Resp't's Ex. 2 at 3-4; June Hr. Tr. at 186-87. Thus, after one phone call and one letter to SSA Pine Bluff, Dorsey received written documentation from SSA about how to properly make the records request.

The following month, on November 23, 2009, Dorsey sent a letter to the Terre Haute SSA Office asking for additional records. Resp't's Ex. 2 at 3-4; June Hr. Tr. at 186-87. LeRoux then called the Terre Haute SSA office on December 4, 2009, and

was told that the requested records had been destroyed and that SSA had already mailed a letter to Dorsey documenting the destruction of the records. *Id.* On December 7, 2009, Dorsey received the letter from SSA. Resp't's Ex. 2 at 5; June Hr. Tr. at 186-87.

In sum, each of Dorsey's three inquiries to SSA regarding Webster's records produced written responses from SSA, and on each occasion, SSA provided the documentation after minimal contact with Dorsey. In light of the relative ease with which Dorsey obtained the records, Moore's testimony becomes even more incredible.

Moreover, Dorsey's efforts show that Moore did not exercise due diligence even if his recently remembered story that he was initially told that the records were destroyed were true. Unlike Dorsey, Moore did nothing to follow-up on his initial failed attempt to obtain records. He did not approach the court or the government, nor did he subpoena a witness from SSA to testify about the destruction of Webster's records. He did not ask for a spoliation instruction as the Dorsey firm did in this case with respect to a missing portion of the SSA records. In short, even if Moore's testimony is credited, he did not exercise due diligence because he failed to do any follow-up whatsoever on SSA's initial representation that the records were unavailable and failed to seek any remedies or instructions to mitigate the absence of the records.

iv. The district court should have found that Moore did not exercise due diligence to get the SSA records because he did not think he needed them.

The only logical explanation for Moore's failure to obtain the SSA records is that he did not think he needed them—not that he exercised due diligence but was unable to obtain them. Moore's failure to diligently pursue the SSA records is most likely attributable to his confidence that he had already obtained overwhelming evidence and prepared an exceptional defense to support a finding of Webster's mental retardation. *See* Resp't's Exs. 3, 4, 5; *Webster*, 784 F.3d at 1127-31. In that context, the SSA records were unnecessary.

Moore's current recollection, however, is colored by the heightened, myopic significance that the SSA records have taken on in the current proceeding. At the time of trial, the SSA records, while of interest to Moore, were hardly the only evidence that he believed would support his intellectual-disability argument. It is understandable that, if he truly made an inquiry, after that inquiry went unanswered, he abandoned further attempts to obtain the records in exchange for an increased focus on other evidence.

Given all of these facts, the only conclusion left is that the district court clearly erred in crediting Moore's newfound certainty that he diligently pursued the SSA records and that they were unavailable despite his efforts. Thus, this Court should

reverse the district court's finding that Webster demonstrated by clear and convincing evidence that he was eligible for relief under Section 2241.

II. Alternatively, the district court erred in finding that Webster was intellectually disabled and in vacating the death sentence as a result.

A. Several standards apply to a finding of intellectual disability.

As with Issue I, the standard of review is clear error. To establish that he is intellectually disabled, Webster had to prove by a preponderance of the evidence that he had significant deficits in adaptive functioning. *See Webster*, 784 F.3d at 1141-44. He failed to do so, and the government offered overwhelming evidence that he did not have any such deficits. The district court clearly erred in finding by a preponderance of the evidence that Webster met his burden.

"Intellectual disability is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 33 (5th ed. 2013) (hereinafter DSM–5). A diagnosis of intellectual disability requires proof of the following criteria: (1) deficits in intellectual functions confirmed by both clinical assessment and standardized intelligence testing; (2) deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility; and (3) onset of

deficits prior to age 18. *Id*. In addition, "to meet the diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in [the intellectual functioning criterion]." *Id*. at 38.

The first criterion involves an assessment of an individual's intellectual functioning, that is, reasoning, problem solving, abstract thinking, learning, and practical understanding. DSM-5 at 37. Intellectual functioning is typically measured with intelligence quotient (IQ) tests. *Id*.

The second criterion for a diagnosis of intellectual disability is "an impairment in everyday adaptive functioning in comparison to age-, gender-, and socioculturally-matched peers." *Id*. Adaptive functioning involves skills in three domains: (1) the conceptual domain; (2) the social domain; and (3) the practical domain. *Id*. Adaptive functioning is assessed via clinical evaluation and standardized measures. *Id*. Information for such assessments can be gathered from the subject, family members, teachers, care providers, and other "knowledgeable informants." *Id*. All data must be "interpreted using clinical judgment." *Id*.

The adaptive functioning criteria is satisfied *only* when at least one of the three domains of adaptive functioning (conceptual, social, or practical) is so impaired that the subject needs "ongoing support" to perform adequately in real-life settings. *Id*. at 38. Moreover, adaptive functioning must be evaluated "in

comparison to others of similar age and sociocultural background." *Id*. Thus, someone from an underprivileged environment should not be compared against a median individual. Additionally, "education, motivation, socialization, personality features, vocational opportunity, cultural experience and coexisting medical conditions or mental disorders can all influence adaptive functioning." *Id*. Likewise, "[a] person whose opportunities to learn adaptive skills has been restricted in comparison to same-age peers may have acquisition deficits unrelated to ID [intellectual disability]." American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports at 52 (11th ed. 2010) (hereinafter AAIDD–11).

In determining whether someone is intellectually disabled, then, it is important to consider whether factors other than deficits in intellectual functioning caused adaptive deficits. In other words, "[t]o meet the diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments" required in the first criteria. DSM-5 at 38. The adaptive-functioning criteria are not satisfied if deficits result from lack of opportunity, lack of motivation, or other mental health conditions. *Id.*; AAIDD-11 at 52.

B.  Webster's evidence failed to meet these standards.

Webster failed to prove that he had significant deficits in any of the three adaptive-functioning domains. And he further failed to prove that any of the

41

minor deficits he did have were "directly related to [any] intellectual impairments" as opposed to being caused by other problems or circumstances. He failed, therefore, to carry his burden of establishing that he is intellectually disabled, and the district court clearly erred in finding otherwise.

i. Webster did not prove significant deficits in the conceptual domain.

Webster's strong conceptual functioning is demonstrated by the fact that he performed well on two standardized tests of academic ability. Indeed, his own experts conceded that his test scores were inconsistent with a diagnosis of intellectual ability. But rather than incorporating the test results into their opinions, Webster's experts concluded—without evidence—that Webster cheated on those tests. Webster, however, bore the burden of proof, and he failed to present compelling evidence that the test scores were the result of cheating. Therefore, he failed to establish that he had significant deficits in the conceptual domain.

While in grade school, Webster took the MAT 6, a national achievement test for students, and scored in the 43rd percentile. Apr. Hr. Ex. 138 at 1146-47. After he was convicted and imprisoned, Webster took the Adult Basic Learning Exam (ABLE) test, a standardized test given to students who enroll in GED preparation courses. Apr. Hr. Ex. 171 at 2465; Apr. Hr. Tr. at 974:2-23. Webster scored at the college level in several subjects. Apr. Hr. Ex. 171 at 2465; Apr. Hr. Tr. at 977:1-7.

42

Webster's experts conceded that these scores, if accurate, would undermine Webster's claim of intellectual disability. Dr. Daniel Reschly testified at the hearing that if Webster's "scores [on the ABLE test] are accurate, [those scores] would not be consistent overall with a diagnosis of intellectual disability." Apr. Hr. Tr. at 227:17-19. And Dr. John Fabian agreed that Webster's scores on the MAT 6 and ABLE tests were "inconsistent with a finding of [intellectual disability]." Apr. Hr. Tr. at 484:18-20. But Webster's experts discounted the accuracy of the scores on the assumption that Webster cheated on these tests. Apr. Hr. Tr. at 224:17-225:5.

Webster, however, bears the burden of proof, and he produced no evidence whatsoever that he cheated on either test. Webster himself has never claimed that he cheated on these tests. *See* Apr. Hr. Tr. at 346:22-23. Indeed, protocols were in place specifically to prevent cheating. *See, e.g.*, Apr. Hr. Ex. 138 at 1146-50 (trial testimony explaining that teachers monitored test-takers during the MAT 6); *id.* at 1150 (trial testimony explaining that the chances that Webster would have been able to cheat on the MAT 6 are "very, very slim"); Apr. Hr. Tr. at 975:24-976:5 (testimony from FCC Terre Haute supervisor of education Phillip Woolston that ABLE test-takers are given different versions of the test so they cannot copy off one another); Apr. Hr. Tr. at 979:18-24 (testimony from Phillip Woolston that the ABLE test is supervised by prison staff).

Not only would cheating have been extremely difficult, Webster lacked any incentive to cheat. There was no benefit to Webster in performing well on a MAT 6 or ABLE test. *See, e.g.*, Apr. Hr. Tr. at 957:22-958:14 (testimony from Phillip Woolston that there were not any benefits that Webster could receive due to his highly-restricted status as a death-row inmate).

Accordingly, the district court should not have credited the argument or assumption that Webster cheated on the ABLE test and MAT 6. And, because cheating cannot be used to discount the scores, Webster's own experts' conclusions about the significance of those test scores should have been credited: Webster's scores were "inconsistent with a finding of [intellectual disability]." Apr. Hr. Tr. at 484:18-20.

ii. Webster did not prove significant deficits in the social domain.

Evidence of Webster's excellent social skills comes from a variety of sources, including teachers, ex-girlfriends, and trained psychologists. Unfortunately, the district court found reasons to discount all of this evidence. Its decision to do so was clearly erroneous.

The district court was particularly dismissive of the testimony of Drs. Erin Conner, a licensed psychologist working at USP Terre Haute, and Jacqueline Blessinger, a former staff psychologist for the Bureau of Prisons. Dkt. 166-1 at 45:24-46:5; 46:20-46:25 (Blessinger Depo.); Apr. Hr. Tr. at 848:16-860:13. The court

discounted their conclusions because both interacted with Webster in a prison setting, and because neither the "quantity nor depth of their interactions with Webster would lead the Court to find their testimony to be more persuasive than that of Drs. Fabian and Reschly." Dkt. 198 at 20. But Webster has been in prison the majority of his life, and, indeed, both Drs. Fabian and Reschley evaluated him in that context. Moreover, Drs. Conner and Blessinger had extensive contact with Webster.

Dr. Erin Conner visited Webster on a monthly basis for a period of several years. Apr. Hr. Tr. at 848:16-860:13. She spoke to Webster at length both at his cell and during private meetings. Apr. Hr. Tr. at 848:16-860:13; 874:1-18. She and Webster conversed about a wide variety of subjects, and Dr. Conner counselled Webster during times of stress and bereavement. *Id.* During the hearing, Dr. Conner testified at length about Webster's good social skills and conversational abilities. *See, e.g.*, Apr. Hr. Tr. at 883:11-884:11; 882:18-23. During all of her time interacting with Webster, Dr. Conner never saw anything that caused her concern about his intellectual functioning, and she never saw any reason to refer him for testing. Apr. Hr. Tr. at 889:15-22. Dr. Conner believed, based on her interactions with Webster, her review of his file, and her consultations with other psychologists, that Webster falls "within the normal range of intellectual functioning." Apr. Hr. Tr. at 890:14-21.

45

In February 2018, Dr. Jacqueline Blessinger was assigned to be the lead psychologist at the Special Confinement Unit (SCU) of the Federal Correctional Facility at Terre Haute. Dkt. 166-1 at 46:15-46:19 (Blessinger Depo.). During her time as lead psychologist for the SCU, she met with each inmate on an at-least monthly basis, and she provided individual counseling services to inmates upon request. Dkt. 166-1 at 51:4-53:10. In this capacity, Dr. Blessinger met with Webster, who was housed in the SCU, on a number of occasions. Dkt. 166-1 at 65:8-66:2; 72:15-90:12. She also spoke with SCU staff, including other psychologists, about Webster and reviewed his records. Dkt. 166-1 at 90:13-91:25.

Dr. Blessinger is a school psychologist with extensive training and experience relating specifically to the diagnosis of intellectual disabilities. Dkt. 166-1 at 18:7-45:2. Her background with intellectually disabled individuals made her particularly aware of the ways in which that condition can affect behavior. Though she did not conduct a formal evaluation of Webster, based on her training and experience, Dr. Blessinger was able to testify that she observed certain behaviors in Webster that were inconsistent with his having an intellectual disability. Dkt. 166-1 at 79:8-80:6; 107:6-108:23; 112:16-116:14. Dr. Blessinger testified that during her interactions with Webster, she did not observe anything that would lead her to suspect that he might have an intellectual disability. Dkt. 166-1 at 124:24-125:13. She further testified that, had she made any such

46

observations, she would have referred Webster for additional evaluation and testing. Dkt. 166-1 at 117:1-117:14; 124:24-125:13. She did not do so because, in her clinical judgment, there were no grounds even to suspect that he might have an intellectual disability. Dkt. 166-1 at 124:24-125:13.

The district court clearly erred in disregarding the testimony of Drs. Conner and Blessinger. Both are licensed psychologists who interacted with Webster frequently. The interactions may have taken place in a prison, but the prison environment has been Webster's environment for the majority of his life; it is nonsensical to discount their observations merely because they conversed with him in his usual environment. Moreover, both Drs. Conner and Blessinger interacted with other prisoners regularly and were able to compare them to Webster. Thus, their observations of Webster's abilities were appropriately contextual. Finally, unlike Drs. Reschley or Fabian (or Dr. Denney, one of the government's experts, for that matter), Drs. Conner and Blessinger were not hired to opine about Webster's intellectual abilities; they are both working psychologists who encountered Webster during their normal job duties. The district court should have given their opinions greater weight than that of the retained experts.

The observations of Drs. Conner and Blessinger are bolstered by those of Webster's ex-girlfriends who knew him before his incarceration. One of Webster's ex-girlfriends, Sylvia Henry, who had a child with him, testified at trial that

47

Webster had no trouble articulating his thoughts or telling stories. Apr. Hr. Ex. 121 at 819, 848. Henry met Webster in a club, began dating him, and eventually invited him to live with her. *Id.* at 807-08. Henry described their relationship as a "normal one" and said she was attracted to Webster because he "seemed normal" and was "a nice guy, [who was] fun to be around." *Id.* at 845-46. She and Webster did "normal things that couples do," and she considered Webster "a smart person intellectually." *Id.* at 845. Webster's relationship with Henry and her assessment of him undercut his argument that he lacked social skills.

Leonda Daniels, another of Webster's ex-girlfriends, testified that Webster never had any difficulty communicating with her. Apr. Hr. Ex. 130 at 1020. Daniels met Webster through his sister, and she described Webster as "nice and sweet" and said that "he was there for me." *Id.* at 1014. Daniels testified that Webster made her laugh, and that even after his kidnapping conviction, she still cared about him. *Id.* at 1014-15. Her testimony demonstrated that Webster had the social skills to form a strong romantic relationship with Daniels, one so strong that she continued to stand by him even after his conviction for a heinous crime. Or, more cynically, one could argue that Webster was able to emotionally manipulate Daniels into seeing past his extreme character flaws. Either way, Webster's social skills greatly exceed those of someone who was intellectually disabled.

48

Webster also dated Gwen Alexander for several years and had a child with her. Apr. Hr. Ex. 130 at 1016; Apr. Hr. Tr. at 367:17-368:1. She and Webster lived together for a time, and Alexander continued her romantic relationship with Webster even after he went to prison. *Id*. The fact that Webster was able to convince a woman to continue dating him even after he was incarcerated shows that he had very good social skills.

iii. Webster did not prove significant deficits in the practical domain.

The practical domain includes "personal care" and daily living skills. DSM-5 at 37. Webster has no deficit here. Even Webster's own experts admitted that he has strong abilities in the practical domain. Dr. Reschly conceded that Webster "certainly mastered the basic fundamental daily living skills of eating, toileting, dressing, [and] things of that nature." Apr. Hr. Tr. at 279:11-13. In fact, Webster went beyond mere competence and took great pride in his personal appearance, always presenting himself as "carefully groomed" and well dressed. Apr. Hr. Tr. at 279:22-280:16.

Webster also has strong abilities outside daily living skills. For instance, he excels as a musician. As a youth, he played drums in his church choir. Ex. 129 at 998. Webster was "[p]retty smooth on the drums and singing," according to his brother Tony, and he received income to play drums at gospel concerts. Apr. Hr.

Exs. 101 at 7; 127 at 967. Webster also taught himself to play guitar while in prison. Dkt. 166-1 at 108 (Blessinger Depo.); Apr. Hr. Tr. at 878:4-11.

Further, Webster was able to travel on his own. In 1992, Webster passed his driver's license test, scoring 96% correct on the first portion of the test and 70% correct on the second portion. Ex. 132 at 1068, 1070-71. He only missed four questions on the entire test. *Id.* And, after passing the written portion of the test, Webster successfully passed a road test. *Id.* at 1072-73.

Webster drove frequently. Dr. Hackett noted that "Webster drove himself to the [Social Security] evaluation." Ex. 102 at 51. Dr. Reschly conceded that Webster could and did drive in everyday situations. Apr. Hr. Tr. at 245:5-10. And, of course, it is well-established that Webster drove Lisa Rene to the park where he murdered her. Ex. 113 at 543. Webster, therefore, had no significant deficits in the practical domain. He was able to take care of his daily tasks with no assistance and even excelled in his musical hobbies.

iv. Webster failed to establish adaptive deficits mandating vacatur of his death sentence.

In sum, the district court clearly erred in disregarding the overwhelming evidence of Webster's normal adaptive abilities. Webster performed well, or even exceptionally well, in each of the adaptive-functioning domains. Prior to his incarceration, he was able to function without special support or assistance. And, although the prison environment is a controlled one, trained psychologists who met regularly with Webster and had the ability to compare him to other prisoners in identical circumstances judged his intellectual ability as normal. The district court improperly disregarded this evidence and relied almost exclusively on the conclusions of paid expert witnesses. It also relied very little on the SSA records that acted as the basis for the hearing in the first place. Its determination that Webster had severe deficits in adaptive function is contradicted by the objective evidence and was clearly erroneous.

More broadly, the district court's finding here is problematic because it derived from a four-day evidentiary hearing involving six witnesses that all but swept away the nearly month-long trial and sentencing proceedings involving 50-plus sentencing witnesses and detailed jury findings on Webster's intellectual functioning that took place in the Fort Worth trial court 23 years ago.  Likewise, it robbed the Rene family of the justice it has been waiting on for a quarter of a

51

century on behalf of Lisa—a 16-year-old girl who endured a terrifying and violent kidnapping, repeated gang-rapes, torture, and a brutal beating with a shovel before Webster finally buried her alive and left her to suffocate and die.

It is simply nonsensical for Webster's case, which has resulted in a lengthy Fort Worth district-court opinion, four Fifth Circuit decisions, two Seventh Circuit decisions, and three denials of certiorari, to end this way. It is also an affront to a number of core tenets of criminal jurisprudence, including stability, reliability, and predictability. For these reasons, the United States respectfully asserts that this Court should take a very close look at the Indiana district court's decisions in this case, which create an unresolvable conflict with the decisions both of the Fifth Circuit and the district court in Lisa's home community that tried and sentenced Webster. *See Webster*, 784 F.3d at 1147 ("Whether he is retarded has been determined after a hearing, collateral review under § 2255, and multiple appeals. What Webster now wants is still another opportunity to litigate that question. The majority gives Webster that opportunity in a new district court and a new circuit, setting up a conflict among federal judges. Section 2255 is designed to prevent that, and prudential considerations also militate against one circuit's disagreeing with another in the same case.") (Easterbrook, J., dissenting).

## CONCLUSION

This Court should reverse the district court's judgment and reinstate

Webster's death sentence.

Respectfully submitted,

ERIN NEALY COX
  *United States Attorney*
  *Northern District of Texas*

JOSH J. MINKLER
  *United States Attorney*
  *Southern District of Indiana*

By:   /s/ JAY WEIMER
  *Assistant U.S. Attorney*
  *Northern District of Texas*

  *Special Assistant U.S. Attorney*
  *Southern District of Indiana*
  *10 West Market St., Ste. 2100*
  *Indianapolis, Indiana 46204*
  *(817) 252-5273*

53

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and (a)(6), as modified by Cir. R. 32(b), because I have prepared this brief in proportionally spaced typeface using Microsoft Word 2016 in 13-point (body) and 12-point (footnotes) Book Antiqua font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by Cir. R. 32(c), in that it contains 12,319 words.

/s/ JAY WEIMER
*Assistant U.S. Attorney*

## CERTIFICATE OF SERVICE

I certify that on November 14, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. The United States will also mail a paper copy to Webster's counsel, Ms. Kathryn Johnson, 50 S. Sixth St., Ste. 1500, Minneapolis, MN 55402.

/s/ JAY WEIMER
*Assistant U.S. Attorney*

## CIRCUIT RULE 30(d) CERTIFICATION

I certify that the following attached appendix includes all of the materials required by Cir. R. 30(a) and that a separate appendix filed concomitantly with the brief will include those materials required by Cir. R. 30(b).

/s/ JAY WEIMER
*Assistant U.S. Attorney*

Case: 19-2683     Document: 12     Filed: 11/14/2019     Pages: 98

## ATTACHED APPENDIX TABLE OF CONTENTS

Page

Entry Following Hearing of June 18, 2018 (entered Aug. 31, 2018) ........................... 1

Entry on Intellectual Disability (entered June 18, 2019) ............................................ 15

Judgment (entered June 18, 2019) ............................................................................... 36

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| **Petitioner,** | ) | |
| vs. | ) | **Cause No. 2:12-cv-86-WTL-MJD** |
| | ) | |
| CHARLES LOCKETT, | ) | |
| | ) | |
| **Respondent.** | ) | |

**ENTRY FOLLOWING HEARING OF JUNE 18, 2018**

This cause is before the Court to determine whether Bruce Webster has satisfied the

savings clause of 28 U.S.C. § 2255, entitling him to bring a petition under 28 U.S.C. § 2241. For

the Court to so find, Webster must show that certain evidence was unavailable to him at trial.

The parties have fully briefed the relevant issues and presented evidence at a hearing. The Court,

being duly advised, finds that Webster has satisfied the savings clause.

## I.   BACKGROUND

### A.  Procedural Background

On November 4, 1994, Bruce Webster was indicted in the United States District Court for

the Northern District of Texas on six counts, including kidnapping in which a death occurred in

violation of 18 U.S.C. §§ 1201(a)(1) and (2), and other various noncapital offenses. Webster was

convicted and was sentenced to death on June 20, 1996. *United States v. Webster*, 162 F.3d 308

(5th Cir. 1998).

Webster filed his initial Motion to Vacate Conviction and Sentence under

28 U.S.C. § 2255 on September 29, 2000. This motion was subsequently amended and was

denied in full on September 20, 2003. *Webster v. United States*, No. 4:00-CV-1646, 2003 WL

001

23109787 (N.D. Tex. Sept. 30, 2003). The Fifth Circuit rejected Webster's motion for relief

under section 2255, *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005), and his application

for an order authorizing a successive 2255 proceeding, *In re Webster*, 605 F.3d 256 (5th Cir.

2010).

On April 6, 2012, Webster filed a Petition for Writ of Habeas Corpus Pursuant to

28 U.S.C. § 2241 in this Court, challenging his death sentence based on what he argued was

previously unavailable evidence that establishes he is mentally retarded and therefore ineligible

for the death penalty. On November 13, 2013, this Court issued an order denying that petition.

The Seventh Circuit affirmed this Court's ruling on August 1, 2014. *Webster v. Caraway*, 761

F.3d 764 (7th Cir. 2014).  However, en banc review was granted, and the en banc court reversed

this Court's decision and remanded for further proceedings. *Webster v. Daniels*, 784 F.3d 1123

(7th Cir. 2015) (en banc). Pursuant to the Seventh Circuit's directive, this Court held a hearing

on June 18, 2018.

The purpose of the hearing was to allow Webster to present evidence as to whether

certain Social Security records were unavailable to him and his counsel at the time of trial. The

Seventh Circuit instructed this Court to evaluate trial counsel's diligence when considering that

question. *Webster*, 784 F.3d at 1146. The parties agree that Webster must prove the

unavailability of the Social Security records by a preponderance of the evidence.

The Seventh Circuit described the relevant Social Security records:

> The newly produced records, which Webster's current lawyers received on
> February 9, 2009, showed that Webster applied for Social Security benefits based
> on a sinus condition when he was 20 years old, approximately a year before the
> crime. The agency's attention was evidently quickly redirected to Webster's
> mental capacity. Two psychologists and one physician examined him. On
> December 22, 1993, Dr. Charles Spellman, a psychologist, evaluated him for the
> purpose of ascertaining his eligibility for Social Security benefits. He noted that
> "[i]deation was sparse and this appeared to be more of a function of his lower

2

cognitive ability than of any mental illness." Dr. Spellman also observed that Webster's intellectual functioning was quite limited: he could not register three objects (meaning that he could not remember three objects a short time after they were shown to him); he could not do simple calculations; and he did not know what common sayings meant. With respect to adaptive functioning, Dr. Spellman stated that Webster lived with his mother; that he watched television, listened to the radio, and went walking; that he did no chores around the house; and that he was idle both in the house and on the streets. Taking into account both his estimate that Webster's I.Q. was 69 or lower and his assessment of adaptive functioning, Dr. Spellman concluded that Webster was mentally retarded and antisocial. He found no evidence of exaggeration or malingering.

A few months earlier, in October 1993, Dr. Edward Hackett conducted a full-scale WAIS I.Q. test on Webster. He came up with a verbal I.Q. of 71, a performance I.Q. of 49, and a full-scale I.Q. of 59. He evaluated Webster as "mildly retarded, but . . . also antisocial." Pertinent to the central question of adaptive functioning, Dr. Hackett noted in a later report that "[Webster] was viewed as a somewhat mild[ly] retarded con man, but very street wise. . . . [H]e could not be functional in a community setting. . . . He would also not function well in the work place." Dr. Hackett did not believe that Webster was capable of managing his own benefits. He found Webster's behavior somewhat bizarre. Finally, he commented that on the I.Q. tests, Webster's performance was estimated to be lower than his verbal score, and that some organic function might be involved.

The last professional to examine Webster in conjunction with the 1993 Social Security application was Dr. C.M. Rittelmeyer, a physician. Dr. Rittelmeyer found Webster's physical health to be fine, but he also had this to say: "Mental retardation. Flat feet. Chronic sinus problems and allergies by history."

The Social Security records included an intriguing letter that strongly suggested that Webster in fact had been in special education classes. It was dated November 8, 1993, and had been written by Lou Jackson, the Special Education Supervisor for the school system Webster had attended, Watson Chapel Schools. Jackson's letter explained that Webster's special education records had been destroyed in 1988, after the family did not respond to a letter "telling them they could have the records if they wanted them."

The Social Security records also provide some direct evidence about Webster's abilities. The form Webster completed, for example, is rife with errors in syntax, spelling, punctuation, grammar, and thought. In response to a question asking him to describe his pain or other symptoms, Webster wrote "it causEs mE to gEt up sEt Easily hEadhurtsdiffiErnt of brEdth." When asked about the side effects of his medication, he wrote "Is lEEp bEttEr." When asked about his usual daily activities, Webster wrote (consistently with the comments from his teacher

3

and employer) "I slEEps look at. cartoon." He reported that he "ain't got no chang" in his condition since its onset.

*Webster*, 784 F.3d at 1133-34.

### B.  The Hearing

Two witnesses testified at the hearing: Larry Moore, Webster's lead trial attorney; and Kristin LeRoux, who lead the paralegal team for Dorsey & Whitney LLP ("Dorsey"), the law firm that has represented Webster since 2008.

First, the Court heard testimony from Moore. Currently, Moore is the chief of the criminal division of the Tarrant County Criminal District Attorney's office in Fort Worth, Texas. Moore has been practicing law for over forty-one years and has been board certified in criminal law since 1982. Moore was in private practice, doing primarily criminal defense, from 1986 to 2015. Otherwise he has been a prosecutor.

In 1994, when Moore was appointed to represent Webster, his practice consisted entirely of criminal defense. Moore had experience trying capital cases both as a prosecutor and as a defense attorney. As a prosecutor, he had tried three capital cases. One defendant was sentenced to death and eventually executed. He also had tried three death penalty cases as a defense lawyer. Additionally, he was involved in numerous other capital cases that were resolved prior to trial. In all, he probably represented sixty or more capital defendants and prosecuted a number of murder cases in which the death penalty was not sought.

Early on in Moore's representation of Webster, it became apparent to Moore that Webster suffered from some kind of mental disability. Based on these observations, the defense team hired and/or had appointed a total of five mental health experts. Moore and his co-counsel, Allan Butcher, split the expense for the experts who were not court appointed. In Moore's experience, having five experts in a Texas capital case in 1996 was exceptional; that number of experts never

4

would have been appointed by a judge, and not many lawyers would pay for the experts out of

their own pockets. None of the experts opined that Webster did not suffer from mental

retardation.[1]

As Moore became more familiar with Webster's case, he came to the opinion that the

Government's guilt phase case was overwhelming. Moore thought that Webster's intellectual

functioning was the key to the penalty phase. Moore knew that the federal death penalty statute

that was enacted in 1994 and became effective just weeks before the crime with which Webster

was charged barred the execution of mentally retarded people.

The federal death penalty statute did not set out a procedure as to who would make the

determination of mental retardation, the standard under which it would be made, or how it would

be made. For that reason, Moore consulted as many legal experts around the country as he could

concerning the role of mental retardation, which he felt was the primary issue in Webster's case.

He also consulted with experts in mental retardation and special education, including a professor

who had assisted in drafting the mental retardation carve-out in the federal death penalty statute.

Additionally, Moore read as many articles as he could find about mental retardation. Although

Moore previously had handled cases with mentally retarded defendants, Webster's case was the

first in which there was a statutory bar to the execution of a mentally retarded person.

Moore also sought out every medical record and school record he could find and also

talked to every person he could find who had known Webster growing up to try to get

information relevant to the issue of Webster's mental retardation. Moore knew that historical

medical records were important in any death penalty case, and he felt that in Webster's case any

---

[1]The Court will use the term that was used at the time of Webster's trial—"mental retardation"—rather than the term "intellectual disability," which is the term now used by the Supreme Court. *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

type of issue regarding Webster's medical or mental background needed to be developed through

as complete a background investigation as could be performed. In 1994, it was Moore's custom

to have a capital client sign blank release forms early in the representation of that client so that

he could complete and send the release without having to go back to the jail each time. Moore

followed this practice in Webster's case and had Webster execute a blank medical release form.

At some point prior to trial, Moore learned that Webster may have been evaluated by the

Social Security Administration ("SSA") for disability benefits. He believed that he learned this

information from Webster's mother, Beatrice Webster, during a trip in late February 1996 to

Little Rock, Arkansas, to interview Webster's family members and other potential witnesses.

Mrs. Webster told Moore that, sometime prior to Webster's arrest, she had made an application

for Social Security benefits for Webster for a physical ailment. She also told Moore that she had

taken Webster to the state agency and the state mental health agency.

Mrs. Webster told Moore that Webster's application was based on a physical ailment, not

intellectual disability. However, based on what Mrs. Webster told him, Moore understood that

during the course of the proceedings Webster may have had testing for possible mental issues,

which Moore suspected may have included testing to determine whether Webster met the criteria

for mental retardation. Moore also knew that Webster had been tested by the Southeast Arkansas

Mental Health agency and been found to be mentally retarded. By the time that Mrs. Webster

told Moore about the testing, Moore already had diagnoses of mental retardation from his own

experts.

Moore considered the information from Mrs. Webster to be critically important, as he

believed that Webster's mental retardation would be the single biggest issue at trial. He knew

that the Government would argue that Webster was not mentally retarded, as it previously had

6

contacted the examiner from the Southeast Arkansas Mental Health Clinic who had diagnosed

Webster as mentally retarded. After the Government's contact, the examiner changed his opinion

as to whether Webster was mentally retarded. Further, Moore knew that, because the application

for disability had been made years prior to the crime with which Webster was charged, any

finding that Webster was mentally retarded would have been made prior to Webster's arrest and

prosecution. He believed that any such finding made prior to the arrest would be critically

important to convince the jury of the accuracy of the diagnosis.

Based on what Mrs. Webster told him, Moore told his legal assistant, Kimberly

Whitehead, to contact the SSA office in Little Rock, Arkansas, to determine how he could get

records for Webster's Social Security benefits application. At the hearing, Moore identified an

undated handwritten note that he had written to Whitehead telling her to call the Pine Bluff SSA

office to find out what information was needed to get copies of the records of Webster's

application for disability. In part, the note explained,



Pet. Ex. 20. Moore thought it was critical to have the test results, and the exclamation point at the

end was to emphasize this fact. The note also included the address and phone number of the Pine

Bluff office, also in Moore's handwriting.

Moore wanted Whitehead to find out exactly what type of release the Social Security

office would require; he knew that some entities required their own release forms. Moore also

identified another note in his trial file as a directive to Whitehead to secure Webster's Social

Security records:

7



Pet. Ex. 23. Again, Moore was instructing Whitehead to get the results of any testing that had

been done. Moore also identified a note in Whitehead's handwriting that had a fax number for

Hal West, the head of the SSA office in Pine Bluff. The note was dated February 29, 1996, and

had the time 11:30 written on it.

A fax transmittal sheet with a handwritten date of March 5, 1996, to recipient Mr. Hal

West, SS Admin. Office, at fax number of 501-535-5381, all in Whitehead's handwriting, was

also in the file. The fax header at the top showed the document was faxed on March 4, 1996, at

23:50 and was page 1. Another document with the same fax header but numbered as page 2 was

a letter dated February 29, 1996, from Kimberly Whitehead to Hal West. The letter, on Moore's

letterhead, reads:

8

Dear Mr. West:

Thank you for visiting with me regarding the above Defendant. As you requested I have enclosed a copy of a Business Records Authorization and Release and a Business Records Affidavit. It is my understanding that Mr. Webster applied for disability in 1992 and some testing was done. He did not receive any disability payments. For purposes of trial, we will need to obtain any information relating to his disability claim.

Mr. J.W. Strickland, of L. Michael Connelley and Associates, will be in Pine Bluff on March 1st through 5th, 1996. He will have in his possession the original authorization signed by Mr. Webster for your files. The Business Records Affidavit will need to be filed out when Mr. Strickland picks up the records. This Affidavit will keep someone from your office from having to come to Fort Worth to testify that these records are true and correct copies of the records in your files.

Please contact me if you have any questions, or if you require anything further in this regard.

Sincerely,

*Kimberly Whitehead*

KIMBERLY J. WHITEHEAD,
Legal Assistant to Larry M. Moore

kw/
Faxed
Enclosures

Pet. Ex. 16.

Moore's trial file also included a Business Records Authorization & Release addressed to

Hal West at the U.S. Social Security Administration, Pine Bluff District Office. This document,

page 3 of the March 4, 1996, 23:50 fax, was signed by Webster and witnessed by Moore and his

co-counsel. Jury selection in Webster's case had begun by March 3, 1996, the date of the release,

and Moore recalled that Webster had executed the authorization at the courthouse. Moore drafted

the business records authorization and release according to the instructions that had been

received from the Arkansas SSA office and included the information that the office had

requested. A business records affidavit had the same fax header other than being numbered

page 4.

9

A transmission verification report showed that on March 4 at 23:50, a fax transmission was sent from Moore's fax machine to Hal West's number. It was four pages and took two minutes to transmit, and the transmission was successful. Moore's file also contained a Federal Express bill for a Federal Express letter sent to Hal West at the SSA in Pine Bluff. The bill notes that the shipment was in connection with the Webster case. The package, which was delivered on March 7, 1996, at 9:38 a.m., contained the same pages that previously had been faxed. It was Moore's practice to always follow up a fax transmission with the hard documents themselves.

J.W. Strickland, one of Moore's investigators, went to Pine Bluff in early March 1996 to interview witnesses and gather facts. Strickland reported to Moore that he had gone to the Pine Bluff Social Security Office but had been told that it had no records on Webster. Moore had Whitehead contact the SSA, and then Moore called West himself.

Even though Strickland had reported to Moore that the SSA had indicated that it had no records, Moore felt that it was his primary responsibility to obtain the records. He had had experiences where a lawyer was able to get results when an investigator had not been able to. Moore wanted to be personally told by someone at the SSA that it did not have any records regarding Webster. Thus, during the first week of March, during voir dire in Webster's case, Moore contacted the Pine Bluff Social Security Office himself. Moore did not recall with whom he spoke at the SSA, but he thought it was Hal West. The person with whom Moore spoke told him that there were no records in existence.

Moore testified that he had no doubt that he personally made contact with the Pine Bluff SSA office to request Webster's records and was told that it did not have any records pertaining

10

to Webster. Having been told this, Moore did not think there was anything else he could do.[2] He did not research the SSA's retention policies. Nor did he seek a subpoena, as he had no good faith belief that the records existed.

Moore's trial file contained no records responsive to his request for the records from the SSA in Pine Bluff.[3] He did not receive any records, nor did he receive any correspondence rejecting his request or asking for additional information. If the SSA had asked for additional information, he absolutely would have provided it. If the SSA had indicated that it had records but denied Moore's request to get them, he would have attempted to get the records by any means. He thought such records were critical to Webster's defense.

Moore first learned of the existence of the records shortly before October 20, 2009. The records would have been very useful in Webster's defense: they indicated that Webster had been tested by the SSA and had been found to be mentally retarded. The diagnosis would have been critically important because it had been made prior to the commission of the crime.

Further, the records contained an indication that Webster's special education records were destroyed in 1988; at trial, there had been an issue as to whether Webster actually had been in special education. Webster's counsel had not been able to obtain records from the school

---

[2]The Government argues that the Court should find Moore's hearing testimony was not credible because it was far more specific and detailed than a declaration he made in 2009. However, the Court credits Moore's explanation that reviewing his trial file, portions of the transcript of Webster's trial, and some of the trial exhibits—which he had not done before making the 2009 declaration—refreshed his recollection about the attempts to obtain any records pertaining to Webster that were in the possession of the SSA. Moore's additional review of the file, which he did after making the 2018 declaration and before the hearing, further helped Moore recall the events, as he remembered that his direct contact with the SSA took place during voir dire.

[3]Moore also testified that the trial file did not contain any documentation that he had made regarding what he had learned from the SSA. While he did not recall whether he had, in fact, made any such document, he testified that many notes from the investigation and trial were no longer in the file.

11

district showing that Webster had been in special education, and at trial the Government had

seized on the lack of records and argued that Webster's family members who testified that he had

been in special education classes were lying.

The Court next heard from LeRoux. Attorneys from Dorsey began representing Webster

in 2008 with plans to prepare a clemency petition. On October 27, 2008, Dorsey sent a request

for Webster's records to the SSA office in Pine Bluff. On February 9, 2009, after requests and

phone calls, Dorsey received records regarding Webster from the SSA.[4] These records were not

part of the trial file that Dorsey had received and indexed.[5]

## II.     DISCUSSION

The Court must determine whether the Social Security records were unavailable to

Webster and his counsel at the time of the trial. In considering that question, the Court must

evaluate trial counsel's diligence. Having observed the demeanor of Moore during the hearing,

the Court finds his testimony to be credible. As such, the Court must determine whether Moore

was duly diligent when, after Moore's investigator reported that the SSA had told him that no

records existed and Moore himself was told by someone from the SSA that no records existed,

Moore relied on these representations and did not take further action. The Court finds that Moore

was duly diligent and that the records were unavailable to Moore and thus Webster at the time of

the trial.

---

[4]After reviewing the records, Dorsey realized that they were incomplete; an index in the file referred to documents that were not in the file the SSA produced to Dorsey. Dorsey sought to obtain these records, but the SSA eventually indicated that it had destroyed Webster's entire file.

[5]Because in the Court's view Dorsey's ability to obtain some of Webster's Social Security records—after what LeRoux characterized as the most difficult records process she had experienced in her twenty-two-year career as a paralegal—is irrelevant to whether Moore exercised due diligence in 1996, the Court need not recite the entire process through which Dorsey obtained the records and attempted to obtain additional records.

12

The Seventh Circuit has explained, in the context of 28 U.S.C. § 2244, that due diligence is reasonable diligence, not "the maximum feasible diligence." *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004) (quotation and citation omitted). The Supreme Court has recognized that "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Here, Moore's only source of information that SSA records might exist was Webster's mother, who herself was intellectually disabled. Moore, recognizing the importance of any records, directed his assistant to contact the SSA to find out how to obtain any records. Pursuant to the instructions from the SSA, Moore drafted a release specifically to meet the SSA's requirements and had Webster sign that release. At Moore's request, Whitehead both faxed and sent via FedEx a packet of material with a letter and the release form that complied with SSA's requirements.

Strickland then went to Pine Bluff to attempt to pick up any records. He reported to Moore that the SSA office had told him that no records existed. Moore then personally called the SSA to follow up because he wanted to confirm that no records existed. Moore also was told that no records existed; he was not told that records existed but would not be provided. He was simply told that no records existed.

Given this response from the SSA, Moore's failure to take further action was reasonable. As such, the Court finds that Moore made diligent efforts to obtain any evidence based on the information he had been provided at the time. Accordingly, the SSA records were unavailable for trial, s*ee Webster v. Daniels*, 784 F.3d at 1140 n.9, and Webster has satisfied the savings clause and may proceed with his section 2241 petition.

13

### III.     CONCLUSION

The Court finds that Webster has met his burden and shown by a preponderance of the

evidence[6] that the Social Security records were unavailable to him at the time of trial despite trial

counsel's due diligence. As such, they constitute newly discovered evidence. Accordingly,

Webster has satisfied the savings clause, and the Court next must turn to the merits of the

petition and determine whether Webster is so intellectually disabled that he is categorically

ineligible for the death penalty.[7] A telephonic status conference will be set by separate order.


    Date: 8/31/18



_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana




 Distribution to all registered counsel by electronic notification via CM/ECF



---

    [6]As noted above, the parties agree that the proper standard is preponderance of the evidence. Even if the applicable standard were clear and convincing, the Court finds that the evidence of record would satisfy that standard as well.
    [7]In light of this Entry, Webster's motion for spoliation sanctions (Dkt. No. 95) is **DENIED AS MOOT**.

14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| BRUCE CARNEIL WEBSTER,            ) | |
|           ) | |
|       **Petitioner,**      ) | |
|     vs.                  ) | **Cause No. 2:12-cv-86-WTL-MJD** |
|           ) | |
| CHARLES LOCKETT,         ) | |
|           ) | |
|      **Respondent.**      ) | |

### ENTRY ON INTELLECTUAL DISABILITY

This cause is before the Court to determine whether Bruce Webster is entitled to relief

under 28 U.S.C. § 2241. For the Court to grant the relief that Webster seeks, Webster must show

by a preponderance of the evidence that he is intellectually disabled[1] and thus categorically

ineligible for the death penalty. The parties have fully briefed the relevant issues and presented

evidence at a hearing. The Court, being duly advised, finds that Webster has satisfied his burden

of proving his intellectual disability by a preponderance of the evidence and is thus ineligible for

the death penalty.

### I.     BACKGROUND

On November 4, 1994, Bruce Webster was indicted in the United States District Court for

the Northern District of Texas on six counts, including kidnapping in which a death occurred in

violation of 18 U.S.C. §§ 1201(a)(1) and (2). Webster was convicted and was sentenced to death

on June 20, 1996. *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).

---

[1]Unless quoting or referring to a diagnosis, the Court will use the term "intellectual disability" rather than the term that was used at the time of Webster's trial—"mental retardation." *See Hall v. Florida*, 572 U.S. 701, 704 (2014).

Webster filed his initial Motion to Vacate Conviction and Sentence under

28 U.S.C. § 2255 on September 29, 2000. This motion was subsequently amended and was

denied in full on September 20, 2003. *Webster v. United States*, No. 4:00-CV-1646, 2003 WL

23109787 (N.D. Tex. Sept. 30, 2003). The Fifth Circuit rejected Webster's motion for relief

under section 2255, *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005), and his application

for an order authorizing a successive § 2255 proceeding, *In re Webster*, 605 F.3d 256 (5th Cir.

2010).

On April 6, 2012, Webster filed a Petition for Writ of Habeas Corpus Pursuant to

28 U.S.C. § 2241 in this Court,[2] challenging his death sentence based on what he argued was

previously unavailable evidence—specifically, evidence from Social Security records—that

establishes he is intellectually disabled and therefore ineligible for the death penalty under *Atkins

v. Virginia*, 536 U.S. 304 (2002) and *Hall v. Florida*, 572 U.S. 701 (2014). On November 13,

2013, this Court issued an order denying that petition. The Seventh Circuit affirmed this Court's

ruling on August 1, 2014. *Webster v. Caraway*, 761 F.3d 764 (7th Cir. 2014).  However, en banc

review was granted, and the en banc court reversed this Court's decision and remanded for

further proceedings. *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc). This Court

held a hearing in June 2018 pursuant to the Seventh's Circuit directive and found that the Social

Security records at issue were unavailable to Webster and his counsel at the time of trial despite

trial counsel's due diligence.

The Seventh Circuit provided the following summary of the Social Security records'

contents:

---

[2]Webster is incarcerated at the United States Penitentiary, Terre Haute, which is located within the Southern District of Indiana.

2

The newly produced records, which Webster's current lawyers received on February 9, 2009, showed that Webster applied for Social Security benefits based on a sinus condition when he was 20 years old, approximately a year before the crime. The agency's attention was evidently quickly redirected to Webster's mental capacity. Two psychologists and one physician examined him. On December 22, 1993, Dr. Charles Spellman, a psychologist, evaluated him for the purpose of ascertaining his eligibility for Social Security benefits. He noted that "[i]deation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness." Dr. Spellman also observed that Webster's intellectual functioning was quite limited: he could not register three objects (meaning that he could not remember three objects a short time after they were shown to him); he could not do simple calculations; and he did not know what common sayings meant. With respect to adaptive functioning, Dr. Spellman stated that Webster lived with his mother; that he watched television, listened to the radio, and went walking; that he did no chores around the house; and that he was idle both in the house and on the streets. Taking into account both his estimate that Webster's I.Q. was 69 or lower and his assessment of adaptive functioning, Dr. Spellman concluded that Webster was mentally retarded and antisocial. He found no evidence of exaggeration or malingering.

A few months earlier, in October 1993, Dr. Edward Hackett conducted a full-scale WAIS I.Q. test on Webster. He came up with a verbal I.Q. of 71, a performance I.Q. of 49, and a full-scale I.Q. of 59. He evaluated Webster as "mildly retarded, but . . . also antisocial." Pertinent to the central question of adaptive functioning, Dr. Hackett noted in a later report that "[Webster] was viewed as a somewhat mild[ly] retarded con man, but very street wise. . . . [H]e could not be functional in a community setting. . . . He would also not function well in the work place." Dr. Hackett did not believe that Webster was capable of managing his own benefits. He found Webster's behavior somewhat bizarre. Finally, he commented that on the I.Q. tests, Webster's performance was estimated to be lower than his verbal score, and that some organic function might be involved.

The last professional to examine Webster in conjunction with the 1993 Social Security application was Dr. C.M. Rittelmeyer, a physician. Dr. Rittelmeyer found Webster's physical health to be fine, but he also had this to say: "Mental retardation. Flat feet. Chronic sinus problems and allergies by history."

The Social Security records included an intriguing letter that strongly suggested that Webster in fact had been in special education classes. It was dated November 8, 1993, and had been written by Lou Jackson, the Special Education Supervisor for the school system Webster had attended, Watson Chapel Schools. Jackson's letter explained that Webster's special education records had been destroyed in 1988, after the family did not respond to a letter "telling them they could have the records if they wanted them."

3

The Social Security records also provide some direct evidence about Webster's abilities. The form Webster completed, for example, is rife with errors in syntax, spelling, punctuation, grammar, and thought. In response to a question asking him to describe his pain or other symptoms, Webster wrote "it causEs mE to gEt up sEt Easily hEadhurtsdiffiErnt of brEdth." When asked about the side effects of his medication, he wrote "Is lEEp bEttEr." When asked about his usual daily activities, Webster wrote (consistently with the comments from his teacher and employer) "I slEEps look at. cartoon." He reported that he "ain't got no chang" in his condition since its onset.

*Webster*, 784 F.3d at 1133-34.

The undersigned held a five-day hearing in April 2019 on the issue of whether Webster is intellectually disabled and thus constitutionally ineligible for the death penalty. The Court heard live testimony from the following witnesses: Dr. Mark Tassé; Dr. Daniel J. Reschly; Dr. John Fabian; Dr. Robert Denney; Dr. Erin Conner; John S. Edwards, III; and Phil Woolston. The Court also received the deposition testimony of Dr. Charles Spellman (video and transcript); Dr. Jacqueline Blessinger (transcript); and Larry Moore (video and transcript). Each party also introduced numerous exhibits.[3]

## II.    DIAGNOSTIC CRITERIA FOR INTELLECTUAL DISABILITY

In determining whether Webster is intellectually disabled, the Court will rely on the clinical definitions of intellectual disability promulgated by the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA") manuals: (1) AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed. 2010) ("AAIDD-11"); and (2) APA, Diagnostic and

---

[3]Over Webster's objection, the Court also has considered the trial transcripts and evidence admitted during the trial that were introduced as exhibits at the hearing, including the Southeast Arkansas Economic Development Records and Arkansas State Police Driving Records.

4

Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-5"). *See Moore v. Texas*, 137 S.

Ct. 1039, 1045 (2017) (relying on AAIDD-11 and DSM-5).

As the Supreme Court has explained,

the generally accepted, uncontroversial intellectual-disability diagnostic definition . . . identifies three core elements: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean— i.e., a score of roughly 70—adjusted for the standard error of measurement); (2) adaptive deficits (the inability to learn basic skills and adjust behavior to changing circumstances); and (3) the onset of these deficits while still a minor.

*Moore*, 137 S. Ct. at 1045. Each of these three prongs must be met for a person to be

intellectually disabled.[4]

The APA defines intellectual disability as "a disorder with onset during the

developmental period that includes both intellectual and adaptive functioning deficits in

conceptual, social, and practical domains." DSM-5 at 33. The following three criteria must be

met before an individual may receive a diagnosis of intellectual disability:

A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

*Id.*

---

[4]The Government does not argue—and there is no suggestion in the record—that if Webster is intellectually disabled that condition did not arise prior to age 18.

5

The AAIDD provides a similar explanation, stating that intellectual disability is "characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAIDD-11 at 6. Deficits in intellectual functioning are established by "an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations." *Id.* at 27. Deficits in adaptive functioning are measured by:

> performance on a standardized measure of adaptive behavior that is normed on the general population including people with and without [intellectual disability] that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, and practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills.

*Id.*

## A. Intellectual Functioning

The first prong requires an assessment of an individual's intellectual functions that "involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding." DSM-5 at 37. Intellectual functioning is typically measured by intelligence quotient (IQ) tests. *Id.* The APA describes this prong, in relevant part, as follows:

> Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

DSM-5 at 37. The AAIDD Manual provides:

6

020

The "significant limitations in intellectual functioning" criterion for a diagnosis of intellectual disability is an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific instruments used and the instruments' strengths and limitations.

AAIDD-11 at 31.

### B. Adaptive Functioning

The second prong involves an assessment of an individual's adaptive functioning to determine whether "adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community." DSM-5 at 33. The APA indicates that adaptive functioning involves adaptive reasoning in three broad domains:

> The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others.

DSM-5 at 37-38.

A person's adaptive functioning in at least one of these three domains must be "sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." *Id.* at 38; *Moore*, 137 S. Ct. at 1046 ("In determining the significance of adaptive deficits, clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean in any of the three adaptive skill sets (conceptual, social, and practical)."). The AAIDD defines the second prong as "significant limitations . . . in conceptual, social, and

021

practical skills." AAIDD-11 at 43. Further, "the deficits in adaptive functioning must be directly related to the intellectual impairments described in [the first prong]." DSM-5 at 38.

Both the DSM-5 and the AAIDD-11 direct clinicians to use standardized measures of adaptive functioning when possible. *See* DSM-5 at 37 ("Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures."); AAIDD-11 at 43 ("[S]ignificant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population . . . .").

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court will address Webster's intellectual functioning and adaptive functioning in turn.

### A.   Webster's Intellectual Functioning

The Court finds that Webster has proved by a preponderance of the evidence that he has significant limitations in intellectual functioning and thus satisfies the first prong of the intellectual disability definition. He has produced reliable evidence that he has an IQ at least two standard deviations below the mean.[5]

Webster has produced the following IQ test scores:

| Psychologist | Year | Score |
|---|---|---|
| Dr. Patrick Caffey (Arkansas Department of Mental Health) | 1992 | 48 (Full scale) 56 (Verbal) 48 (Performance) |
| Dr. Edward Hackett (Social Security Administration) | 1993 | 59 (Full scale) 71 (Verbal) 49 (Performance) |
| Dr. Raymond Finn (Defense trial expert) | 1995 | 59 (Full scale) 59 (Verbal) |

---

[5]"Although far from perfect, intellectual functioning is currently best represented by IQ scores when they are obtained from appropriate, standardized and individually administered assessment instruments." AAIDD-11 at 31.

022

| | | 60 (Performance) |
|---|---|---|
| Dr. Dennis Keyes (Defense trial expert) | 1995 | 55 (Composite) 67 (Crystalized) 46 (Fluid) |
| Dr. Raymond Finn (Defense trial expert) | 1996 | 65 (Full scale) 72 (Verbal) 59 (Performance) |
| Dr. Dennis Keyes (Defense trial expert) | 1996 | 51 (Full scale) N/A (Verbal) N/A (Performance) |
| Dr. George Parker (Government trial expert) | 1996 | 72 (Full scale) 77 (Verbal) 67 (Performance) |
| Dr. Robert Denney (Government expert) | 2018 | 61 (Full scale) 63 (Verbal) 69 (Performance) |
| Dr. Daniel Reschly (Webster expert) | 2018 | 53 (Full scale) N/A (Verbal) N/A (Performance) |

Additionally, as noted above, as part of the Social Security process in 1993, Dr. Spellman estimated that Webster's IQ was 69 or lower, and Dr. Rittelmeyer commented that Webster was mentally retarded.

All of Webster's full-scale IQ tests fall below 75. The parties agree that some of the tests are invalid and should not be considered.[6] Eliminating those scores, the remaining scores are as follows: 59, 59, 65, 51, 55, 61, and 53.[7] Thus, if these scores are valid, they demonstrate that Webster satisfies the intellectual deficit prong of intellectual disability.

_____

[6]Specifically, the score obtained in 1992 by Dr. Caffey might have been artificially low because the test was administered while Mr. Webster was experiencing mental health symptoms, including perhaps symptoms of schizophrenia, and in 1996 Dr. Parker improperly omitted certain subtests, which rendered the results he obtained unreliable.

[7]The weight of the evidence supports a finding that Webster was not motivated to underperform on tests conducted prior to his trial. The evidence presented at the trial included only one IQ test that had been performed on Webster before the crime—the 1992 test done at the Southeast Arkansas Mental Health Clinic. Notably, the jury did not hear evidence that was later obtained from Webster's Social Security files: Webster had scored 59 on Dr. Hackett's test; Dr. Spellman had estimated Webster's IQ to be 69 or lower; and Dr. Rittelmeyer commented that Webster was "mentally retarded." In light of the Government's arguments at trial that Webster

9

The scores themselves were obtained over a period of twenty-five years and consistently

demonstrate that Webster has an IQ that falls within the range of someone with intellectual

deficits. In reaching this conclusion, the Court finds that the evidence does not support a finding

of malingering[8] such that the tests are invalid. The Court relies on the testimony of Dr. Fabian,

who is board certified in forensic psychology and clinical psychology and fellowship trained in

neuropsychology.[9] Specifically, Dr. Fabian explained that the effort testing[10] showed, at most,

---

was motivated to underperform on later tests to avoid the death penalty, this omission is
particularly significant.

[8]The APA describes malingering as follows:

> The essential feature of malingering is the intentional production of false or
> grossly exaggerated physical or psychological symptoms, motivated by external
> incentives such as avoiding military duty, avoiding work, obtaining financial
> compensation, evading criminal prosecution, or obtaining drugs. . . . Malingering
> should be strongly suspected if any combination of the following is noted:
>
> 1. Medicolegal context of presentation (e.g., the individual is referred by an
>    attorney to the clinician for examination, or the individual self-refers while
>    litigation or criminal charges are pending).
>
> 2. Marked discrepancy between the individual's claimed stress or disability and
>    the objective findings and observations.
>
> 3. Lack of cooperation during the diagnostic evaluation and in complying with
>    the prescribed treatment regimen.
>
> 4. The presence of antisocial personality disorder.

DSM-5 at 726-27.

[9]The Court finds the testimony of Dr. Fabian to be extremely credible and persuasive. Of
particular note is that Dr. Fabian acknowledged and considered evidence that was contrary to his
ultimate conclusion. As he put it, "Certainly, there are strengths and weaknesses in these cases.
They're not perfect cases, but you want to look at the case in its totality and come up with your
clinical judgment and overall opinion as to your findings as in this case what intellectual
disability is or whether that person has it." Dkt. No. 192 at 161. Nonetheless, after applying his
clinical judgment to the totality of the evidence and facts, Dr. Fabian concluded that Webster did
have a mild intellectual disability.

[10]Effort testing involves stand-alone or embedded questions within another test used to
determine whether someone is putting forth adequate effort on a test.

that Webster at times had variable effort.[11] He also distinguished malingering from poor effort

and pointed to Webster's "base foundation of complex trauma" and the atypical testing

conditions. Dkt. No. 192 at 145. Dr. Fabian also testified that low IQ creates a risk of false

positives for poor effort on effort tests and that Webster passed most of the Reliable Digit Span

tests and other later effort tests. The Court credits Dr. Fabian's testimony that, considering all of

these factors, Webster was not malingering.[12]

Further, the Court credits the testimony of Dr. Reschly, a school psychologist who is

currently a professor emeritus of Education and Psychology at Vanderbilt University, that it

would be "extremely difficult" to consistently fake IQ scores in that range over the course of

twenty-seven years.[13] Dkt. No. 189 at 173. The Court also credits the testimony of Dr. Reschly

---

[11]The Government argues that the validity tests indicated that Webster was malingering. Specifically, the Government points to the testimony of Dr. Denney that Webster failed the Word Memory Test ("WMT") and that Webster's results on the Medical Symptom Validity Test ("MSVT") also showed that Webster was malingering. For the reasons explained below, the Court gives Dr. Denney's testimony little weight.

[12]The Government has pointed to contrary evidence, including DSM-5 factors that the Government argues indicate that malingering should be strongly suspected. Specifically, the Government points to the fact that much of Webster's testing occurred in the medicolegal context of presentation. Further, the Government points to evidence that there was a marked discrepancy between Webster's claimed disability and the objective findings and observations. As the Government notes, even some of Webster's own experts were surprised by the test results. The Government acknowledges that it is difficult to evaluate the third factor—lack of cooperation with the diagnostic evaluation and in compliance with the prescribed treatment regimen—but points to Dr. Hackett's observation that Webster showed no signs of wanting to improve. Finally, Webster has been diagnosed with antisocial personality disorder. While the Court gives this evidence some weight, for the reasons explained above, the Court finds that this evidence is outweighed by other evidence that does not support a finding of malingering.

[13]The Court finds the testimony of Dr. Denney, a licensed clinical psychologist who is board certified in clinical neuropsychology and forensic psychology, overall to be not credible and thus gives it little or no weight. As a whole, Dr. Denney focused on evidence that supported his conclusions while ignoring, disregarding, or minimizing evidence that called his conclusions into question.

For example, the Court finds that the testimony of Dr. Denney that malingering on IQ tests is easy is unsupported by the article on which Dr. Denney relied. In fact, the article reached the following conclusion: "The results of this study suggest that faking low on the WAIS-R is a

11

that it would be "extremely unusual" for a person to have the same performance across multiple

subtests; rather, what happens frequently "is that there are fairly wide variations across different

subtests." Dkt. No. 189 at 178.[14] The Court also credits the testimony of Dr. Fabian that

Webster's IQ scores were consistent and indicated mild intellectual disability. Dr. Fabian's own

difficult endeavour." Lorraine Johnstone & David J. Cooke, "Feigned Intellectual Deficits on the Wechsler Adult Intelligence Scale-Revised," 42 *British J. of Clinical Psych.* 303, 314 (2003). When asked about this statement in the article, Dr. Denney replied, "Yes. It says that in that sentence, but that's not what that's talking about at that point." Dkt. No. 192 at 118. He did not elaborate. In any case, the study did not address the ease of repeatedly producing fake low IQ test results over several decades, as the Government argues Webster did.

Similarly, Dr. Denney's criticism of Dr. Reschly for allegedly being not properly licensed in Indiana and allegedly practicing outside his training as a school psychologist is not well taken. Dr. Denney himself is not licensed in Indiana, and Dr. Denney acknowledged that he worked with a master's level school psychologist who did testing in a prison setting.

More importantly, some of Dr. Denney's testimony is demonstrably incorrect or appears to reveal biases. Specifically, Dr. Denney testified that the results of the Test of Malingering Memory ("TOMM") administered by Dr. Reschly should be considered invalid because Dr. Reschly "didn't give the whole test. He only gave the first two trials. He didn't give the retention trial, which research shows makes it a more sensitive validity test. He didn't do that, but the results of it were within expected limits." Dkt. No. 191 at 208. Dr. Reschly, however, did administer all three trials of the TOMM, including the retention trial, and Webster passed all three trials. Dr. Denney testified that he had access to the raw data from Dr. Reschly's administration of the TOMM—which shows that the retention trial was administered.

Also troubling to the Court is Dr. Denney's reliance on an evaluation done on July 8, 1992, in which, according to Dr. Denney, psychiatrists at the Southeast Arkansas Mental Health Center "did not see an indication of a substantially low intellectual functioning in their examination." Dkt. No. 192 at 25. Notably, the report to which Dr. Denney refers does not mention Webster's intellectual functioning, instead focusing on Webster's reports of the voices in his head that were telling him to kill people. It does, however, mention that Webster was in for psychological testing. At the time Dr. Denney formed his opinion on the psychiatric evaluation report, he had not realized that another report, completed by a psychologist examiner and consulting psychologist at the Southwest Arkansas Mental Health Center on the same day, showed that Webster had a full-scale IQ of 48. Even after Dr. Denney reviewed the reports of the psychological evaluation for the first time during the hearing, he refused to consider explanations other than the conclusion he had reached before learning of the psychological evaluation report.

[14]The Government points to Dr. Denney's testimony that Webster's test results are inconsistent and mutually contradictory. The Court has considered this testimony but finds that it is outweighed by other evidence discussed above.

026

testing to assess Webster's general reasoning ability was also consistent with the IQ testing that

Drs. Denney and Reschly conducted.

Looking first at the tests that were performed before the crime, the weight of the evidence

supports a finding that Webster was not motivated to underperform on the testing performed as

part of his application for Social Security.[15] In the form Webster filled out, he described his

symptoms as follows:

---

[15]The Government argues that Webster had motive to malinger when he was tested to determine his eligibility for Social Security benefits. In support of that argument, the Government points to the testimony of Dr. Denney: "And, while Webster argues that he only applied for benefits due to sinus problems, his mother told Dr. Denney that she brought Webster to the Social Security Administration because of his sinus problem and concerns that he may have issues with his brain. Hr. Tr. 688:1-9." Dkt. No. 195 at 38.

In fact, Dr. Denney testified as follows:

Q: In 1993, [Webster] applied for Social Security; is that correct?
A: I'm not exact on the date; but yes, he did apply.
Q: Okay. And he applied because he had sinus trouble; is that right?
A: Well, that's what's written on the document. I recalled -- actually, I recalled it last night, that Mrs. Webster told me during her interview that they applied for sinus problems; and she also told me that she was concerned that that might relate to his brain.
Q: That his sinus trouble might relate to his brain?
A: Yes.
Q: That's what Mrs. Webster told you?
A: Yes, it was in the notes.

Dkt. No. 192 at 34-35. As such, the Government's argument mischaracterizes Dr. Denney's testimony.

13

Understanding that this statement is for the use of the Social Security Administration, I hereby certify that- the information below is correct

A. Describe your pain (or other symptoms) it causes mE to gEt up set easily hEadhurts diffiErnt ot brEali

1. What does it feel like? it fEElslea rEal bad

2. Where does it hurt? all in my hEad, nosE, EyEs

3. What activities cause the pain (or other symptoms)? dust grass colognE spray BEing out sidE

4. How long does it usually last? oh e times windba

Hrg. Ex. 21 at 63.[16] In additional Social Security documents, Webster also referred to sinus symptoms as the basis for his disability claim.

Further, Dr. Charles Spellman,[17] a psychologist who conducted a mental status evaluation of Webster at the request of the Social Security Administration in 1993 and who found that Webster's total presentation was of someone who was mentally retarded, with an IQ of 69 or lower, testified that he is "always hyper vigilant for malingering" Dkt. No. 164-1 at 31, yet he found no evidence of exaggeration or malingering.[18]

With regard to the testing that was performed after the crime and before Webster's trial, the testimony of Larry Moore, Webster's trial attorney, which the Court finds to be credible, established that Webster did not know the purpose of the testing that was conducted between the time of the crime and Webster's trial and that Moore told Webster to do his best because the

---

[16]The Court did not consider Exhibits 42 and 43 in making its ruling, as the Court found other evidence sufficient to make its findings with regard to whether Webster is intellectually disabled.

[17]The Court considered the testimony of Dr. Spellman over Webster's objection.

[18]During Dr. Spellman's deposition, the Government asked Dr. Spellman many hypothetical questions about whether a person who was intellectually disabled could perform certain tasks. The Court gives no weight to his answers to those questions, as the questions did not provide Dr. Spellman with enough details or context to warrant giving his answers weight in making a finding specific to Webster.

14

better Webster did, the more it would help him. Moreover, Moore testified that he purposely

avoided telling Webster that he planned to argue that Webster was mentally retarded until right

before jury selection because he knew that Webster did not like the term and "didn't want to be

stigmatized as being retarded." Dkt. No. 164-2 at 25. Accordingly, the Court finds that Webster

has presented convincing evidence that he was not motivated to malinger on the IQ tests given in

1995 and 1996 and that the results of those tests are valid.

The Court finds that Webster has shown by a preponderance of the evidence that his IQ

scores were valid, and, after considering the evidence as a whole, the Court finds that Webster

has shown by a preponderance of the evidence that he has deficits in intellectual functioning.[19]

### B.      Webster's Adaptive Functioning

The Court finds that Webster also has proved by a preponderance of the evidence that he

has significant limitations in adaptive functioning and thus satisfies the second prong of the

intellectual disability definition.

The Court gives great weight to the testimony of Dr. Fabian that Webster has significant

deficits in adaptive behavior. Dr. Fabian administered a series of tests to Webster and considered

adaptive functioning assessments administered by other psychologists. Dr. Fabian also spent a

great deal of time interviewing Webster and reviewed numerous records, including Webster's

school records and the Social Security records. Additionally, Dr. Fabian's explanation of why he

gave weight to some evidence while giving little weight to other evidence was especially

persuasive. In particular, the Court found Dr. Fabian's explanation of why he gave little weight

---

[19]In reaching its decision, the Court has considered the evidence that could suggest that Webster does not have deficits in intellectual functioning, including Dr. Denney's testimony as to the import of the results of Webster's effort testing, Webster's real-world functioning, and Webster's achievement test scores.

029

to Webster's adaptive functioning in prison to be very convincing. Dr. Fabian explained that a prison environment is very structured, and everything is available to an inmate.

The Court also credits the testimony of Dr. Reschly that Webster meets the second prong. Dr. Reschly considered a wide variety of information in reaching his decision, and he interviewed many people who knew Webster during the developmental period, including people who are not his direct relatives. Dr. Reschly also considered standardized adaptive behavior assessments, and the Court finds his explanation of why the more recent adaptive behavior assessments should be viewed with caution to be persuasive. Dr. Reschly explained that someone with an intellectual disability does not likely function in the "predictable, very rigid structure" of prison the same way that person would function outside of that environment. Dkt. No. 190 at 43. The Court also credits the testimony of Dr. Reschly that Webster has deficits in the conceptual, social, and practical domains.

In reaching this conclusion, the Court also has looked to the Social Security records that were not available to Webster at the time of his trial. As the Seventh Circuit pointed out, the application materials revealed that Webster was barely literate.[20] For example, for information about his job duties, Webster listed his job title as "Cement" and provided the following description:

---

[20]The Court also found persuasive Dr. Fabian's characterization of Webster's responses to questions in the Social Security records as being concrete and limited, which Dr. Fabian testified was consistent with his interactions with Webster.



Hrg. Ex. 21 at 66. He listed this same job on four separate pages, although the instructions

indicated that the applicant should provide the information for each job he had listed, and

Webster had listed only one job.

Webster's answers to the section on Recreational Activities and Hobbies also supports

the conclusion that Webster was barely literate:

17

Recreational Activities and Hobbies

A.  Do you do any reading?  |☑| Yes  |☐| No
    If yes, describe what you read:  _Playboy naked_
    _books_

               How often and how long do you read?  _____
    _long times_

    If no, describe why not:  _____

B.  Do you watch television or listen to the radio?  |☑| Yes  |☐| No
    If yes, describe what you watch or listen to:  _cartoons_
    _BEt cinamacks rap musics_

               How much time do you spend doing this?  _____
    _lots ot times_

    If no, describe why not:  _____

C.  Do you have any hobbies or pastimes?  |☑| Yes  |☐| No
    If yes, describe the things you do:  _radio, tv past_
    _my times_
               How often do you do these things?  _every day_

               How much time do you spend doing these?  _a lots ot_
    _time_

    If no, describe why not:  _____

D.  Describe any changes in these activities since your condition began:
    _thats my EvEry day thang_

Hrg. Ex. 21 at 19.

18

The Government has pointed to evidence that Webster does exhibit areas of strength, including, but not limited to, his musical ability, excellent hygiene, ability to drive, achievement test scores, and ability to engage in conversation.[21] The Government also has argued that the facts of the crime demonstrate that Webster does not have deficits in adaptive functioning.[22] However, in accordance with guidance from the medical community and as instructed by the Supreme Court, the Court has focused its adaptive-functioning inquiry on adaptive deficits. *See Moore I*, 137 S. Ct. at 1050 (citing AAIDD-11, at 47 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills"); DSM-5, at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning"; deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits); *see Brumfield* [*v. Cain*, 135 S. Ct. 2269, 2281 (2015)] ("[I]ntellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.'" (quoting AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 8 (10th ed. 2002))).

Over Webster's objections, the Court has considered evidence about Webster's behavior, education, work, and mental health in prison, including all of the Bureau of Prisons records[23]

---

[21]For reasons explained above, the Court gives little weight to the testimony of Dr. Denney that Webster does not have significant deficits in the conceptual domain, social domain, or practical domain. The Court has looked at the evidence pointed to by Dr. Denney in support of his conclusion and does not find Dr. Denney's explanation as to the conclusions that he has drawn to be persuasive.

[22]Over Webster's objection, the Court has considered evidence about the facts of the crime and has viewed those facts in the light that most favorably supports the Government's argument.

[23]These records include the emails that the Government argues that Webster has written while incarcerated. The Court has assumed for the purposes of making its findings that Webster did, in fact, write these emails himself.

introduced by the Government and the testimony of Dr. Jacqueline Blessinger; John S. Edwards, III; and Phil Woolston.[24] The Court also considered much of the testimony of Dr. Erin Conner.[25] The Court gives little weight to this evidence, relying on Dr. Fabian's cautions as to the use of such evidence. *See also Moore I*, 137 S. Ct. at 1050 ("Clinicians, however, caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is. DSM-5, at 38 ('Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.'); *see* AAIDD-11 User's Guide 20 (counseling against reliance on 'behavior in jail or prison'").). Additionally, the Court would give little weight to the testimony of Drs. Conner and Blessinger even had their interactions with Webster not taken place in a prison setting. Neither the quantity nor depth of their interactions with Webster would lead the Court to find their testimony to be more persuasive than that of Drs. Fabian and Reschly. The Court did consider Edwards' testimony as to his conversations with Webster, observations of Webster's behavior and performance as an orderly, and emails that he received that he believed to be from Webster but finds that this testimony is outweighed by other evidence discussed above.

Weighing the evidence as whole, the Court finds that Webster does have deficits in his adaptive functioning.[26]  Further, the Court finds that the evidence supports a finding that

---

[24]Woolston has only been briefly introduced to Webster. Woolston testified to lay the foundation for the BOP educational records, which the Court has admitted and considered.

[25]The Court finds that Dr. Conner's testimony about inmate Ronell Wilson is not relevant; as such, the Court did not consider that testimony.

[26]While there was some evidence that Webster was not in special education classes in school, the Court finds that the weight of the evidence supports a finding that Webster was, in fact, in special education. In making this finding, the Court has considered, over Webster's objections, the school records introduced by the Government at the hearing.

20

Webster's deficits are related to intellectual functioning.[27] In making this decision, the Court has considered, over Webster's objection, evidence of Webster's other psychological conditions.[28] Therefore, the Court finds that Webster has shown by a preponderance of the evidence that he has significant deficits in adaptive functioning and as such satisfies the second prong of intellectual disability.

## IV.    CONCLUSION

The Court finds that Webster has met his burden and shown by a preponderance of the evidence that he is intellectually disabled, as he meets all three prongs of intellectual disability: 1) Webster has intellectual-functioning deficits; 2) Webster has adaptive deficits; and 3) the onset of these deficits was while Webster was a minor. In making this ruling, the Court has carefully considered the totality of the evidence and weighed the testimony in accordance with its credibility assessment of each witness.

Accordingly, Webster's petition for a writ of habeas corpus is **GRANTED**. Webster's death sentence is vacated under 28 U.S.C. § 2241. The Attorney General has 120 days from the Entry of Final Judgment to take appropriate action in light of the writ. Further sentencing proceedings shall occur in the Northern District of Texas.

SO ORDERED: 6/18/2019

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[27]Dr. Tassé testified that it is impossible to prove this relationship clinically. See Dkt. No. 189 at 48 ("[W]e wouldn't know whether it's the adaptive behavior deficits that caused the intellectual functioning deficits or the intellectual deficits caused the adaptive behavior deficits."). The Court finds his testimony on this topic to be persuasive.

[28]Specifically, the Government has pointed to Webster's antisocial personality disorder.

21

035

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| **Petitioner,** | ) | |
| vs. | ) | **Cause No. 2:12-cv-86-WTL-MJD** |
| | ) | |
| CHARLES LOCKETT, | ) | |
| | ) | |
| **Respondent.** | ) | |

## JUDGMENT

The Court having this day directed the entry of final judgment, the Court now enters

**FINAL JUDGMENT** in favor of the petitioner, Bruce Webster, and against the respondent.

Webster's petition for a writ of habeas corpus is granted. Webster's death sentence is vacated

under 28 U.S.C. § 2241. The Attorney General has 120 days from the Entry of Final Judgment to

take appropriate action in light of the writ. Further sentencing proceedings shall occur in the

Northern District of Texas.

SO ORDERED: 6/18/2019

Laura A. Briggs, Clerk

BY: _____
Deputy Clerk, U.S. District Court

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

036