No. 19-2683

IN THE

# United States Court of Appeals

FOR THE SEVENTH CIRCUIT

BRUCE CARNEIL WEBSTER,

*Petitioner-Appellee,*

v.

T.J. WATSON, WARDEN

*Respondent-Appellant.*

On Appeal from the United States District Court
for the Southern District of Indiana, No. 2:12-CV-086-JPH-MJD
Hon. William T. Lawrence, District Judge

**APPENDIX FOR THE RESPONDENT WARDEN**

ERIN NEALY COX
  *United States Attorney*
  *Northern District of Texas*

JOSH J. MINKLER
  *United States Attorney*
  *Southern District of Indiana*

JAY WEIMER
  *Assistant U.S. Attorney*
  *Northern District of Texas*

  *Special Assistant U.S. Attorney*
  *Southern District of Indiana*
  *10 West Market St., Ste. 2100*
  *Indianapolis, Indiana 46204*
  *(817) 252-5273*

## CIRCUIT RULE 30(d) CERTIFICATION

I certify that this appendix includes all of the materials required by Cir. R. 30(b).

/s/ JAY WEIMER
*Assistant United States Attorney*

## CERTIFICATE OF SERVICE

I certify that on November 14, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. The United States will also mail a paper copy to Webster's counsel, Ms. Kathryn Johnson, 50 S. Sixth St., Ste. 1500, Minneapolis, MN 55402.

/s/ JAY WEIMER
*Assistant United States Attorney*

i

## APPENDIX TABLE OF CONTENTS

Page

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998)
(affirming convictions and sentence on direct appeal) ........................................ 1

*Webster v. United States*, 528 U.S. 829 (1999) (denying cert.) .................................... 41

*Webster v. United States*, No. 4:00-CV-1646 (N.D. Tex. Sept. 30, 2003)
(denying the Section 2255 motion) ........................................................................ 42

*United States v. Webster*, 392 F.3d 787 (5th Cir. 2004) (denying COA on
certain issues not authorized by the district court)............................................. 55

*United States v. Webster*, 421 F.3d 308 (5th Cir. 2005) (affirming on the
Section 2255 issues on which the district court granted COA) .......................... 66

*Webster v. United States*, 549 U.S. 828 (2006) (denying cert.).................................... 72

*In re: Webster*, 605 F.3d 256 (5th Cir. 2010) (denying authorization to file a
successive Section 2255 motion) ........................................................................... 73

*Webster v. United States*, 562 U.S. 1091 (2010) (denying cert.).................................. 77

*Webster v. Lockett*, No. 2:12-CV-86 (S.D. Ind. Nov. 13, 2013)
(denying the Section 2241 petition) ....................................................................... 78

*Webster v. Caraway*, 761 F.3d 764 (7th Cir. 2014) (affirming the denial of the
Section 2241 petition)............................................................................................... 85

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc) (reversing the denial
of the Section 2241 petition and remanding for further proceedings) .............. 90

162 F.3d 308
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Bruce Carneil WEBSTER, a/k/
a B–Love, Defendant–Appellant.

No. 96–11224.
|
Dec. 3, 1998.
|
Rehearing Denied Jan. 29, 1999.

**Synopsis**

Defendant was convicted in the United States District Court for the Northern District of Texas, Terry R. Means, J., of kidnaping resulting in death, conspiring to kidnap, and using and carrying firearm during crime of violence, and sentenced to death. Defendant appealed. The Court of Appeals, Jerry E. Smith, Circuit Judge, held that: (1) jury was not limited to considering only defendant's intent and conduct in assessing aggravating factors; (2) instructions did not improperly allow jury to "double-weigh" intent; (3) statutory and non-statutory aggravating factors did not overlap; (4) instruction which incorrectly applied "substantial planning and premeditation" aggravating factor to kidnapping and not just murder was harmless; (5) trial court did not commit constitutional error in rejecting mitigating factors; (6) jurors were not required to weigh each mitigating factor found by at least one juror; (7) kidnapping instruction was proper; (8) police had probable cause to arrest defendant; (9) defendant was not singled out for selective prosecution; (10) trial court did not abuse its discretion in denying defendant's motion for post-trial discovery; (11) district court had authority to order psychiatric exam; (12) juror was properly struck for her views on capital punishment; (13) district court properly denied challenges for cause; (14) defendant was not prejudiced by improper substitution of alternate; (15) government proffered race-neutral explanations for peremptory challenges of black jurors; (16) trial court did not plainly err in its sua sponte finding that defendant was not mentally retarded; (17) death sentence was warranted; (18) Federal Death Penalty Act (FDPA) is constitutional; and (19) trial court did not commit plain error in failing to sua sponte suppress testimony of co-defendants.

Affirmed.

**Attorneys and Law Firms**

**\*317** Christopher Allen Curtis, Asst. U.S. Atty., Fort Worth, TX, Delonia Anita Watson, Dallas, TX, for Plaintiff–Appellee.

Allan K. Butcher, Larry M. Moore, Fort Worth, TX, for Defendant–Appellant.

Appeal from the United States District Court for the Northern District of Texas.

Before SMITH, DUHÉ and WIENER, Circuit Judges.

**Opinion**

JERRY E. SMITH, Circuit Judge:

Bruce Webster challenges his conviction of, and sentence for, kidnaping resulting in death, conspiring to kidnap, and using and carrying a firearm during a crime of violence. We affirm.

I.

The facts are the same as in the case of Webster's co-conspirator, Orlando Hall. *See United States v. Hall,* 152 F.3d 381 (5th Cir.1998). Webster, Hall, and Marvin Holloway ran a marihuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marihuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marihuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.

**\*318** On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, and Hall took a flight to Dallas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D. Hall), picked up Hall at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marihuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marihuana, but Vitalis and N. Rene never appeared.

When Hall got in touch with Vitalis and N. Rene by telephone, they claimed they had been robbed of the $4700. Using the

telephone number that Beckley had dialed to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas, from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car they had driven to the car wash, which they claimed was stolen from them along with the $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

On September 24, Hall contacted Holloway and had him drive Webster to the Little Rock airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac owned by Cassandra Ross, Hall's sister. Hall and Webster were armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. They approached the apartment from which they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door and knocked. The occupant, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and the police emergency phone number. After Webster unsuccessfully attempted to kick in the door, he and D. Hall looked through a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the door with the bat; Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving. Once there, they exited the Cadillac and forced Lisa Rene into the back seat of Beckley's car; Hall climbed into the back seat as well. With Beckley at the wheel and Webster in the front passenger seat, they drove around looking for a secluded spot. During the drive, Hall raped Lisa Rene and forced her to perform fellatio on him.

Unable to find a spot to their liking, they eventually returned to Ross's apartment. From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. En route to Pine Bluff, Webster and D. Hall took turns raping Lisa Rene. Once Beckley, D. Hall and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on the morning of September 25. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Webster and Hall went to Byrd Lake Park and dug a grave. That same evening, Webster, Hall, and Beckley took Lisa Rene to the park but could not find the grave site in the dark, so they returned to the motel room. In the early morning of September 26, Beckley and D. Hall moved Lisa Rene to another motel because they believed the security guard at the first motel was growing suspicious.

The same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. They covered her eyes with a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned   **\*319**   Lisa Rene's back toward the grave, placed a sheet over her head, and hit her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley hit her in the head twice with the shovel and handed it to Hall. Webster and Hall began taking turns hitting her with the shovel. Webster then gagged her and dragged her into the grave. He stripped her, covered her with gasoline, and shoveled dirt back into the grave. When buried, Lisa Rene, although unconscious, likely was still breathing. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

Based on information from the victim's brothers, D. Hall was arrested; Hall and Beckley subsequently surrendered to the police. On September 29, just after turning himself in, Beckley gave a confession to a police detective and an FBI agent in which he admitted to the kidnaping of Lisa Rene and implicated himself, Hall, and an individual known as "B–Love." Beckley stated that he had last seen Lisa Rene at the Pine Bluff Motel with B–Love. A security guard at the motel informed the agents and officers that Webster went by the name B–Love, and provided a description of Webster and his vehicle. When Webster pulled into the motel parking lot during the early morning of September 30, he was detained and subsequently arrested.

II.

In November 1994, a six-count superseding indictment charged Webster, Hall, D. Hall, Beckley, and Holloway with various offenses related to the kidnaping and murder of Lisa Rene. Specifically, the indictment charged Webster with kidnaping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count 1), conspiracy to commit kidnaping in violation of 18 U.S.C. § 1201(c) (count 2), traveling in interstate commerce with intent to promote extortion in violation of 18 U.S.C. § 1952 (count 5), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count 6). In February 1995, the government filed its notice of intent to seek the death penalty against Webster pursuant to § 3593(a) of the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. §§ 3591– 3598.

Webster's trial was severed from that of his co-defendants. The jury returned a verdict of guilty on counts 1, 2 and 6, and count five was dismissed on the government's motion. The court conducted a separate sentencing hearing before the same jury. *See* § 3593. After the penalty phase, the jury returned special findings that Webster satisfied the requisite elements of intent, *see* § 3591(a), and that three statutory and two non-statutory aggravating factors existed. [1] *See* § 3592. Varying numbers of jurors found nine mitigating factors. [2] *See* § 3592. **\*320** The court sentenced Webster to death on count one of the superseding indictment; life imprisonment on count two; and sixty months' imprisonment on count six to run consecutively to the sentence in count 2.

### III.

 Webster raises several grounds for reversing his conviction and/or sentence that we already have ruled on in *Hall:*

1. The district court violated Webster's Fifth and Eighth Amendment rights by conditioning the admission of psychiatric testimony in mitigation of punishment upon Webster's submission to a government psychiatric examination. [3]

2. The district court abused its discretion by admitting certain unfairly prejudicial materials into evidence, namely photographs and a videotape. [4]

3. The admission of evidence regarding unadjudicated offenses [5] during the penalty **\*321** phase and a lack of a jury instruction requiring the jury to apply some burden of proof to this evidence rendered the death sentence unreliable.

4. The admission of nontestimonial victim impact statements violated due process and the Eighth Amendment, Webster's Sixth Amendment right of confrontation, and the FDPA's evidentiary standards.
We addressed and rejected each of these arguments in *Hall,* which controls the outcome here. [6]

### IV.

Webster appeals his judgment of conviction and death sentence on the following grounds that we must address, as we did not consider them in *Hall:*

1. The court erroneously instructed and materially misdirected the jury in numerous ways at the penalty phase.

2. The court failed to instruct the jury accurately regarding on which non-monetary benefit(s) of the kidnapping the government relied and regarding the need for the jury to agree on such a benefit unanimously in order to convict in the guilt-innocence phase.

3. The court admitted the fruits of a search pursuant to, and statements given after, an arrest contravening the Fourth Amendment.

4. The court erred by refusing to dismiss the government's notice to seek the death penalty based on allegations of racial discrimination in death penalty charging decisions and by refusing Webster's request for discovery on that claim.

5. The court abused its discretion by refusing Webster's motion for post-trial discovery on a claim that the government had provided sexual favors to a prisoner-witness.

6. The court lacked authority to order Webster to undergo a government psychiatric exam as a condition to admitting psychiatric testimony in mitigation of punishment.

7. The court abused its discretion in granting the government's *Witt* challenge to a venireman.

8. The court's rejection of defense challenges for cause to impaired and biased veniremen denied Webster an impartial jury and his statutory right to free exercise of peremptory challenges.

9. The court erred in excusing a venireman whose juror questionnaire contained false information.

10. The court clearly erred in denying Webster's *Batson* claims.

11. The court erred by impaneling an alternate juror during the penalty phase who did not deliberate during the guilt-innocence phase.

12. The court violated Webster's constitutional rights and abused its discretion by limiting surrebuttal.

13. The court plainly erred and violated Webster's constitutional rights by entering a factual finding that he is not mentally retarded.

14. There is insufficient evidence to support the sentence of death.

15. Certain provisions of the FDPA are unconstitutional.

16. The court *sua sponte* should have suppressed the testimony of Webster's co-conspirators, who testified in exchange for leniency.

We address each of these issues in turn.

A.

Webster contends that the district court erroneously instructed and materially misdirected the jury at the penalty phase. District courts enjoy substantial latitude in formulating a jury charge, and hence we review **\*322** all challenges to, and refusals to give, jury instructions for abuse of discretion.[7]

 A conviction will not be reversed for an alleged error in the instructions unless, when viewed in their entirety, they fail correctly to state the law. *Jones,* 132 F.3d at 243; *United States v. Flores,* 63 F.3d 1342, 1374 (5th Cir.1995). Technical errors will be overlooked, and the court's instructions will

be affirmed, if the charge in its entirety presents the jury with a reasonably accurate picture of the law. *Jones, 132 F.3d at 243.* A refusal to give a requested instruction constitutes reversible error only if the proposed instruction (1) is substantially correct, (2) is not substantively covered in the jury charge, and (3) pertains to an important issue in the trial, such that failure to give it seriously impairs the presentation of an effective defense. *United States v. Garcia Abrego, 141 F.3d 142, 153 (5th Cir.),* *cert. denied,* 525 U.S. 878, 119 S.Ct. 182, 142 L.Ed.2d 148 (1998); *Jones, 132 F.3d at 242.*

1.

Webster argues that the court erred in refusing to instruct the jury that, in assessing the aggravating factors, it could consider only his intent and conduct and not the words or acts of any other codefendant or participant in the crime. The argument is without merit.

a.

Webster's reasoning hinges on *Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982),* and *Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).* He contends that these cases require a two-pronged focus in the decision-making process to impose a death sentence: the defendant's participation (conduct) and his intent (state of mind). It follows, Webster believes, that the court should have instructed the jury to consider only his conduct in assessing the aggravating factors.

b.

Webster misreads *Enmund* and *Tison.* In those cases, the Court addressed the degree of culpability required of a defendant to impose a death sentence under the felony-murder doctrine. The Court did require a certain level of culpable conduct and state of mind. *See Enmund, 458 U.S. at 801, 102 S.Ct. 3368; Tison, 481 U.S. at 158, 107 S.Ct. 1676.* But Webster takes the requirement too far.

The point of *Tison* and *Enmund* is that a death sentence may not be imposed unless the sentencer has examined

Case: 19-2683 Document: 13 Filed: 11/14/2019 Pages: 115

the defendant's "own personal involvement in the crimes." *Tison,* 481 U.S. at 158, 107 S.Ct. 1676. Enmund escaped capital punishment because he "did not kill or attempt to kill," nor did he have "any intention of participating in or facilitating a murder." *Enmund,* 458 U.S. at 798, 102 S.Ct. 3368. The Tisons, on the other hand, failed to obtain a reversal, because they were sufficiently involved in the crimes. See *Tison,* 481 U.S. at 158, 107 S.Ct. 1676.

The gist of these cases is that before a death sentence may be recommended, the Eighth Amendment requires that the defendant, for example, killed, inflicted serious bodily injury resulting in death, or participated in a felony with reckless disregard for human life resulting in death. The FDPA meets this requirement in § 3591, by limiting even the possibility of a death sentence to those defendants with sufficient culpability. The jury found Webster guilty of "engaging in conduct intending death to result or that lethal force would be used" and of "engaging in conduct knowing that it created grave risk of death."

Once the constitutionally-required minimum level of culpability is found, however, there is no reason why the jury cannot take a broader look at the crime in assessing the aggravating factors; it need not limit itself exclusively to the defendant's conduct or intent. Indeed, an aggravating factor properly may focus on the defendant, on the **\*323** circumstances of the crime itself, or on characteristics of the victim. [8]

### c.

Furthermore, one of the FDPA's aggravating factors requires a jury to examine a factor that has nothing to do with the defendant's conduct or intent—the victim's vulnerability. *See* § 3592(c)(11); *cf. Tuilaepa,* 512 U.S. at 977, 114 S.Ct. 2630. The government alleged that Lisa Rene's young age rendered her particularly vulnerable, hence constituting an aggravating factor. Because the factor has nothing to do with Webster's conduct or intent, his proffered general instruction would have incorrectly stated the law.

In addition, the charge as a whole substantially covered the proffered instruction and sufficiently pointed the jury to Webster's conduct and intent. The court instructed that "[i]n considering the question of intent, as it related to

aggravating factors, you may consider only the intent of the defendant, Bruce Carneil Webster." The aggravating factors, other than the victim vulnerability factor, all pointed to Webster's conduct. The instructions explaining the factors repeatedly referred to Webster's conduct and intent. [9] The non-statutory factor Webster specifically attacks, "the effect of the offense on Lisa Rene and her family," focuses on the harm caused by Webster's "commission of the offense." The court did not abuse its discretion in refusing this instruction; including it would have misstated the law.

### 2.

Webster objects to the instruction on the "elements of intent." He argues that the court failed to require the jury to select a single element of intent, and to do so unanimously. This failure allegedly allowed the jury impermissibly to "double-weigh" a single factor—intent—in imposing the death penalty, skewing the process toward capital punishment.

Although Webster rightly points out the risk of unconstitutionally arbitrary application of the death penalty if the jury is permitted to double-count aggravating factors, *see Jones,* 132 F.3d at 250–51, the court did not err in this regard. The instructions on the elements of intent properly followed the language of § 3591(a)(2). They stated that the jury's findings as to the "elements of intent" had to be unanimous. [10] If any doubt remained, the special findings form that the jury filled out prominently displayed the word "unanimously" before the "yes" and "no" lines to be checked for each of the four elements.

In addition, the instructions accurately charged that the jury was not to weigh the elements of intent in deciding whether to impose the death penalty. At least one of the elements of intent needs to be found only as a threshold, or gateway, matter; and only once at least one is found does the weighing of aggravating factors and mitigating factors take place—with no further consideration of the "elements of intent."

The instructions walked the jury through this sequential process. The court instructed the jury first to determine whether one of the requisite elements of intent existed. Then the instructions set forth the aggravating and mitigating factors.

The instructions nowhere indicated that the jury was to consider the elements of **\*324** intent once it began to weigh the aggravating and mitigating factors. In fact, the jury specifically was instructed to weigh aggravating and mitigating factors with no mention of the elements of intent. The special jury form also segregated the elements of intent from the lists of aggravating and mitigating factors, and made clear the sequential nature of the process.

Finally, the court specifically instructed the jury to consider and weigh only the aggravating and mitigating factors outlined in the instructions, which did not include the elements of intent. Assuming, as we must, that the jury followed its instructions, it did not weigh the elements of intent even once. The court did not abuse its discretion in denying the proffered instruction.

3.

a.

In a similar vein, Webster argues that two of the aggravating factors overlapped, allowing the jury to weigh the same factor twice. Specifically, one statutory factor read: "the defendant committed the offense in an especially heinous, cruel and depraved manner in that it involved torture and serious physical abuse to the victim, Lisa Rene." One non-statutory factor addressed "the effect of the offense on Lisa Rene and her family, namely, that the commission of the offense caused emotional injury and anguish to Lisa Rene, and emotional injury, anguish, sorrow, and loss to her family." Webster contends that these aggravating factors are duplicative because "there is no effective distinction between infliction of 'severe mental and physical pain or suffering upon the victim' (authorized by the court's instructions for a finding on the statutory aggravating factor) and the 'emotional injury and anguish to Lisa Rene' focused upon in the 'non-statutory' aggravating factor."

Webster points out that the charge allowed the jury to find that the statutory factor existed based on a finding of "torture," defined to include "mental as well as physical abuse" and the intent to "inflict severe mental or physical pain or suffering upon the victim," of which the victim must be conscious. Webster alleges that there is no distinction between the statutory factor's "severe mental or physical pain or suffering" and the non-statutory factor's "emotional injury and anguish."

b.

Webster failed to object to these instructions, so we review for plain error. *See* *Jones,* 132 F.3d at 243. The court did not err in instructing on both factors because, although they may rely on similar underlying facts, they focus on different aspects of the crime and its results.

The statutory factor directs the jury to consider whether Webster committed the offense in an especially heinous, cruel, and depraved manner, hence focusing attention on his actions and intent. The non-statutory victim impact factor, on the other hand, directs the jury's attention to the harm caused by Webster to the victim and her family. This factor looks not to his actions but to their result. Because one factor addresses directly Webster's conduct and intent (the "manner" of commission), and the other the impact of that conduct and intent, the two factors are not duplicative.

Webster's reliance on *Jones* proves unavailing. In *Jones,* we found two non-statutory aggravating factors duplicative. One addressed the victim's "young age, her slight stature, her background, and her unfamiliarity with [the locale where the crime took place]," and another dealt with the victim's "personal characteristics" and the impact of the crime. We held the factors duplicative because " 'personal characteristics' ... necessarily includes 'young age, slight stature, background, and unfamiliarity.' " *Id.* at 250.

But the difference between the challenged factors in the case *sub judice* proves to be more than semantic. The "heinous, cruel and depraved" manner in which a crime is carried out, even though the instructions require that the victim is conscious of the emotional abuse, does not necessarily include, nor even overlap with, consideration of the effects of the crime on the victim and her family. The court did not plainly err in providing both instructions.

**\*325** 4.

a.

Webster argues, and the government concedes, that, by allowing the jury to consider premeditation with respect to the kidnaping and not just the murder, the court improperly charged the jury on the statutory aggravating factor of whether

Webster engaged in "substantial planning and premeditation" of the offense. [11] The special findings form also contained language relating the premeditation to the kidnaping rather than to causing death. The statute requires a finding that "the defendant committed the offense after substantial planning and premeditation to cause the death of a person," § 3592(c)(9), obviously directing the premeditation to causing death and not to mere commission of the offense when the two diverge. The parties disagree, however, as to whether this constitutes reversible error. We find it does not.

### b.

The government argues that Webster invited the erroneous instruction and now should not be heard to complain. *See United States v. Baytank (Houston), Inc.,* 934 F.2d 599, 606 (5th Cir.1991). Although Webster's requested jury instruction properly focused on substantial planning and premeditation for the murder, the government points to his proposed changes to the special findings form in which Webster proposed the following language: "Beyond a reasonable doubt and looking only to the conduct and intentions of the defendant, Bruce Carneil Webster, he, Bruce Carneil Webster, committed the killing of Lisa Rene after substantial planning and premeditation to commit the kidnaping of Lisa Rene." The government surmises that the court adopted this language in formulating the instructions and special issue.

Although it is possible that Webster's misstatement influenced the instructions, Webster also proffered instructions correctly applying the substantial planning and premeditation to the killing rather than to the kidnaping. Given the inconstant way in which Webster addressed the issue, we cannot conclude he invited the error.

### c.

The error notwithstanding, we affirm the sentence. The FDPA provides that a "court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." § 3595(c)(2)(C).

Our duty when the jury finds an invalid aggravating factor is to strike the factor and either reweigh the remaining factors against the mitigating evidence or apply harmless error review. *See Jones,* 132 F.3d at 251; *see also Clemons v. Mississippi,* 494 U.S. 738, 741, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). If we choose to reweigh the evidence, we must determine what the jury would have done absent the invalid aggravator. *See Jones,* 132 F.3d at 251.

In conducting a harmless error review, on the other hand, we may inquire into whether, beyond a reasonable doubt, either (1) the death sentence would have been imposed had the invalid aggravating factor been properly defined in the jury instructions or (2) the death sentence would have been imposed absent the invalid aggravating factor. *See id.* at 252. If the government establishes that the error is harmless beyond a reasonable doubt, we may not reverse or vacate the death sentence unless such error denies constitutional rights. *See* § 3595. We may decide which of the three methods to apply, although "[i]t matters not which standard of review an appellate court chooses to apply because all three standards lead to the same conclusion." *Jones,* 132 F.3d at 252.

**\*326** The parties expend a great deal of effort arguing whether the jury would have found the factor had it been accurately stated. The effort is wasted, however, because the sentence may be affirmed without that aggravating factor. We opt to apply the second method of harmless error review, and inquire into whether the sentence would have been imposed absent the invalid aggravator. [12]

After removing the offensive statutory aggravating factor, we are left with two statutory factors (that Webster committed the offense in an especially heinous, cruel, or depraved manner, and that Lisa Rene was vulnerable), two non-statutory aggravating factors (Webster's future danger to others, and the effect of the crime on Lisa Rene's family), and nine mitigating factors found to exist by varying numbers of jurors. The government contends, and we agree, that the facts supporting the "especially heinous, cruel or depraved" factor alone, when weighed against the extant mitigating factors, justify a finding that the jury still would have imposed a death sentence. The addition of the other three factors merely buttresses the conclusion. [13]

Furthermore, we fail to see why the jury would have placed much emphasis on the invalid factor as it was improperly defined and charged. The import of substantial planning and premeditation to commit the offense of kidnaping pales in comparison to the brutal nature of Webster's actions and the suffering Lisa Rene must have felt as a result, so we do not think the jury would have placed significant weight on the invalid factor relative to the others.

Finally, the paltry mitigating factors that the jury found fail to indicate that it placed much weight on countervailing factors. No juror found that Webster had talents, capabilities, or qualities of some value to society or that he could be of some productive value in a prison setting. Only two jurors believed that he even could be controlled in a prison setting, and only two found he likely would adapt to prison. The jury found only one factor unanimously: Webster suffered from physical or emotional abuse or parental neglect during his upbringing; and yet no juror believed that this abuse caused significant impairment of Webster's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. The government has proven beyond a reasonable doubt that the jury would have imposed the death sentence absent the invalid aggravating factor, so its inclusion was harmless error. [14]

5.

Webster contends that the court erred when it refused to submit several nonstatutory mitigating factors. [15] Just this past Term, however, in *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998), the Court squarely held that, although "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence," a death penalty scheme "may shape and structure the jury's consideration of mitigation so long as it does not preclude **\*327** the jury from giving effect to any relevant mitigating evidence." The Court further explained that its "decisions suggest complete jury discretion is constitutionally permissible." *Id.*

The standard for reviewing jury instructions on mitigation is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* (quotation and citation omitted). Indeed, in *Buchanan,*

refusing to submit four *statutory* mitigating factors during the penalty phase of the capital trial fell short of constitutional error.

Many of the mitigating factors presented to the jury touched on the ones Webster complains were omitted. To ensure that the jury considered all potentially mitigating evidence, the special findings form included a catch-all mitigation factor. The charge specifically instructed the jury that it "must consider" any other mitigating factors it found, "whether or not specifically argued by defense counsel."

The instructions left no room for the jury to ignore constitutionally relevant evidence. The court neither committed constitutional error nor abused its discretion in rejecting the mitigating factors.

6.

Webster avers that the instructions misstated the law by not requiring, once one or more jurors had found a mitigating factor to exist by a preponderance of the evidence, that all jurors consider a mitigating factor in weighing aggravating and mitigating factors. [16] Webster misreads the statute; although any one juror may find and weigh a mitigating factor, the others may make their own determinations with respect to each mitigator.

Webster relies on § 3593(e), which reads, in part, "the jury ... shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." Webster reads this provision to say that once any juror finds a mitigating factor, *all* jurors *must* weigh the factor. But the quoted language does not require Webster's reading; the provision lacks any modifier indicating who must find or weigh the mitigating factor(s).

Reading the section as a whole, we conclude that Congress did not intend Webster's reading. The prior subpart states that "[a] finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for the purposes of this section regardless of the number of jurors who concur that the factor has been established." § 3593(d). Reading the two sections *in pari materia,* we reason that the language does not contemplate

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

forcing all jurors to consider a mitigator when any one or more finds it to exist. Rather, each juror may consider a factor regardless of whether others concur. In addition, it would be nonsensical for Congress to require a juror to weigh a factor that he or she does not believe the evidence warrants.

Webster, in an apparent attempt to avoid this last problem, argues that "[o]nce a mitigating factor has been established, then the sentencer *must* consider it, even though it may be assigned whatever weight it is deemed to deserve." But, naturally, those jurors who did not find the mitigating factor to exist would assign it no weight, which does not differ from the result Webster hopes to avoid, i.e., not requiring them to consider it at all. Because the plain language of the statute does not compel every juror to weigh each mitigating factor found by at least one **\*328** juror, the court did not abuse its discretion in denying the instruction that would have required it.

### B.

### 1.

The indictment alleged, *inter alia,* that Webster and others violated 18 U.S.C. § 1201(a), proscribing kidnaping. Pursuant to that indictment, the court charged the jury that to convict, it had to find beyond a reasonable doubt the element "[t]hat the defendant held such person for ransom, reward, or some other benefit that the defendant intended to derive from the kidnapping." The court further charged that "a benefit is any legal or illegal object of the kidnaping which a perpetrator might consider sufficient motive to induce him to undertake the kidnaping. The government has the burden of proving whatever benefit alleged by proof beyond a reasonable doubt."

Webster objects to this instruction on the ground that, because the indictment failed to allege any specific benefit other than ransom or reward, the jury should not be able to consider any other benefit, and because the instruction fails to require unanimity on the benefit found. The government responds that the benefit is not a specific element of the crime, so it need not allege one in the indictment, nor does one need to be specified in the jury instructions; furthermore, unanimity is not required.

### 2.

We review alleged errors in jury instructions for abuse of discretion; a conviction will not be reversed for an alleged error in the instructions unless, when viewed in their entirety, they failed to state the law correctly. *Jones,* 132 F.3d at 243. These instructions did not fail to state the law correctly.

### a.

The parties agree that the kidnaping statute protects those who have been kidnaped and held for any reason. Before 1934, the Federal Kidnaping Act applied only if the captive was held for ransom or reward. *See United States v. Healy,* 376 U.S. 75, 81, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964). Congress amended the Act in 1934 to encompass persons held "for ransom or reward or otherwise." *Id.* In *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 80 L.Ed. 522 (1936), the Court interpreted the "or otherwise" amendment to encompass any benefit a captor might attempt to receive. Subsequently, in *Healy,* the Court held the Act is not limited to kidnapings for an ultimately illegal purpose.[17]

Consistent with the Court's pronouncements, this court held in *Clinton v. United States,* 260 F.2d 824, 825 (5th Cir.1958), that an indictment need not include the words "for ransom, reward or otherwise." The panel reasoned that the phrase would add nothing "because obviously 'otherwise' comprehends any purpose at all." *Id.*

Webster asserts that we overruled *Clinton* in *United States v. Osborne,* 68 F.3d 94 (5th Cir.1995). In *Osborne,* we held that the government must prove four elements of the kidnaping offense: "1) the transportation in interstate commerce; 2) of an unconsenting person who is 3) held for ransom, reward, or otherwise; and 4) the acts were done knowingly and willingly." *Id.* at 100. According to Webster, the third element requires the government to plead in the indictment and prove up at trial, and the court to instruct the jury on, some specific purpose(s) for the kidnaping.

*Osborne* does not compel this conclusion. We certainly did not purport to overrule *Clinton* 's holding that the indictment need not include a benefit; the issue was not before us in *Osborne.* And nothing in *Osborne* contravenes *Clinton.*

More accurately, the gravamen of the third element is the act of holding, not the benefit. If "otherwise" can include any purpose, adding it to the indictment—irrespective of whether it specifies the "otherwise" benefit—adds nothing. **\*329** This view consists with that of our sister circuits. [18]

#### b.

Webster points out that in many of the above-mentioned cases, including *Clinton,* one reason the court gave for finding the lack of specificity unproblematic is that the defendant can request a bill of particulars to clarify on what benefit the government will rely. Webster made such a request, which the court denied; he complains that this prevented him from presenting an effective defense. We fail to see how.

Although the government must plead and prove that the defendant held the victim for some purpose, the exact nature of that purpose is inconsequential. Indeed, as noted, any purpose will do. In arguments to the jury, the government mentioned several possible benefits, including retribution and revenge, sexual gratification, greed, and that Lisa Rene knew too much; all are valid benefits. In light of this breadth, Webster's claim that the failure to specify a benefit in the indictment or jury instructions denied him a defense is vapid.

If any benefit will do, the only possible defense is that the defendant obtained absolutely no benefit at all—and no pleading or jury instruction is needed to prepare the defendant for this defense. Accordingly, we decline to require specificity in the factual basis of the benefit. [19]

#### c.

The only circumstance under which a jury might need to be instructed on specific potential benefits is if the jurors must agree unanimously on what benefit the defendant derived; if that is the case, failure to instruct on particular benefits (as well as the failure to instruct on the required unanimity, of course) might constitute reversible error. On the other hand, if unanimity is not required, an instruction on specific benefits proves pointless, because each juror can pick a benefit from among the facts presented at trial.

The question, then, should be framed as follows: If some jurors believed that Webster held Lisa Rene for one purpose,

e.g., sexual gratification, and others believe for another benefit, e.g., revenge for a drug deal gone bad, does that disagreement, that lack of unanimity, evidence a reasonable doubt that Webster held Lisa Rene for some benefit? The inquiry is governed by *United States v. Correa–Ventura,* 6 F.3d 1070 (5th Cir.1993).

In *Correa–Ventura,* we analyzed whether a jury needed to reach unanimous consensus on which of several weapons seized from the defendant's apartment had been used in the commission of a drug trafficking offense. In the process of holding factual unanimity was not required, we explicated the case-by-case analysis we must follow here. *See id.* at 1081.

As we explained, the unanimity rule ensures that the jury has found guilt beyond reasonable doubt, and disagreement as to critical facts may reflect such doubt. *Id.* at 1078. But not all facts require unanimity. To determine which ones do, we examine "[s]tatutory language and construction, legislative intent, historical treatment of the crime by the courts, duplicity concerns with respect to defining the offense, and the likelihood of jury confusion in light of the specific facts presented." *Id.* at 1082. After considering these factors, we conclude that the jury need not concur on the benefit the defendant derived from holding the kidnaping victim.

**\*330** Looking at the language of the element, we see that the *actus reus* proscribed is the "holding" of a victim. The benefit, "for ransom, reward, or otherwise," merely adds purpose to the act of holding. Looking to the offense as a whole, we see that the essential elements, stripped to the bones, are transporting and holding against consent with a *mens rea.* The "interstate commerce" serves as a mere jurisdictional hook, and the benefit language simply provides guidance to a jury in understanding the crime—why the defendant may have committed the offense. The essence of kidnaping is a non-consensual transporting and holding, done wilfully or knowingly; the language in no way implies that the benefit serves an important function in singling out the guilty from the innocent or in deterring future conduct.

The history of the offense also points to the insubstantial role of the benefit. The Supreme Court has admonished that Congress added the "or otherwise" language because "ransom or reward" proved too narrow; Congress desired to expand the statute by eliminating the limiting effect that the phrase had. *See Gooch,* 297 U.S. at 128, 56 S.Ct. 395; *Healy,* 376 U.S. at 81–82, 84 S.Ct. 553. We should not circumscribe

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

the statute's reach, once again giving the phrase a narrowing function, by requiring factual concurrence among the jurors.

Interpretive caselaw and the issue of duplicative convictions also support rejecting a unanimity requirement. As cited above, we and our sister circuits always have emphasized the breadth of the benefit phrase. We are aware of no case in which a court has limited the kidnaping offense through the benefit requirement.

In addition, concerns regarding duplicative convictions have not arisen. Webster does not argue that a lack of concurrence on the factual predicate of a benefit risks duplicative convictions for a single act of holding and transporting. We know of no case in which a defendant was convicted of or even charged with multiple kidnaping offenses of the same victim because it was done for more than one benefit.

Finally, the circumstances of the instant case do not justify vacating the sentence and requiring unanimity on the benefit. Several benefits were argued to the jury. There was sufficient evidence from which a juror could find that Webster was motivated by the lure of those benefits. Indeed, if unanimity had been required, it is likely that the jury unanimously would have found several benefits garnered by Webster, including revenge and sexual gratification. The court provided a general unanimity instruction, focusing the jury's attention on the need to agree on the essential elements of the crime. Unanimity on the factual basis of the benefit is not required, and the court did not abuse its discretion in refusing Webster's instruction. [20]

### C.

Webster contends that his arrest was unconstitutional and that the fruits obtained from it should have been suppressed. More specifically, he argues that the court erred by failing to suppress the fruits of the search of Webster and his automobile following his arrest, that any purported consent given by him was nullified by the illegality of the arrest, and that the court erred by failing to suppress his statements following his arrest. It readily becomes apparent that Webster's arguments hinge on his view that the arrest was unconstitutional. Because we find both this arrest and subsequent police conduct fully constitutional, the court properly admitted the fruits of the search and the subsequent statements.

### 1.

The issues of probable cause and reasonable suspicion, which, in this case, control the constitutionality of Webster's arrest, are mixed questions of law and fact. *See* **\*331** *United States v. Tompkins,* 130 F.3d 117, 120 (5th Cir.1997), *cert. denied,* 523 U.S. 1036, 118 S.Ct. 1335, 140 L.Ed.2d 495 (1998). So, we review the historical facts for clear error and ultimate legal determinations *de novo. Id.* Because Webster does not challenge the findings of fact, our review is limited to a *de novo* review of the legal conclusions.

### 2.

The Fourth Amendment requires that all arrests be based on probable cause. *See* U.S. CONST. amend. IV; *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Gerstein,* 420 U.S. at 111, 95 S.Ct. 854 (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)) (alteration in original). Based on this standard, the police had probable cause to arrest Webster.

The day before the arrest, police took a written statement from Beckley, Webster's partner-in-crime. This inculpatory statement suggested Webster's criminal involvement in the kidnaping (and ultimate murder) of Lisa Rene. Such statements taken from an accomplice give rise to probable cause to arrest those so implicated. *United States v. Barfield,* 507 F.2d 53, 58 (5th Cir.1975).

Matters admittedly are complicated by the fact that, although the police had probable cause to arrest Webster following Beckley's statements, they did not know exactly who Webster was. That is, the issue of identification comes into play, as the police must have had probable cause to believe that the man whom they arrested was indeed Webster. Based on the totality of the circumstances, we find that such probable cause existed.

Beckley identified Webster as "B–Love" and described him as "a black dude about 20 years old, about 5′9″, 150–160 pounds, black low cut hair, brown skinned." Beckley explained how he and B–Love were involved in the sale of marihuana and

how the kidnaping of Lisa Rene arose from Beckley and Webster's drug transactions.

Beckley told the police that he and B–Love took Lisa Rene to a cheap motel, tying her to a chair in a room that ended in the digits "13." Beckley led Detective Ford and FBI Special Agent Floyd to this motel, called the Pine Bluff Motel. He took them to room 513, which he identified as the room in which he and B–Love had taken Rene. Floyd interviewed the hotel manager, obtaining a receipt for room 513 in the name of Bruce Webster.

FBI Special Agent Mason and Agent McCall were assigned to assist Ford and Floyd by going to the motel to help gather evidence. They were told to be on the lookout for "B–Love," who had kidnaped Lisa Rene and kept her in room 513. Mason and McCall questioned a security guard about the guests of room 513 and were told that a local man named Bruce Webster had stayed in that room, along with three other black men, on the dates in question. The guard added that Webster went by the nickname of "B–Love" and described him as "a black male, approximately 5′8″ tall and 150 pounds," seen wearing a black leather cap and driving an older American, dark blue, square-looking sedan. The guard also told the agents that Webster was a drug dealer.

Later that day, the agents observed a black man driving an older American, dark blue, square-looking car and wearing a black leather cap; a woman was in the passenger seat. The agents signaled the suspect to stop; in response, the suspect sped up, apparently attempting to flee. The agents pursued, and when one of them shouted "B–Love, this is the F.B.I. Stop where you are and put your hands up," the driver stopped. The driver was, of course, Webster, also known as B–Love. At that point, the police placed Webster on the ground and handcuffed him.

The agents had probable cause to arrest Webster for kidnaping. Although they did not have personal knowledge of his specific wrongdoings, they are permitted to act on the probable cause determination of others in their department. See *Charles v. Smith,* 894 F.2d 718, 724 (5th Cir.1990).

**\*332**    The security guard's description of B–Love was sufficiently detailed and accurate to provide the police with probable cause to believe that the man they were arresting was B–Love.[21] The reliability (in terms of veracity) of the guard,

as a disinterested witness, is presumed. See *United States v. Hernandez,* 825 F.2d 846, 849 (5th Cir.1987).

Moreover, "the sufficiency of a particular description is largely a factual matter," so we give greater deference to the district court's finding of probable cause under these circumstances. See *Pollack,* 739 F.2d at 190. And in doing so, we must recall that "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment."[22]

3.

Even if the police initially lacked probable cause to arrest Webster, they most certainly had reasonable suspicion to stop him. See *Terry v. Ohio,* 392 U.S. 1, 22–24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Watson,* 953 F.2d 895, 897 (5th Cir.1992). Their actions following this legitimate stop were likewise constitutional, so all the evidence and statements gathered from Webster are admissible.

Reasonable suspicion is a standard lower than probable cause. *Terry,* 392 U.S. at 16–22, 88 S.Ct. 1868; *Watson,* 953 F.2d at 897 n. 1. Reasonable suspicion sufficient to justify a *Terry* stop exists when law enforcement officials are able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. The matching description of Webster, taken together with the guard's identification of him as a drug dealer and his presence at the motel, satisfy this test of reasonable suspicion.

After stopping Webster, the police were within their constitutional authority to pat him down for their personal safety. *Terry,* 392 U.S. at 27–28, 88 S.Ct. 1868; *United States v. Michelletti,* 13 F.3d 838, 840–41 (5th Cir.1994) (en banc). They also were within their authority to handcuff Webster, even if probable cause to arrest him was lacking. See *United States v. Sanders,* 994 F.2d 200, 205–07 (5th Cir.1993).

In addition, the police acted constitutionally when they asked Webster whether he had any needles in his pockets that could injure them during their pat down; such questioning, needed

to protect the officers, does not constitute interrogation under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Accordingly, Webster's response, indicating that he had marihuana in his pocket, was not obtained in violation of *Miranda* and was fully admissible.

Webster's admission that he possessed marihuana gave the police probable cause to arrest him, at the very least for narcotics possession. This renders unproblematic the lengthy (1 ½–hour) detention of which Webster complains.

Lengthy detentions following *Terry* stops are often problematic, because they serve to escalate an investigatory stop, which can be initiated with only reasonable suspicion, into an arrest, which requires probable cause.[23] In this case, however, the officers' **\*333** reasonable suspicion developed into probable cause when Webster indicated that he possessed drugs, and when the police uncovered the key to room 513 on his person. Consequently, the conversion of Webster's investigatory stop into an arrest is both proper and to be expected. *Adams,* 407 U.S. at 148–49, 92 S.Ct. 1921. The search of Webster's person was in order as a valid search incident to a valid arrest. *United States v. Edwards,* 415 U.S. 800, 802, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

Next, the police searched Webster's car, revealing two guns and other incriminating items. There are two valid, independent justifications for this police action, although only one is needed to affirm.

First, as the search of Webster's person revealed a key to room 513, police now had undisputable probable cause to arrest for the kidnaping. Therefore, it was reasonable for the police thoroughly to search Webster's car for evidence of the kidnaping. *See California v. Acevedo,* 500 U.S. 565, 579–80, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

Second, Webster orally consented to this search. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 235, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Such consent operates as a waiver of Fourth Amendment rights if, by a preponderance of the evidence, it is found to have been given voluntarily under the totality of the circumstances. *See id.* at 235–40, 93 S.Ct. 2041; *United States v. Cooper,* 43 F.3d 140, 144 (5th Cir.1995). Factors to consider in making this determination are the coerciveness of police procedures, the extent of the defendant's cooperation, his awareness of his right to refuse consent, his education and intelligence, and his belief as to whether incriminating evidence will be found. *Cooper,* 43 F.3d at 144.

Webster's experience in police procedure, resulting from his lengthy criminal record, belies the assertion that he was unaware of his rights or uneducated as to the situation he faced. And the fact that the police asked him not once but twice for permission to search his automobile (the second time being when they came to the trunk of the car) undercuts the argument that the police were coercive in their request. Under these facts, Webster's consent was freely given.

## D.

Webster argues that the court erred by denying his motion to dismiss the government's notice to seek the death penalty based on racial discrimination in the charging decision and by denying his discovery request on this issue. To support the motion to dismiss, Webster offered an affidavit showing that 66% of federal death penalty cases involved black defendants. The court denied both the motion to dismiss and the motion for discovery and an evidentiary hearing, noting that Webster had failed to make out the requisite *prima facie* case that he had been singled out for prosecution but others similarly situated were not prosecuted.

### 1.

We review constitutional claims *de novo. See United States v. Estrada–Trochez,* 66 F.3d 733, 735 (5th Cir.1995). A district court's decisions in overseeing criminal discovery, however, receive great deference on appeal. Alleged errors are subject to review for abuse of discretion, and we reverse only if a defendant establishes prejudice to substantial rights. *United States v. Mora,* 994 F.2d 1129, 1138 (5th Cir.1993).

### 2.

#### a.

Case: 19-2683     Document: 13     Filed: 11/14/2019     Pages: 115

The decision to prosecute one person and not another is a proper exercise of executive discretion with which we are reticent to interfere. *United States v. Hoover,* 727 F.2d 387, 389 (5th Cir.1984). To establish that the government has engaged in unconstitutionally discriminatory selective prosecution, a defendant must make a two-pronged showing.

First, he needs to make out a *prima facie* showing that he has been singled out for prosecution but others similarly situated of a **\*334** different race were not prosecuted. *See United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *United States v. Sparks,* 2 F.3d 574, 580 (5th Cir.1993); *Hoover,* 727 F.2d at 389. In *Armstrong,* the Court stated, "The vast majority of Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not, and this requirement is consistent with our equal protection case law." *Armstrong,* 517 U.S. at 469, 116 S.Ct. 1480. Second, he must demonstrate that the discriminatory selection of him for prosecution is invidious or in bad faith, in that it rests on such impermissible considerations as race, religion, or the desire to prevent his exercise of his constitutional rights. *See Sparks,* 2 F.3d at 580; *Hoover,* 727 F.2d at 389.

In making these requisite showings, the defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner. *Hoover,* 727 F.2d at 389. To dispel the presumption of prosecutorial good faith, "a criminal defendant must present 'clear evidence to the contrary.' " *Id.* at 465, 116 S.Ct. 1480 (quoting *United States v. Chemical Found., Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)).

A defendant is not automatically entitled to an evidentiary hearing to make the required showing. He must first present facts "sufficient to create a reasonable doubt about the constitutionality of [his] prosecution" resulting from selective prosecution. [24] Mere statistical evidence of racial disparity usually will be *per se* insufficient to support an inference of any "unacceptable risk" of racial discrimination in the administration of capital punishment. *McCleskey v. Kemp,* 481 U.S. 279, 294–97, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

b.

Webster has failed to make a sufficient showing that he was singled out for selective prosecution. He has not even attempted to show that other similarly situated individuals committing similar acts were not prosecuted. Such a showing would be challenging under the FDPA, as no one yet had been prosecuted under that Act when Webster was indicted. But Webster also did not attempt to make the showing under other federal death penalty acts.

Webster relies primarily on his statistical evidence, which under *McCleskey* fails to rebut the good faith presumption. Webster cites *McCleskey,* 481 U.S. at 293 n. 12, 107 S.Ct. 1756, which may allow finding a constitutional violation (or *prima facie* finding thereof) in very limited circumstances if the data presents a "stark" enough picture. But the 66% figure Webster provides is no more stark than were the statistics in the Baldus Study at issue in *McCleskey.* [25]

Webster also argues that counsel would have shown that they had requested that the Department of Justice consider this racial disproportionality as a factor mitigating against authorization of the death penalty in this case, and the government refused because of "the purported 'race neutrality' required by DOJ policies in capital charging decisions." Likewise, Webster contends that "failure of the Government to 'affirmatively act' to overcome such racially discriminatory application" of the death penalty "amounted to purposeful discrimination." This, however, fails to establish the discriminatory purpose required under the second prong of the selective prosecution test.

**\*335** Discriminatory purpose "implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 291, 107 S.Ct. 1756 (quotation omitted). The above evidence, at best, shows action in spite of a putatively adverse discriminatory effect and not purposeful discrimination.

Furthermore, a non-discriminatory explanation for seeking the death penalty against Webster is evident on the facts: It is justified by the objective circumstances of the crime and the sufficiency and availability of evidence to prove the required elements under the law. These are the precise

considerations the Supreme Court identified as proper and legitimate grounds for such a decision. *See* *id.* at 307 n. 28, 107 S.Ct. 1756. The verdict attests to the objective considerations, and Webster has made no effort to rebut them.

3.

Webster's attempt to obtain discovery on the issue stands on equally faulty ground. In *Armstrong,* the Court addressed the issue of the showing necessary to obtain discovery on a claim of selective prosecution based on racial discrimination. The Court first quickly disposed of any claim for discovery under FED.R.CRIM.P. 16, stating, "We hold that Rule 16(a)(1)(C) authorizes the defendants to examine Government documents material to the preparation of their defense against the Government's case-in-chief, but not to the preparation of selective-prosecution claims." *Armstrong,* 517 U.S. at 463, 116 S.Ct. 1480.

Webster contends that a defendant "necessarily has a lesser burden when seeking discovery to aid in proving the elements of a prima facie case of selective prosecution." The Court, however, held squarely against Webster's assertion, stating, "The justification for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* at 468, 116 S.Ct. 1480.

Finally, Webster argues that he requested the discovery also to establish mitigating evidence that a death sentence would propagate a racially discriminatory application of the federal death penalty. Webster makes no argument other than that a defendant is entitled to present any mitigating evidence, which he was denied by denial of the discovery request.

The government aptly responds that the *Armstrong* discovery rule for selective prosecution applies, requiring a *prima facie* showing. Any other rule would allow circumvention of *Armstrong*'s requirements.

Furthermore, the Court in *Armstrong* justified its high standard for discovery in selective prosecution claims, explaining:

> Judicial deference to the decisions of [prosecutors] rests in part on an

assessment of the relative competence of prosecutors and the courts. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis courts are competent to undertake. It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Governments enforcement policy.

517 U.S. at 465, 116 S.Ct. 1480 (citations and quotations omitted). The competency concerns apply a *fortiori* when lay jurors are asked to analyze prosecutorial decisions.

In addition, Webster had the statistical evidence regarding the allegedly discriminatory manner in which the modern federal death penalty has been applied and yet chose not to attempt to introduce it during the sentencing hearings; this may indicate his lack of confidence in this evidence's mitigating value.

**\*336** E.

Webster contends that the district court erred in denying his motion for post-trial discovery on the issue of whether one of the case's lead law enforcement investigators, Special Agent Floyd, had "purchased" the testimony of a prosecution witness, John Clay, by allowing a conjugal visit at a private residence in violation of agency guidelines. Webster argues that if discovery had verified this claim, it would have impeached the testimony of Clay and Floyd, thus constituting grounds for a new trial.

### 1.

We review discovery rulings for abuse of discretion. *United States v. Dukes,* 139 F.3d 469, 476 (5th Cir.), *cert. denied,* 525 U.S. 894, 119 S.Ct. 215, 142 L.Ed.2d 177 (1998); *United States v. Johnston,* 127 F.3d 380, 391 (5th Cir.1997), *cert. denied,* 522 U.S. 1152, 118 S.Ct. 1174, 140 L.Ed.2d 183 (1998). We will order a new trial based on discovery violations only where the party demonstrates prejudice to his substantial rights. *Dukes,* 139 F.3d at 476. To prevail, then, Webster must establish that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.... [A] reasonable probability is shown where the nondisclosure 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury verdict.' " *United States v. Fisher,* 106 F.3d 622, 634 (5th Cir.1997) (quoting *Westley v. Johnson,* 83 F.3d 714, 725 (5th Cir.1996), *cert. denied,* 519 U.S. 1094, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997)).

### 2.

The government introduced testimony from Clay during the rebuttal portion of the penalty phase. Clay, who had charges pending against him for drug dealing that included the possibility of a life sentence, was taken to the holdover cell on the second floor of the federal courthouse. When he arrived from the Mansfield Correctional Enforcement Center, Webster was present in the holdover cell. Webster then left and came back and began jumping around, saying that "there has got to be a God" because his trial had been set to a later day. Clay testified that Webster also preached a thirty-minute sermon, "quot[ing] scriptures out of the Bible that has to be photographic in his mind because it was so accurate." Clay and Webster conversed in "pig latin" after Webster started using it. Clay demonstrated pig latin for the jury.

Webster then told Clay about a "master mind plan" to arrange for each of them to have sexual contact with a female inmate by manipulating the visiting process. Before the two men were taken back to Mansfield, Webster told Clay that he would write a letter to him in pig latin to explain the plan. Webster in fact sent such a letter to Clay—the letter was introduced into evidence, with the defense stipulation that

Webster had authored it. With the prosecutor reading the letter, Clay interpreted some of the slang used.

Clay also testified that he was cooperating with the government in hopes of a sentence reduction. Counsel for Webster questioned Clay about his criminal background and his current charges, and attempted to impeach Clay by implying that he was angry with Webster because Webster allegedly had written a letter to Clay's girlfriend, who also was a prisoner at the Mansfield Correctional Center.

Floyd testified during the penalty phase regarding oral statements Webster made while in custody. The statements included that killing Lisa Rene was "just business." [26]

Approximately two months after trial and two days after filing a motion for new trial, Webster filed an addendum to his motion for new trial, setting forth an allegation from a local newscast that Floyd had permitted Clay to engage in a conjugal visit with Clay's girlfriend after Floyd had taken Clay from **\*337** the detention center for an unrelated investigation. Webster alleged that this "reward" to Clay should have been reported to the defense pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Webster asked the court to order the government to disclose any information that reasonably could be obtained regarding inducements given by Floyd to Clay and, specifically, that the government be ordered to disclose the results of any investigation relating to the matter. The government already had volunteered to provide the requested information to Webster, subject to confidentiality limitations.

In its response to the motion for new trial, the government reaffirmed its continuing obligation and intention to disclose any mitigating or impeaching evidence. The government further noted that it would work with Webster's counsel to help them secure affidavits that had been filed in other cases in connection with the allegations. Webster then filed a motion in which he requested the court to

> order the attorneys for the government to produce and hand over to the defense counsel all information associated with the activities of Special Agent Garrett Floyd of the Federal Bureau of Investigation that are related to the granting

of inducements, favors, privileges, rewards, concessions or anything of value to any witness directly or indirectly associated with this instant case. This order should extend as well to any other case which is, or may be, a part of a systematic action on the part of Agent Floyd or other government actors to grant favors to witnesses in return for their testimony.

Counsel for Webster acknowledged that he had received copies of the affidavits used in other cases involving the same allegation and that defense investigators were looking into other possible sources of information.

In response to the motion for post-trial discovery, the government noted that the district court having jurisdiction over the cases in which this allegation had been made had determined that Floyd was unaware that Clay had had sexual contact while in Floyd's custody and that a new trial was not warranted. The government asked the court to deny Webster's post-trial motion because the motion was too broad, and again reiterated its continuing discovery obligation.

The court denied Webster's motion, stating that even

> assuming that all of the facts asserted in [Webster's] motion and the addendum are true—that the Federal Bureau of Investigation Special Agent assigned with primary responsibility for investigating this case took federal prisoner John Clay from his detention facility, transported him to the home of a female friend, and knowingly allowed Clay and the female to engage in sexual activities, all in exchange for Clay's testimony in this cause, and the prosecutor knowingly withheld this information from Defendant,

the evidence was not material. Citing 🚩 *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481

(1985), the court found that even if this information had been disclosed before trial, the result would have been the same.

### 3.

The court did not abuse its discretion in denying the motion for post-trial discovery. Even assuming the allegations are true, they fail to undermine confidence in the verdict. Clay was only one of many government witnesses who testified to rebut Webster's claim of mental retardation, including school teachers, counselors, principals, employers, and detention center personnel. Much of Clay's testimony focused on the letter written by Webster's own hand that set forth the "plan" for a sexual rendezvous with female inmates. It is evident from the record that Webster concocted the elaborate scheme to manipulate the detention center's visitation system and sought Clay's assistance. Clay's other testimony could be redacted, and there would still be ample evidence to support the jury's findings regarding Webster's mental abilities.

Furthermore, Clay admitted that he had testified in hopes of a reduced sentence, and the defense impeached his testimony with the allegation that Clay held a grudge against Webster. Further impeachment via the possible *quid pro quo* of sex for testimony likely **\*338** would not have affected more than marginally the weight the jury gave to Clay's testimony.

With respect to Floyd's testimony, he too was only one of many witnesses who testified regarding Webster's future dangerousness. Other witnesses included Special Agent William Eppright, who testified that, on an occasion separate from the one testified to by Floyd, Webster said killing Lisa Rene was "strictly business." Mohamed Ghene testified regarding Webster's attempted robbery of his clothing store and the shots Webster fired at him from across the street. Tlisha Booth presented testimony pertaining to a shoving match over a piece of candy. Sylvia Henry, corroborated by a security guard and Booth, testified that Webster had assaulted her at a nightclub. Pine Bluff Police Department Officer Lance Lawhorn testified that, while he was transporting Webster, Webster stated that if he was not in custody he would "kill the bitch" who gave him a venereal disease. Even if Floyd's testimony regarding Webster's oral statements were redacted, the record provides ample evidence of future dangerousness.

Moreover, any damage to Floyd's credibility caused by these allegations would be mitigated by the finding of the district

court with jurisdiction over the cases where the allegations were initially made that Floyd was unaware that Clay had any sexual contact while in his custody and that a new trial was not warranted. There is no reasonable probability that the verdict would have been different had the jury known of the alleged Floyd–Clay incident, so the court did not abuse its discretion in denying discovery.

F.

Webster argues the district court lacked a statutory or constitutional (Fifth Amendment) basis to compel him to submit to a mental health exam by a government expert as a prerequisite to introducing his own expert psychiatric testimony. We find no error.

1.

Although compelling Webster to a government psychiatric exam, the court also granted, in part, Webster's motion to limit the scope of the exam. Specifically, the court barred examination of Webster's future dangerousness. The government's witness, Dr. George Parker, however, testified that he found that Webster's incarceration would lead to "a potentially very dangerous situation." Webster argues this aspect of the testimony constitutes a Fifth Amendment violation.

Webster's argument falls well short of reversible error. First, he mischaracterizes the record. There is no evidence that any government expert was asked to [27] or did conduct an examination of Webster with regard to his future dangerousness. The reports of Dr. Coons and Dr. Parker state that they had sufficient data to assess Webster's future dangerousness without examination designed to uncover that. Our reading of the record leads us to conclude that, contrary to Webster's assertion, Coon's testimony regarding Webster's future dangerousness did not turn on an examination in violation of the court ordered limits.

Second, Webster never objected on these grounds, so he failed to preserve the issue for appeal. Finally, even if such testimony were given and properly objected to, the error of allowing the testimony proves harmless, because there is ample independent evidence to support a finding of future dangerousness. [28]

2.

The *Hall* panel avoided the question of statutory authority because it had not been properly briefed. *See* Hall, 152 F.3d at 398. We now face the issue and conclude that the **\*339** district court had the authority to order the exam.

a.

A district court's decisions in overseeing criminal discovery are entitled to great deference. Alleged error is subject to review for abuse of discretion, and we will reverse only if a defendant establishes prejudice to substantial rights. Dukes, 139 F.3d at 476; Johnston, 127 F.3d at 391. Because the court-ordered exam did not violate Webster's constitutional rights, and he makes no other claim of prejudice, any finding of authority to order the exam negates prejudice to substantial rights.

b.

Although Webster correctly asserts that the court lacked statutory authority to order the psychiatric exam, a district court possesses inherent powers "reasonably useful to achieve justice," In re Stone, 986 F.2d 898, 902 (5th Cir.1993) (recognizing several categories of inherent court powers), including certain powers over the administration of civil and criminal discovery, Natural Gas Pipeline Co. v. Energy Gathering, Inc., 2 F.3d 1397, 1406 (5th Cir.1993). In fact, FED.R.CRIM.P. 57(b) provides that where no law or rule is directly applicable, "[a] judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district." The existence of the federal rules does not preempt this power, if the rules do not exclude the exercise of the specific putative inherent power. Id. at 1407. [29] Before the enactment in 1974 of FED.R.CRIM.P. 12.2, which establishes the procedures governing psychiatric exams at trial, numerous courts had recognized the existence of inherent judicial authority to order a defendant to give the government notice of a psychiatric defense and to submit to examination by a government expert. [30] This court, too, in

other circumstances, has found inherent power to compel a psychological examination of a criminal defendant. [31]

Acknowledging that a district court has such inherent authority furthers the goals of the FDPA. If the federal courts have supervisory authority to "formulate procedural rules not specifically required by the Constitution or the Congress" to "preserve the integrity of the judiciary by ensuring that a conviction rests on appropriate considerations validly before the jury," *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), that authority must extend to the sentencing phase of a trial as well.

The FDPA provides, "[t]he government and the defendant shall be permitted to rebut any information received at the [sentencing] hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death." § 3593(c). Webster indicated his intention to present expert psychiatric testimony at the sentencing **\*340** hearing. The government would not have a "fair opportunity" to rebut that testimony if it could not conduct an examination of its own; and to ensure that the sentence rests on appropriate considerations, the government must have the opportunity to rebut the defense's claims. [32]

Allowing the court to require disclosure of the defendant's experts' reports and to compel the defendant to submit to a government psychiatric exam on the government's motion constitutes a fair procedure for achieving these goals in a timely manner. *Cf.* FED.R.CRIM.P. 12 (establishing similar procedure for guilt-innocence phase). The court had the inherent authority to order the exam, and, therefore, did not abuse its discretion.

### G.

Webster's first challenge relating to veniremen alleges that the court abused its discretion in granting the government's *Witt* challenge of Linda Vicar. A review of the record reveals that the court had sufficient grounds to grant the challenge.

### 1.

A court may excuse a prospective juror for cause because of his views on capital punishment if those views would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and oath. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Williams v. Collins,* 16 F.3d 626, 633 (5th Cir.1994). Determination that a juror would automatically vote against the death penalty in every case is not the only situation in which that standard would require dismissal. *Flores,* 63 F.3d at 1355. The court has the discretion to excuse a juror when it "is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* (quoting *Witt,* 469 U.S. at 426, 105 S.Ct. 844). We give considerable deference to the decision to excuse a juror on this basis, because such decisions are based on face-to-face credibility assessments. [33]

### 2.

Webster's argument focuses on Vicar's statements that she believed capital punishment was a deterrent to crime and that "the possibility is there" that situations existed in which she could impose a death sentence. Based on this, Webster believes her ability to perform her duties as a juror was not impaired.

Other excerpts, however, support the government's concern and the court's decision. Vicar stated, "I mean from one day to the next, I don't have the same opinion of what I could do. I think there could be, depending on what the situations were, that I could say, yes, that's what it should be, that's what the penalty should be. I don't consistently, from day to day, think I could actually do that if there really is a life sentence."

Indeed, in answering several questions, Vicar wavered on whether she could sentence a defendant to death if a life sentence without parole option were a viable alternative. [34] **\*341** The government, in objecting to Vicar, pointed to her demeanor, her long pauses before answering questions, and her admission of equivocation. Although she stated she could envision circumstances in which she might be able to impose a death sentence, the presence of the alternative of a life sentence without parole raised serious questions about her ability to follow the law. In addition, the whole of her testimony could have left the court with the impression that she favored the death penalty as a theoretical necessity, but

would not be able to recommend it. The court did not abuse its discretion in granting the challenge for cause for Vicar's inability to apply the death sentence.


## H.

Webster avers that the court abused its discretion in denying several of his challenges for cause. He challenged veniremen Deanna Hailey and Carolyn Coffelt on the ground that they stated that if they found Webster guilty of the primary offense of kidnaping resulting in death, they would have to answer "yes" to the statutory aggravating factor that the defendant caused the death of the victim during a kidnaping. Webster challenged Jimmy Chambless, Kristi Magouirk, and David Hoffman because all allegedly were biased in favor of finding him guilty during the guilt-innocence phase. The court denied these challenges, forcing Webster to use peremptory challenges in all five cases. He now says the denial of his for-cause challenges was an abuse of discretion. We disagree.


### 1.

The Sixth Amendment right to a fair trial includes the right to an impartial jury. *Morgan v. Illinois,* 504 U.S. 719, 727, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). In a capital sentencing context, there is the right to challenge for a cause a juror whose views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt,* 469 U.S. at 424, 105 S.Ct. 844 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). The government has the right to challenge for cause those veniremen whose views in opposition to the death penalty will substantially impair their duty. *Id.* As a corollary, the capital murder defendant has a right to challenge for cause any juror who will automatically vote for the death penalty in every case, because that juror "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Hall,* 152 F.3d at 407 (quoting *Morgan,* 504 U.S. at 729, 112 S.Ct. 2222).

Although Webster complains that the failure to grant his challenges for cause forced him to exhaust his peremptory challenges and, after running out, to take objectionable jurors, he does not allege that any of **\*342** the jurors who served

was not impartial. [35] We do not face, therefore, a pure constitutional challenge. *Cf. id.* at 407–08. [36] Rather, we address Webster's statutory right to the free exercise of his peremptory challenges as a means of implementing the constitutional guarantees.

"While peremptory challenges, or the number provided by FED.R.CRIM.P. 24(b) may not be constitutionally required, it does not follow that a trial court's wrongful reduction of the number so provided is not reversible error on direct appeal." *United States v. Munoz,* 15 F.3d 395, 398 n. 1 (5th Cir.1994). [37] " 'The denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice.' " *Hall,* 152 F.3d at 408 (quoting *United States v. Broussard,* 987 F.2d 215, 221 (5th Cir.1993)). Because the district court's predominant function is determining the credibility of the veniremen, however, "deference must be paid to the trial judge who sees and hears the prospective juror." *Id.* at 407 (quoting *Witt,* 469 U.S. at 426, 105 S.Ct. 844). "We will only second-guess the court's decision that a juror is unbiased if there is an abuse of discretion." *Id.* (quoting *Flores,* 63 F.3d at 1357).


### 2.

#### a.

Webster contends that the court should have granted his challenge to Deanna Hailey because she automatically would answer "yes" to one of the statutory aggravating factors if she had found him guilty. Specifically, Hailey said that if she had found a defendant guilty of an intentional kidnaping that results in death, she always would find the statutory aggravating factor of § 3592(c)(1) to be true—that the defendant had caused the death during the commission of the offense. [38]

This, Webster argues, runs afoul of *Morgan,* because Hailey would fail to consider additional evidence before finding the statutory factor. In addition, Webster claims, Congress, when it provided the aggravating factor, must have contemplated a juror's consideration of something more than or different

from the evidence at trial; otherwise, the aggravating factor would be superfluous. We disagree; the court did not abuse its discretion in finding Hailey unbiased and capable of serving.

First, *Morgan* does not apply here; it holds that a juror should be excused if a finding of guilt automatically would lead him to recommend a sentence of death. *See* *Morgan, 504 U.S. at 729, 112 S.Ct. 2222.* The instant alleged error is a far cry from that in *Morgan.* The problem of which Webster complains is that a finding of guilt automatically would lead to the finding of an aggravating factor-not to a recommendation of death. An automatic finding of an aggravating factor in no way runs afoul of *Morgan* 's requirement that a juror appears able to "consider the evidence of aggravating and mitigating circumstances as the instructions require him to do," *id.,* because the automatic finding of an aggravating factor is not the same as an inability to consider aggravating and mitigating circumstances. A juror could find the aggravator of kidnaping resulting in death and yet determine that the mitigating factors outweigh that and other aggravating **\*343** factors, sparing the defendant's life. [39]

Second, as we held in *Jones* and *Hall,* allowing a juror, having already found the existence of a certain set of facts beyond a reasonable doubt during the guilt-innocence phase, to answer "yes" to an aggravating factor based on the same facts does not raise constitutional problems. *See* *Hall, 152 F.3d at 416–17;* *Jones,* 132 F.3d at 248–49. Indeed, it merely allows the jury to consider the facts or elements of the offense as an aggravating factor that, having already been found beyond a reasonable doubt, it then weighs—just once—in determining whether to return a death sentence. Allowing the factor to be weighed does not violate the narrow strictures of *Morgan,* even if a juror believes the finding of guilt automatically leads to a finding of the factor.

Finally, Hailey answered Webster's hypothetical questions in ignorance of the law the court would instruct her to apply. Contrary to Webster's assertion, she did not implicitly say she would not follow instructions; to the contrary, she stated that she would be able to follow the instructions and procedures. The court did not abuse its discretion in finding that she would obey those instructions when informed how to determine the existence of aggravating factors. [40]

b.

Webster finds error in the denial of his challenge for cause to venireman Carolyn "Kay" Coffelt. Webster believes Coffelt should have been excused for the same reason as for Hailey, although Coffelt more ambiguously answered that she would automatically find the first aggravating factor after finding guilt. [41] Coffelt also explicitly stated she would be able to follow the instructions and knew there was nothing automatic in assessing the death penalty. For the reasons given above, the district court did not abuse its discretion.

c.

Webster claims the court should have granted his challenge for cause of venireman Jimmy Chambless because he was predisposed to find Webster guilty. Chambless, on his own initiative, informed the court that he had been exposed to pre-trial publicity, "and what little I know about this, ... I'm already leaning towards the prosecution.... That's not saying I couldn't be swayed with the evidence and everything that could come up, but I have got to be honest at this point, the defense is not starting even with the prosecution."

He also stated he leaned toward the prosecution because Webster had been arrested, and "if someone was arrested for this, I feel like there was a reason for it.... I feel like there was probably a good reason they were arrested. I'm not saying that I couldn't, again, be swayed...." Based on these statements, Webster believes Chambless should have been excused for cause because he was predisposed to find an arrested defendant guilty and would shift the burden of proof onto the defense. We disagree; other statements Chambless made demonstrate the court did not abuse its discretion in denying the for-cause challenge.

When questioned by the court, Chambless agreed the verdict must be based on the evidence presented in the courtroom, and believed he could limit himself to such evidence. He affirmed that the prosecution carries the burden of proving guilt beyond a reasonable doubt, and would require as much with respect to every element. He also believed he could give a fair trial to both the defense and the prosecution, putting his predisposition aside. The court found him credible in making these statements and denied the challenge for cause.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

"A person is not automatically rendered unqualified to serve as a juror merely because **\*344** he has been exposed to media coverage of the charged crime. The issue becomes whether exposure to the media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented."

🚩 *Hall,* 152 F.3d at 411 (quoting 🔖 *Bell v. Lynaugh,* 828 F.2d 1085, 1093 (5th Cir.1987)). We "decline to second-guess the district court's determination, made after face-to-face credibility assessment and thorough questioning, that [Chambless] could faithfully follow the court's instructions and reach a verdict based solely upon the evidence presented at trial." *Id.* [42]

d.

 Webster contends the court should have granted his challenge for cause of venireman Kristi Magouirk for a demonstrated bias against him, an inability to provide a presumption of innocence or to follow the instructions not to listen to news reports. During voir dire, Magouirk admitted, "I guess I'm more prone to look for evidence to convict rather than evidence not to convict, reasonable doubt." She later claimed not to be prone to convict, but "I feel like the government must a have good evidence to have this person on trial." She expressed her view that black men "have a grudge against me and my race" but asserted that that feeling would not affect her decision. She also stated, "I am all for the death penalty. I would just as soon see them die for their crime than to live out their life on my taxes"; but she explained that she could recommend a life sentence without parole.

Furthermore, she later reiterated her preconceptions of evidence of guilt because "if the person is charged, they must have good evidence." She said, "I would like to give him a clean slate. It's just that, to be honest, yes, it's hard because he's here.... So there has got to be something against him." She also recounted news stories on the crime from as recently as the previous day. It "would be pretty hard" for her not to discuss the case with her husband and not to keep up with the press accounts. Despite Webster's claims that Magouirk showed bias and an inability to follow the instructions, the court deemed her capable of serving. We decline to second-guess that determination.

The decision is supported by ample evidence that, combined with the court's assessment of Magouirk's credibility, justifies its refusal to dismiss her for cause. As explained, knowledge of the case from news accounts does not preclude service, and Magouirk agreed she would follow the instructions to avoid the news, assume anything she heard outside the courtroom was false, and base her decision solely on the evidence. She recognized that the government carried the burden of proving guilt beyond a reasonable doubt. She stated, "I guess, since I haven't heard any evidence, I don't have anything against him. So to me he is innocent. Until I hear the facts, then he is innocent, yes." She affirmed that she would follow her oath as a juror and the court's instructions, including not discussing the case with her husband. The court acted within its discretion.

e.

 Webster claims error in the refusal to grant his challenge for cause to venireman David Hoffman. Webster believes Hoffman demonstrated bias resulting from Webster's being charged with the offense and an inability to separate the victim from thoughts of Hoffman's own daughter. Hoffman testified that, based on news accounts, he believed a girl named Lisa Rene was kidnaped, taken to Arkansas, and murdered, even though those were the elements the government would have to prove. Recognizing the government had brought charges, he admitted, "I guess for that reason alone I would have to say that there's a certain bias there, or else he wouldn't be here." Hoffman also stated that he might find it difficult to "wall off" thoughts of his daughter during sentencing, and they might affect his vote "to a certain extent."

Hoffman said, however, "I believe that I would be able to force [thoughts of my kids from my mind] and weigh purely on the **\*345** evidence there." [43] He stated his view that much information coming from the media proved false. He believed he could keep an open mind, follow his oath as a juror, and base his verdict and sentence recommendation on the evidence and law.

A juror need not, and indeed cannot, leave his experiences and circumstances outside the jury room. What he must do is base a decision solely on the evidence presented, as seen in a fair and unbiased manner through the lens of his experiences. The district court found Hoffman excruciatingly honest, but dedicated to and capable of overcoming any difficulties he might have as a juror. On this cold appellate record, we cannot find that determination an abuse of discretion.

## I.

Before the jury retired for deliberations at the penalty phase, the court excused one of the jurors and elevated an alternate to replace him. Webster alleges the court erred, but we disagree.

## 1.

Webster styles the claim of error as an abuse of discretion in not granting a mistrial. We review a refusal to grant a mistrial for abuse of discretion. *United States v. Willis,* 6 F.3d 257, 263 (5th Cir.1993). But Webster moved for a mistrial because the court had substituted an alternate juror allegedly after the jury had retired to consider its verdict. Under FED.R.CRIM.P. 23(b) and 24(c), we review a decision to substitute jurors at that late stage for prejudice. *United States v. Huntress,* 956 F.2d 1309, 1316 (5th Cir.1992); *United States v. Helms,* 897 F.2d 1293 (5th Cir.1990).

## 2.

During the punishment phase, but before the jury had begun deliberations, the court excused juror Charles Fox after he came to court in severe pain from an automobile accident. After extensive discussion with counsel for the defense and prosecution, the court decided to substitute Fox with an alternate juror, Christopher Rawlinson. Rawlinson had sat through the guilt-innocence phase but had neither participated in nor observed those jury deliberations; he also sat through the penalty phase testimony. Webster moved for a mistrial and objected to using an alternate juror; the court ruled against him. In the sentencing phase charge, the court instructed the jurors, "As you will recall, a member of the jury which returned the verdict in the guilt phase of the trial was excused for health reasons. An alternate juror was substituted in his place. You are instructed that this substituted juror shall not be treated any differently than any other juror during your deliberations."

## 3.

Webster admits the propriety of dismissing Fox. In fact, that decision falls soundly within the court's discretion: "The

district court has the discretion to remove a juror 'whenever the judge becomes convinced that the juror's abilities to perform his duties becomes impaired.'" *United States v. Leahy,* 82 F.3d 624, 629 (5th Cir.1996) (quoting *Huntress,* 956 F.2d at 1312). Webster complains only of the lack of authority to replace Fox with an alternate.

The court presented the parties with three alternatives: continue with eleven jurors, impanel an alternate, or declare a mistrial and impanel a new jury. The court observed that "the law isn't real clear" on how to proceed. The prospect of repeating the entire penalty phase hearing made the last alternative highly unattractive, although that is the alternative Webster urged; he would not stipulate to an eleven-member jury.

If this had taken place before the jury retired at the guilt-innocence phase of the **\*346** trial, the answer to the question would be simple, for rule 24(c) provides that "alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Rule 24(c) also states, however, that all alternate jurors who have not replaced a regular juror "shall be discharged after the jury retires to consider its verdict." *Id.*

When a juror is disqualified after the jury retires, on the other hand, the court has the authority to require the jury to proceed to verdict with only eleven members, with or without stipulation by the parties, and this should be done particularly in lengthy and complicated trials. [44] We have explained our justification for proceeding with eleven jurors instead of substituting an alternate:

> An alternate juror replacing a regular juror after the jury has commenced its deliberations may be unable to participate equally with the other jurors, because he will lack the benefit of prior deliberations. There is a danger that the other jurors will have already formulated positions or viewpoints or opinions in the absence of the alternate juror and then pressure the newcomer into possibly ratifying this predetermined verdict, thus denying the defendant the right to consideration of the case by twelve jurors.

*United States v. Quiroz–Cortez,* 960 F.2d 418, 420 (5th Cir.1992).

The complication in the instant case, of course, is the bifurcated trial. The FDPA provides that if the defendant is found guilty, the court

> shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted—
>
> (1) before the jury that determined the defendant's guilt;
>
> (2) before a jury impaneled for the purpose of the hearing if—
>
> ...
>
> > (C) the jury that determined the defendants guilt was discharged for good cause
>
> ....
>
> A jury impaneled pursuant to paragraph (2) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate, with approval of the court, that it shall consist of a lesser number.

§ 3593(b). [45] How should a court apply rules 23 and 24, if at all, when the jury has returned from deciding one verdict but has yet to retire to consider the second? This presents an issue of first impression.

The Federal Rules of Criminal Procedure apply to sentencing hearings; FED.R.CRIM.P. 1 provides, "These rules govern the procedure in all criminal proceedings in the courts of the United States...." Rule 54, FED.R.CRIM.P., excludes certain proceedings, but not sentencing hearings. Section 3593(c) waives rule 32(c)'s presentence report requirement, which suggests the negative implication that the Rules of Criminal Procedure usually do apply to sentencing hearings under the FDPA. The district court correctly looked at rules 23 and 24, therefore, in deciding what to do after excusing Fox. But how should a court apply these rules in light of the fact that they fail to contemplate a bifurcated proceeding?

If, hypothetically, the entire jury had been discharged for good cause after returning its guilty verdict, the court would have impaneled **\*347** an entirely new one pursuant to § 3593(b)(2). Presumably, that jury would have included alternates. If the court then had discharged a juror for cause before the jury had retired to consider the sentence, would the court have been entitled to elevate an alternate? Rule

24(c) answers in the affirmative (alternate "shall replace" juror excused before jury retires).

The superficial conclusion, then, is that the court has the same authority to impanel an alternate when the same jury sits for both phases of the trial. And this conclusion answers Webster's primary contention: Because an alternate was available and the jury had not retired to deliberate on its sentence recommendation, the court had the authority, under rule 24(c), to elevate the alternate.

The answer, unfortunately, is not so facile, for rule 24(c) also provides, "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." This mandatory language appears to compel the court to dismiss the alternate jurors once the jury retires at the end of the first phase—even the jury first retires to consider its verdict. If the court were to follow this mandatory language, no alternates would remain to be substituted for jurors whom the court might have to discharge before the end of the second phase. [46] In fact, the court dismissed three of the five alternate jurors; the remaining two were retained for the penalty phase of the hearings.

The court erred in not dismissing the juror at the end of the first phase. The mandatory language of rule 24(c) requires the court to dismiss the alternates when the jury retires to deliberate. This conclusion adheres faithfully to the language of the rules.

Nevertheless, we affirm the sentence. Webster did not object to the failure to dismiss the alternates at the time; he complained only of elevating an alternate to the jury and not granting a mistrial. [47] Because the jury had not retired when the court dismissed Fox and substituted Rawlinson, any available alternate could be elevated consistent with the rule. Webster, therefore, waived the objection he should have made —the failure to dismiss the alternates. When the defendant has waived an objection for failure to follow the substitution rules, an error alone does not warrant reversal; we also review for prejudice from the resulting elevation of the substitute. [48]

Webster did not suffer prejudice. The court provided the jury with an instruction to include the new juror equally in all deliberations. Furthermore, the jury had not started deliberating at the penalty phase. Those issues were distinct from those decided at the guilt-innocence phase; any overlap is irrelevant, because the jury specifically was instructed to consider everything as if for the first time. Interestingly, on the

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

sole penalty phase issue as to which prejudice seems possible, which is in the first aggravating factor that overlapped with the offense decided in the first phase—kidnaping in which death results—the jury failed to find the aggravating factor. Webster's generic claims of prejudice fail, as there is nothing inherently prejudicial in a rule 24(c) violation. *See* Huntress, 956 F.2d at 1316 n. 7.

### J.

Webster contends that the court erred in excusing juror Urbano Gomez on learning that, in response to the juror questionnaire, he had not disclosed past encounters with the judicial system. At the very least, Webster claims, the court erred by not recalling Gomez to ask him further questions. We conclude the court acted within its discretion by dismissing Gomez, even absent further questioning to determine whether he had lied.

### *348  1.

After the court qualified Gomez as a juror, the prosecutor notified the court that it had uncovered a criminal record for him. The government challenged Gomez for cause because he had not answered his questionnaire truthfully. The government presented evidence that Gomez had been charged with shoplifting and spent three days in county jail, had been convicted of aggravated assault on a police officer and received one month of confinement,[49] and had been convicted of aggravated assault with a deadly weapon for which he received five years' probation. None of these was mentioned in Gomez's answer to the questionnaire.[50] Over defense objections, the court dismissed Gomez for providing false information, without recalling him for questioning.

### 2.

The court has discretion to excuse an untruthful juror.[51] The scope of the examination, if any, into juror misconduct rests within the court's sound discretion. *Fryar,* 867 F.2d at 854.[52] We will not disturb the court's findings on this issue except for want of factual support. Coleman, 997 F.2d at 1105. No evidentiary hearing is necessary. *Id.* (holding that court properly excused juror after government informed court that

juror had failed to disclose he had been subjected to two ATF investigations). In light of the deferential standard, the court acted within its discretion in granting the challenge for cause.

### K.

Webster argues the court erred in denying his *Batson* motion, objecting to the government's use of peremptory challenges on black veniremen. We find no clear error in the court's acceptance of the government's non-racial justifications for the strikes.

### 1.

After voir dire, the court presented the parties with a list of sixty potential jurors, of whom five were black and one was Asian.[53] Each side exercised its twenty challenges. Webster objected to the government's strikes eliminating the Asian and the five blacks. To establish his *prima facie* case of racial discrimination, Webster relied solely on the fact that the government had stricken all black jurors. The court questioned whether this made out a *prima facie* case, but nonetheless called on the government to provide rationales for its strikes.

The government provided race-neutral rationales. Webster filed a motion disputing those reasons for each of the black jurors.[54] Webster argued the reasons were a pretext and that the prosecution did not strike other similarly-situated jurors who were not black. The government filed a response explaining why it found the jurors Webster claimed to be similarly situated were in fact different.

The court entered an order denying Webster's *Batson* motion, finding that (1) the  *349  motion was untimely; (2) Webster had failed to make out a *prima facie* case; (3) the government's race-neutral reasons were believable; and (4) Webster had failed to prove purposeful discrimination. We affirm on the latter two grounds.

### 2.

"The use of peremptory challenges to exclude veniremen 'solely on account' of race violates the equal protection component of the due process clause of the fifth amendment."

*United States v. Terrazas–Carrasco,* 861 F.2d 93, 94 (5th Cir.1988). Courts address *Batson* claims under the familiar burden-shifting scheme. *See* 🚩 *Batson v. Kentucky,* 476 U.S. 79, 96–97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); 🚩⚠️ *United States v. Fields,* 72 F.3d 1200, 1206 (5th Cir.1996). "The Supreme Court has outlined a three-step process for determining whether peremptory strikes have been applied in a discriminatory manner. First, the claimant must make a *prima facie* showing that the peremptory challenges have been exercised on the basis of race. Second, if this requisite showing has been made, the burden shifts to the party accused of discrimination to articulate race-neutral explanations for the peremptory challenges. Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination." *United States v. Bentley–Smith,* 2 F.3d 1368, 1373 (5th Cir.1993); *see also* 🚩 *United States v. Huey,* 76 F.3d 638, 640–41 (5th Cir.1996). The party making the claim of purposeful discrimination bears the ultimate burden of persuasion. *Bentley–Smith,* 2 F.3d at 1373.

We assume, *arguendo,* that Webster timely made his *Batson* motion and that he made a *prima facie* case. The court called on the government to provide race-neutral justifications for the use of its peremptory strikes. Once a court has taken that step, we no longer examine whether a *prima facie* case exits.[55] Our decision, then, must rest on (1) whether the government articulated race-neutral explanations for the exercise of its challenges and (2) whether Webster has demonstrated that those justifications are pre-textual and that the government engaged in purposeful discrimination.

a.

Unless a discriminatory intent is inherent in the explanation, the reason offered should be deemed race-neutral. 🚩 *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859 (plurality). "[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-biased." *Bentley–Smith,* 2 F.3d at 1375. The "race-neutral explanation tendered by the proponent need not be persuasive, or even plausible." 🚩 *Huey,* 76 F.3d at 641; *see also* 🚩 *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). It simply must be race-neutral and honest. Determining whether

counsel speaks the truth in offering its reasons turns on in-person credibility assessments, so we review for clear error. 🚩 *Huey,* 76 F.3d at 640–41; 🚩⚠️ *Fields,* 72 F.3d at 1206.

The government offered reasons for excusing each of the five jurors, with concerns ranging from a juror's establishing a rapport with defense counsel to a fear that none of the five would be able to recommend a death sentence when the time came, and from relatives with criminal records to relatives living in the city where the murder took place. The court accepted and believed these explanations. Having reviewed the record, we cannot say the court clearly erred.

b.

At the third stage of the inquiry, Webster bears the burden of establishing that the **\*350** government engaged in "purposeful discrimination" based on race. 🚩 *Purkett,* 514 U.S. at 767, 115 S.Ct. 1769; *Bentley–Smith,* 2 F.3d at 1373 ("The ultimate burden of persuasion always lies with the party making the claim of purposeful discrimination."). The "[p]roof of racially discriminatory intent or purpose ... 'implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker selected a particular course of action at least in part because of, not in spite of, its adverse effects upon an identifiable group.' " 🚩 *United States v. Garcia,* 1 F.3d 330, 335 (5th Cir.1993) (quoting 🚩 *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859). Webster fails to meet this burden.

Webster offers no direct evidence of purposeful discrimination, but rather argues that the government's proffered reasons are pretextual, and the government did not dismiss similar white jurors.[56] Because the determination turns on credibility assessments, we review for clear error at this stage as well. *Bentley–Smith,* 2 F.3d at 1373; 🚩 *United States v. Seals,* 987 F.2d 1102, 1109 (5th Cir.1993).

The government offered distinguishing characteristics for each of the jurors Webster claims were similarly situated. They had different combinations of qualities, and some had more government-desired qualities than did the jurors the government preempted. *See* 🚩 *United States v. Jimenez,* 77 F.3d 95, 100–01 (5th Cir.1996) (other redeeming qualities relevant). Although Webster asserts the proffered reasons for

striking the black jurors are mere proxies for race, he provides no basis as to why; and the reasons resemble ones we have accepted in the past. [57] The court did not find the proffered reasons pretextual and found no other evidence of purposeful discrimination; we cannot say it clearly erred.

## L.

The court forced Webster to choose one of two expert psychiatric witnesses to testify during surrebuttal. Webster claims this limitation violated his due process rights. We find no error.

Webster styles his claim of error as a due process violation. Due process requires a fair opportunity to defend against the charges, including calling and cross-examining witnesses; keeping information, including witnesses, from the jury may violate due process. *See, e.g., Montana v. Egelhoff,* 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996); *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *United States v. Thompson,* 130 F.3d 676, 686 (5th Cir.1997), *cert. denied,* 524 U.S. 920, 118 S.Ct. 2307, 141 L.Ed.2d 166 (1998).

We never have intimated, however, that this due process right extends to presenting witnesses at surrebuttal. Indeed, we know of only two published opinions that have addressed limitations on surrebuttal in a due process context. [58] Even assuming surrebuttal **\*351** implicates due process concerns, we cannot say that the court's limitation of Webster's surrebuttal to one of two expert witnesses whom the court considered cumulative was so arbitrary and fundamentally unfair as to deprive him of due process. [59]

## M.

After entering a sentence of death on the verdict, the court filed a finding entitled Factual Finding Regarding Mental Retardation in which the court stated, "Webster is not mentally retarded and ... he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty." [60] Webster objects to this finding on several grounds: (1) It was made in contravention of the FDPA; (2) it was made in derogation of Webster's rights to due process and effective assistance of counsel; (3) it was contrary to the greater weight of the credible evidence; and (4) it was inconsistent with the verdict on this issue. [61] We conclude that the court took proper action, and the finding was supported by the evidence.

Webster failed to object to the factual finding. Our review, therefore, is limited to plain error. *United States v. Calverley,* 37 F.3d 160, 162 (5th Cir.1994) (en banc). To find plain error, we must perceive (1) an error by district court, in that it deviated from a legal rule, (2) that was clear and, at a minimum, obvious under current law at the time of the trial, and (3) the error must affect substantial rights. *Id.* at 162–63.

### 1.

Webster alleges the factual finding was in contravention of the FDPA's statutory scheme, but the statute fails to address how to ensure that the mandate of § 3596(c) is carried out. Because the statute fails to provide guidance, and no case has addressed this issue, the law is not pellucid; the court did not plainly err in its *sua sponte* finding that Webster is not mentally retarded.

Webster argues that the statute provides sufficient guidance. We disagree. Webster points to § 3593(b)(3), which provides that the court will act as a fact-finder "upon the motion of the defendant and with the approval of the attorney for the government." Webster interprets this to preclude any fact-finding by the court absent the defendant's motion. The conclusion, however, does not flow from the statute.

Section 3593(b) provides that "the judge who presided at the trial ... shall conduct a separate sentencing hearing to determine the punishment imposed. The hearing shall be conducted ... (3) before the court alone, upon the motion of the defendant and with the approval of the attorney for the government." This provision refers only to the determination

of the sentence; it is located in the section captioned "Special hearing to determine whether a sentence of death is justified." It in no way implies that all court **\*352** fact-finding must be on the defendant's motion.

Webster also asserts that, in the absence of a specific statutory scheme, the only logical conclusion is that the jury must be the fact-finder on the issue of mental retardation. This "logical" claim suffers from gaps in reasoning.

First, only §§ 3592 and 3593 address issues that a jury may be called on to consider. Section 3592 lays out all of the factors for the finder of fact to consider—the mitigating and aggravating factors. Section 3593 explains the procedure for the sentencing hearing, including laying out the options for who the fact-finder may be—jury, newly impaneled jury, or judge.

Section 3596 addresses "Implementation of a sentence of death." It is here that Congress chose to indicate its restriction on who could be executed. Placement of the consideration here, rather than in the earlier sections addressing the issues for the jury to consider in imposing the sentence, belies Webster's assertion that the issue obviously belongs to the jury.

In addition, although Webster did request and receive submission of the mitigating factor that he "is or may be mentally retarded," he did not request a jury instruction that placed in the jury's hands the job of factually finding whether Webster is mentally retarded. That the jury could consider whether Webster "is *or may be* retarded" falls woefully short of the factual finding required in § 3596 of mental retardation to prevent the implementation of the death sentence. The lack of a jury instruction request, along with failing to object to the factual finding, suggests that Webster's "logical assumption" placing this issue in the jury's hands was no more obvious to him at trial than it was to the district court.

The statutory scheme simply does not answer who decides this issue, so we cannot say the court's decision clearly contravened the FDPA. Given the lack of clarity, the court did not commit plain error in deciding the issue itself.

2.

Webster asserts that the procedure the court chose violated due process and deprived him of effective assistance of counsel. Neither is true. Webster rests these claims on the fact that the court acted without statutory authority and without notice to him. Bare assertions aside, Webster provides no analysis as to why the court's determination violates the Constitution.

The alleged denial of effective assistance of counsel presumably rests on Webster's lack of opportunity to present his case. Even assuming this rises to the level of constitutional error, it is harmless. Webster had just finished presenting voluminous evidence to the jury, in support of his claim of mental retardation.[62] The court had ample information before it to make its decision; indeed, just before the jury retired, Webster had asked the court to find him mentally retarded as a matter of law, taking the mitigating factor out of the jury's hands. Webster makes no showing of prejudice to his substantial rights by arguing there is something additional he would have presented to the court. The court did not plainly err in failing to provide Webster with notice, and did not deprive him of a fundamentally fair trial.

3.

Webster contends that the finding that he is not mentally retarded is against the greater weight and credibility of the evidence. The standard of review for a finding that a defendant is not mentally retarded under § 3596 presents an issue of first impression. Because it is a factual finding, we adopt the clearly erroneous standard.[63]

**\*353** The government presented substantial evidence to support the finding. Furthermore, only four of the twelve jurors found that Webster is or may be mentally retarded and that he suffers from low intellectual functioning. We cannot say the court clearly erred in deciding that Webster is not mentally retarded.

4.

Webster contends that the court's determination conflicts with the verdict on this issue. Webster fails to indicate the import of this argument, aside from supporting his claim of a constitutional violation and his assertion that the finding contradicts the greater weight of the evidence.

Only four of twelve jurors concluded Webster "is or may be mentally retarded." Webster's failure to convince a majority of the jurors alone suggests the court's finding is not inconsistent with the verdict. Furthermore, those four jurors found only that he is or *may be* mentally retarded. Obviously, this mitigating factor requires less certainty than does the determination that he is not mentally retarded.

As a result of this lesser standard, we can conclude that eight jurors were not convinced that he even "may be" mentally retarded; they believed he was not. We cannot conclude that the court's agreement with a majority of the jurors constitutes a clear, obvious error.

### N.

Webster argues that the evidence does not support the special findings of the existence of the aggravating factors and that the sentence of death was imposed under the influence of passion, prejudice, or some other arbitrary factor. This contention stems directly from the FDPA's requirement that a court of appeals "shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592." § 3595(c)(1).

Webster fails to distinguish between these two requirements as distinct responsibilities of an appellate court. Rather, he suggests that the only way we can fulfill our responsibility under the provision as a whole is to conduct "a *de novo* review and a balancing of the evidence." Any other method, Webster claims, will fail to ferret out which verdicts were imposed under the impermissible factors.[64] An appellate court, however, is a court of review. We do not sit as a second jury. Instead, we will address the two aspects of our review in turn. See *Hall,* 152 F.3d at 426 (addressing each in turn, rather than engaging in one unified, *de novo* review).

### 1.

First, we must determine whether the evidence supports the jury's special findings of the aggravating factors. The statute does not clarify what standard of review we should use.

Nothing in the FDPA, however, indicates that it alters our ordinary standards of review.[65] To protect the jury's domain, we apply the usual standard of sufficiency of the evidence.[66]

"Review for sufficiency of the evidence is decidedly narrow —a [finding of an aggravating factor] must be affirmed if a rational trier of fact could have found that the evidence established the essential elements of [its existence] beyond a reasonable doubt."[67] In view of this record, a rational **\*354** jury could find beyond a reasonable doubt that all four remaining aggravating factors exist.

### 2.

Our next responsibility is to ensure that the sentence was not handed down under the influence of passion, prejudice, or some other arbitrary factor. Again, Webster asserts this requires a *de novo* re-weighing of the evidence, for any other assessment will fail to negate the possibility that arbitrary factors were at work.

We question whether this is an accurate statement of our responsibility under the FDPA.[68] We need not decide this issue today, however, for we have already conducted a thorough reexamination of the aggravating and mitigating factors in part IV.A.1.c, *supra,* as part of our harmless error review. We also see nothing in the record indicating that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The death sentence is warranted by the jury's specific findings.

### O.

Webster launches a variety of attacks on the constitutionality of the FDPA. We entertained and rejected most of these arguments in the past, *see Hall,* 152 F.3d at 413–19; *Jones,* 132 F.3d at 239–42, foreclosing our reconsideration of them today.[69] Those arguments that we have not heard in the past we consider *de novo. See United States v. Bailey,* 115 F.3d 1222, 1225 (5th Cir.1997), *cert. denied, 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 764 (1998).*

1.

Webster's constitutional challenges that we have addressed in the past we deal with expeditiously. Contrary to Webster's arguments, (1) the FDPA provides sufficient safeguards to prevent the arbitrary imposition of the death penalty, *Jones,* 132 F.3d at 241; (2) the FDPA sufficiently circumscribes its delegated authority with "intelligible principles" to avoid violating the nondelegation doctrine, *id.* at 239; (3) the Constitution does not mandate "proportionality review," that is, a comparison of the penalties imposed in similar cases, *id.* at 240; (4) the FDPA's relaxed evidentiary standard at the sentencing hearing is not unconstitutional, *id.* at 241–42; (5) the "especially heinous, cruel or depraved manner" aggravating factor is not impermissibly vague, at least where the vagueness is cured by the statutory limitation that the offense involve torture or serious physical abuse and by further limitation in the jury instructions, *id.* at 249; *Hall,* 152 F.3d at 414–15;[70] and (6) the FDPA's inclusion of the "mere fact" that Webster was convicted of kidnaping and murdering Lisa Rene as an aggravating factor does not constitute constitutionally impermissible "stacking," or double-counting, *Jones,* 132 F.3d at 249; *Hall,* 152 F.3d at 416–17.[71]

2.

Webster raises three constitutional arguments that we address as matters of first impression. We reject them *seriatim*.

a.

Webster argues that the FDPA is unconstitutional for failing significantly to narrow the class of offenses to which the death penalty applies. Under *Maynard v. Cartwright,* 486 U.S. 356, 363–64, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the government may not make every unjustified intentional killing **\*355** qualify for the death penalty. The FDPA does precisely that, Webster argues, by making the four mental states of murder aggravating factors that qualify the defendant for capital punishment under § 3591(a). Webster's argument stems from a misreading of the statute.

As the government points out, § 3591(a) does not set forth a list of aggravating factors, but, on the contrary, serves a gatekeeping function. Section 3591(a) codifies the command in *Enmund,* 458 U.S. at 797, 102 S.Ct. 3368, and *Tison,* 481 U.S. at 157, 107 S.Ct. 1676, to limit the imposition of the death penalty to those murderers who both undertake felony participation and demonstrate at least reckless indifference to human life. Satisfaction of these elements only begins the death penalty inquiry; it does not and cannot establish death penalty eligibility by itself. The limiting factors, which Webster claims are lacking, are, of course, the aggravating circumstances set forth in § 3592(b) and (c), which guide the jury in its capital decision after it finds at least one element of intent under § 3591(a) as a threshold matter.

b.

Webster contends that the FDPA is unconstitutional because it permits the multiple weighing of aggravating factors (specifically, the § 3591(a)(2) *mens rea* factors). This argument stems from the same fundamental misunderstanding of § 3591(a) discussed above. *See* part IV.N.2.a, *supra; see also* part IV.A.2, *supra* (discussing "double weighing"). As we have explained, § 3591(a) does not set forth aggravating factors, but rather serves as a preliminary qualification threshold. The fact that a defendant could satisfy more than one of these via the same course of action does not, therefore, constitute impermissible double counting. Thus, although Webster is correct in noting that many courts have held that "double counting" of aggravating factors is to be avoided, the FDPA does not present such a problem.[72]

c.

Webster asserts that by precluding consideration of "race, color, religious beliefs, national origin, or sex of the defendant or of any victim" as a mitigating factor, the FDPA is unconstitutional. *See* § 3593(f). Webster correctly interprets the FDPA, but incorrectly interprets

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

the Constitution; the FDPA can be constitutional only by precluding such factors.

The Equal Protection Clause protects from purposeful state discrimination on the basis of race. *Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). The Due Process Clause of the Fifth Amendment provides this same "equal protection" against the federal government. *Bolling v. Sharpe,* 347 U.S. 497, 498–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Court proceedings, especially criminal trials, implicate state action, therefore bringing them under equal protection scrutiny. *Georgia v. McCollum,* 505 U.S. 42, 49–55, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 621–29, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).

More specifically, the Equal Protection Clause prohibits the state from using race in its decision-making, unless it can meet the "most exacting scrutiny ... justified by a compelling government interest." [73] In the realm of capital sentencing, this standard never can be met, because race is a "totally irrelevant factor." *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Therefore, the FDPA can pass constitutional muster only if it is interpreted absolutely to prohibit racial considerations in sentencing. Because we are obligated to interpret a statute in such a way as to preserve, if possible, its constitutionality, *Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *United* **\*356** *States v. Bird,* 124 F.3d 667, 678–79 (5th Cir.1997), *cert. denied,* 523 U.S. 1006, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998), we reason that race cannot be considered as either a mitigating or aggravating factor under the FDPA.

Although the use of race in government decision-making is, as a general matter, "odious to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi,* 320 U.S. at 100, 63 S.Ct. 1375, the use of race in sentencing determinations is particularly invidious. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell,* 443 U.S. 545, 555, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). And, in capital sentencing, the use of race becomes more offensive still:

Considering the race of a defendant or victim in deciding if the death penalty should be imposed is completely at odds with th[e] concern that an individual be evaluated as a unique human being. Decisions influenced by race rest in part on a categorical assessment of the worth of human beings according to color, insensitive to whatever qualities the individuals in question may possess.

*McCleskey,* 481 U.S. at 336, 107 S.Ct. 1756 (Brennan, J., dissenting).

Although divided in its decision, the Court in *McCleskey* was unanimous in its acknowledgment of "the illegitimacy of race as a consideration in capital sentencing." *Id.* at 341, 107 S.Ct. 1756 (Brennan, J., dissenting); *id.* at 292–93, 107 S.Ct. 1756 (majority opinion). Webster would have us go against this precedent, and rule that a defendant can be spared the death penalty because of his race. Such practices are precisely those forbidden by the Equal Protection Clause. *Id.* at 341, 107 S.Ct. 1756 (noting that "enhanced willingness to impose the death sentence" or "diminished willingness to render such a sentence" are impermissible when based on race).

In sum, a long line of Supreme Court precedent admonishes that the guillotine must be as color-blind as is the Constitution. *See McCleskey,* 481 U.S. at 292–93, 107 S.Ct. 1756; *Zant,* 462 U.S. at 885, 103 S.Ct. 2733; *Rose,* 443 U.S. at 555, 99 S.Ct. 2993. Today's decision recognizes this precedent in interpreting the FDPA in the only way constitutionally permissible: as prohibiting the consideration of race in sentencing.

Webster has constructed an artificial conflict, however, between the FDPA and Supreme Court precedent regarding mitigating evidence. He reads *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256, and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978),

as mandating the use of race in sentencing. Such a reading of *Penry* and *Lockett* is erroneous for at least two reasons: It ignores the concept of relevancy, and it would cause those cases to conflict with the Fourteenth Amendment for the reasons discussed above.

*Penry* and *Lockett* hold that in capital sentencing, a defendant must be permitted to introduce all "evidence *relevant* to the defendant's background or character ... that mitigate against imposing the death penalty." *Penry,* 492 U.S. at 318, 109 S.Ct. 2934 (emphasis added). [74] As a matter of law, race is "totally irrelevant to the sentencing process." *Zant,* 462 U.S. at 885, 103 S.Ct. 2733; *McCleskey,* 481 U.S. at 316, 107 S.Ct. 1756 (discussing the unconstitutionality of using the "irrelevant factor of race" in sentencing). Therefore, when the FDPA and the Supreme Court speak of "background or character" evidence, they obviously mean to permit, and can mean to permit only, the specific beliefs and life experiences of the defendant in question.

 Thus, although race *per se* is an irrelevant and inadmissible factor, the *effects* and *experiences* of race may be admissible. If a defendant can show that his life has **\*357** been marked by discrimination or some other set of experiences, irrespective of whether the result, in part, of his race, then that properly might be admissable as relevant mitigating background or character evidence. But this is a far cry from using race in and of itself as a proxy for such a set of beliefs and experiences. Pigmentation does not define a person's character or background; the life that a person has led and the things that he has experienced do.

### P.

We permitted Webster to file a supplemental brief raising an additional issue on appeal, arguing that his conviction and sentence were based on testimony that was illegally induced from his co-defendants. Citing *United States v. Singleton,* 144 F.3d 1343 (10th Cir.), *vacated for reh'g en banc,* 144 F.3d 1361 (10th Cir.1998), Webster contends that the testimony of his co-defendants against him was induced by the government in violation of 18 U.S.C. § 201(c)(2). [75] Because we find no plain error in the failure *sua sponte* to suppress the co-defendants' testimony, we deny Webster's attempt to raise this issue for the first time on appeal.

### 1.

In *Singleton,* a panel held that the plain language of § 201(c)(2) prohibits prosecutors from making promises "of value" to witnesses in exchange for testimony. According to the panel, such prohibited promises include promises not to prosecute for certain offenses, promises to inform authorities of cooperation, and promises to inform the court of cooperation. *See Singleton,* 144 F.3d at 1348. Webster claims that the government's promises to his co-defendants —not seeking the death penalty, agreeing to guilty pleas for lesser crimes, not prosecuting other acts stemming from the same incident, dismissing remaining indictment counts, notifying the court of cooperation, and filing a motion for downward departure in sentencing—violate the plain language of § 201(c)(2) in the same manner as did the promises in *Singleton.*

### 2.

### a.

Because Webster did not move to suppress the testimony of his co-defendants, the issue of their testimony's legality presents an entirely new issue. We may consider this question on appeal, therefore, only if it constitutes plain error. [76]

 We find plain error "only when the appellant shows that (1) there is an error, (2) the error is plain, and (3) the error affects her substantial rights." *Ravitch,* 128 F.3d at 869 (citing *Olano,* 507 U.S. at 732, 113 S.Ct. 1770). Even if we find such an error, however, we will not "exercise [our] discretion to correct such errors unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

 "Error is defined as a deviation from a legal rule in the absence of a valid waiver." *Calverley,* 37 F.3d at 162. "Plain is synonymous with 'clear' or 'obvious' and 'at a minimum' contemplates an error which was 'clear under current law' at the time of the trial." *Id.* Finally, "affecting substantial rights" is understood to mean that the error **\*358** "must affect the outcome of the proceeding." *Id.* at 164.

b.

Webster argues that the court erred by failing *sua sponte* to apply § 201(c)(2) and suppress the testimony of his co-defendants. Moreover, he argues that without the testimony of his co-defendants, there is great doubt that he would have been convicted.

Although Webster's argument that the suppression of co-defendant testimony substantially would have affected his conviction is persuasive, Webster faces an insurmountable burden in showing that the court plainly erred. At the time of trial, *Singleton* had not yet been handed down. Thus, the court did not commit plain error when it did not follow a decision that had not yet been decided. Moreover, even if *Singleton* had been decided before trial, decisions of other circuits are not binding on the courts of this circuit, so according to the "current law" of this circuit, the testimony of co-defendants still would have been admissible. [77]

The best Webster can argue is that, at the time of his trial, the applicability of § 201(c)(2) to government plea bargains

in this circuit was uncertain. [78] "The uncertainty manifest in [an] area of the law illustrates that any error on the part of the trial court could not have been plain." *Calverley,* 37 F.3d at 165.

Webster challenges a district court decision on the basis of a new interpretation of an existing law even though no Fifth Circuit precedent directly supports his reading of § 201(c)(2). [79] At most, he can support the uncertainty of § 201(c)(2)'s applicability to government plea bargains. A court's failure to apply an uncertain interpretation of a statute is far from plain error. Rather than finding plain error by adopting a new interpretation of an existing statute based on the vacated decision of another circuit, we deny Webster's challenge to the court's failure to suppress the testimony of his co-defendants.

AFFIRMED.

**All Citations**

162 F.3d 308

Footnotes

1    The jury unanimously found all but the first of the following statutory aggravating factors:
  II(A). The defendant, Bruce Carneil Webster, caused the death of Lisa Rene, or injury resulting in death of Lisa Rene, which occurred during the commission of the offense of kidnapping.
  II(B). The defendant ... committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of Lisa Rene.
  II(C). The defendant ..., after substantial planning and premeditation, committed the offense of kidnapping in which the death of Lisa Rene resulted.
  II(D). The victim, Lisa Rene, was particularly vulnerable due to her age.
  In addition, the jury unanimously found both of the proposed non-statutory aggravating factors:
  III(A). The defendant ... constitutes a future danger to the lives and safety of other persons.
  III(B). The effect of the instant offense on Lisa Rene's family.

2    Webster proposed the following statutory mitigating factors (with the number of jurors finding each mitigating factor shown in brackets):
  1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired. [0]
  2. The defendant was under unusual and substantial duress. [0]
  3. Another defendant or defendants, equally culpable in the crime, will not be punished by death. [4]
  4. The defendant does not have a significant prior history of other criminal conduct. [0]
  5. The defendant committed the offense under severe mental or emotional disturbance. [0]
  Webster proposed the following non-statutory mitigating factors (with the number of jurors finding each mitigating factor shown in brackets):
  1. The defendant is or may be mentally retarded. [4]
  2. The defendant has low intellectual functioning. [4]
  3. The defendant suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing. [12]

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

4. The defendant, as a result of a personality disorder, a mental illness, and/or low intellectual functioning, has a lesser capability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law than that of a normal person. [0]

5. The defendant was youthful at the time of the commission of the crime, although not under the age of eighteen. [0]

6. The defendant has talents, capabilities, or qualities which are of some value to society (such as musical talent, religious devotion, etc.). [0]

7. The defendant is unduly susceptible to influence by others. [0]

8. The defendant's level of participation in the commission of this offense was attributable, at least in part, to the influence of one or more of the other participants involved in the commission of this crime. [4]

9. The defendant grew up in an atmosphere of violence and fear, which has misshaped his perception as to the acceptability or necessity of violent conduct. [6]

10. The defendant can be controlled in a prison setting. [2]

11. The defendant can be of some productive value in a prison setting. [0]

12. The defendant has the love and support of other members of his family. [11]

13. The defendant does not have a significant prior history of violent crime. [0]

14. The defendant is the product of an impoverished background which virtually precluded his integration into the social and economic mainstream of the community. [0]

15. The defendant has responded well to structured environments and would likely adapt to prison life if he were sentenced to life imprisonment. [2]

16. Any other factor or factors in the defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of the death sentence. [0]

3  Webster raises an additional Fifth Amendment argument relating to his compelled examination, not addressed in *Hall,* with which we deal *infra.*

4  Webster attempts to parlay his evidentiary objection into a constitutional claim; having upheld the evidence's admissibility as an evidentiary matter, we cannot conclude that its admission nonetheless violated his constitutional rights.

5  Webster specifically complains about the following evidence:

• the oral statement "If I was out now, I'd kill the bitch" that gave him a venereal disease.

• the oral statement that killing Lisa Rene wasn't personal, "it was strictly business."

• an escape attempt where he entered an unauthorized area (the women's shower) of the Mansfield jail.

• the sexual rendezvous with female inmates planned with fellow inmate John Clay.

• the alleged shooting at a store owner after an attempted theft.

• the assault of Sheila Henry, a girlfriend.

• a shoving match over a piece of candy.

Webster also argues these should have been excluded because of the need for sufficient reliability of evidence in capital proceedings. *See Caldwell v. Mississippi,* 472 U.S. 320, 340, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

We find ample support in the record of the evidence's reliability, which justifies putting it before the jury. First, it was testimony based on first-hand observations; Webster had the opportunity to confront and challenge each of the witnesses. Second, because Webster was given advance notice that the government would be introducing evidence of unadjudicated offenses, he had the opportunity independently to investigate and respond to the evidence. Third, the government introduced corroborating evidence for several of the incidents. Fourth, the statements of which Webster complains were not related to unadjudicated offenses; rather, they were statements made to law enforcement officers after his arrest. Finally, Webster provides no reason why we should be reticent to believe any of the testimony or that the incidents occurred.

6  *See Hall,* 152 F.3d at 398 (compelled psychiatric exam), *id.* at 400–03 (evidentiary rulings on photographs and videotape), *id.* at 403–04 (unadjudicated offenses), *id.* at 404–06 (nontestimonial victim impact statements).

7  *United States v. Jones,* 132 F.3d 232, 242–43 (5th Cir.1998), *cert. granted,* 525 U.S. 809, 119 S.Ct. 39, 142 L.Ed.2d 31 (1998); *United States v. Manges,* 110 F.3d 1162, 1176 (5th Cir.1997), *cert. denied,* 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998).

8  *See Tuilaepa v. California,* 512 U.S. 967, 976, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (holding that "[t]he circumstances of the crime are a traditional subject for consideration by the sentencer," and may include factors such as

Case: 19-2683     Document: 13     Filed: 11/14/2019     Pages: 115

the defendant's age); *Roberts v. Louisiana,* 431 U.S. 633, 636, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977) (holding that a murder victim's status as peace officer performing regular duties constitutes permissible aggravating factor).

The court's examples included the following: " 'Cruel' means that the defendant intended to inflict a high degree of pain ...," " '[d]epraved' means that the defendant relished the killing or showed indifference ...," and "[t]he government must prove beyond a reasonable doubt that the defendant committed the offense after substantial planning and premeditation."

The court instructed that "you must as a preliminary matter unanimously agree that the government has proven beyond a reasonable doubt that the defendant ... either ...," followed by a list of the four possible intents, and "if you unanimously find ..." one or more of the elements of intent, the jury was to consider aggravating factors.

The court charged that "[t]o establish the existence of the aggravating factor of substantial planning and premeditation, the government must prove beyond reasonable doubt that the defendant committed the offense after substantial planning and premeditation.... The amount of time needed for *premeditation of a kidnapping* in which a death occurs depends on the person and the circumstance." (Emphasis added.)

We also find that the government has established beyond a reasonable doubt that the jury would have found the aggravating factor if the instructions properly had charged the jury on it; thus we can affirm under the first harmless error review, as well.

Webster asserts that we should give the aggravating factor dealing with victim vulnerability little weight because the *Hall* jury did not find it. But Webster's jury did, and we refuse to question that determination.

We see no reason why the inclusion of the invalid factor rises to the level of a denial of constitutional rights that would require vacating the sentence.

The rejected factors are:

8. The defendant ... suffers from a mental disease, illness, defect, or personality disorder; ...

13. The defendant ... has personal qualities which are worth saving; ...

14. The defendant ..., due to circumstances of intellectual impairment, and dysfunctional family background, and upbringing, should be extended mercy; ...

21. The defendant ..., if not sentenced to death, will be sentenced to life in prison without any possibility of parole or release[.]

The court charged that

[a] finding with respect to a mitigating factor may be made by any one or more of the members of the jury, and any member who finds the existence of a mitigating factor may consider such factor established regardless of whether any other jurors agree that such mitigating factor has been established.... In determining whether a sentence of death is appropriate, each of you must weigh in your own mind, any aggravating factor or factors that the jury unanimously finds to exist beyond a reasonable doubt—whether statutory or non-statutory—against any mitigating factor or factors that you individually find to exist by a preponderance of the evidence.

*See Healy,* 376 U.S. at 82, 84 S.Ct. 553 (stating that "we find no compelling correlation between the propriety of the ultimate purpose sought to be furthered by a kidnaping and the undesirability of the act of kidnaping itself").

*See United States v. Adams,* 83 F.3d 1371, 1372–74 (11th Cir.1996) (indictment sufficient that alleged only that the victim was "held"); *United States v. Martell,* 335 F.2d 764, 766 (4th Cir.1964) (same); *Hayes v. United States,* 296 F.2d 657, 665–67 (8th Cir.1961) (same); *United States v. Atchison,* 524 F.2d 367, 369–71 (7th Cir.1975) (indictment sufficient that merely alleged victim was held for "ransom, reward, or otherwise"); *United States v. Bentley,* 310 F.2d 685, 685 (6th Cir.1962) (same); *Hall v. United States,* 410 F.2d 653, 659–60 (4th Cir.1969) (same); *Loux v. United States,* 389 F.2d 911, 914–16 (9th Cir.1968) (same).

*Cf. United States v. Barnhart,* 889 F.2d 1374, 1378 (5th Cir.1989) (holding factual basis for falsity in perjury indictment not required).

*Cf. Correa–Ventura,* 6 F.3d at 1076–86 (no unanimity requirement as to particular firearm used in 18 U.S.C. § 924(c) prosecution); *United States v. Linn,* 889 F.2d 1369, 1374 (5th Cir.1989) (holding that jury need not be unanimous as to identity of five individuals in prosecution for continuing criminal enterprise); *United States v. Sutherland,* 656 F.2d 1181, 1202 (5th Cir. Unit A Sept.1981) (no unanimity requirement as to overt acts in multiple-object conspiracy).

*See, e.g., United States v. Pollack,* 739 F.2d 187, 190 (5th Cir.1984) (holding that probable cause existed to arrest individual described as "a white male, approximately 50 years old, 5'8 or 5'9, with a short, stocky, medium build, glasses, and a receding hairline, wearing a dark blue or black coat, a light colored shirt and blue jeans"); *United States v. Maryland,*

479 F.2d 566, 569 (5th Cir.1973) (declaring that probable cause existed to arrest individuals described as "four Negroes, two men and two women ... traveling in a 'black and white vinyl over green Cadillac' ").

22    *Hill v. California,* 401 U.S. 797, 804, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) (holding that probable cause existed even though the police arrested the *wrong person* because of an imperfect description).

23    *See* *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *see also* *California v. Beheler,* 463 U.S. 1121, 1123–25, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (holding that whether an individual has been arrested, in the constitutional sense, is an objective, legal determination based on the circumstances of his restraint).

24    *United States v. Jennings,* 724 F.2d 436, 445–46 (5th Cir.1984) (finding bare generic allegations concerning the selective prosecution of racial groups insufficient to justify an evidentiary hearing); *United States v. Ramirez,* 765 F.2d 438, 440 (5th Cir.1985) (holding "conclusional allegations of impermissible motive are not sufficient" to demonstrate the government acted in bad faith).

25    Baldus reported that Georgia prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims, 32% of the cases involving white defendants and white victims, 15% of the cases involving black defendants and black victims, and 19% of the cases involving white defendants and black victims. *See* *McCleskey,* 481 U.S. at 287, 107 S.Ct. 1756.

26    Floyd also provided some of the testimony relevant to the admission of Webster's confession. As discussed above, the district court properly denied the motion to suppress the confession; the questions Webster raises regarding Floyd's credibility do not alter that determination.

27    When first contacted and hired, before the court's limiting order, Dr. Coons was informed that part of the exam would be for future dangerousness. But nothing in the record indicates that either Coons or Dr. Parker actually conducted an exam for future dangerousness.

28    *See* *Satterwhite v. Texas,* 486 U.S. 249, 257–58, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (citing numerous cases for proposition that constitutional errors in criminal trial are usually subject to harmless error review).

29    *See also* *United States v. Nobles,* 422 U.S. 225, 236, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (finding that FED.R.CRIM.P. 16 did not preempt an inherent power of the judiciary in criminal trial).

30    *See, e.g., United States v. Albright,* 388 F.2d 719, 722 (4th Cir.1968); *Pope v. United States,* 372 F.2d 710 (8th Cir.1967) (en banc), *rev'd on other grounds,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); *Alexander v. United States,* 380 F.2d 33 (8th Cir.1967); *Winn v. United States,* 270 F.2d 326 (D.C.Cir.1959).

31    *See* *United States v. Cohen,* 530 F.2d 43, 47 (5th Cir.1976) (holding that court possesses inherent authority to order exam and admit psychiatric testimony regarding sanity at time of offense in conjunction with exam for competency to stand trial performed pursuant to 18 U.S.C. § 4244); *United States v. Moudy,* 462 F.2d 694, 697 (5th Cir.1972) (same); *accord United States v. Malcolm,* 475 F.2d 420, 424–25 (9th Cir.1973) (same); *Gibson v. Zahradnick,* 581 F.2d 75, 78 (4th Cir.1978) (same); *United States v. Green,* 544 F.2d 138, 145 (3d Cir.1976) (holding that court possesses inherent power to compel exam by own psychiatrist under 18 U.S.C. § 4244); *United States v. Phelps,* 955 F.2d 1258, 1263 (9th Cir.1992) (inherent authority to compel psychiatric exam to determine whether release appropriate after verdict of not guilty by reason of insanity); *United States v. Lewis,* 53 F.3d 29, 35–36 n. 9 (4th Cir.1995) (holding that court did not err in ordering psychiatric examination in light of defendant's stated intent to rely on claim of sub-normal intelligence in support of entrapment defense despite the technical inapplicability of rule 12.2(b)).

32    *See* *Estelle v. Smith,* 451 U.S. 454, 465, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (noting that forbidding a government examination "may deprive the State of the only effective means it has of controverting [the defendant's] proof on an issue that he has injected into the case").

33    *See* *Flores,* 63 F.3d at 1355; *see also* *Witt,* 469 U.S. at 426–29, 105 S.Ct. 844 (although in habeas context, discussing universal reasons for deference); *United States v. Bryant,* 991 F.2d 171, 174 (5th Cir.1993) (decision to excuse juror for actual bias reviewed for *manifest* abuse of discretion).

During questioning by the government, Vicar gave the following answers:

A. I guess it's not something that I have ever wanted to do. I guess I have debated since we filled out that questionnaire whether I could really do it or not, but that doesn't say I don't think it's necessary. I guess I asked the question this morning about whether we really had a life sentence that were truly without parole or any chance of getting out. I don't know if I could tell you at this time whether I could make a decision for the death penalty or—I mean, I don't know if I could sit here and tell you today whether I could really do that or not. That's why I had the questions I had this morning about whether if you're telling me there really is a life sentence without parole, if that is really true, if you tell me in the courtroom that there is that option.

Q. ... knowing that a person you might convict of an offense like this is never going to be released, ever, period, and he's going to be in prison for the rest of his life, that realistically you could never vote for the death penalty, then you really need to let us know that now, okay?

A. I guess I feel like—since there is that other option, I'm not sure. I thought before that I could vote for the death penalty, but I don't really know, if it came right down to it, if I could do it or not. I'm not saying that I could not. I guess a lot of it would just have to do with the facts of the case. I don't know if I could do it or not. I couldn't tell you that I know I could or that I know I couldn't.

Q. ... Why do you feel that would be such a problem? Realistically, why do you feel that's a problem?

A. I guess I'm just torn between the fact of whether I thought there were cases that I have heard of that I thought that's exactly what they deserved, but whether I could—whether that decision—I guess whether it conflicts with my religious beliefs, whether that decision should really be up to me or not. I don't know if I could make that decision or if I could be guaranteed that person would be in prison for life. I guess it's probably primarily just—just something within myself that I don't know if I could do it or not, because I might think that person deserved exactly that, but whether I should be the one here on earth to make that decision.

Webster asserts, without substantiation or explanation, only that he was forced to take several "questionable" jurors.

The failure properly to grant a challenge for cause rises to the level of a constitutional violation and warrants reversal only "if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him." *Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Absent such a showing, the defendant has not been denied his Sixth Amendment right to an impartial jury. Webster has made no claim of incompetent jurors.

*See also* *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976) ("[A]s a general rule it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges.").

Hailey actually answered the question, "Yes, I guess so."

*Cf.* *United States v. McVeigh,* 153 F.3d 1166, 1206–08 (10th Cir.1998) (giving *Morgan* a narrow reach by holding that court need not allow the defense to ask veniremen *Morgan*-type questions that include consideration of facts and circumstances beyond a mere finding of guilt automatically leading to a recommendation of death under the FDPA).

*See* *Hall,* 152 F.3d at 410–11 (statements in ignorance of law combined with affirmation that venireman will follow instructions allows district court to find venireman competent).

Coffelt answered, "Possibly."

*See also* *Bell,* 828 F.2d at 1093 (holding that court properly declined to strike venireman for cause in similar circumstances, where pre-trial publicity predisposed venireman to find guilt).

Hoffman demonstrated both the difficulty and, ultimately, his ability to make a decision based on the evidence and not on his feelings for his children:

Where I feel that I would have a harder time at that—walling that off—is if a guilty verdict is determined and sentencing begins. I would still, again, look at the individual evidence itself and weigh all the circumstances, but just being a human being, I have experiences and feelings, and that's what makes us all individuals, of course, and those feelings for my children would probably end up coming out in some form in the sentencing.

*See* FED.R.CRIM.P. 23(b); *Huntress,* 956 F.2d at 1317 ("We wish to emphasize that district judges in this circuit should follow Rule 23(b) rather than substitute alternate jurors when a juror is excused after deliberations begin.").

This language allowing for the parties to stipulate to a jury of less than 12 members is similar to former rule 23(b), which did not allow the court to order the case to proceed even absent stipulations. Before changes to rule 23(b) in 1983, caselaw allowed a court to substitute an alternate juror even when deliberations had begun, if the parties refused to

stipulate to a jury of fewer than 12 members. *See [United States v. Phillips,](#) 664 F.2d 971, 996 (Former 5th Cir. Dec. 1981); [FED.R.CRIM.P. 23(b),](#)* advisory committee note. In such a case, the defendant had to show he was prejudiced by the use of the alternate juror. *See [Huntress,](#) 956 F.2d at 1316.*

Webster points out that when the jury was first impaneled, the court instructed that "once the deliberations begin, we will dismiss any alternate who has not been seated as a primary juror."

On appeal, Webster focuses on the same complaint. In some places, however, he mentions the failure to dismiss the alternates when deliberations began at the guilt-innocence phase.

*See [Huntress,](#) 956 F.2d at 1316–17* (holding that failure to make the proper objection to violation of juror rules leads to review for prejudice in the substitution).

The parties agree this must have been pled down to some lesser offense, given the punishment.

The most evident problem is with the response to Question 73, "Have you or a relative been convicted of any offense other than a traffic ticket?" Gomez checked "Yes," and under "details" noted "brother-in-law, child abuse." Five other questions were answered inaccurately, given Gomez's record of arrests, convictions, and probation.

*[United States v. Fryar,](#) 867 F.2d 850, 853 (5th Cir.1989); [United States v. Coleman,](#) 997 F.2d 1101, 1105 (5th Cir.1993)* ("A trial judge may 'remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties have become impaired.' ") (quoting *[United States v. Dominguez,](#) 615 F.2d 1093, 1095 (5th Cir.1980)).* Webster argues that mere abuse of discretion review provides insufficient protection to a capital defendant and that the heightened need for reliability in capital cases should compel us to examine errors with greater scrutiny. He provides no authority for this claim, and we see no reason to depart from the ordinary standard of review.

*See also [Rosales–Lopez v. United States,](#) 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981)* (district court has broad discretion in determining how best to conduct voir dire).

There also were several hispanics whom the government did not strike.

Webster conceded a legitimate reason existed for the Asian juror—difficulty with the English language.

*See [United States v. Broussard,](#) 987 F.2d 215, 221 (5th Cir.1993)* ("appellate review should not become bogged down on the question of whether the defendant made a prima facie showing in cases where the district court has required an explanation") (citing *[United States v. Forbes,](#) 816 F.2d 1006, 1010 (5th Cir.1987)); see also [Hernandez v. New York,](#) 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)* (plurality) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

*See [Bentley–Smith,](#) 2 F.3d at 1374* (noting difficulty of bringing forward such evidence, and frequent necessity of relying on rebuttal of proffered reasons and comparison to jurors not stricken).

*See, e.g., [United States v. Fields,](#) 72 F.3d 1200, 1206 (5th Cir.1996)* (juror trying to develop rapport with defense attorney); *[United States v. Stedman,](#) 69 F.3d 737, 739 (5th Cir.1995)* (potential juror's brother convicted of a criminal offense, another potential juror appeared disinterested; another juror had lived in area of concern in the case; another juror's sister had been arrested for a narcotics charge); *[United States v. Jackson,](#) 50 F.3d 1335, 1341 (5th Cir.1995)* (prosecutor believed that potential juror gave hostile look to prosecutor); *[United States v. Mixon,](#) 977 F.2d 921, 923 (5th Cir.1992)* (potential juror appeared to prosecutor to express animosity toward prosecution).

*See [United States v. Clark,](#) 617 F.2d 180, 183, 187 (9th Cir.1980)* (recognizing as due process claim, but treating under abuse of discretion standard); *[United States v. One Single Family Residence Located at 15526 69th Drive N.,](#) 778 F.Supp. 1215, 1219 (S.D.Fla.1991)* (finding due process violation for a complete denial of surrebuttal).

Typically, we review the decision to permit or deny surrebuttal under the abuse of discretion standard. *See, e.g., [United States v. Alford,](#) 999 F.2d 818, 821 (5th Cir.1993); [United States v. Moody,](#) 903 F.2d 321, 330 (5th Cir.1990).* The Ninth Circuit has examined a due process claim under the same standard. *See [Clark,](#) 617 F.2d at 187.* Under this standard, too, limiting surrebuttal that the district court considers cumulative rests soundly within its discretion. *See, e.g., [United States v. O'Brien,](#) 119 F.3d 523, 531 (7th Cir.1997)* (no abuse of discretion where surrebuttal would be cumulative); *[United States v. Blackstone,](#) 56 F.3d 1143, 1146 (9th Cir.1995)* (same); *[United States v. Wilford,](#) 710 F.2d 439,*

*452 (8th Cir.1983)* (same); *United States v. Burgess,* 691 F.2d 1146, 1153 n. 19 (4th Cir.1982) (same); *United States v. Stirling,* 571 F.2d 708, 736 (2d Cir.1978) (same).

Section 3596(c) provides,

A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

Webster intimates that imposing the death sentence on him, if he is mentally retarded, would violate the Eighth Amendment. The Supreme Court has rejected this argument. *See* *Penry v. Lynaugh,* 492 U.S. 302, 340, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ("[W]e cannot hold today that the Eighth Amendment precludes the execution of any mentally retarded person ... simply by virtue of his or her mental retardation alone.").

*Cf.* *United States v. Bachynsky,* 949 F.2d 722, 732–33 (5th Cir.1991) (holding that sentencing court cannot base decision on matters outside of presentence report without notice to defendant to provide "ample opportunity to raise his factual contention.").

*Cf.* *United States v. Kimbrough,* 69 F.3d 723, 733 (5th Cir.1995) (noting that we review factual findings in examining a sentence imposed for clear error).

Webster also suggests this requires a proportionality review; we see no basis in the statute for such an assertion.

*See* *United States v. Chandler,* 996 F.2d 1073, 1083 (11th Cir.1993) (holding similar provision of 21 U.S.C. § 848(q)(3) does not alter ordinary standards of review).

*See* *Hall,* 152 F.3d at 426 (finding "the record contains ample evidence from which the jury could conclude beyond a reasonable doubt" that the aggravating factors existed).

*United States v. Ramirez,* 145 F.3d 345, 350 (5th Cir.1998), *petition for cert. filed* (Sept. 28, 1998) (No. 98–6687); *United States v. Cluck,* 143 F.3d 174, 180 (5th Cir.1998) (noting that "we review the evidence in the light most favorable to the jury verdict"), *petition for cert. filed* (Sept. 26, 1998).

*See* *Hall,* 152 F.3d at 426 (stating that "[w]e have found nothing in the record indicating that the jury's recommendation of a death sentence was motivated in any degree by passion, prejudice, or any other arbitrary factor").

*See* *Garcia Abrego,* 141 F.3d at 151 n. 1 ("It has long been the rule of this court that no panel of this circuit can overrule a decision previously made by another." (internal quotation marks omitted)).

Webster also asserts, without analysis, that the "substantial planning and premeditation" aggravator is impermissibly vague. His argument is foreclosed by our analysis of the same language in the analogous 21 U.S.C. § 848(e) death penalty scheme. *See* *Flores,* 63 F.3d at 1373–74.

Further, because the jury did not find the aggravator of which Webster complains, he cannot claim his sentence is impaired.

As we have said in part IV.A.2, *supra,* the instructions sufficiently informed the jury not to weigh the elements of intent.

*Palmore v. Sidoti,* 466 U.S. 429, 432–33, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984); *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); *Hopwood v. Texas,* 78 F.3d 932, 939–40 (5th Cir.), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2580, 2581, 135 L.Ed.2d 1094, 1095 (1996).

*See also* *McKoy v. North Carolina,* 494 U.S. 433, 440, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (explaining that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" from its meaning during the case in chief; evidence is relevant if "it tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value") (quoting *North Carolina v.* *McKoy,* 323 N.C. 1, 372 S.E.2d 12, 45 (N.C.1988) (Exum, C.J., dissenting)).

Section 201(c)(2) reads,

Whoever—

directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any

court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom; shall be fined under this title or imprisoned for not more than two years, or both.

*See* *United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("No procedural principle is more familiar to this Court than that a [right] may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.") (quoting *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (internal citations omitted)); *see also* *United States v. Ravitch,* 128 F.3d 865, 869 (5th Cir.1997); *Calverley,* 37 F.3d at 162; *Helms v. United States,* 340 F.2d 15, 19 (5th Cir.1964).

We recently agreed to review a claim that was not raised until appeal when we found there had been an intervening change in the law. *See* *DSC Communications Corp. v. Next Level Communications,* 107 F.3d 322, 326 n. 2 (5th Cir.1997). Unlike Webster, however, the appealing party in *DSC Communications* relied on an intervening change in the law of this circuit, whereas Webster relies on a vacated opinion of another circuit.

The uncertainty of this circuit's law on this point is already anticipated in two recent district court decisions. In *United States v. Duncan,* 1998 U.S. Dist. LEXIS 11123, 1998 WL 419503 (E.D.La. July 15, 1998), the court refused to order a new trial based on § 201(c)(2). But in *United States v. Fraguela,* 1998 U.S. Dist. LEXIS 14347, 1998 WL 560352 (E.D.La. Aug. 27, 1998), the court granted a new trial and adopted the *Singleton* panel's reading of § 201(c)(2).

Because we find no plain error in the failure to suppress the co-defendants' testimony, we do not reach the question of the proper reading of § 201(c)(2). A review of this circuit's precedents shows, however, that we consistently have upheld government efforts to provide benefits to witnesses in exchange for testimony when challenged on other grounds. The district court did not err by conforming to this precedent.

In *United States v. Cervantes–Pacheco,* 826 F.2d 310, 315 (5th Cir.1987) (en banc), we explained our views on the propriety of giving benefits in exchange for witness testimony when we held that contingent compensation for witnesses may occur as long as the nature of such compensation is fully disclosed to the jury. We noted that "[n]o practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." *Id.* We went on to point out that "courts uniformly hold that such a witness may testify so long as the government's bargain with him is fully ventilated so that the jury can evaluate his credibility." *Id.* Thus, our general rule has been to allow the government to confer benefits upon witnesses in exchange for testimony (even contingent monetary compensation).

Along with our sister circuits, we also explicitly have upheld admitting the testimony of witnesses who were promised reduced sentences. *See* *United States v. Kimble,* 719 F.2d 1253 (5th Cir.1983); *see also* *United States v. Evans,* 697 F.2d 240 (8th Cir.1983); *United States v. Miceli,* 446 F.2d 256 (1st Cir.1971); *United States v. Vida,* 370 F.2d 759 (6th Cir.1966); *Lyda v. United States,* 321 F.2d 788 (9th Cir.1963) (discussed in *United States v. Dailey,* 759 F.2d 192, 198–200 (1st Cir.1985)).

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-2683　　Document: 13　　Filed: 11/14/2019　　Pages: 115

120 S.Ct. 83
Supreme Court of the United States

Bruce Carneil WEBSTER, petitioner,

v.

UNITED STATES.

No. 98-9212.
|
Oct. 4, 1999.

**Synopsis**

Case below, 162 F.3d 308.

**Opinion**

Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.

**All Citations**

528 U.S. 829, 120 S.Ct. 83 (Mem), 145 L.Ed.2d 70, 68 USLW 3224

---

**End of Document**　　　　　© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 23109787
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Fort Worth Division.

Bruce Carneil WEBSTER, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

No. Civ.A. 4:00–CV–1646–.
|
Sept. 30, 2003.

MEMORANDUM OPINION AND ORDER
DENYING AMENDED MOTION TO
VACATE CONVICTION AND SENTENCE

MEANS, J.

 **\*1** Petitioner Bruce Carneil Webster (Webster) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, has filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. The government filed a brief opposing the motion and Webster replied. The Court denies Webster's motion.


I


*History of the Case*

On June 7, 1996, a jury convicted Webster of kidnaping in which a death occurred, conspiracy to commit kidnaping, and carrying a firearm during a crime of violence because of Webster's involvement in the kidnaping of Lisa Rene. After a subsequent punishment hearing the jury, after finding certain aggravating and mitigating factors to be present, recommended on June 20, 1996, that Webster receive the death penalty. This Court assessed the death penalty on September 30, 1996. The case was appealed to the Fifth Circuit Court of Appeals, which affirmed Webster's conviction and sentence. *United States v. Webster,* 162 F.3d 308 (5 th Cir.1998).

Webster filed an initial motion to vacate on September 29, 2000. On April 4, 2001, this Court granted Webster's request to file a discovery motion, which he did on April 30, 2001. On June 18, 2002, this Court denied his motion for discovery, and Webster filed an amended motion to vacate on August 16, 2002. The government filed its response on November 14, 2002, and Webster filed a reply on March 13, 2003.

The Fifth Circuit Court of Appeals recited the following factual background in its opinion on direct appeal:

Webster, [Orlando] Hall and Marvin Holloway ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marijuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marijuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, and Hall took a flight to Dallas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D.Hall), picked up Hall at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marijuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marijuana, but Vitalis and N. Rene never appeared.

When Hall got in touch with Vitalis and N. Rene by telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had dialed to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas, from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car they had driven to the car wash, which they claimed was stolen from them along with the $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

 **\*2** On September 24, Hall contacted Holloway and had him drive Webster to the Little Rock airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac owned by Cassandra Ross, Hall's sister. Hall and Webster were armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. They approached the apartment from which they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door and knocked. The occupant, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and the police emergency phone number. After Webster unsuccessfully attempted to kick in the door, he and D. Hall looked through a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the door with the bat; Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving. Once there, they exited the Cadillac and forced Lisa Rene into the back seat of Beckley's car; Hall climbed into the back seat as well. With Beckley at the wheel and Webster in the front passenger seat, they drove around looking for a secluded spot. During the drive, Hall raped Lisa Rene and forced her to perform fellatio on him.

Unable to find a spot to their liking, they eventually returned to Ross's apartment. From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. En route to Pine Bluff, Webster and D. Hall took turns raping Lisa Rene. Once Beckley, D. Hall and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on the morning of September 25. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Webster and Hall went to Byrd Lake Park and dug a grave. That same evening, Webster, Hall, and Beckley took Lisa Rene to the park but could not find the grave site in the dark, so they returned to the motel room. In the early morning of September 26, Beckley and D. Hall moved Lisa Rene to another motel because they believed the security guard at the first motel was growing suspicious.

The same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. They covered her eyes with a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned Lisa Rene's back toward the grave, placed a sheet over her head, and hit her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley hit her in the head twice with the shovel and handed it to Hall. Webster and Hall began taking turns hitting her with the shovel. Webster then gagged her and dragged her into the grave. He stripped her, covered her with the gasoline, and shoveled dirt back into the grave. When buried, Lisa Rene, although unconscious, likely was still breathing. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

**\*3** Based on information from the victim's brothers, D. Hall was arrested; Hall and Beckley subsequently surrendered to the police. On September 29, just after turning himself in, Beckley gave a confession to a police detective and an FBI agent in which he admitted to the kidnaping of Lisa Rene and implicated himself, Hall, and an individual known as "B–Love." Beckley stated that he had last seen Lisa Rene at the Pine Bluff Motel with B–Love. A security guard at the motel informed the agents and officers that Webster went by the name B–Love, and provided a description of Webster and his vehicle. When Webster pulled into the motel parking lot during the early morning of September 30, he was detained and subsequently arrested.

*Webster,* 162 F.3d at 318–20.

II.

*Standard of Review*

28 U.S.C. § 2255 provides that a federal prisoner may move the convicting court to vacate, set aside, or correct a conviction or sentence on the grounds that it was imposed in violation of the Constitution or the laws of the United States. *See* 28 U.S.C. § 2255. A petition under § 2255 "may not do service for an appeal," and it is presumed that a defendant stands fairly and finally convicted. *United States v. Shaid,* 937 F.2d 228, 231–32 (5th Cir.1991) (en banc), *citing* *United States v. Frady,* 456 U.S. 152, 164 (1982). Therefore a defendant may not raise even constitutional or jurisdictional issues for the first time on collateral appeal without establishing both cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error. *Id.* A defendant must meet this cause-and-prejudice standard

Case: 19-2683 Document: 13 Filed: 11/14/2019 Pages: 115

even where he alleges a fundamental constitutional error. *Id.,* citing *Murray v. Carrier,* 477 U.S. 478, 493 (1986). Other types of error may not be raised for the first time under § 2255 unless the defendant establishes that the error could not have been raised on direct appeal *and,* if the error were condoned, it would result in a complete miscarriage of justice. *United States v.. Pierce,* 959 F.2d 1297, 1301 (5 th Cir.1992).

Moreover, claims that were raised but rejected on direct appeal are also barred from federal habeas review. *United States v. Rocha,* 109 F.3d 225, 229 (5 th Cir.1997). A federal habeas petitioner cannot, however, be expected to have raised a claim based on a Supreme Court case before that case was handed down. *Id.* Furthermore, ineffective assistance of counsel on appeal does satisfy the cause-and-prejudice standard. *Id.* And, finally, the Supreme Court has recently held that claims that counsel was ineffective at trial can be raised on habeas review under § 2255 regardless of whether the claims were previously raised on direct appeal. *United States v. Massaro,* 538 U.S. 500, 123 S.Ct. 1690, 1693–94, 155 L.Ed.2d 714 (2003).

III

*Issues Presented*

In his motion to vacate his conviction and sentence, Webster raises the following sixteen claims for relief:

**\*4** 1. Webster's rights to due process and equal protection and right to be free from cruel and unusual punishment were violated by the racially discriminatory effects of the federal capital sentencing scheme.

2. Webster's due-process rights were violated because the trial court made a factual finding on the issue of mental retardation that should have been made by the jury.

3. Trial counsel were ineffective in failing to investigate and present additional evidence regarding mental retardation.

4. Trial counsel were ineffective in failing to investigate and present evidence regarding racial bias in the school system in which Webster attended school as well as the potential biases of certain witnesses for the government.

5. Trial counsel were ineffective in failing to object to the trial court's decision to make the factual finding on the issue of mental retardation.

6. Trial counsel were ineffective in allowing a breakdown in communication with the mitigation specialist to affect the discovery, investigation, and presentation of evidence at trial.

7. Trial counsel were ineffective in failing to investigate and present to the jury an accurate portrait of the extreme abuse suffered by Webster as mitigating evidence.

8. Trial counsel were ineffective in failing to present evidence of Webster's special talents, musical abilities, and religious devotion as mitigating evidence.

9. Webster's due-process rights and right to be free from cruel and unusual punishment were violated because the government withheld information suggesting that Webster did not receive special education services in school because of racial discrimination.

10. Webster's due-process rights and right to be free from cruel and unusual punishment were violated by false testimony given by co-defendant Steven Beckley.

11. Webster's due-process rights and right to be free from cruel and unusual punishment were violated by false testimony given by co-defendant Marvin Holloway.

12. Webster is ineligible to be executed because he is mentally retarded.

13. The evidence presented at trial was insufficient to support the trial court's finding that Webster is not mentally retarded.

14. The trial court erred in dismissing a jury member and replacing him with an alternate juror after deliberations occurred at the guilt phase of the trial.

15. Webster's due-process rights have been violated because 18 U .S.C. § 3596 is unconstitutionally vague.

16. International law prohibits Webster's execution because he is mentally retarded.

Webster also requests an evidentiary hearing before this Court.

IV

*Procedural Bars*

In its response to Webster's petition, the government asserts several procedural bars to this Court's consideration of many of the claims that Webster raises in his petition. The government asserts that Webster is procedurally barred from raising his first, twelfth, thirteenth, and fourteenth claims because they were raised and rejected on direct appeal. The government also asserts that Webster is barred from raising his fifteenth claim for relief because it was not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default.

**\*5** In his reply, Webster asserts that he can overcome these procedural defaults, either because he raises claims based on new factual or legal bases or because his appellate counsel was ineffective on direct appeal. With respect to Webster's first, twelfth, and thirteenth grounds, this Court agrees that these previously raised and rejected grounds are based on new facts or law. Specifically, Webster's selective-prosecution claim is based on statistics from the Department of Justice that were not available at the time of his trial or appeal. Likewise, his mental retardation claims, including claims twelve and thirteen, are based, in essence, upon cases handed down by the Supreme Court since his appeal became final. Accordingly, these claims are not procedurally barred from habeas review. And, in the interest of justice, this Court will address Webster's fifteenth ground although it was not raised on direct appeal, as Webster has alleged, albeit in a perfunctory manner, that his appellate counsel was ineffective.

Webster's fourteenth ground for relief, however, concerning this Court's decision to excuse one juror and replace him with an alternate juror, was raised and rejected on appeal. Webster does not allege any new factual or legal basis for this claim that would render it necessary for this Court to revisit this issue. Accordingly, the Court agrees that this claim is barred from review.

V

*Discussion of Claims*

A. *Selective–Prosecution claim*
In his first claim for relief, Webster, in essence, makes a selective-prosecution claim. Specifically, Webster contends that the government violated his constitutional rights because it has used ethnicity as a basis for seeking the death penalty against African–Americans like himself. Webster bases his claim on statistics that purport to show that the government has sought the death penalty against African–American defendants with disproportionate frequency as compared to defendants of other races.

*Applicable Law*

In *United States v. Armstrong,* 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a selective-prosecution claim. In *Armstrong,* the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then went on to state that, in order to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464–65.

*Analysis*

At trial, Webster made a motion to dismiss the government's notice to seek the death penalty based on an affidavit presented to this Court indicating that 66% of federal death-penalty cases involved African–American defendants. This Court denied the motion and Webster's discovery request. Webster then appealed these decisions. On direct appeal, the Fifth Circuit denied this claim, holding that Webster had failed to make a sufficient showing that he was selectively prosecuted because he had not shown that the government had failed or refused to seek the death penalty against other similarly situated individuals, and he had failed to establish a discriminatory purpose on the part of the Department of Justice. The Fifth Circuit further held that Webster's statistical

Case: 19-2683     Document: 13     Filed: 11/14/2019     Pages: 115

evidence did not rebut the presumption of good faith on the part of the prosecution. *Webster,* 162 F.3d at 334–35.

**\*6** On habeas review, Webster now points to statistics compiled by the Department of Justice as support for his claim. (Webster's Ex. A). But contrary to his assertion that this statistical evidence is sufficient to establish a *prima-facie* selective prosecution case, the Fifth Circuit in *United States v. Jones,* 287 F.3d 325, 333–35 (5th Cir.), *cert. denied,* 537 U.S. 1018 (2002), ruled that these statistics were not sufficient to establish a *prima-facie* case after being presented with the same Department of Justice Report, titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988–2000)." As Webster presents to this Court the same statistics that the Fifth Circuit has previously held to be insufficient to support a claim of selective prosecution, this Court is not at liberty to rule otherwise, and Webster's first claim for relief is denied. [1]

### B. *Ineffective-assistance claims*

In grounds three through eighth, Webster asserts that his trial counsel were ineffective in several respects. Specifically, Webster contends that his trial counsel were ineffective for: failing to present additional evidence of his mental retardation, evidence of a racial bias in the school system for the area in Arkansas where Webster grew up as additional mitigating and impeachment evidence, accurate evidence regarding the abuse Webster suffered as a child, and evidence of Webster's musical abilities and religious devotion. Webster further asserts that his trial counsel were ineffective for allowing a breakdown in communication with their mitigation specialist to affect the investigation and presentation of evidence and for failing to object to this Court's decision to make the factual finding with regards to mental retardation.

### *Standard of Review*

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344–45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington,* 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a

defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. 466 U.S. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. *See also Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993) (holding habeas petitioner must show that trial result was unreliable or proceeding fundamentally unfair due to deficient performance of counsel).

### *Applicable Facts*

At the punishment phase of the trial, defense counsel presented testimony from four experts regarding Webster's mental abilities, including Dr. Raymond Finn (R. 23:172–244), Dr. Denis Keyes (R. 24:2–119), Dr. Robert Fulbright (R. 24:120–172), and Dr. Mark Cunningham (R. 24:183–224). Furthermore, Dr. George Denkowski testified at surrebuttal in order to critique the methodology used by one of the government's experts in testing Webster's I.Q. (R. 26:200–219), and Dr. Cunningham also testified about abuse as a child and its effects on adults.

**\*7** Moreover, the defense put on testimony from Webster's mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All of these witnesses testified, with varying degrees of knowledge, about the severe physical and sexual abuse that Webster's father inflicted on his wife and children, including weekly beatings with hoses and extension cords that left scars; the encouragement of sexual activity between the siblings and, on one instance, between one of Webster's brothers and his mother; and various forms of torture, including forcing the children to eat hog slop or to kiss the anus of a cat, burning one of his sons with an iron, placing hot sauce and pepper in the children's anuses, having the children beat each other, shooting guns at the children when they ran from the house, and killing Webster's dog. (R. 23:8–10, 13–14, 21, 37–40, 42, 55–7, 59, 105, 107–110, 112–13, 122–24, 126–27).

Webster's family members also testified that one of his brothers has been diagnosed as retarded and receives Social Security disability payments, one of his sisters receives disability payments due to a mental disorder, and another sister and his mother have received treatment for mental

Case: 19-2683     Document: 13     Filed: 11/14/2019     Pages: 115

health problems. (R. 23:19,35–6, 71, 118–19, 136). The defense also presented testimony from an officer of the juvenile court in Arkansas that removed one of Webster's brothers from the home because of the abuse. (R. 24:171–182). Furthermore, Webster's mother testified about the murder of one of her sons and the serious effects that it had on Webster, such that she took him to a mental health clinic for evaluation. (R. 23:146–49). And, several of his family members testified that Webster went to church regularly and was active in church, knew the Bible well, and sang and played the drums in church. (R. 23:43, 48–9, 71–2, 78, 83, 140, 155).

Defense counsel also presented testimony from two defense investigators in an effort to impeach the testimony given by two government witnesses. Investigator Lawrence Connelley testified that he interviewed E.C. Turner, a school counselor who had earlier testified for the government, and Mr. Turner told him that Webster was more of a follower than a leader and was easily influenced. Connelley further testified that he interviewed Pat Drewett, who also told him that Webster was a follower who was easily influenced by others. (R. 26:192–94). Investigator John Strickland testified that he interviewed Greg Barber, Webster's parole officer who had earlier testified for the government. Strickland testified that Barber had told him that Webster was a follower who was easily influenced by other people. (R. 26:196–98).

As support for his ineffective-assistance claims, Webster has submitted written exhibits, including: court documents that indicate that the Watson Chapel School District, the district in which Webster attended school, was under federal-court supervision from 1971 until 1991 because it was deemed a racially segregated district (Webster's Ex. B–E); documents indicating that a school teacher in that district successfully sued the district in the 1980's for racial discrimination in its failure to promote her to a position of assistant principal (Exhibits F & G); and affidavits from defense counsel Larry Moore and mitigation specialist Annette Lamoreaux outlining differences between the two regarding fees claimed by Lamoreaux and their respective theories about the case. (attachments H & I).

### Analysis

 **\*8**  Webster faults his trial counsel primarily for not presenting additional mitigating evidence at the punishment phase of the trial, including additional evidence of mental

retardation, additional evidence of abuse from his childhood, and additional evidence of his musical abilities and his religious devotion. Specifically, Webster asserts that his trial counsel should have developed and presented evidence of the racially discriminatory history of the school district in which he attended school, as well as testimony from certain other witnesses located by habeas counsel, as evidence that Webster was not in special education classes in school because the district was racially biased against African–Americans, not because he was not eligible for these classes. Webster further asserts that his trial counsel should have elicited further testimony from government witness E.C. Turner about his belief that Webster was a "follower;" that counsel should have presented other unspecified evidence about Webster's musical abilities and religious devotion; and that counsel was ineffective for allowing a breakdown in communication with the mitigation specialist, which resulted in counsel using their investigators to investigate possible mitigating evidence rather than Ms. Lamoreaux. Finally, Webster contends that his counsel were ineffective for failing to object to this Court's findings regarding mental retardation, which resulted in the issue's being reviewed only for plain error on direct appeal.

With regard to Webster's assertion that his trial counsel was ineffective for failing to present *additional* evidence of his mental retardation, the abuse in his family, and his religious devotion and musical abilities, as outlined earlier, defense counsel put substantial amounts of this evidence into trial. Thus, Webster is contending that his counsel were ineffective for failing to put *enough* of this type of information into evidence. The Fifth Circuit, however, has cautioned that a reviewing court should be wary of claims that an attorney did not investigate enough or failed to present enough evidence. *Smith v. Cockrell,* 311 F.3d 661, 669 (5 th Cir.2002), *citing Dowthitt v. Johnson,* 230 F.3d 733, 743 (5 th Cir.2000). And although more of the same or similar evidence could have possibly been presented by defense counsel, defense counsel did place a great deal of this type of evidence about Webster's past before the jury, and counsel were not ineffective for failing to present more of the same. *Prejean v. State,* 889 F.2d 1391, 1898–9 (5 th Cir.), *cert. denied,* 494 U.S. 1090 (1990).

Likewise, counsel were not ineffective for failing to discover and present evidence about the racial discriminatory past of the school district. Webster contends that it was vitally important that his trial counsel establish that he was prevented from attending special education classes because of his race,

not because he did not qualify. Webster contends that, had defense counsel placed this type of information into evidence, it would have effectively countered the government's contention that Webster is not mentally retarded. This Court, however, disagrees with Webster about the importance of this information. The government disputed Webster's allegations of mental retardation primarily through its own experts and the testimony of people other than his family who have known him both in and out of the prison system, not primarily by arguing that he is not mentally retarded because he was not in special education classes in school. Moreover, Webster's brother Mark testified that most of his brothers were in special education classes, and Tony Webster acknowledged that he was in "resource" classes in school. (R. 23:19, 31, 36). Therefore, any assertion that Webster was not placed in special education classes because the school district ignored the problems of its black students is countered by the fact that members of Webster's own family were in such classes. The Supreme Court noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 2065. Given the fact that evidence was presented at trial that other members of Webster's family were in special education classes at school, counsel cannot be faulted for not pursuing evidence of the school district's troubled past. Webster has failed to establish either prong of the *Strickland* standard with respect to this claim.

 **\*9**  With respect to Webster's claim that his attorneys were ineffective for failing to question E.C. Turner directly about his previous statements about Webster and his claim that they were ineffective in their relationship with the mitigation specialist, Webster has failed to prove any prejudice. Defense counsel put an investigator on the stand to impeach Turner's testimony at trial that Webster was not, in his opinion, retarded with other statements made by him. And, regardless of the type of relationship defense counsel had with the mitigation specialist, the defense called numerous witnesses to the stand to testify regarding several different mitigation issues. In fact, all twelve of the jurors found as a mitigating factor the fact that Webster suffered from abuse and neglect at home, four found as a mitigating factor that he either is or may be mentally retarded, six found it mitigating that he grew up in an atmosphere of violence and fear which misshaped his perception of violence, four found as a mitigating factor that his participation in the crime was, at least in part, attributable to the influence of another, and eleven jurors found as a mitigating factor the fact that he has the love

and support of other members of his family. *Webster, 162 F.3d at 319, n. 2*. These findings indicate that defense counsel were successful in presenting convincing mitigating evidence. Webster has not shown that cross-examining Mr. Turner, rather than having an investigator testify, or that a better relationship between the attorneys and the mitigation specialist would have resulted in any substantially different information being placed before the jury or, more importantly, that the result of the trial would have been different.

Finally, with regards to Webster's claim that his attorneys were ineffective for failing to object to the factual finding on mental retardation by this Court, as the Fifth Circuit noted on direct appeal, the law on this issue is far from settled or clear. *Webster,* 162 F.3d at 351.[2] Counsel cannot be deemed ineffective for failing to object when the law is not clear that a potential error has occurred. *See* *Clark v. Collins,* 19 F.3d 959 (5th Cir.1994) (holding that counsel was not deficient in failing to object to racially-motivated peremptory strikes before *Batson* was handed down by the Supreme Court). Webster has not established either prong of the *Strickland* standard with respect to this claim. Webster's ineffective-assistance claims are without merit and are denied.

C. *Mental–Retardation claims*

In his second, twelfth, thirteenth, fifteenth, and sixteenth grounds for relief, Webster asserts various claims that he is ineligible for the death penalty because he is mentally retarded. In his second claim, Webster asserts that this Court usurped the jury's role by making a factual finding that Webster is not mentally retarded. Instead, Webster asserts that he had a due process right to have the jury make that finding. In ground twelve, Webster asserts that he is ineligible for execution because he is mentally retarded. In ground thirteen, Webster contends that the evidence was insufficient to support this Court's finding that he was not mentally retarded. In ground fifteen, Webster argues that the federal statute that exempts mentally retarded defendants from execution is unconstitutionally vague, and in ground sixteen Webster argues that international law prohibits his execution because he is mentally retarded.

1. *Claims concerning* *18 U.S.C. § 3596*
 **\*10**  In his second claim for relief, Webster asserts that he had a due-process right to have the jury make the

factual determination under 18 U.S.C. § 3596(c) regarding whether he is ineligible for execution because is mentally retarded, and in his fifteenth ground, Webster contends that § 3596(c) is unconstitutionally vague.

18 U.S.C. § 3596 concerns the implementation of a sentence of death, and 18 U.S.C. § 3596 states, in relevant part, that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." *See* 18 U.S.C. § 3596(c). This subsection does not, however, give any guidance as to who is to make this determination. At trial, this Court chose to make the factual determination that, based upon the evidence presented at trial, Webster is not, as a matter of law, mentally retarded. (R. 26:227–28).

On appeal, using the clear-error standard because Webster did not object at trial, the Fifth Circuit held that this Court had not erred in opting to make the factual finding itself. *Webster, 162 F.3d at 351.* In his habeas petition, however, Webster cites *Apprendi v. New Jersey, 530 U.S. 466 (2000),* and *Ring v. Arizona, 536 U.S. 584 (2002),* handed down after the opinion in this case on direct appeal, as support for his assertion that he had a due-process right to have the jury make this determination. In *Apprendi,* the Supreme Court held that a jury, rather than a judge, must find beyond a reasonable doubt any fact that exposes a criminal defendant to a penalty greater than the statutory maximum. *Id.* at 482–83. In *Ring,* the Supreme Court extended the rule announced in *Apprendi,* holding that capital-murder defendants are entitled to a jury determination on any fact that increases their maximum punishment, such as aggravating circumstances that make a capital defendant eligible for the death penalty. *Ring, 536 U.S. at 588.*

The Fifth Circuit, however, has specifically held that the rule announced in *Apprendi* is a new criminal procedural rule that is not retroactively applicable under the exceptions set forth in *Teague v. Lane, 489 U.S. 288 (1989). United States v. Brown, 305 F.3d 304, 309–10 (2002).* Accordingly, *Apprendi* is not applicable to initial petitions under § 2255. *Id.* While the Fifth Circuit has not ruled whether the rule in *Ring* should be applied retroactively, a case issued by the Fifth Circuit last year strongly suggests that it should not. *See In re Johnson, 334 F.3d 403, 405 n. 1 (5th Cir.2003)* (noting that,

as *Ring* is essentially an application of *Apprendi,* logic would suggest that the rule announced in *Ring* is not retroactively available). Moreover, even if *Ring* is retroactively applicable, the Fifth Circuit has recently observed, albeit in the context of a state defendant seeking permission to file a second habeas petition, that neither *Ring* nor *Apprendi* renders the absence of mental retardation an element of capital murder which must be proven beyond a reasonable doubt. *Johnson, 334 F.3d at 405.* That is, the status of *not* being mentally retarded does not raise the sentence for the capital crime for which Webster was convicted to one where the death penalty is available. Rather, the status of being mentally retarded prevents the death penalty from being carried out with regards to a federal defendant. Because neither *Ring* nor *Apprendi* is applicable to § 3596(c), Webster has not shown any reason for this Court to re-examine the Fifth Circuit's determination that it was not error for this Court to make the factual determination under § 3596(c).

**\*11** Webster further contends that § 3596(c) is unconstitutionally vague because it does not provide any guidance on who is to be the fact-finder, does not outline a burden of proof, and does not set forth any standards for defining mental retardation. He offers no case law as support for this claim. Moreover, as noted by the government in its response, even were this portion of the statute determined to be unconstitutionally vague, this would have no effect on Webster's conviction, as this statutory prohibition on execution has no bearing on his underlying conviction. Moreover, regardless of the failings of 18 U.S.C. § 3596(c), Webster's execution would be prohibited by Supreme Court case law were it determined that Webster is mentally retarded, *Atkins v. Virgina, 536 U.S 304 (2002),* and *Atkins* provides its own guidance for making this determination. Webster is therefore not entitled to relief on either of these claims.

*2. Sufficiency of evidence regarding mental retardation*

In his twelfth ground for relief, Webster asserts that he is ineligible for the death penalty because he is mentally retarded, and in his thirteenth ground he contends that the evidence is insufficient to support this Court's factual finding that Webster is not mentally retarded. As support for these grounds, Webster relies on *Atkins v. Virginia, 536 U.S. 304 (2002),* and *Jackson v. Virginia, 443 U.S. 307 (1979).* In

*Atkins,* the Supreme Court held that the Eighth Amendment's ban on cruel and unusual punishment prohibits the execution of a mentally retarded person, while in *Jackson v. Virginia,* the Supreme Court held that a state inmate is entitled to federal habeas relief if a review of the record in the light most favorable to the prosecution established that no rational trier of fact could have found the proof of guilt beyond a reasonable doubt. *Id.* at 324, 326.

On direct appeal, the Fifth Circuit, using the "clearly erroneous" standard for review of a factual finding, held that the evidence presented at trial was sufficient to support this Court's finding that Webster is not mentally retarded. *Webster,* 162 F.3d at 352–53. Specifically, the Fifth Circuit noted that, not only had the government presented "substantial" evidence to support the finding, but only four of the twelve jurors found that Webster either is or may be retarded. Accordingly, the Fifth Circuit held that it could not be said that this Court clearly erred in making this finding. *Id.*

Webster, however, contends that the Fifth Circuit erred in this decision. While recognizing that neither § 3596(c) nor *Atkins* delineates a particular standard of review that should be used when assessing whether a finding regarding mental retardation is supported by the evidence, Webster argues that the *Jackson v. Virginia* standard should be utilized in determining on collateral review whether or not he is mentally retarded (Motion at 58).

It is highly unlikely that the "beyond a reasonable doubt" standard would be applicable to a factual finding on mental retardation, as this standard would imply that the government bore the burden of doubt of establishing "beyond a reasonable doubt" that a federal defendant is *not* retarded, which the opinion in *Atkins* does not even suggest. However, even were *Atkins* to require some greater standard of review than the "clear error" standard already used by the Fifth Circuit, such as the *Jackson* standard, viewed in the light most favorable to the prosecution, a rational fact-finder could have found that Webster is not mentally retarded based upon the evidence presented at trial.

**\*12** In that regard, this issue was a highly contested one at trial. Webster called four expert witnesses who testified about his mental capacity, including Dr. Raymond Finn, Dr. Denis Keyes, Dr. Robert Fulbright, and Dr. Mark Cunningham. Webster was given different I.Q. tests by some of these experts, and he scored between a composite score of between a 51 and a 65. (R. 23:184–94; R. 24:20). Webster's experts agreed that an I.Q. score of around 70 or lower, along with a lack of adaptive skills and the onset of these deficits before the age of 18, are the criteria for a diagnosis of mental retardation. (R. 23:183, 229–30). [3] In order to assess Webster's adaptive skills, Dr. Keyes used the Vineland test, which involved asking numerous questions of people who knew Webster before he was eighteen, including family members, teachers, and friends, but dropping those answers that are inconsistent with the answers of most of the interviewees. (R. 24:36–42). From this, Keyes determined that Webster lived at home, did not have a bank account or a charge card, and was never observed setting the dinner table, assisting in the preparation of meals, or making his bed. He also determined that no one had known Webster to keep secrets or confidences or address envelopes on his own. (R. 24:44–5, 73–6). Dr. Keyes testified that he did not speak to Webster's fellow gang members or police officers who had dealt with him before he was eighteen-years-old in reaching his results on the Vineland test. (R. 24:82–4). Based on this test, Dr. Keyes opined that Webster did have a lack of adaptive skills. Based on the I.Q. scores, along with this adaptive skills test and evidence from family members that Webster had been "slow" as a child, all of Webster's experts diagnosed him as being mentally retarded. (R. 24:43, 47, 144, 189).

Both Dr. Finn and Dr. Keyes acknowledged that cultural factors can have an effect on I.Q. scores (R 23:212; R. 24:59), and Dr. Keyes testified that the I.Q. tests required Webster to define words and recognize faces, and he did not know the definition of "inflation," nor did he recognize pictures of Shakespeare, Mark Twain, or Einstein, but he did recognize Elvis Presley and Stevie Wonder. (R. 24:60–2). Dr. Keyes also testified that Webster had reading and writing abilities that were unusual in a person with his alleged level of retardation and that Keyes attributes this to his belief that Webster probably suffers from "inorganic," as opposed to "organic" retardation. (R. 24:48, 111). Dr. Keyes also acknowledged, upon being questioned by this Court, that evidence that Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim. (R. 24:102).

The government, on the other hand, offered testimony from two experts, Dr. George Parker and Dr. Richard Coons. Dr. Parker testified that he administered an I.Q. test to Webster and his composite score was a 72. (R. 26:49). Dr. Parker

and Dr. Coons testified that they did not believe that Webster is mentally retarded. (R. 26:143). Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this to prior tests where he scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps. (R. 26:51–3, 60–1, 63, 67, 126, 142). Parker also observed that the fact that someone like Webster lived in a sub-culture in which he was not exposed to a lot of vocabulary could cause his I.Q. scores to be lower. (R. 26:50–51).

**\*13** Primarily, however, Parker and Coons questioned the results obtained by the defense when the test was administered to determine Webster's adaptive skills. Parker testified that he did not believe that the Vineland test was appropriate in Webster's case because of Webster's lifestyle, namely that of a drug dealer. Because of choices that Webster had made in his life, and because Webster had been in prison most of the time since he was fifteen years old, Parker and Coons believed that he would rate deceptively poor on the Vineland test. Dr. Parker and Dr. Coons also disputed some of the results Dr. Keyes did obtain with the Vineland test. Specifically, Dr. Keyes had indicated on the test that Webster's family members stated that Webster did not speak in complete sentences, did not read simple stories aloud, and did not read on his own initiative, when both the two experts and officers at the prison where he was housed after being charged in the instant case had observed that Webster did all of these things. Moreover, his family had stated that they did not know whether Webster addressed envelopes, put his clothes away, or made his own bed, whereas Parker had in his possession an envelope Webster had addressed and had observed that Webster put his clothes away and made his bed in his jail cell. (R. 26: 58–9, 136–39). Parker and Coons also noted that Webster had shown cleverness when he sneaked into the women's part of the jail at one point, and he had shown the ability to adapt to the life he had chosen, as well as life in prison. (R. 26:143–44). Furthermore, Webster had shown adaptability by being deceitful to the police by way of cover stories and excuses when he was arrested with a motel key in his pocket, and had the adaptive ability to destroy evidence when he burned his clothes after Lisa Rene's murder. (R. 26:65–6).

Moreover, the government placed into evidence the testimony of Greg Barber, Webster's former parole officer, Gene Stewart, who was the principal at the junior high that Webster attended, and Rick McLaughlin, the vice-principal at that same school. They all testified that they did not believe that Webster was mentally retarded and that, when they were visited by Dr. Keyes earlier and told him their opinions, he told them that they could not help him because he was trying to keep Webster from being executed, a charge he disputed in his testimony. (R. 25:26–8, 238, 239–40, 247–48, 249). Moreover, E.C. Turner, Pat Drowett, and Linda Monk, a counselor and two teachers from the junior high Webster attended, testified that in their opinion, while Webster was in "basic" classes at school rather than advanced classes and dropped out in the ninth grade, he is not retarded. (R. 25:34–70). Finally, two fellow inmates and several officers from the federal prison where Webster had been housed for some time testified that Webster wrote letters to other inmates, albeit in almost indecipherable slang, received letters and newspapers, read aloud from the newspapers, wrote request slips for various services, wrote written grievances, submitted names and addresses of people for his visitation list, appeared to be reading from law books in the law library and taking notes, and on one occasion complained because the change he had received after purchasing materials from the commissary was incorrect. (R. 25:86–103, 111–18, 122–25, 128–30, 136–38, 141–46; R. 26:24–35).

**\*14** In summary, all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low IQ. The experts disagreed about how low, but even a 72 I.Q. falls into the range where one can be diagnosed as mentally retarded, if one also has a deficit in adaptive skills. (R. 26:85–6). And the issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not. Looking at all of the evidence presented by both sides at trial, while it is undisputed that Webster has had low scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of a quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-2683    Document: 13    Filed: 11/14/2019    Pages: 115

rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills. *See* *Atkins,* 536 U.S. at 308, n. 3. The evidence at trial therefore supports a finding that Webster is not mentally retarded and therefore is not rendered ineligible for the death penalty under either *Atkins* or 18 U.S.C. § 3596(c).

### 3. *International Law claim*

In his final claim on the issue of mental retardation, Webster asserts that binding international law prohibits his execution because he is mentally retarded. As support for this claim, Webster points to resolutions from the United Nations and the International Commission on Human Rights. (Motion at 65). Aside from whether these resolutions are, in fact, binding on the United States, as the government notes, because the Supreme Court has recently held that the United States Constitution prohibits the execution of the mentally retarded, international law provides no greater relief to him than domestic law. Webster's second, twelfth, thirteenth, fifteenth, and sixteenth grounds for relief are without merit and are denied.

### D. *Brady claim*

In his ninth ground for relief, Webster contends that the government violated its duty under *Brady v. Maryland,* 373 U.S. 83 (1963), because the government was in possession of mitigating and impeachment evidence but did not provide it to Webster. Specifically, Webster asserts that the government knew that the reason he was not placed in special education classes when he was in school was because of racial discrimination and knew that certain of the government's witnesses who testified at punishment about his educational background were biased against Webster.

**\*15** Under *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the suppression of evidence favorable to the accused and material to either guilt or punishment by the State violates a defendant's due-process rights under the federal constitutional. And under *Brady,* the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley,* 473 U.S. 667, 682, 685 (1985). Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability of a different result is shown when the suppression

of evidence undermines confidence in the verdict. *Bagley,* 473 U.S. at 678.

Webster asserts that the government was aware that the Watson Chapel School District in Arkansas, where Webster attended school, had had a history of discriminating against African–Americans. Webster further asserts that part of this discrimination was the failure to place African–American students in special education classes when needed. Therefore, Webster asserts, had this information been provided to the defense, the defense could have impeached certain government witnesses, such as E.C. Turner, Linda Monk, and Pat Drewett, who testified that they did not believe that Webster was retarded and noted that he was not in special education classes in school. (R. 25:34–56).

Putting aside the issue of whether knowledge of the history of the Watson Chapel school district can be imputed to the prosecutors who prosecuted Webster's case, Webster has not established that, even if the evidence was withheld and could have been effectively used to impeach allegedly "biased" witnesses, it is material. In that regard, the Fifth Circuit has recognized that the materiality prong of the *Brady* standard is identical to the prejudice prong of the *Strickland* standard. *Martin v. Cain,* 246 F.3d 471 (5th Cir.), *cert. denied,* 534 U.S. 885 (2001); *Johnson v. Scott,* 68 F.3d 106, 109–10 (5th Cir.1995). That is, in both instances, a habeas petitioner must establish a reasonable probability of a different verdict had the alleged error not occurred. In the instant case, this Court has already determined that Webster has failed to establish any prejudice because his trial counsel did not discover and present this purported evidence of the school system's history of racial discrimination. Accordingly, Webster has failed to establish that this evidence was material to the punishment he received as he has not shown a reasonable probability that he would not have received the death penalty had defense counsel known about this information. These claims are denied.

### E. *False-testimony claims*

In his tenth and eleventh grounds for relief, Webster argues that his due-process rights were violated when the government presented the "untrue and damaging" testimony of two of his co-defendants, Steve Beckley and Marvin Holloway. Specifically, Webster contends that, after his trial, Beckley told a correctional officer and a fellow inmate that he had lied at Webster's trial in order to improve his own situation. Webster further contends that, after

Case: 19-2683     Document: 13     Filed: 11/14/2019     Pages: 115

Webster's trial, his co-defendant Orlando Hall received a letter from Holloway indicating that Holloway owed Webster an apology, a statement that Webster alleges indicates that Holloway lied at trial. Webster further argues that his due-process rights were violated even if the government did not know about any untruthful testimony.

**\*16** Beckley and Holloway were co-defendants who testified at Webster's trial regarding both their own and Webster's involvement in the crime. Both testified about their motives for testifying against Webster, namely that both had pled guilty to various offenses and were hoping that the government would recommend to this Court that their sentences be lowered in recognition of their cooperation. (R. 19:4–7; R. 20:94–9). Nevertheless, Webster contends that he has evidence that both Beckley and Holloway lied when they testified about Webster's involvement in the crime.

It should be noted that Webster has not presented any actual evidence to this Court that either Beckley or Holloway have ever stated that they lied at Webster's trial. In that regard, the statements allegedly made by Beckley and Holloway could very easily be read to mean that both men were apologetic for testifying at Webster's trial in order to improve their own situations. But even if Webster's allegations are taken as true, and all of Beckley's and Holloway's testimony about Webster's involvement in the crime is suspect, Webster has shown no due-process violation. In that regard, the Supreme Court has held that the presentation and admission of false evidence at trial violates a criminal defendant's due-process rights if the reliability of a given witness may be determinative of guilt or innocence. *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *Mooney v. Holohan,* 294 U.S. 103 (1935). And this is true whether the presentation was intentional or through negligence. *Giglio v. United States,* 405 U.S. 150, 154 (1972). Predictably, then, none of the cases cited by Webster supports his contention that it is a due-process violation for false testimony to be presented at trial without the knowledge of the prosecution. [4] In fact, contrary to this assertion, in order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, Webster must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois,* 360 U.S. at 271. Webster has failed even to allege that the government knew that any testimony

given by Holloway or Beckley was false. Accordingly, this Court denies relief with respect to these claims.

## VI

### *Request for Evidentiary Hearing*

Webster also requests that this Court conduct an evidentiary hearing on the claims he raised in his motion. Section 2255 does not require that a hearing be held to dispose of every motion made under its authority. *Coco v. United States,* 569 F.2d 367, 369 (5th Cir.1976). But § 2255 does require a hearing unless the motion, files, and record of the case conclusively show that no relief is appropriate. *United States v. Bartholomew,* 974 F.2d 39, 41 (5th Cir.1992). However, conclusive, rather than direct evidence, is required in order to deny relief without a hearing. *United States v. Drummond,* 910 F.2d 284, 285 (5th Cir.1990). Bona fide or contested fact issues must be resolved on the basis of an evidentiary hearing. *Booth v. United States,* 507 U.S. 243 (5th Cir.1975); *Reagor v. United States,* 488 F.2d 515 (5th Cir.1973).

**\*17** The record before this Court, including the exhibits submitted by Webster with his motion, do not create any contested fact issues that must be resolved in order to decide Webster's claims. To the contrary, most of Webster's claims are based on the record from the trial. And, with regard to the claims for which Webster has submitted additional evidence, the Court has decided these claims either by assuming that everything Webster alleges is true or based on legal, not factual, bases. Accordingly, because the record before this Court shows conclusively that Webster is not entitled to relief, his request for an evidentiary hearing is denied.

It is therefore ORDERED that Petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 be, and is hereby, DENIED.

It is further ORDERED that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 23109787

Case: 19-2683      Document: 13      Filed: 11/14/2019      Pages: 115

Footnotes

1       Webster further asserts that the fact that this Court denied him the right to conduct discovery on this issue is the reason he cannot establish both prongs of the *Armstrong* standard. But in both his motion for discovery and here, while Webster has arguably presented some statistical evidence to support his claim that there has been a disparate effect on African–Americans, Webster has presented no evidence that there were *similarly situated* white defendants against whom the death penalty was not sought. Furthermore, Webster has failed to present any evidence, inferred or otherwise, that there has been any discriminatory intent when prosecutors have decided to ask for permission to seek the death penalty against African–American individuals or when the Department of Justice has authorized the death penalty in cases against African–American defendants. Accordingly, following the reasoning in *Armstrong,* Webster's statistical evidence is not sufficient to establish either the elements of his claim of selective prosecution or the "some evidence" standard necessary to establish good cause for discovery.

2       Indeed, as of the date of this opinion, a search on Westlaw reveals that only two published federal cases even mention

        18 U.S.C. § 3596(c), the statute concerning the federal statutory prohibition on executing the mentally retarded. One

        was the instant case on direct appeal before the Fifth Circuit and the other is *Atkins v. Virginia,* 536 U.S. 304 (2002), the recent Supreme Court case that held that executing the mentally retarded violates the Constitution. *Atkins* only mentions this statute in passing in a footnote. *Id .* At 314, n. 10.

3       This definition is the same as that outlined by the Supreme Court in *Atkins,* 536 U.S. at 308, n. 3, 318.

4       Webster does not contend that the evidence is insufficient to support his conviction or sentence without the alleged false testimony. Indeed, after he was arrested, Webster gave a written confession that was admitted into evidence at trial in which he acknowledged that he participated in the kidnaping of Lisa Rene, although, not surprisingly, by his accounting his participation in the crime was less than his co-defendants. (R. 20:40–55). Furthermore, Holloway's and Beckley's testimony was corroborated by the testimony of Demetrius Hall, another co-defendant (R. 18:98–152); the testimony of a woman who saw Webster at a 7–Eleven near the victim's apartment (R. 18:280); testimony from a security guard at the motel where the victim was kept that the room was rented in Webster's name and he saw Webster on the premises (R. 19:176–92); testimony that Webster had the key to the motel room in his pocket when he was arrested (R. 19:247–54); testimony that Webster helped police officers locate the grave (R. 20:32–4); testimony that Webster had the victim's gold bracelet and necklace on him when he was arrested (R. 20:217, 219, 222); and testimony about Webster's own statements to the police that the killing was "strictly business." (R. 21A:72).

---

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                                054   13

392 F.3d 787
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Bruce Carneil WEBSTER, Defendant-Appellant.

No. 03-11194.
|
Dec. 7, 2004.

**Synopsis**

**Background:** Defendant, whose conviction of capital murder and death sentence were affirmed, 162 F.3d 308, moved to vacate his conviction and sentence. The United States District Court for the Northern District of Texas, Terry R. Means, J., 2003 WL 23109787, denied relief, and defendant requested certificate of appealability.

**Holdings:** The Court of Appeals, Jerry E. Smith, Circuit Judge, held that:

absence of mental retardation was not element of capital murder sentence that was constitutionally required to be determined by jury;

defendant's counsel was not ineffective;

statistical evidence was insufficient to make prima facie showing that defendant's sentence was result of racial discrimination;

defendant was not denied due process, even if inculpatory testimony elicited by government from co-defendants was false, absent allegation government knew of falsity; and

denial of discovery did not violate due process.

Relief denied.

**Attorneys and Law Firms**

**\*790** Nancy E. Larson, Richard Bratton Roper, III, Asst. U.S. Attys., Fort Worth, TX, for Plaintiff-Appellee.

Gary Allen Taylor, Austin, TX, Philip Alan Wischkaemper, Snuggs & Wischkaemper, Lubbock, TX, for Defendant-Appellant.

Appeal from the United States District Court for the Northern District of Texas.

Before SMITH, WIENER, and BARKSDALE, Circuit Judges.

**Opinion**

JERRY E. SMITH, Circuit Judge:

Bruce Webster requests a certificate of appealability ("COA") for issues the district court, which granted a COA on two issues, deemed unworthy of collateral review. Because Webster has failed to make a substantial showing of the denial of a constitutional right, we deny his application.

I.

In 1996, a federal jury convicted Webster of, and sentenced him to death for, three offenses-kidnapping resulting in death, conspiring to kidnap, and using and carrying a firearm during a crime of violence-for his role in the shocking and exceedingly brutal kidnapping, rape, and murder of sixteen-year-old Lisa Rene.[1] We affirmed the conviction and sentence on direct appeal, *see* United States v. Webster, 162 F.3d 308 (5th Cir.1998), *cert. denied,* 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999).

In September 2000 Webster filed a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255, and an amended § 2255 motion challenging his conviction and sentence on sixteen grounds in August 2002. The district court rejected Webster's claims and dismissed his petition. *See* Webster v. United States, No. 4:00-CV-1646-Y, 2003 WL 23109787 (N.D.Tex. Sept.30, 2003).

Webster subsequently filed (in the district court) an application for a COA on all grounds raised in his § 2255 motion. In January 2004, the district court issued a COA limited to Webster's claims that (1) his mental retardation renders him ineligible for the death penalty and (2) the evidence **\*791** was insufficient to warrant the finding that he is not mentally retarded.[2] Webster thereafter filed the instant application with this court expressly limited (as is the

government's brief in opposition) to requesting a COA on the issues not certified by the district court. [3]

## II.

A defendant may not appeal a final order in a § 2255 proceeding unless a circuit justice or judge issues a COA. *See* 28 U.S.C. § 2253(c)(1)(B). To obtain a COA, Webster must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). [4] He must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 327, 123 S.Ct. 1029 (citing *Slack,* 529 U.S. at 484, 120 S.Ct. 1595).

In determining whether to grant a COA, we are limited "to a threshold inquiry into the underlying merit of [Webster's] claims." *Id.* "This threshold inquiry does not require full consideration of the factual and legal bases adduced in support of the claims." *Id.* at 336, 123 S.Ct. 1029. Instead, our determination is based on "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* In death penalty cases, "any doubts as to whether a COA should issue must be resolved in [petitioner's] favor." *Hernandez v. Johnson,* 213 F.3d 243, 248 (5th Cir.2000).

## III.

## A.

Before the jury retired for deliberations at the penalty phase, the district court excused juror Albert Fox and elevated an alternate. Webster alleges that the court committed constitutional error in replacing the dismissed juror with an alternate. Because this claim was raised and rejected on direct appeal, *see Webster,* 162 F.3d at 345-47, the district court properly held that Webster was barred from raising it on collateral review. [5] We therefore deny a COA on this issue.

## B.

After imposing a death sentence on the verdict, the district court entered a factual finding that Webster is not mentally retarded and is therefore not immune from the death penalty under 18 U.S.C. § 3596(c). [6] Webster challenged this finding on direct appeal, claiming that the statutory scheme precluded factfinding by the court absent the defendant's motion, and that the court acted without notice, **\*792** thereby depriving him of due process. Reviewing the statutory challenge for plain error as a result of Webster's failure to object, and the due process claim *de novo,* we rejected both claims. *See Webster,* 162 F.3d at 351-52.

Relying on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Webster sought habeas relief, asserting that he has a due process right to have the jury make the determination as to retardation. [7] The district court denied relief, concluding that *Apprendi* does not retroactively apply to initial habeas petitions under § 2255 and that the absence of mental retardation is not an element of the sentence constitutionally required to be found by the jury. Webster seeks a COA on this claim.

Webster has not made the requisite showing of the denial of a constitutional right in this instance. As an initial matter, the procedural rule announced in *Apprendi* is not retroactively applicable to initial habeas petitions under § 2255. *See United States v. Brown,* 305 F.3d 304, 309 (5th Cir.2002). Although this court has yet to determine whether *Ring* applies retroactively, because "the rule in *Ring* is essentially an application of *Apprendi,* logical consistency suggests that the rule announced in *Ring* is not retroactively applicable." *In re Johnson,* 334 F.3d 403, 405 n. 1 (5th Cir.2003). [8]

Even assuming *arguendo* that *Ring* applies retroactively, "neither *Ring* [nor] *Apprendi* ... render[s] the *absence* of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt." *Id.* at 405 (emphasis added). [9] Thus, because *Apprendi* does not apply retroactively to Webster's initial § 2255 motion, and *Ring,* even if retroactive, does not render the absence of mental retardation an element of the sentence that is constitutionally required to be determined by a jury, Webster has failed to make the requisite showing. We deny a COA on this issue.

Case: 19-2683     Document: 13          Filed: 11/14/2019     Pages: 115

### C.

Webster contends that his trial counsel provided ineffective assistance of counsel under the Sixth Amendment. He alleges the following specific deficiencies:

**\*793** (1) Counsel failed to investigate and present additional evidence demonstrating mental retardation and the extreme abuse Webster suffered as a child;

(2) Counsel failed to investigate and present (for purposes of mitigation and impeachment) evidence of racial discrimination in Webster's Arkansas school district;

(3) Counsel allowed a "breakdown in communication and a dispute over money with the mitigation specialist" to affect the sentencing phase of trial; and

(4) Counsel failed to object to the district court's factual finding regarding mental retardation.

To make a substantial showing of the denial of his Sixth Amendment right to reasonably effective assistance of counsel, Webster must satisfy *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, he must demonstrate "that counsel's performance was deficient," *id.* at 687, 104 S.Ct. 2052, and that "the deficient performance prejudiced ... [his] defense," *id.*

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88, 104 S.Ct. 2052. Judicial scrutiny of counsel's performance must be "highly deferential," *id.* at 689, 104 S.Ct. 2052, and we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," *id.* There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104

S.Ct. 2052. The district court's denial of relief is not debatable among jurists of reason, even on threshold review, so we deny a COA on these claims.

### 1.

Webster contends that his trial counsel were ineffective in failing to investigate and present additional mitigating evidence demonstrating mental retardation and the extreme abuse he suffered as a child. The district court denied habeas relief, characterizing this ineffective assistance claim as one of degree-i.e., Webster does not allege that counsel utterly failed to present evidence of mental retardation and child abuse but, instead, that counsel were ineffective for failing to investigate and present *enough* of such evidence. After engaging in an exhaustive review of the trial record, the district court determined that defense counsel presented a significant amount of such evidence; and, although more of the same or similar evidence could have been furnished, counsel were not constitutionally ineffective for failing to present more of the same.

Indeed, our review of the trial record confirms that Webster's counsel were far from constitutionally ineffective in investigating and presenting evidence of his mental condition and the abuse he suffered as a child. During the punishment phase, counsel presented lengthy and detailed testimony from four medical experts regarding Webster's mental capacity [10] and the testimony of a fifth medical expert on surrebuttal to critique the methodology **\*794** used by one of the government's experts in testing Webster's cognitive abilities.

Moreover, counsel presented substantial evidence of the abuse Webster suffered as a child, including testimony from his mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All of these witnesses testified about the severe physical and sexual abuse that Webster's father inflicted on his children and his wife (Webster's mother). These witnesses recounted graphic and violent stories of sexual abuse; weekly beatings with hoses, fan belts, and extension cords; and various other forms of torture, including electric shock and burning. Even further, counsel presented testimony from an officer of the juvenile court in Arkansas that removed one of Webster's siblings from the home because of abuse.

In light of this substantial body of evidence and the pre-trial investigation its presentation required, Webster's generalized

allegation that more evidence of mental retardation and child abuse should have been presented is arguably frivolous. In any event, it is insufficient to demonstrate objectively deficient performance by counsel. [11] Because Webster has failed to make the requisite showing of deficient performance, we need not address the prejudice portion of the *Washington* inquiry. [12] We **\*795** deny a COA on this ineffective assistance claim.

### 2.

Webster faults his trial counsel for failing to investigate and present evidence of racial discrimination allegedly existing in the district where he attended school. Webster claims it is vitally important for counsel to demonstrate that the reason he was not enrolled in special education courses was the district's racially discriminatory practice of not placing black students in such courses even when necessary, and not because he did not qualify. Had such evidence been presented, Webster contends, it would have effectively countered the government's assertion that he is not mentally retarded.

In denying habeas relief, the district court concluded that Webster had failed to establish either prong of the *Washington* standard on this claim. Significantly, the court disagreed with Webster about the salience of the evidence. First, the court observed that the government disputed Webster's claim of mental retardation primarily through the testimony of its medical experts, cross-examination of Webster's medical experts, and the testimony of other witnesses familiar with Webster both in and out of the prison system. Thus, although certain government witnesses noted the fact that Webster was not in special education courses, this point was merely incidental to the government's case. [13]

Second, the district court noted that Webster's brother Mark testified that most of his brothers *were* in special education classes, and Tony Webster acknowledged that he was in "resource" classes. Surmising that any evidence that the school district did not place black students in special education classes when necessary would have been countered by such testimony, the court concluded that counsel could not be faulted for failing to pursue this track.

Even assuming *arguendo* that counsel's failure to investigate and present such evidence constitutes objectively deficient performance, the district court's conclusion that Webster

cannot demonstrate the requisite prejudice is not debatable. Indeed, in rejecting Webster's claim on direct appeal that the evidence was insufficient to warrant the conclusion that he was not mentally retarded, this court noted that "[t]he government presented *substantial* evidence to support the finding." *Webster,* 162 F.3d at 353 (emphasis added). Consequently, the incremental impeachment value, if any, of such evidence does not raise a reasonable possibility that, had the evidence been presented, the outcome would have been different. [14] We therefore deny a COA on this ineffective assistance claim.

### 3.

Webster contends that his trial counsel were ineffective in allowing a breakdown in communication and a dispute over fees with the mitigation specialist to affect the investigation and presentation of mitigating evidence. Although the factual basis underlying this claim differs from his other ineffective assistance claims, the substance of the claim remains the same: But for this "breakdown," additional mitigating evidence of mental retardation, child **\*796** abuse, and racial discrimination in school could have been discovered and presented.

Webster's vague and generalized allegations of additional (unspecified) evidence of retardation and extreme child abuse notwithstanding, defense counsel presented substantial quantities of mitigating evidence concerning retardation and child abuse. [15] Webster cannot, therefore, on threshold review, establish either deficient performance or prejudice for this claim. We therefore deny a COA on this ineffective assistance claim.

### 4.

Webster claims ineffective assistance from counsel's failure to object to the district court's factual finding, discussed above, that he is not mentally retarded and thus is not exempt from the death penalty under § 3596(c). The district court disagreed, concluding that counsel's failure to object to the finding cannot be deemed ineffective assistance when it was not evident, based on the law at the time, that a potential error had occurred.

At the time of trial (which is what matters when assessing counsel's performance),[16] there was no law on who has the authority to decide-court or jury-whether a defendant is mentally retarded within the meaning of § 3596(c).[17] Thus, there was no legal basis on which trial counsel could conclude (or even suspect) that the court had committed error.[18] This dearth **\*797** of authority persists even today; no statutory amendment or judicial decision has addressed whether the mental retardation finding envisioned by § 3596(c) is a question for the court or the jury. Moreover, even if there were a subsequent legal development holding that the jury is the fact-finder required by § 3596(c), the admonition to reviewing courts to "eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time," *Washington,* 466 U.S. at 689, 104 S.Ct. 2052, would render Webster's claim meritless.[19]

It follows, then, that counsel cannot be deemed constitutionally ineffective for failing to anticipate a "subsequent development," and Webster cannot rely on the failure to object as a basis for showing deficient performance. Reasonable jurists cannot disagree with the district court's conclusion that counsel were not constitutionally ineffective. We deny a COA on this ineffective assistance claim.

### D.

Webster seeks a COA on his claim that the prosecution withheld impeachment evidence in contravention of its due process obligation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. The evidence allegedly withheld is the same material Webster faults his trial counsel for not investigating and presenting to the jury: alleged racial discrimination in the district where Webster attended school and specific evidence of the district's discriminatory practice of failing to place black students in special education classes when necessary. As with his ineffective assistance claim, Webster maintains that disclosure of this evidence would have provided a basis for impeaching government witnesses who testified that he was not mentally retarded and who noted the fact that he was not enrolled in special education classes.

The right to due process is violated where, on request, the government conceals evidence (exculpatory as well as impeachment) that is favorable to the defendant and material to guilt or innocence, irrespective of the good faith of the prosecution. *See id.* at 87-88, 83 S.Ct. 1194; *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Ellender,* 947 F.2d 748, 756 (5th Cir.1991). "[E]vidence is **\*798** material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375.

Relying on its antecedent conclusion that Webster could not demonstrate prejudice from counsel's failure to discover and present evidence of the school district's discriminatory practices, the district court denied habeas relief on this claim. Jurists of reason cannot find debatable or wrong the rejection of Webster's *Brady* claim.

Even assuming, *arguendo,* that Webster can make the threshold showing that the government suppressed (and was therefore in possession of) this information,[20] Webster's claim fails the threshold showing of materiality. "In assessing the materiality of undisclosed impeachment evidence, 'we must consider the nature of the impeachment evidence improperly withheld and the additional evidence ... independent of the disputed testimony.' " *Wilson v. Whitley,* 28 F.3d 433, 439 (5th Cir.1994) (quoting *United States v. Weintraub,* 871 F.2d 1257, 1262 (5th Cir.1989)).

Although Webster maintains that such evidence could have effectively countered the government's position that he is not mentally retarded, our analysis of his related ineffective assistance claim obtains equally here.[21] In the main, the prosecution presented substantial evidence countering Webster's claim of mental retardation, **\*799** and the government's effort did not depend in any significant respect on Webster's non-enrollment in special education courses.

To the contrary, beyond cross-examining defense experts, the government produced two medical experts who testified that they did not believe Webster was mentally retarded, and, primarily, that the methodology used by the defense experts to gauge his mental capacity was critically flawed.[22] Moreover, the government presented numerous other

witnesses whose testimony contradicted Webster's claim of mental retardation. [23] Thus, the incremental impeachment value, if any (given the conflicting testimony by Webster's brothers), of such evidence does not raise a reasonable probability that, had the evidence been disclosed, the outcome would have been different. [24]

In sum, even indulging (on this threshold review) Webster's highly attenuated and suspect attempt to impute knowledge of this evidence to the prosecution, the evidence allegedly withheld is not material. Because jurists of reason could not find this due process claim debatable, we deny a COA on this issue.

### E.

Webster contends that § 3596(c) is unconstitutionally vague and violates his right to due process because it fails to provide any guidance on (1) whether the issue of mental retardation is to be decided by the judge or jury; (2) whether the decision is to be made pretrial or at sentencing; (3) what is the burden of proof; and (4) what is the relevant standard for a finding of retardation. Although the district court noted that Webster had failed to raise this claim on direct appeal, [25] the court nevertheless proceeded to consider and reject it on the merits.

Webster may not, however, raise this issue for the first time on collateral review without showing both "cause" for his procedural default and "actual prejudice" resulting from the error. *See, e.g., United States v. Shaid,* 937 F.2d 228, 232 (5th Cir.1991) (en banc). He has neither alleged nor shown cause and prejudice, so **\*800** this claim cannot form the basis of a substantial showing of the denial of a constitutional right. We deny a COA on this issue.

### F.

Webster avers that the death sentence was applied in his case as a result of a "systematic pattern of racial discrimination" on the part of the government in violation of the Fifth and Eighth Amendments. This claim was raised and rejected on direct appeal. [26] Attempting to breathe new life into it on collateral review, Webster relies on new statistical evidence compiled by the Department of Justice. [27] Finding that those statistics

are identical to those held insufficient to state a *prima facie* case of selective prosecution in *United States v. Jones,* 287 F.3d 325, 332-35 (5th Cir.2002), the district court rejected this claim.

We agree that the statistics are wholly insufficient to meet the threshold requirement that Webster was singled out in the capital charging decision on the basis of his race, but that others similarly situated were not. Despite citing to new statistical data, Webster has done no more than repeat his claim of error rejected on direct appeal. Because he has failed to make the requisite showing of the denial of a constitutional right, we deny a COA on this issue.

### G.

Webster contends that his due process rights were violated by the presentation of "perjured and damaging testimony" from co-defendants Steven Beckley and Marvin Holloway. He alleges that two post-trial events provide a basis for this claim: first, that Beckley told a correctional officer and an inmate that he had lied at Webster's trial in an effort to improve his standing with the government; and second, that Orlando Hall, another co-defendant, received a letter from Holloway stating that he owed Webster an apology-a statement Webster cites as evidence that Holloway lied at trial.

The district court determined that, even if Webster's allegations of perjury were accepted as true, his claim is meritless given his failure even to allege that the government knew that any of the testimony given by Beckley or Holloway was false. [28] Jurists of reason could not find debatable or wrong the district court's rejection of this claim.

"[I]t is established that a conviction obtained through the use of false evidence, *known to be such* by representatives of the State, must fall under the Fourteenth Amendment.... The same **\*801** result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."

*United States v. O'Keefe,* 128 F.3d 885, 893 (5th Cir.1997) (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (emphasis added)). To establish a due process violation based on the government's use of false or misleading testimony, Webster must show that (1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

testimony was false. *Id.* at 893 (citing *United States v. Blackburn,* 9 F.3d 353, 357 (5th Cir.1993)).

As a threshold matter, Webster has failed to identify even a single specific statement made by either witness that is false; instead, he offers only conclusional statements about the ultimate falsity of Beckley's and Holloway's testimony. Moreover, even if Webster's allegations of perjury are accurate, his underlying due process claim is not debatable, because he has failed even to allege that the prosecution knew that any statements made by either witness were false.[29]

Because Webster has failed to identify any statement that is false, and has not even alleged the government knowledge of falsity on which a due process claim is based, he has not made a substantial showing of the denial of his constitutional right to due process. We deny a COA on this issue.

### H.

Webster seeks a COA on his claim that his (alleged) mental retardation renders his execution contrary to binding international law. The district court rejected this claim on the merits, concluding that international law affords Webster no greater relief than does domestic constitutional relief under the Eighth Amendment as interpreted in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Jurists of reason could not disagree or find wrong the district court's conclusion in that regard.

Reliance on that conclusion is not necessary, however. Because Webster did not raise this claim on direct appeal and has failed to demonstrate cause and prejudice for this default, in either his § 2255 motion or his COA application in the district court or with this court, he may not raise it for the first time on collateral review. *See, e.g., Shaid,* 937 F.2d at 232. We deny a COA on this issue.

### I.

Webster seeks a COA regarding the district court's denial of his request for discovery.[30] He claims that the court abused its discretion in denying discovery, thereby violating his due process rights.

A habeas petitioner may "invoke the process of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." *Rector v. Johnson,* 120 F.3d 551, 562 (5th Cir.1997) (citing *Perillo v. Johnson,* 79 F.3d 441, 444 (5th Cir.1996)). "A federal habeas court must allow discovery and an evidentiary hearing only where **\*802** a factual dispute, if resolved in the petitioner's favor, would entitle him to relief...." *Ward v. Whitley,* 21 F.3d 1355, 1367 (5th Cir.1994). Conclusional allegations are insufficient to warrant discovery; the petitioner must set forth specific allegations of fact. *Id.* (citing *Willie v. Maggio,* 737 F.2d 1372 (5th Cir.1984)).

Webster's application does not allege a single factual dispute, which, if resolved in his favor, would entitle him to relief.[31] Instead, he merely claims error in the denial of discovery and lists the thirteen grounds for relief on which he seeks to engage in discovery. His application thus reflects a desire to use the habeas corpus discovery mechanism to explore his case "in search of its existence." *Id.* (quoting *Aubut v. Maine,* 431 F.2d 688, 689 (1st Cir.1970)). This court does not, however, "sanction fishing expeditions based on petitioner's conclusory allegations." *Rector,* 120 F.3d at 562 (citing *Perillo,* 79 F.3d at 444). Because Webster has failed to identify, with specific allegations, any dispositive factual disputes, we deny a COA on this issue.

The application to extend the COA issued by the district court is in all respects DENIED.

**All Citations**

392 F.3d 787

Footnotes

1     The facts are set forth in detail in *United States v. Webster,* 162 F.3d 308, 317-19 (5th Cir.1998).

Although the claims on which the district court granted a COA are not presently before us, we note that Webster's claim that the evidence at trial was insufficient to warrant the district court's finding that he is not mentally retarded was raised and rejected on direct appeal. *See id.* at 352-53.

*See* *United States v. Kimler,* 150 F.3d 429, 431 & n. 1 (5th Cir.1998) (stating that defendant must expressly seek COA on additional issues not certified by district court).

*See* *Miller-El v. Cockrell,* 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

*See, e.g.,* *United States v. Kalish,* 780 F.2d 506, 508 (5th Cir.1986) ("It is settled in this Circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 motions."); *United States v. Rocha,* 109 F.3d 225, 229 (5th Cir.1997).

The district court's factual finding, entitled Factual Finding Regarding Mental Retardation, states, "Webster is not mentally retarded and ... he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty." Section 3596(c) provides:

> A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

In *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348, the Court held that "any fact [other than the fact of a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." In *Ring,* 536 U.S. at 589, 122 S.Ct. 2428, the Court extended the rule announced in *Apprendi* to capital cases: "Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."

*See also* *Ring,* 536 U.S. at 620-21, 122 S.Ct. 2428 (O'Connor, J., dissenting) (opining that *Ring*'s impact would be reduced by *Teague*'s non-retroactivity principle). *See* *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

*See also* *Ring,* 536 U.S. at 609, 122 S.Ct. 2428 (noting that jury finding is constitutionally required for aggravating factors that operate as "the functional equivalent of an element of a greater offense"); *Johnson,* 334 F.3d at 405 ("[T]he absence of mental retardation is not an element of the sentence any more than sanity is an element of an offense.").

Raymond Finn, a clinical psychologist, testified that he had examined Webster on two occasions, first in 1995 and again immediately preceding trial, and believed him to be mildly retarded or in what he termed the educable range of the mentally retarded. Denis Keyes, a certified school psychologist, a Ph.D. in special education, and a professor of special education at the College of Charleston, testified that, based on Webster's scores on I.Q. and adaptive skills tests, he believed Webster to be mentally retarded. Mark Cunningham, a clinical and forensic psychologist, testified that he had examined Webster and had diagnosed him with several psychological disorders, including mild variety mental retardation, anti-social personality disorder, and a non-specific personality disorder involving narcissistic and dependant features.

> Robert Fulbright, a clinical neuropsychologist, testified at length about the battery of tests he had administered to Webster, measuring numerous cognitive functions, including, *inter alia,* Webster's attention; concentration; flexibility of thought; problem-solving skills; language functioning; academic abilities; selected sensory and motor functioning; visual-facial skills; and verbal and visual memory. Fulbright stated that Webster's test results indicated significant deficits in cognitive functioning consistent with a finding of mental retardation (or someone who had suffered some type of organic brain injury).

*See, e.g.,* *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000) (stating that the deferential review mandated by *Washington* requires courts to be "particularly wary" of claims that counsel failed to present "enough" evidence on a certain issue); *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999) ("Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing."); *Prejean v. State,* 889 F.2d 1391, 1398-99 (5th Cir.1990) ("Although it is possible that [trial counsel] could have produced more of the

same type of [mental capacity] evidence ... such detail is not required by [*Washington*].”); *see also Wilson v. Ozmint,* 352 F.3d 847, 861-62 (4th Cir.2003) (finding counsel's decision not to present additional mitigating evidence reasonable in light of counsel's belief that “their best mitigation evidence had been presented,” and “that the additional evidence would only have detracted from the power of the mitigation evidence that they had already presented”).

**12** *See, e.g., Dowthitt,* 230 F.3d at 745 (assuming, *arguendo,* deficient performance and rejecting ineffective assistance claim on prejudice grounds) (citing *Buxton v. Lynaugh,* 879 F.2d 140, 142 (5th Cir.1989) (“[*Washington*] allows the habeas court to look at either prong first; if either one is found dispositive, it is not necessary to address the other.”)); *Murray v. Maggio,* 736 F.2d 279, 282 (5th Cir.1984) ( “[I]n addressing [an ineffective assistance] claim, we need not approach the inquiry in any particular order or even address both stages of the inquiry if an insufficient showing is made as to one. A claim may be disposed of for either reasonable performance of counsel or lack of prejudice, without addressing the other.”).

**13** E.C. Turner, Linda Monk, and Pat Drewett, a counselor and two teachers, respectively, from the junior high school Webster attended, testified that, in their opinion, Webster was not mentally retarded, and noted that he was not in special education classes.

**14** *See Washington,* 466 U.S. at 694, 104 S.Ct. 2052 (explaining that the prejudice standard requires demonstration that, but for challenged performance, “result of the proceeding would have been different”).

**15** The jury's findings on the statutory and non-statutory mitigating factors proposed by defense counsel demonstrate the point: All twelve jurors found that Webster “suffered from physical abuse, emotional abuse, and/or parental neglect during his upbringing”; six jurors found that he “grew up in an atmosphere of violence and fear, which has misshaped his perception as to the acceptability or necessity of violent conduct”; four jurors found that he “is or may be mentally retarded” and “has low intellectual functioning”; four jurors found that his level of participation in the commission of the offense “was attributable, at least in part, to the influence of one or more of the other participants involved in the commission of this crime”; all but one of the jurors found that he “has the love and support of his family”; four jurors found that other defendants, “equally culpable in the crime, will not be punished by death”; and two jurors found that Webster “would likely adapt to prison life if he were sentenced to life imprisonment,” and “can be controlled in a prison setting.” *See Webster,* 162 F.3d at 319-20 n. 2. In fact, defense counsel presented expert testimony to the point that the district court decided to limit Webster's surrebuttal on cumulativeness grounds. *See id.* at 350-51 (rejecting due process challenge to this limitation).

**16** *See, e.g., Lucas v. Johnson,* 132 F.3d 1069, 1078 (5th Cir.1998) (“The determination whether the performance of counsel was deficient is based upon the law as it existed at the time of trial.”).

**17** *See Webster,* 162 F.3d at 351 (“Webster alleges the factual finding was in contravention of the [Federal Death Penalty Act's] statutory scheme, but the statute fails to address how to ensure that the mandate of § 3596(c) is carried out.”); *id.* (noting that “[b]ecause the statute fails to provide guidance, and no case has addressed this issue, the law is not pellucid”); *id.* at 352 (“The statutory scheme simply does not answer who decides this issue....”).

**18** We suppose that trial counsel could have advanced the statutory argument Webster made on direct appeal-namely, that § 3593(b)(3), which provides that the court will act as a fact-finder “upon the motion of the defendant and with the approval of the attorney for the government,” precludes any fact-finding by the court absent a motion by defendant. On direct appeal, however, we rejected this argument, noting that this provision refers “only to the determination of the sentence”, *Webster,* 162 F.3d at 351, and “in no way implies that all court fact-finding must be on the defendant's motion,” *id.* at 351-52.

Trial counsel might also have advanced the other argument made by Webster on direct appeal: that in the absence of a specific statutory scheme, the only logical conclusion is that the jury must be the fact-finder on the issue of mental retardation. Here again, however, we rejected this self-styled “logical” argument, noting that it “suffers from gaps in reasoning.” *Id.* Thus, even these arguments, which are based not on any clearly established law, but rather on inferences from the presence and absence other statutory provisions, were deemed meritless on direct appeal, and thus trial counsel's failure to raise them cannot form the basis of a finding of ineffective assistance of counsel.

*See, e.g., Kimler,* 167 F.3d at 893 (reasoning that attorney's failure to raise meritless argument cannot form basis of ineffective assistance claim).

*See, e.g., Lucas,* 132 F.3d at 1078-79 (rejecting claim of deficient counsel performance "because counsel is not required to anticipate subsequent developments in the law"); *Ogan v. Cockrell,* 297 F.3d 349, 360-61 (5th Cir.2002) (holding that failure to object to supplemental mitigating evidence instruction was not deficient performance before the issuance of *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001)); *Clark v. Collins,* 19 F.3d 959, 965-66 (5th Cir.1994) (rejecting claim of deficient performance for failure to object to racially-motivated peremptory strikes before issuance of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)); *Wiley v. Puckett,* 969 F.2d 86, 102 (5th Cir.1992) (same); *Gray v. Lucas,* 677 F.2d 1086, 1096 n. 9 (5th Cir.1982) (holding that failure to object to prosecutor's interjection of future dangerousness through expert testimony did not constitute deficient performance in advance of caselaw discrediting such testimony); *see also United States v. Kleinbart,* 27 F.3d 586, 593 (D.C.Cir.1994) (holding that failure to appeal jury instruction did not constitute ineffective assistance "[g]iven the unclear state of the law").

Webster attempts to make this showing by vaguely referring to a desegregation lawsuit prosecuted by the Department of Justice against seven Arkansas school districts, including his, in 1970. *See generally United States v. Watson Chapel Sch. Dist. No. 24,* 446 F.2d 933 (8th Cir.1971) (consolidated appeal regarding, *inter alia,* order requiring district to implement plan for unitary school district, and order finding members of school board guilty of civil contempt for failing to comply with implementation order). Webster maintains that "by virtue of its previous prosecution of the school district, [the government] was in possession of evidence which questioned the credibility of their witnesses." In other words, Webster seeks to impute to the federal prosecutors trying his case knowledge of a desegregation lawsuit filed in the 1970's against his childhood school district, from which he claims some impeachment evidence can be inferred.

Although "the prosecution" for *Brady* purposes does encompass more than the individual prosecutor or group of prosecutors trying the case, and the prosecution may be deemed, in limited circumstances, to be in "constructive possession" of *Brady* material, *see, e.g., Martinez v. Wainwright,* 621 F.2d 184, 186-87 (5th Cir.1980) (finding no suggestion in *Brady* "that different 'arms' of the government are severable entities"); *United States v. Auten,* 632 F.2d 478, 481 (5th Cir.1980) (finding prosecution was in possession of criminal history of witness even though no background check was conducted)*; United States v. Deutsch,* 475 F.2d 55, 57-58 (5th Cir.1973) (finding prosecutor was, for purposes of *Brady,* in possession of information in Postal Service files), there are limits on the imputation of knowledge from one arm of the government to prosecutors. "[T]he prosecution is deemed to have knowledge of information *readily available to it.* ..." *Williams v. Whitley,* 940 F.2d 132, 133 (5th Cir.1991) (emphasis added). If this evidence is deemed "readily available" to the prosecutors for purposes of *Brady,* we are hard-pressed to conceive of any information that would fall outside *Brady* 's constitutional mandate of disclosure. After all, even knowledge of the school district's history of segregation would not lead a reasonable prosecutor where Webster claims it leads, *i.e.,* to question the credibility of school district employees testifying about Webster's mental capacity. Thus, Webster's conclusional allegation of knowledge is not sufficient to demonstrate suppression for purposes of *Brady.*

*Accord Wilson,* 28 F.3d at 437 n. 6 (noting that *Bagley* 's formulation of the materiality standard for *Brady* claims is derived from *Washington,* 466 U.S. at 698, 104 S.Ct. 2052).

Both government experts, George Parker and Richard Coons, testified that, in their opinion, Webster had an incentive not to perform well on the cognitive tests administered after he was charged in this case, and pointed to prior cognitive tests taken by Webster on which he scored higher. Parker also testified at length regarding his position that the so-called "Vineland test" administered by defense expert Dr. Keyes was an inappropriate and deceptive measure of Webster's adaptive skills given Webster's lifestyle as a drug-dealer.

These witnesses included correctional officers and fellow inmates who testified that, while incarcerated, Webster engaged in various activities potentially inconsistent with a finding of mental retardation. For example, he wrote letters to fellow inmates; received letters and newspapers; read aloud from newspapers; wrote request slips for various services; wrote written grievances; submitted names and addresses of people for his visitation list; and on one occasion complained because the change he received from the prison commissary was incorrect.

*See, e.g.,* 🚩 *Drew v. Collins,* 964 F.2d 411, 419-20 (5th Cir.1992) (holding that incremental impeachment value from minor inconsistencies between witness' taped and written statements did not satisfy *Brady*'s materiality standard).

Indeed, as we noted, Webster argued on direct appeal that the statute did provide sufficient guidance: It entrusted the decision to the jury. As support for this interpretation, Webster pointed to 🚩 18 U.S.C. § 3593(b), which provides that the court will act as a fact-finder "upon the motion of the defendant and with the approval of the attorney for the government."

He asserted that this provision precluded any fact-finding by the court absent the defendant's motion. *See* 🚩 *Webster,* 162 F.3d at 351-52.

Webster argued on direct appeal that the district court erred by denying his motion (which was based on alleged racial discrimination in the charging decision) to dismiss the government's notice to seek the death penalty. In rejecting this claim, we concluded that Webster had failed to make the requisite showing that he was singled out for selective prosecution; that his statistical evidence was insufficient to rebut the good-faith presumption on the part of the prosecution; and that the objective circumstances of the crime and the sufficiency and availability of evidence to the prove the elements required constituted proper and legitimate non-discriminatory grounds for seeking the death penalty. *See* 🚩 *id.* at 333-35.

*See* DEP'T OF JUSTICE: THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY 19882000 (2000) .

The district court also questioned whether Webster had presented any evidence demonstrating that either witness lied at trial. In fact, the court observed that both Beckley's alleged statement and Holloway's letter could plausibly be read as indications that both men were apologetic about testifying against Webster to improve their own liability situations and not as admissions of perjury.

*See, e.g.,* 🚩 *East v. Scott,* 55 F.3d 996, 1005 (5th Cir.1995) (holding that allegations failed to establish *prima facie* case of *Napue* violation where defendant "fails to allege any facts suggesting prosecution knew about" contested subject); *see also* 🚩 *O'Keefe,* 128 F.3d at 893; 🚩 *Blackburn,* 9 F.3d at 357.

During the pendency of his initial § 2255 motion, Webster requested and was granted permission to file a motion for discovery, which the court denied.

*Compare* 🚩 *Perillo,* 79 F.3d at 444-45 (finding error in denial of discovery where habeas petitioner had stated a specific factual dispute-whether her attorney represented another person involved in the charged crime, and therefore had a conflict of interest-which, if resolved in her favor, would entitle her to relief), *with* 🚩 *Rector,* 120 F.3d at 562 (affirming denial of discovery request where habeas petitioner had "failed to make at least a *prima facie* showing of what specifically he intends to prove").

---

**End of Document**      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   065 11

421 F.3d 308
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Bruce Carneil WEBSTER, Defendant-Appellant.

No. 03-11194.
|
Aug. 11, 2005.

**Synopsis**

**Background:** Following affirmance, 🔖162 F.3d 308, of conviction and sentence of death in the United States District Court for the Northern District of Texas, Terry R. Means, J., on charges of kidnapping resulting in death, conspiring to kidnap, and using and carrying firearm during crime of violence, defendant moved to vacate or set aside sentence. The District Court denied defendant's motion, 2003 WL 23109787, and denied a certificate of appealability (COA) on most claims raised therein, affirmed, 392 F.3d 787. Defendant appealed claims for which COA was granted.

**Holdings:** The Court of Appeals, Jerry E. Smith, Circuit Judge, held that:

government is not required to prove, by any standard, that capital defendant is not mentally retarded, and

sufficient evidence supported District Court's finding that defendant was not mentally retarded.

Affirmed.

**Attorneys and Law Firms**

 **\*308** Delonia Anita Watson, Richard Bratton Roper, III, Asst. U.S. Atty., Fort Worth, TX, for Plaintiff-Appellee.

Philip Alan Wischkaemper, Snuggs & Wischkaemper, Lena G. Roberts, Boerner & Dennis, Lubbock, TX, for Defendant-Appellant.

Appeal from the United States District Court for the Northern District of Texas.

 **\*309** Before SMITH, WIENER, and BARKSDALE, Circuit Judges.

**Opinion**

JERRY E. SMITH, Circuit Judge:

Bruce Webster, a federal prisoner under a sentence of death, appeals the denial of his petition for post-conviction relief under 28 U.S.C. § 2255 on two related claims that the district court rejected on the merits but on which it granted a certificate of appealability ("COA"). Concluding that Webster is not entitled to relief, we affirm.

I.

A.

In 1996, a federal jury convicted Webster of three offenses-kidnaping resulting in death, conspiring to kidnap, and using and carrying a firearm during a crime of violence-for his role in the shocking and exceedingly brutal kidnaping, rape, and murder of sixteen-year-old Lisa Rene. [1] The government sought a death sentence pursuant to the Federal Death Penalty Act of 1994, 🔖18 U.S.C. §§ 3591-🔖3598, and after a separate sentencing hearing the jury returned special findings that Webster satisfied the requisite elements of intent, *see* 🔖§ 3591(a), and that three statutory and two non-statutory aggravating factors existed, *see* § 3592. [2] Varying numbers of jurors found nine mitigating factors. [3] By unanimous vote as required, the jury recommended that Webster be sentenced to death.

After imposing a death sentence on the verdict, the district court entered a finding that Webster is not mentally retarded and is therefore not exempt from the death penalty under 🔖18 U.S.C. § 3596(c), [4] which prohibits the imposition of a death sentence on a person who is mentally retarded or, because of a mental disability, lacks the mental capacity to understand the death penalty or why it was imposed.

Webster maintained during the penalty phase that he is mentally retarded and, in support, presented testimony from four medical experts regarding his mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by one of the government's

experts in testing his cognitive abilities. [5] Webster presented voluminous evidence of the abuse he suffered as a child, including testimony from his mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All these witnesses testified about the severe physical and sexual abuse Webster's father inflicted on his children and his wife (Webster's mother).

**\*310** The government vigorously disputed Webster's claim of mental retardation. Beyond cross-examining defense experts, the government produced two medical experts who testified that they did not believe Webster was retarded and, moreover, that the methodology used by defense experts to gauge his mental capacity was critically flawed and misleading. The government presented numerous other witnesses, including correctional and probation officers, former teachers, and fellow inmates, whose testimony contradicted Webster's claim of retardation.

### B.

We affirmed the conviction and sentence on direct appeal, *see* *United States v. Webster,* 162 F.3d 308 (5th Cir.1998), *cert. denied,* 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999). Among the more than twenty claims Webster raised on direct appeal, we rejected his claim that the district court's finding that he is not mentally retarded, to which no objection was made at trial, was against the greater weight and credibility of the evidence. *See* *id.* at 352-53. Reviewing for clear error, we determined that "[t]he government presented substantial evidence to support the finding," *id.* at 353, and accordingly we rejected the claim.

Webster thereafter filed, in 2000, a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255, and an amended § 2255 motion challenging his conviction and sentence on sixteen grounds in 2002. The district court rejected Webster's claims and dismissed his motion, *see* *Webster v. United States,* No. 4:00-CV-1646-Y, 2003 WL 23109787 (N.D.Tex. Sept. 30, 2003).

Webster applied for a COA on each of the sixteen grounds raised in his amended § 2255 motion. [6] The district court granted a COA limited to two of the sixteen claims: first, that the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded;

and second, that his alleged retardation renders him ineligible for a death sentence.

Webster then applied to this court for a COA on the fourteen issues deemed unworthy of collateral appellate review by the district court; we denied a COA on each of the additional claims, *see* *United States v. Webster,* 392 F.3d 787 (5th Cir.2004). We now address, on the merits, Webster's appeal on the two issues rejected on the merits but on which the district court granted a COA.

### II.

### A.

Webster contends that the evidence presented at trial was insufficient to warrant the district court's finding that he is not mentally retarded. The government argued to the district court that this claim is procedurally barred because it was raised and rejected on direct appeal, [7] but the district court appears to have concluded that, though on direct appeal we rejected Webster's claim that the finding was against the greater weight and credibility of the evidence, the intervening decision in

**\*311** *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that the Eighth Amendment prohibits execution of the mentally retarded) saves this claim from a procedural bar. *See* *Webster,* 2003 WL 23109787, at *5.

Yet, even before *Atkins,* at the time of Webster's trial, 18 U.S.C. § 3596(c) prohibited the execution of mentally retarded offenders in federal prosecutions. The only substantive change (as explained further *infra*) ushered in by *Atkins* with respect to federal capital defendants, then, is the recognition of a new source of federal law (*i.e.,* constitutional) that bars their execution. In any event, we assume for present purposes that *Atkins* permits, whether by way of clarification of the meaning of mental retardation or some other reason, Webster to restate his sufficiency challenge, so we proceed to address the merits, but we do so without deciding that we must.

### B.

In advancing his collateral challenge to the sufficiency of the evidence, Webster invokes *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which held that a state defendant is entitled to federal habeas corpus relief if the state's evidence was such that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Webster argues that *Jackson* provides the standard against which the evidence supporting the finding that he is not mentally retarded should be measured-the necessary implication being that the government had the burden of proving beyond a reasonable doubt that Webster is *not* mentally retarded.

But the *Jackson* standard is inapposite here, where the challenged finding is the *absence* of mental retardation, and not a substantive element of the offense to which *Jackson* applies by its own terms, [8] or an aggravating circumstance, sentencing factor, or special issue in the context of capital proceedings, to which *Jackson* has since been applied. [9]

Moreover, nothing in the Federal Death Penalty Act requires the government to prove-by any standard, much less beyond a reasonable doubt-that a capital defendant is not mentally retarded. Nor does anything in *Atkins* require, as a constitutional matter, the government to prove-again, by any standard, much less beyond a reasonable doubt-that a capital defendant is not mentally retarded. Instead, the Court in *Atkins* decided to "leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242 (quoting *Ford v. Wainwright,* 477 U.S. 399, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (alterations in original)). And several states have since **\*312** placed the burden on capital defendants to prove by a preponderance of the evidence that they are mentally retarded. [10]

In fact, even before the district court looked askance at Webster's suggestion on collateral review that the government had to prove his non-retardation beyond a reasonable doubt, we had already rejected the claim, albeit in the context of a state prisoner on federal habeas review, that *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), when read together with *Atkins,* require the government to prove beyond a reasonable doubt that a capital defendant is not mentally retarded. In *In re Johnson,* 334 F.3d 403, 405 (5th Cir.2003), we squarely held that "neither *Apprendi* and *Ring* nor *Atkins* renders the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt." [11]

Indeed, it was on this basis that we denied Webster a COA on his claim that *Apprendi* and *Ring* alone require the government to prove his non-retardation beyond a reasonable doubt. *See Webster,* 392 F.3d at 791-92. [12] Accordingly, we reject Webster's claim to the extent it is based on an alleged constitutional error in the allocation of the burden of persuasion and standard of proof.

C.

In any event, the district court proceeded dutifully to re-examine the extensive record evidence bearing on Webster's mental capacity and concluded, once again, that a "rational fact-finder could have found that Webster is not mentally retarded based on the evidence presented at trial." *Webster,* 2003 WL 23109787, at *11. Once again, we cannot say the district court erred in reaching this conclusion and rejecting Webster's renewed sufficiency challenge. *See Webster,* 162 F.3d at 352-53.

To be sure, as the district court noted, "all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that **\*313** Webster has a low I.Q." *Id.* at *14. [13] But, under the definition of mental retardation cited in *Atkins, see* 536 U.S. at 308 n. 3, 122 S.Ct. 2242, a showing of borderline or below average intelligence does not alone constitute an adequate showing of retardation. Rather, an adequate showing of mental retardation also requires significant deficits in adaptive skills, [14] and it is here, as the district court concluded, that the government effectively countered Webster's claimed retardation:

> [T]he issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family

stated he did not. Looking at all the evidence presented by both sides at trial, while it is undisputed that Webster has had low I.Q. scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills.

*Webster,* 2003 WL 23109787, at *14. [15]

III.

Webster claims he is mentally retarded and thus ineligible for his death sentence, but given our rejection of his claim regarding **\*314** the standard of proof and sufficiency of the evidence supporting the contrary finding at trial, this claim is reduced, in essence, to nothing more than an attempt to re-litigate the question. Indeed, Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences. [16]

Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him. The question whether he is mentally retarded was, as the district court observed, "a highly contested one at trial," *Webster,* 2003 WL 23109787, at *12, and Webster failed to convince *either* the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may be* retarded. And the record supports those findings.

The judgment denying Webster's petition for post-conviction relief is AFFIRMED.

**All Citations**

421 F.3d 308

Footnotes

1    The facts are set forth in chilling detail in *United States v. Webster,* 162 F.3d 308, 317-19 (5th Cir.1998).

2    *See id.* at 319 n. 1 (identifying aggravating factors unanimously found by the jury).

3    *See id.* at 319-20 n. 2 (identifying statutory and non-statutory mitigating factors presented by Webster and the number of jurors, if any, that found each factor).

4    The finding provides:

   After consideration of all the evidence and information presented in the guilt and punishment phases of trial, the Court hereby issues its factual finding that the defendant Webster is not mentally retarded and that he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty.

5    *See United States v. Webster,* 392 F.3d 787, 793-94 & n. 10 (5th Cir.2004) (summarizing Webster's expert testimony and denying a COA, as discussed *infra*); *Webster v. United States,* No. 4:00-CV-1646-Y, 2003 WL 23109787, at \*\*6-7, \*\*12-14 (N.D.Tex. Sept. 30, 2003) (reviewing defense expert testimony on mental retardation).

6    *See* 28 U.S.C. § 2253(C)(1)(B) ("Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from ... the final order in a proceeding under section 2255.").

7    *See United States v. Kalish,* 780 F.2d 506, 508 (5th Cir.1986) ("It is settled in this Circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 motions."); *United States v. Rocha,* 109 F.3d 225, 229-30 (5th Cir.1997).

8    *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found *the essential elements of the crime* beyond a reasonable doubt.") (second emphasis added).

*See, e.g.,* 🚩 *Lewis v. Jeffers,* 497 U.S. 764, 781, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (holding that in reviewing whether a state court's finding of an aggravating factor is so erroneous as to constitute an Eighth Amendment or due process violation, a federal court considering a habeas corpus petition should apply the "rational factfinder" test established in *Jackson* ); 🚩 *Martinez v. Johnson,* 255 F.3d 229, 244-45 (5th Cir.2001) (applying *Jackson* to sufficiency challenge to future dangerousness finding); *Fierro v. Lynaugh,* 879 F.2d 1276, 1280 (5th Cir.1989) (same); 🚩 *Green v. Johnson,* 160 F.3d 1029, 1046-47 (5th Cir.1998) (applying *Jackson* to a challenge to the sufficiency of a finding of deliberateness); 🚩 *Callins v. Collins,* 998 F.2d 269, 276 (5th Cir.1993) (same).

*See, e.g., Ex Parte* 🚩 *Briseno,* 135 S.W.3d 1, 12 (Tex.Crim.App.2004); 🚩 *Russell v. State,* 849 So.2d 95, 148 (Miss.2003); 🚩⚠ *State v. Williams,* 831 So.2d 835, 860-61 (La.2002); 🚩 *Murphy v. State,* 54 P.3d 556, 568 (Okla.Crim.App.2002).

*See also* 🚩 *Ring,* 536 U.S. at 609, 122 S.Ct. 2428 (noting that jury finding beyond a reasonable doubt is constitutionally required for aggravating factors that operate as "the functional equivalent of an element of a greater offense"); 🚩 *Walker v. True,* 399 F.3d 315, 326 (4th Cir.2005) (rejecting claim that *Ring* requires a jury determination of mental retardation, and reasoning that "an increase in a defendant's sentence is not predicated on the outcome of the mental retardation determination; only a decrease") (internal marks omitted); 🚩 *Johnson,* 334 F.3d at 405 ("[T]he absence of mental retardation is not an element of the sentence any more than sanity is an element of an offense."); *cf.* 🚩 *Medina v. California,* 505 U.S. 437, 449, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (holding that a state may presume a defendant to be competent and require him to carry the burden of proving his incompetence by a preponderance of the evidence).

Even if the rules announced in *Apprendi* and *Ring* were applicable to the absence of mental retardation, the bar of non-retroactivity would preclude their application to cases already final on direct review. *See Webster,* 392 F.3d at 792; *see also* 🚩 *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004) (holding that the procedural rule announced in *Ring* is not retroactive to cases already final on direct review); *United States v. Brown,* 305 F.3d 304, 310 (5th Cir.2002) (holding that the procedural rule announced in *Apprendi* is not retroactively applicable to initial post-conviction petitions under § 2255).

There was a dispute as to how low, and both government experts, Dr. George Parker and Dr. Richard Coons, testified that, in their opinion, Webster had an incentive not to perform well on cognitive tests administered after he was charged in this case; they pointed to earlier tests taken by Webster on which he scored higher. Parker also testified that lifestyle choices and cultural factors can account for low I.Q. scores (a point defense experts Dr. Keyes and Dr. Finn acknowledged), thus casting doubt on the reliability of the I.Q. tests administered by Keyes, which required Webster to define words (he was unable to define "inflation") and recognize faces (he could not identify Shakespeare, Mark Twain, or Albert Einstein from pictures) to which he was unlikely to have been previously exposed.

Mental retardation has as its essential feature significantly subaverage general intellectual functioning accompanied by significant limitations in adaptive functioning, with onset before the age of eighteen. 🚩 *Morris v. Dretke,* 413 F.3d 484, 487 (5th Cir.2005) (quoting AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (text rev. 4th ed.2000)).

In fact, not only were government experts able to refute many of the specific findings obtained from the "Vineland test" administered by Keyes, *see Webster,* 2003 WL 23109787, at *13, but they testified that the test was an inappropriate and deceptive measure of Webster's adaptive skills, given his lifestyle as a drug dealer. Moreover, government experts noted that Webster had shown cleverness and adaptability when he sneaked into the women's portion of the jail in which he was held, concocted cover stories and made excuses to police when he was arrested with a key in his pocket to the motel room in which Lisa Rene was held and raped repeatedly, and burned his clothes to destroy evidence after her murder.

The government also presented the testimony of numerous other witnesses, including correctional officers and fellow inmates that, while incarcerated, Webster engaged in various activities potentially inconsistent with a finding of retardation. For example, he wrote letters to fellow inmates; received letters and newspapers; read aloud from newspapers; wrote request slips for various services; prepared written grievances; submitted names and addresses of people for his visitation list; and on one occasion complained because the change he received from the prison commissary was incorrect.

16    Webster's brief does refer to evidence marshaled in the district court on collateral review concerning racial discrimination in the district where Webster attended school, which Webster continues to assert would have, if presented at trial, demonstrated why he was not enrolled in special education courses and therefore would have effectively countered the government's assertion that he is not mentally retarded. But we previously denied Webster a COA on an ineffective assistance of counsel claim premised on the failure of defense counsel to investigate and present such evidence and on a vague yet related claim under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *see Webster,* 392 F.3d at 795, 797-99.

Our analysis of those claims obtains equally here: "In the main, the prosecution presented substantial evidence countering Webster's claim of mental retardation, and the government's effort did not depend in any significant respect on Webster's non-enrollment in special education courses." *Id.* at 798-99. Thus, we held that even if Webster could otherwise sustain his claims, "the incremental impeachment value, if any, of such evidence does not raise a possibility that, had the evidence been presented, the outcome would have been different." *Id.* at 795; *see also id.* at 799.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-2683      Document: 13          Filed: 11/14/2019      Pages: 115

127 S.Ct. 45
Supreme Court of the United States

Bruce Carneil WEBSTER, petitioner,

v.

UNITED STATES.

No. 05-10470.
|
Oct. 2, 2006.

**Synopsis**
Case below, 421 F.3d 308.

**Opinion**
Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.

**All Citations**

549 U.S. 828, 127 S.Ct. 45 (Mem), 166 L.Ed.2d 47, 75 USLW 3165

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

605 F.3d 256
United States Court of Appeals,
Fifth Circuit.

In re: Bruce Carneil WEBSTER, Movant.

No. 09–11039.
|
April 28, 2010.

**Synopsis**
**Background:** Following affirmance of his conviction for kidnapping resulting in death and of his death sentence, 162 F.3d 308, and affirmance of the denial of his initial motion to vacate, 421 F.3d 308, defendant moved for an order authorizing the United States District Court for the Northern District of Texas to consider a successive motion to vacate on the basis that he was mentally retarded and therefore ineligible for the death penalty.

Addressing an issue of apparent first impression for the court, the Court of Appeals, Jerry E. Smith, Circuit Judge, held that a defendant seeking only to challenge his eligibility for the death penalty cannot do so under the statute governing the filing of successive motions to vacate on the basis of newly discovered evidence where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, that is, capital murder.

Motion denied.

Wiener, Circuit Judge, filed concurring opinion.

**Attorneys and Law Firms**

**\*256** Steven Joseph Wells, Dorsey & Whitney, L.L.P., Minneapolis, MN, for Webster.

On Motion for Authorization to File Successive 28 U.S.C. § 2255 Motion in the United States District Court for the Northern District of Texas.

Before SMITH, WIENER, and PRADO, Circuit Judges.

**Opinion**

JERRY E. SMITH, Circuit Judge:

Bruce Webster moves for an order authorizing the district court to consider a successive motion to vacate his federal death sentence under 28 U.S.C. § 2255, as amended by section 105 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Because he does not meet the procedural requirements of § 2255(h), we deny the motion.

**\*257** I.

In June 1996, Webster was sentenced to death for his role in the kidnaping and brutal murder of a sixteen-year-old girl. He filed a direct appeal of his conviction, including among his nineteen assignments of error a challenge to the district court's finding that he was not mentally retarded. We affirmed in all respects. United States v. Webster, 162 F.3d 308, 358 (5th Cir.1998), cert. denied 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999). He then filed for relief under § 2255, which motion the district court denied, concluding that, even in the wake of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the evidence supported a finding that Webster was not mentally retarded. Webster v. United States, No. 4:00–CV–1646–Y, 2003 WL 23109787, at \*14 (N.D.Tex. Sept. 30, 2003). And, after the district court granted a certificate of appealability on two of the issues concerning mental retardation, we again affirmed the sentence. United States v. Webster, 421 F.3d 308, 310 (5th Cir.2005), cert. denied, 549 U.S. 828, 127 S.Ct. 45, 166 L.Ed.2d 47 (2006).

Now Webster asks for another chance to argue that he is mentally retarded and therefore ineligible for the death penalty.[1] Specifically, he contends that in light of newly discovered evidence—in the form of government and school records and additional testimony—no reasonable factfinder could conclude that he is not mentally retarded.

II.

Section 2255(h) governs the filing of second or successive motions:

A second or successive motion must be certified as provided in 🔖 section 2244 by a panel of the appropriate court of appeals to contain—

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h).

This court has not had occasion to consider whether a petitioner seeking only to challenge his eligibility for the death penalty can do so under § 2255(h)(1).[2] We now conclude that a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.,* capital murder.

That result is compelled by the plain language of § 2255(h)(1), which does not encompass challenges to a sentence. Instead, it states that a petitioner wishing to rely on newly discovered evidence (as distinguished from being able to point to a **\*258** qualifying new rule of constitutional law)[3] to support a second § 2255 motion must "establish by clear and convincing evidence that no reasonable factfinder would have found the movant *guilty of the offense.*" § 2255(h)(1) (emphasis added).

Webster nevertheless urges us to read "offense" broadly so that § 2255(h)(1) would cover not only a claim that a prisoner is not guilty of the offense of conviction but also a claim that he is merely "not guilty of the death penalty." Such an interpretation accords with prior habeas corpus law interpreting "actual innocence" to include "innocence of the death penalty." *Cf.* 🔖 *Sawyer v. Whitley,* 505 U.S. 333, 340–41, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). But, as Judge Posner cogently explained,

> Courts that before the amendment had to decide whether an application for postconviction relief came within

the "actual innocence" exception to the requirement of proving cause and prejudice in order to be permitted to revive a waived ground for relief extended the exception to sentencing issues .... But we do not think the exception survives the amendment. The "actual innocence" exception of the prior law was judge-made, and so its contours were appropriately judge-fashioned and permissibly judge-expanded. The exception in the new law is graven in statutory language that could not be any clearer. When we consider ... the absence of any indication in the legislative history that "offense" was being used in some special sense different from its ordinary meaning, we think it highly unlikely that Congress intended the word to bear a special meaning.

🔖 *Hope v. United States,* 108 F.3d 119, 120 (7th Cir.1997) (Posner, J.).[4]

That is to say, there is no reason to believe that Congress intended the language "guilty of the offense" to mean "eligible for a death sentence."[5] Had Congress wanted the provision to cover challenges to a sentence—even if only to a death sentence—it easily could have referenced sentences explicitly in the text, as it did numerous times throughout § 2255.[6] Or if Congress had intended to **\*259** signal courts to incorporate the old, broad interpretation of actual innocence, it well could have used the words, "actual innocence."[7] Instead, it elected to couch § 2255(h)(1), as well as 🔖 § 2244(b)(2)(B)(ii), in the markedly different, unmistakable terms of *guilt of the offense.* Absent some indication that Congress meant for the language in § 2255(h)(1) not to be taken literally, we decline to interpret it any other way.

In summary, Webster's application does not satisfy § 2255(h)(1), and § 2255(h)(2) is inapplicable. The motion for authorization to file a successive § 2255 motion is DENIED.[8]

WIENER, Circuit Judge, concurring:

I concur in the majority opinion, as I believe that it is a correct interpretation of 28 U.S.C. § 2255(h), but I write separately to emphasize the absurdity of its Kafkaesque result: Because Webster seeks to demonstrate only that he is constitutionally ineligible for the death penalty—and not that he is factually innocent of the crime—we must sanction his execution.

If the evidence that Webster attempts to introduce here were ever presented to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded. In 1993—more than a year before his indictment for the offense of conviction—Webster applied for Social Security benefits.[1] To determine his eligibility for those benefits, three separate government physicians performed medical and psychological examinations on him. Notably, all three physicians independently concluded that Webster is mentally retarded. First, Dr. Rittelmeyer diagnosed Webster as suffering from "[m]ental retardation." Then, Dr. Spellman described Webster as "a slow fellow who did not know much and did not know how to communicate well." Explaining that he had found no evidence of exaggeration or malingering during his examination, Dr. Spellman concluded that Webster's IQ was 69 or lower and that his significant cognitive difficulties were attributable not to mental illness but to "mental retardation." Finally, Dr. Hackett performed an IQ test and concluded that Webster's IQ was 59. Dr. Hackett described Webster as "mildly retarded," "antisocial," and unable to "function well in the work place."

These reports, the merits of which have never been considered by any judge or jury, refute much of the evidence introduced by the government at the penalty phase of Webster's trial. For example, **\*260** the government's physicians—all of whom examined Webster while he was incarcerated for the offense of conviction—suggested that he was malingering and exaggerating his symptoms in the hopes of being found ineligible for the death penalty. In contrast, none of the Social Security physicians who diagnosed Webster's mental retardation many years earlier noted any such evidence. Moreover, at trial, the government introduced testimony that Webster had never been placed in special education classes, which weighed further still against a finding of mental retardation. Again, though, the Social Security records tell a different story. Specifically, a letter to the Social Security Administration from Lou Jackson, the Special Education Supervisor for the Watson Chapel Schools, indicates that Webster was indeed enrolled in special education classes but that the records of his enrollment there were destroyed in 1988 after his family did not respond to a letter "telling them they could have the records if they wanted them."[2] Under § 2255(h), however, we must turn a blind eye to this evidence, as it speaks to Webster's constitutional eligibility for the death penalty and not his factual guilt or innocence of the crime.

The Supreme Court explained in Atkins v. Virginia that because mentally retarded persons suffer from "disabilities in areas of reasoning, judgment, and control of their impulses, they do not act with the level of *moral culpability* that characterizes the most serious adult criminal conduct."[3] Thus, "in the light of our evolving standards of decency," the Court held that the Eighth Amendment prohibits as excessive the execution of mentally retarded defendants.[4] Although I concur in the majority's opinion as a correct statement of the law, I continue to harbor a deep and unsettling conviction that, albeit under Congress's instruction which ties our judicial hands so illogically, we today have no choice but to condone just such an unconstitutional punishment.

**All Citations**

605 F.3d 256

Footnotes

1       Webster's execution is stayed for reasons not related to the instant motion.

2       Nor have we had occasion to consider that question with regard to 28 U.S.C. § 2244(b)(2)(B)(ii), which includes the same language. Section 2255 governs collateral attacks on federal convictions; § 2244, attacks on state court convictions. Nevertheless, "[b]ecause of the similarity of the actions under [these sections], they have traditionally been read *in pari materia* where the context does not indicate that would be improper." United States v. Flores, 135 F.3d 1000, 1002 n. 7 (5th Cir.1998).

3       *See* § 2255(h)(2).

075

4    *See also* *In re Dean,* 341 F.3d 1247, 1248–49 (11th Cir.2003); *In re Jones,* 137 F.3d 1271, 1274 (11th Cir.1998); *Burris v. Parke,* 130 F.3d 782, 785 (7th Cir.1997); *Burris v. Parke,* 116 F.3d 256, 258 (7th Cir.1997); *In re Medina,* 109 F.3d 1556, 1565–66 (11th Cir.1997), *overruled on other grounds by* *Stewart v. Martinez–Villareal,* 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998). Two other circuits addressed the issue but avoided deciding it. *See* *LaFevers v. Gibson,* 238 F.3d 1263, 1267 (10th Cir.2001) ("[T]here is a split among the three circuits that have addressed the question .... This court need not resolve that difficult question ...."); *In re Vial,* 115 F.3d 1192, 1198 n. 12 (4th Cir.1997) (en banc) ("We need not address the question of whether, under the AEDPA, an individual subject to a sentence of death may assert the existence of new evidence establishing that the sentence was imposed improperly, *i.e.,* that he is 'innocent' of the death penalty.").

5    By this we do not mean to suggest that a prisoner is jurisdictionally barred from seeking successive review where he contests a factual predicate of his capital murder conviction, without which he would have been guilty only of non-capital murder. *Cf.* *Thompson v. Calderon,* 151 F.3d 918, 923–24 (9th Cir.1998) (en banc).

6    *Cf., e.g.,* 28 U.S.C. § 2255(b) ("If the court finds that the judgment was rendered without jurisdiction, or that *the sentence imposed* was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner *or resentence him* or grant a new trial *or correct the sentence* as may appear appropriate." (Emphasis added.)).

7    Or, indeed, "eligible for the death penalty," per *Sawyer,* 505 U.S. at 336, 112 S.Ct. 2514. *See* *Thompson,* 151 F.3d at 923 (noting that the difference between the language in *Sawyer* and the language in § 2244(b)(2)(B)(ii) could suggest that Congress chose to deviate from it).

8    Our decision that the instant motion is beyond the reach of § 2255 is jurisdictional in nature, going to the ability of the district court and this court to entertain the § 2255 motion in the first instance. The result makes it unnecessary for this court to address whether, as the government claims, the evidence that Webster seeks to introduce is neither newly discovered nor substantive.

1    Although Webster's counsel requested these Social Security records long before his trial, they were only recently produced. And, when Webster sought additional discovery in connection with his first habeas petition, the district court denied his motion—just two days before the Supreme Court's landmark decision in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)—and required that he file his petition within sixty days, i.e., less than two months after *Atkins* was decided and without the benefit of additional discovery.

2    Of course, this is all in addition to the already substantial evidence of mental retardation that Webster introduced before the trial court, including, *inter alia,* testimony from Doctor Finn that Webster's IQ was 59; testimony from Dr. Keyes that Webster had an IQ of 51 with the adaptive functioning of a seven-year-old; testimony from Dr. Cunning that Webster suffered from mild mental retardation; and testimony from several witnesses familiar with Webster's adaptive deficits in communication, conceptual skills, home living, functional academics, and day-to-day life.

3    536 U.S. at 320, 122 S.Ct. 2242 (emphasis added).

4    *Id.*

---

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-2683     Document: 13     Filed: 11/14/2019     Pages: 115

131 S.Ct. 794
Supreme Court of the United States

Bruce Carneil WEBSTER, petitioner,

v.

UNITED STATES.

No. 10–150.
|
Dec. 6, 2010.

**Synopsis**
Case below, 605 F.3d 256.

**Opinion**
Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.

**All Citations**

562 U.S. 1091, 131 S.Ct. 794 (Mem), 178 L.Ed.2d 531, 79 USLW 3077, 79 USLW 3339, 79 USLW 3342

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 6007593
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Terre Haute Division.

Bruce Carneil WEBSTER, Petitioner,
v.
Charles LOCKETT Warden, United States
Penitentiary, Terre Haute (USP), Respondent.

Cause No. 2:12–cv–86–WTL–WGH.
|
Nov. 13, 2013.

**Attorneys and Law Firms**

Eric K. Koselke, Indianapolis, IN, Kirsten E. Schubert, Steven J. Wells, Dorsey & Whitney LLP, Minneapolis, MN, for Petitioner.

Gerald A. Coraz, United States Attorney's Office, Indianapolis, IN, for Respondent.

### ENTRY ON PETITION FOR
### WRIT OF HABEAS CORPUS

WILLIAM T. LAWRENCE, District Judge.

**\*1** This cause is before the Court on Petitioner Bruce Carneil Webster's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. [1] Dkt. No. 1. Webster's motion is fully briefed, and the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

### I. BACKGROUND

During the fall of 1994, Webster, Orlando Hall, and Marvin Holloway operated a marijuana trafficking business in Pine Bluff, Arkansas. [2] With the help of Steven Beckley, the men regularly purchased marijuana from the Dallas/Fort Worth area in Texas and transported the drugs back to Arkansas. On September 21, 1994, Hall flew to Dallas to purchase marijuana from two local drug dealers, Stanfield Vitalis and Neil Rene. That same day, Hall and Beckley met with Vitalis and Rene at a car wash and gave them $4,700 for the purchase

of marijuana. The men agreed to return to the car wash later that that day to transfer the drugs. Vitalis and Rene, however, never returned to the car wash and later claimed they were robbed of the $4,700.

On September 24, 1994, Webster flew to Dallas where he met with Hall, Hall's brother Demetrius Hall, and Beckley. After they discovered where Neil Rene lived, the four men drove to Rene's apartment and knocked on his door. Lisa Rene, Neil Rene's sixteen-year-old sister, was the only one home. She refused to let the men in and called police. Armed with handguns, a baseball bat, duct tape, and gasoline, the men forced their way into the apartment and kidnapped Lisa before police arrived. Lisa was eventually taken to a motel in Pine Bluff, Arkansas where she was held for several days. During the ordeal, she was repeatedly sexually assaulted by Webster and the other men. After two days of captivity, Webster, Hall, and Beckley drove Lisa to a park where they placed a sheet over her head and beat her with a shovel. "Webster then gagged her and dragged her into [a] grave. He stripped her, covered her with gasoline, and shoveled dirt back into the grave." *Webster Direct Appeal,* 162 F.3d at 319. Although she was "likely still breathing," Webster, Hall, and Beckley buried Lisa and returned to the motel. *Id.*

Shortly thereafter, Beckley was arrested and confessed to police. As a result, Webster was charged by indictment with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count one), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) (count two), traveling in interstate commerce with the intent to promote extortion in violation of 18 U.S.C. § 1952 (count five), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count six). In February 1995, the Government filed its notice of intent to seek the death penalty against Webster.

In 1996, a jury found Webster guilty of counts one, two, and six of the indictment. [3] During a separate sentencing hearing before the same jury, Webster's defense team argued that Webster is mentally retarded and thus could not be sentenced to death pursuant to 18 U.S.C. § 3596(c). [4] In support of this argument, defense counsel introduced as evidence Webster's low IQ scores, testimony from Webster's friends and family, and testimony from four psychologists and psychiatrists who examined Webster after his arrest. [5]

**\*2** During the hearing, clinical psychologist Dr. Raymond Finn testified that he administered a full-scale intelligence test on Webster, the Wechsler Adult Intelligence Scale–Revised ("WAISR"), and Webster received an IQ score of 59. Dr. Finn also opined that Webster is "clearly mentally retarded." Similarly, psychologist Dr. Denis Keyes testified that he administered two intelligence tests on Webster, the Stanford–Binet Fourth Edition and the Kaufman Adolescent and Adult Intelligence Test, and Webster's IQ scores were 51 and 55, respectively. Dr. Keyes also conducted a Vineland adaptive skills test on Webster to measure his "adaptive functioning." [6] Dr. Keyes ultimately concluded that Webster functions at the level of a sevenyear-old and is mentally retarded. Neuropsychologist Dr. Robert Fulbright testified that he performed several neuropsychological tests on Webster. Based on the results, he believed Webster had significant impairment in his intellectual capacity, attention capacity, and reasoning abilities, and suffered from limited language and memory capabilities. The fourth expert, Dr. Mark Cunningham, testified that he spoke with Webster's family and examined Webster while he was in prison. Dr. Cunningham further testified that Webster suffers from mild mental retardation

Defense counsel also introduced evidence of an IQ test that was given to Webster by an Arkansas state mental health center in 1992. The test demonstrated that Webster had an IQ of only 48 more than a year before Lisa's kidnapping and murder. Webster's friends and family also testified at the hearing. They stated that Webster had to repeat two grades in school, was in special education classes, was unable to live away from his mother, received income from welfare, food stamps, family members, and girlfriends, and had illegible handwriting.

To rebut Webster's evidence of mental retardation, the Government presented testimony from two experts. Dr. George Parker testified that he administered a partial WAIS–R and estimated Webster's IQ to be 72. He also testified that Webster does not suffer from mental retardation, and Webster's IQ scores were artificially deflated because he was motivated to do poorly on the tests to avoid the death penalty. Dr. Richard Coons, a psychiatrist, testified similarly. Dr. Coons further claimed that Webster had lied about taking special education classes in his youth. [7]

The Government also focused on Webster's apparent ability to adapt to life in jail. Dr. Parker and Dr. Coons testified that Webster made his bed, put away his clothes, and kept an organized cell while awaiting trial. Fellow inmates and corrections officers also testified that Webster had written letters, grievances, and requests for various services, read newspapers aloud, submitted names and addresses for his visitation list, appeared to be reading from law books and taking notes in the law library, and on one occasion, Webster complained because he received incorrect change from the commissary.

**\*3** At the conclusion of the hearing, the jury determined that several statutory and non-statutory aggravating factors existed, *see* 18 U.S.C. § 3592, and concluded that the death penalty was an appropriate sentence for Webster's actions. On September 30, 1996, the court agreed with the jury's recommendation and sentenced Webster to death on count one, life imprisonment on count two, and sixty months' imprisonment on count six. The court also issued an entry entitled Factual Finding Regarding Mental Retardation stating that, "Webster is not mentally retarded and ... he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty." *Webster Direct Appeal,* 162 F.3d at 351.

Webster appealed his convictions and sentence to the Fifth Circuit arguing, among other things, that his death sentence was unconstitutional because he is, in fact, mentally retarded. The court disagreed, however, noting that "[t]he government presented substantial evidence to support the finding" the he was not mentally retarded. *Id.* at 353. Webster's conviction and death sentence were ultimately affirmed by the Fifth Circuit, and the Supreme Court of the United States denied his petition for certiorari. *Webster v. United States,* 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999).

Thereafter, on September 29, 2000, Webster timely filed a motion for relief pursuant to 28 U.S.C. § 2255. [8] Again, Webster argued that his death sentence is improper because he is mentally retarded. Webster also argued that counsel was ineffective in failing "to investigate and present additional evidence demonstrating mental retardation and the extreme abuse Webster suffered as a child." *United States v. Webster,* 392 F.3d 787, 793 (5th Cir.2004) (*"Webster 2255 I"* ). The district court denied his motion, but granted a certificate of appealability as to two of Webster's claims: "first, that the

evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and second, that his alleged retardation renders him ineligible for a death sentence." *United States v. Webster,* 421 F.3d 308, 310 (5th Cir.2005) (*"Webster 2255 II"* ).

Once more, however, the Fifth Circuit rejected Webster's arguments regarding his alleged mental retardation and provided the following explanation for its decision:

> Webster claims he is mentally retarded and thus ineligible for his death sentence, but ... Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences.

> Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him. The question whether he is mentally retarded was, as the district court observed, "a highly contested one at trial," and Webster failed to convince either the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may be* retarded.

 **\*4** *Id.* at 313–14 (citation omitted) (emphasis in original). Webster's petition for a writ of certiorari was denied by the Supreme Court. *Webster v. United States,* 549 U.S. 828, 127 S.Ct. 45, 166 L.Ed.2d 47 (2009).

Webster also separately appealed the district court's denial of a certificate of appealability on the remainder of his § 2255 claims, including the allegation that counsel was ineffective in failing to present additional evidence of his mental retardation during the sentencing hearing. The Fifth Circuit, however, agreed with the district court's assessment of Webster's ineffective assistance of counsel claim noting that

> [a]fter engaging in an exhaustive review of the trial record, the district court determined that defense counsel presented a significant amount of such evidence; and, although more of the same or similar evidence could have been furnished, counsel were not

constitutionally ineffective for failing to present more of the same.

*Webster* 2255 I, 392 F.3d at 793. The Fifth Circuit further stated:

> Indeed, our review of the trial record confirms that Webster's counsel were far from constitutionally ineffective in investigating and presenting evidence of his mental condition and the abuse he suffered as a child. During the punishment phase, counsel presented lengthy and detailed testimony from four medical experts regarding Webster's mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by one of the government's experts in testing Webster's cognitive abilities.

*Id.* at 793–94.

Webster's appeals did not stop there, however. On October 22, 2009, Webster moved the Fifth Circuit for authorization to file a second motion for relief under 28 U.S.C. § 2255. Pursuant to § 2255(h)(1),

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.

Webster argued that a successive 2255 motion was warranted because he had newly discovered evidence "in the form of government and school records and additional testimony"

establishing that he is mentally retarded, and thus, ineligible for the death penalty. *In re Webster,* 605 F.3d 256, 257 (5th Cir.2010) (*"Webster 2255 III"* ). Webster's "newly discovered evidence" included records from the Social Security Administration indicating that he was diagnosed with mental retardation months before he kidnapped, assaulted, and murdered Lisa and a letter from his school indicating that he was, in fact, enrolled in special education classes. Webster argued that, had this evidence been presented at trial, it would have refuted the Government's arguments that he was pretending to be mentally retarded to avoid the death penalty and he was lying when he said he attended special education classes. The Fifth Circuit, however, held that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.,* capital murder." *Id.* at 257. Because Webster's newly discovered evidence challenged only his sentence, i.e., his death sentence, the court denied Webster's request to file a subsequent § 2255 motion without considering the merits of the new evidence.[9]

**\*5** Webster now seeks relief from this Court pursuant to 28 U.S.C. § 2241 based on the same newly discovered evidence addressed in his motion for authorization to file a second motion under 28 U.S.C. § 2255. Webster argues that "because section 2255 is inadequate and ineffective, section 2241 is the appropriate mechanism for Petitioner to challenge the unconstitutionality of his death sentence based on previously unavailable evidence." Webster's Pet. at 26.

### II. *STANDARD*

A federal court may issue a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c)(3) if it finds the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." Webster seeks such a writ from this Court.

### III. *DISCUSSION*

Before the Court may consider the merits of Webster's petition, the Court must determine whether he satisfies the savings clause of § 2255, and is thus entitled to attack his sentence under § 2241.

In general, federal prisoners who wish to attack the validity of their convictions or sentences are required to proceed under § 2255. Furthermore, in the overwhelming majority of cases § 2255 specifically prohibits prisoners from circumventing § 2255 and challenging their convictions to sentences through a habeas petition under § 2241. There is, however, a recognition in the statute that it will not apply in a narrow class of cases. This is the so-called "savings clause" of § 2255, which allows prisoners to bring § 2241 petitions if they can show that the § 2255 remedy "is inadequate or ineffective to test the legality of [the prisoner's] detention."

*United States v. Prevatte,* 300 F.3d 792, 799 (7th Cir.2002) (quoting *Garza v. Lappin,* 253 F.3d 918, 921 (7th Cir.2001)). According to the Seventh Circuit, "[a] federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first 2255 motion." *In re Davenport,* 147 F.3d 605, 611 (7th Cir.1998); *see also* *Collins v. Holinka,* 510 F.3d 666, 667 (7th Cir.2007) (if § 2255 offers "one full and fair opportunity to contest" one's conviction, a § 2241 petition must be dismissed under § 2255), *Potts v. United States,* 210 F.3d 770, 770 (7th Cir.2000) ("The essential point is that a prisoner is entitled to one unencumbered opportunity to receive a decision on the merits."). The following qualifications, however, apply to this rule:

> The first is that the change of law has to have been made retroactive by the Supreme Court.... The second is that it must be a change that eludes the permission in section 2255 for successive motions.... Third, "change in law" is not to be equated to a difference between the law in the circuit in which the prisoner was sentenced and the law in the circuit in which he is incarcerated.

*Id.* at 611–12.

Post-*Davenport,* the Seventh Circuit has concluded that "[e]very court that has addressed the matter has held that § 2255 is 'inadequate or ineffective' only when a structural problem in § 2255 forecloses even one round of effective collateral review—and then only when as in *Davenport* the claim being foreclosed is one of actual innocence." *Taylor v. Gilkey,* 314 F.3d 832, 835 (7th Cir.2002); *see also Unthank v. Jett,* 549 F.3d 534, 536 (7th Cir.2008) (" § 2255 is inadequate or ineffective only when a prisoner is unable to present a claim of actual innocence"). In other words, a petitioner cannot show that a motion under § 2255 is "ineffective" simply because that remedy is no longer available, either because the deadline for filing such a motion has passed or because petitioner filed a previous motion under § 2255 and cannot satisfy the requirements for filing a second motion under § 2255(h). *Unthank,* 549 F.3d at 535–36 (citing *Taylor,* 314 F.3d at 836) (further rejecting argument that "whenever § 2255(h) closes the door to a renewed challenge under § 2255, then § 2255(e) must open the door to a challenge under § 2241").

 **\*6** In *Taylor,* the petitioner was convicted of several drug and firearms offenses. After the Seventh Circuit affirmed his convictions and sentences, Taylor filed a motion for relief pursuant to § 2255 with the district court arguing that "an error in applying the Sentencing Guidelines' grouping rules had elevated his range by 6 to 21 months, and that the judge should correct this error by reducing his sentence." *Id.* at 833. The court denied his motion under then prevailing Circuit law without investigating whether "counsel's failure to call this to the attention of the trial and appellate courts was constitutionally deficient." *Id.*

Thereafter, the Supreme Court issued a decision unrelated to Taylor's case that suggested that the district court erred in denying Taylor's § 2255 motion. As a result, Taylor filed a petition for writ of habeas corpus under § 2241, arguing effectively that "his lawyer furnished ineffective assistance by failing to argue at sentencing or on appeal that his convictions should have been grouped under U.S.S.G. § 3D1.2," as the Supreme Court had ruled in a similar case. *Id.* at 836. In determining whether Taylor's petition satisfied the savings clause of § 2255, the court reasoned that "the sort of argument Taylor want[ed] to present ... has been around for a long time.... It does not illuminate any structural defect in §

2255 or present any fundamental error equivalent to actual innocence." *Id.* Moreover, the court noted that, although the Supreme Court issued a decision showing that the disposition of his first § 2255 proceeding had been mistaken, "[t]he intervening decision did not ... create a new and retroactive rule of constitutional law; at most it just showed that an error had been made in applying an old rule to Taylor's situation." *Unthank,* 549 F.3d at 535. Accordingly, Taylor's petition was denied.

Here, Webster argues that he is mentally retarded and thus ineligible for the death penalty. This sort of argument, however, is by no means new. *See Atkins v. Virginia,* 536 U.S. 304, 314, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) ("In 1988, when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a 'sentence of death shall not be carried out upon a person who is mentally retarded.' "). Thus, the law on this topic has not recently changed such that Webster was *unable* to argue that he was mentally retarded prior to the instant petition. Rather, it is clear from the record that Webster's mental ability was a highly contested issue at every stage of the proceedings. [10] *Cf. Felder v. McVicar,* 113 F.3d 696, 698 (7th Cir.1997) ("A newly discovered factual basis for a claim may permit filing a successive petition raising a new claim, ... but it does not permit filing a successive petition raising the same claim that was presented in a previous petition."); *In re Hill,* 715 F.3d 284, 292 (11th Cir.2013) (Petitioner "cannot convert his previously asserted 'claim' into a wholly new 'claim' merely by coming forward with new supporting evidence or even new legal arguments.").

 **\*7** Notwithstanding the foregoing, Webster argues that "[t]he newly available evidence ... taken together with the evidence presented at trial, proves that Mr. Webster is mentally retarded and, therefore, 'actually innocent' of the death penalty." Webster's Br. at 32. Thus, like one of the petitioners in *Davenport,* he is "actually innocent" of the offense and the Court should consider the merits of his petition. The Government argues, on the other hand, that "a challenge to a sentence does not amount to a claim that a prisoner is innocent of the offense." Government's Resp. at 13, Dkt. No. 17.

The term "actual innocence" is derived from § 2255(h)(1), which allows for successive 2255 motions under limited circumstances. The rule provides as follows:

A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.

Before it was codified in § 2255 of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "the 'actual innocence' exception ... was judge-made." *Hope v. United States,* 108 F.3d 119, 120 (7th Cir.1997). The Supreme Court discussed the judge-made actual innocence exception as it applies in capital cases in *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). In that case, the Court held that "to show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at 336. In other words, "actual innocence" could mean "innocent of the death penalty." Webster argues that this Court should apply this definition and allow his petition to proceed.

Webster, however, made this exact argument before the Fifth Circuit on his motion for authorization to file a second motion for relief under 28 U.S.C. § 2255, and the Fifth Circuit rejected his argument, concluding that the judge-made exception noted in *Sawyer* no longer applied. It decided that

there is no reason to believe that Congress intended the language "guilty of the offense" to mean "eligible for a death sentence." Had Congress wanted the provision to cover challenges to a sentence— even if only to a death sentence

—it easily could have referenced sentences explicitly in the text, as it did numerous times throughout § 2255. Or if Congress had intended to signal courts to incorporate the old, broad interpretation of actual innocence, it well could have used the words, "actual innocence." Instead, it elected to couch § 2255(h)(1) ... in the markedly different, unmistakable terms of *guilt of the offense.*

*Webster 2255 III,* 605 F.3d at 258–59 (emphasis in original). Moreover, since the actual innocence exception was codified, Circuit courts, including the Seventh Circuit, have unanimously held that the Sawyer exception did not survive the enactment of AEPDA. *See, e.g., Hope,* 108 F.3d at 120; *Hill,* 715 F.3d at 300; *Webster 2255 III,* 605 F.3d at 258. Therefore, as the Government contends, actual innocence means innocent of the offense—not innocent of the death penalty.

**\*8** Webster does not argue that he is actually innocent of his crimes. He argues only that he is not eligible for the death penalty because he is mentally retarded. Thus, based on the foregoing case law, Webster is unable to show that § 2255 is an inadequate or ineffective remedy such that he may bring a petition for writ of habeas corpus under § 2241. Accordingly, and unfortunately, the Court is unable to consider the merits of Webster's petition.

## IV. *CONCLUSION*

For the foregoing reasons, Webster's petition for writ of habeas corpus under 28 U.S.C. § 2241 is **DENIED.**

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6007593

Footnotes

1    Although Webster received a sentence of death and is currently incarcerated in the Special Confinement Unit in Terre Haute, Indiana, his execution has been stayed pending the outcome of *Roane v. Gonzalez,* 1:05–cv–2337 (D.D.C.).

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

*Roane* involves a constitutional challenge to the method of lethal injection used by the federal government. Webster's Pet. at 2, n. 1, Dkt. No. 1.

2    The circumstances that led to Webster's arrest and convictions are discussed in more detail in ⚑ *United States v. Webster,* 162 F.3d 308 (5th Cir.1998) (*"Webster Direct Appeal"* ).

3    The Government agreed to dismiss count five.

4    ⚑ Section 3596(c) provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded."

5    A fifth medical expert was presented on surrebuttal to critique the methodology used by one of the Government's experts.

6    The term "adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition,* Text Revision (DSMIV–TR) at 42.

7    Two witnesses from Watson Chapel Schools testified at the sentencing hearing that Webster did not attend special education classes while in school.

8    An amended motion was filed on August 16, 2002.

9    The court, however, was not unsympathetic to Webster's situation, as one concurring judge wrote that the court's holding, although legally correct, was absurd and "Kafkaesque." *Id.* at 259. He believed that if Webster were allowed to present the newly discovered evidence "to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded," and thus, ineligible for the death penalty. *Id.*

10   Webster argues that "it was simply not possible for [him] to bring his claim in connection with his original petition because most of the new evidence upon which [his] Petition is based was in government files that were neither produced to [him] nor made available to him, despite his request." Webster's Br. at 31. Based on the affidavits provided by Webster, trial counsel requested the information prior to Webster's trial, but the documents were never produced. Apparently, trial counsel did not follow-up on his request. The information was not requested again until October 2008, more than twelve years after his trial and several years after his direct appeals and his initial § 2255 motion were unsuccessful. Unfortunately, it is now too late to present this evidence.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

761 F.3d 764
United States Court of Appeals,
Seventh Circuit.

Bruce Carneil WEBSTER, Petitioner–Appellant,

v.

John F. CARAWAY, Warden, United States
Penitentiary, Terre Haute, Respondent–Appellee.

No. 14–1049.
|
Argued July 24, 2014.
|
Decided Aug. 1, 2014.

**Synopsis**

**Background:** Following affirmance on direct appeal of
federal prisoner's convictions for kidnapping resulting in
death and related offenses and his death sentence, 162
F.3d 308, he filed a § 2241 habeas petition challenging his
sentence. The United States District Court for the Southern
District of Indiana, William T. Lawrence, J., 2013 WL
6007593, denied the petition. Prisoner appealed.

**Holdings:** The Court of Appeals, Easterbrook, Circuit Judge,
held that:

evidence presented in support of prisoner's prior application
for social security disability benefits was not sufficient
to demonstrate statutory inadequacy or ineffectiveness of
available remedy of motion to vacate, as required to authorize
§ 2241 petition, and

statute authorizing § 2241 petition did not contract subject
matter jurisdiction.

Affirmed.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*765** Steven J. Wells, Attorney, Timothy J. Droske,
Attorney, Kirsten E. Schubert, Attorney, Dorsey & Whitney,
Minneapolis, MN, for Petitioner–Appellant.

James Wesley Hendrix, Attorney, Office of the United States
Attorney, Dallas, TX, for Respondent–Appellee.

Before BAUER, EASTERBROOK, and SYKES, Circuit
Judges.

**Opinion**

EASTERBROOK, Circuit Judge.

Bruce Webster was convicted of a federal capital offense and
sentenced to death. Details of the crime, which do not matter
for current purposes, may be found in *United States v. Webster,*
*392 F.3d 787 (5th Cir.2004)* (direct appeal), and *United*
*States v. Webster,* 421 F.3d 308 (5th Cir.2005) (28 U.S.C. §
2255). The Fifth Circuit also denied Webster's application
for permission to pursue a second collateral attack. *In re*
*Webster,* 605 F.3d 256 (5th Cir.2010). Having exhausted his
opportunities within the Fifth Circuit, where the crime and
trial occurred, Webster asked for collateral relief under 28
U.S.C. § 2241 **\*766** in the Southern District of Indiana,
where he is confined.

Webster's guilt, and the heinousness of his acts, are
uncontested. He sought to persuade a jury, the district judge,
and the judges of the Fifth Circuit that he is not death-
eligible because he is mentally retarded. The Supreme Court
held in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242,
153 L.Ed.2d 335 (2002), that the Constitution forbids the
execution of persons who are retarded or unable to understand
what capital punishment means and why they have been
sentenced to die. See also *Hall v. Florida,* —— U.S. ——,
134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014). Webster did not
need to rely on the Constitution, however, for he has the
protection of a federal statute: "A sentence of death shall not
be carried out upon a person who is mentally retarded. A
sentence of death shall not be carried out upon a person who,
as a result of mental disability, lacks the mental capacity to
understand the death penalty and why it was imposed on that
person." 18 U.S.C. § 3596(c). At trial Webster introduced
evidence from multiple experts who concluded that his IQ is
less than 70 and that he is retarded. The prosecutor responded
with evidence from other experts who concluded that Webster
is not retarded and was malingering in an effort to evade
punishment. The jury sided with the prosecution, the judge
sentenced Webster to death, and the Fifth Circuit held both on
direct appeal and in a collateral attack under § 2255 that ample
evidence supports this decision. (Webster does not argue that

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

he is unable to understand the concept of capital punishment or why he has received that sentence.)

In the current proceeding Webster does not contend that the law—or his mental condition—has changed since the Fifth Circuit's decisions on direct and collateral review. Instead he contends that he has new evidence bearing on the question that the jury decided adversely to him. His current legal team has acquired records that the Social Security Administration created when he applied for disability benefits. The SSA sent him to see a psychologist, who administered an IQ test that produced a score under 60. This psychologist, plus two consulting physicians, concluded that he is retarded. The SSA nonetheless classified him as not disabled. He contends that the three medical reports could have changed the outcome of the trial, since the Social Security proceedings predated the crime of which he stands convicted—and therefore, his lawyers insist, occurred before he had an incentive to deceive people about his mental condition.

But the district court dismissed the § 2241 petition without a hearing, ruling that it is blocked by § 2255(e), which reads: "An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained ... unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention." The district judge saw nothing "inadequate or ineffective" about § 2255, which Webster had been able to use to obtain a decision by the Fifth Circuit about his mental condition. *Webster v. Lockett,* 2013 U.S. Dist. LEXIS 161375 (S.D. Ind. Nov. 13, 2013). The judge thought that a prisoner's own failure to present evidence does not demonstrate statutory inadequacy or ineffectiveness.

We agree with that conclusion. Taken in the light most favorable to Webster—which is to say, on the assumption that the evidence *is* "newly discovered" and might have affected the jury's evaluation—the arguments now presented tend to impugn the effectiveness of Webster's former lawyers but not of § 2255. The **\*767** trial, the direct appeal, and the proceeding under § 2255 offered opportunities to use the evidence that Webster now seeks to present. That Webster's legal team did not take (full) advantage of those opportunities does not demonstrate a flaw in the statute.

No court of appeals has deemed § 2255 "inadequate or ineffective" just because counsel failed to take maximum advantage of the opportunity it extends. To get anywhere, Webster must persuade us not only to break new ground

but also to hold that the changes to § 2255 made in 1996 by the Antiterrorism and Effective Death Penalty Act—and particularly the addition of § 2255(h), which limits second or successive petitions to those that satisfy a short list of conditions—made § 2255 ineffective. In other words, he must persuade us that the AEDPA is self-negating, that by restricting the number of § 2255 petitions Congress indirectly authorized an unlimited number of § 2241 petitions seeking the same relief. At oral argument, Webster's counsel was explicit: He asked us to apply pre–1996 law and to hold that an additional collateral attack is proper whenever the prisoner does not abuse the writ. That would write § 2255(h) and 28 U.S.C. § 2244(b) out of the United States Code. Yet courts do not interpret statutes to make revisions self-cancelling. We have held that § 2255(h) does not make § 2255 as a whole inadequate or ineffective. See *Unthank v. Jett,* 549 F.3d 534, 535–36 (7th Cir.2008); *Taylor v. Gilkey,* 314 F.3d 832, 835 (7th Cir.2002). Webster does not persuade us to change course.

Our decisions in *In re Davenport,* 147 F.3d 605 (7th Cir.1998), and *Brown v. Caraway,* 719 F.3d 583 (7th Cir.2013), discuss the circumstances that may justify a federal prisoner's use of § 2241 to test the validity of his conviction or sentence. When a change of law, retroactively applicable, shows that the prisoner did not commit a crime or has received an illegally high sentence, § 2241 is available if it otherwise would be impossible to implement the Supreme Court's intervening decision. Section 2255(h) allows for a new round of collateral review in response to retroactive constitutional decisions, but Congress did not appear to contemplate the possibility of retroactive *statutory* decisions that show a prisoner's innocence. That's the flaw that *Davenport* and *Brown* see as justification for invoking § 2241.

*Davenport* and its successors conclude that § 2241 is available to provide the full retroactive effect contemplated by the Supreme Court. But Webster is not the beneficiary of a retroactive decision that cannot be implemented except through § 2241. There has been no change of law; § 3596(c) predates his crime and trial. Nor does Webster contend that his mental condition has changed. Instead he wants to use § 2241 to make a better factual record and

to place his arguments before a different circuit, hoping for a better result. These desires, understandable as they are, do not call into question the adequacy or effectiveness of § 2255.

For what little it is worth given this legal conclusion, we add that the evidence that Webster wants to introduce cannot helpfully be called "newly discovered." Webster has long known of it, or readily could have discovered it. It concerns his own application for Social Security disability benefits. He knew about that; his lawyer at trial knew about it too (his mother mentioned the subject during her testimony); and it would have been possible to retrieve the records in time for use during the trial and § 2255 proceeding.

Webster's current legal team asserts that his former lawyer was stonewalled when trying to obtain these records, but that is not what the former lawyer himself **\*768** said. He related that he asked the Social Security Administration for Webster's records but lacks any memory of a response and therefore *assumes* that he must have been denied access. Yet that assumption is unfounded. Former counsel did not produce his file (he says that he no longer has it) and therefore did not have any records about the request (if any) and response (if any); he has only a lack of recollection to go on. That's pretty weak. One sensible inference would be that former counsel, or an investigator on his behalf, simply did not follow through. Current counsel obtained the records less than four months after asking, even though the disability case is an old one and many records had been sent to long-term storage. None of the difficulties (if there were any) that original counsel encountered can be blamed on § 2255.

Nor would the Social Security records facilitate a new line of defense. Webster's trial counsel had, and introduced, other medical records in which physicians diagnosed retardation before the murder. These records enabled him to ask the jury to infer that he had not started trying to deceive examiners after the prosecution began. The prosecutor could and did reply that Webster had reasons other than a desire to avoid the death penalty to minimize his mental abilities. Trying to obtain disability benefits would have been one such reason, so the evidence that current counsel now wants to use could have been subject to much the same response as the prosecutor made to the records introduced at sentencing.

But we have not set out to decide what effect the SSA records might have had in the hands of a top-notch lawyer; it is enough to conclude that the to-and-fro between the prosecutor and Webster's current legal team does not hint at a structural

problem in § 2255, so § 2255(e) disallows the use of § 2241 to get a fresh decision.

Before we close, we must consider whether the district court entered the proper judgment. The court dismissed the § 2241 petition with prejudice. That's the right step if the court had subject-matter jurisdiction. Yet several circuits have held that § 2255(e) limits the federal courts' subject-matter jurisdiction. See *Williams v. Warden,* 713 F.3d 1332, 1337–40 (11th Cir.2013) (collecting cases). The Eleventh Circuit treated us as reaching a contrary conclusion in *Brown v. Rios,* 696 F.3d 638 (7th Cir.2012), but discounted that decision on the ground that the court had "simply accepted the government's concession" ( *id.* at 1340 n. 1)—which would be an improper way to address a jurisdictional issue. See also *Sperberg v. Marberry,* 381 Fed.Appx. 602 (7th Cir.2010) (nonprecedential) ( "[w]hether the proceeding is allowable under § 2255(e) is a question on the merits; it does not affect subject-matter jurisdiction."). In light of *Williams* we have taken a fresh look at the issue and once more conclude that § 2255(e) does not curtail subject-matter jurisdiction.

Here is its language again: "An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained ... unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention." It does not employ the word jurisdiction—nor is § 2255 itself a jurisdictional statute. A motion under § 2255 is one in the criminal case, and jurisdiction thus comes from 18 U.S.C. § 3231, which supplies subject-matter jurisdiction in all federal criminal prosecutions. Section 2255(e) does not purport to contract that jurisdiction.

Nor does § 2255(e) restrict the several sources of subject-matter jurisdiction **\*769** available when a federal prisoner seeks a writ of habeas corpus. One source is 28 U.S.C. § 1331, which creates jurisdiction for claims arising under federal law. Another is 28 U.S.C. § 1343(a)(4), which deals with civil-rights claims, of which petitions for habeas corpus are examples. Then there is § 2241 itself, which appears to authorize federal litigation independent of other statutes (which, when § 2241 was enacted, had amount-in-controversy limits that could have made them unavailable for claims within its scope). Section 2241(e) has two

subdivisions that expressly limit subject-matter jurisdiction, but neither applies to a claim arguably blocked by § 2255(e). Because § 2241 itself tells us when subject-matter jurisdiction runs out, it is inappropriate to infer additional limits from non-jurisdictional language in a different statute.

*Arbaugh v. Y & H Corp.,* 546 U.S. 500, 516, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006), says that if "Congress does not rank a statutory limitation ... as jurisdictional, courts should treat the limitation as nonjurisdictional". See also, e.g., *Gonzalez v. Thaler,* —— U.S. ——, 132 S.Ct. 641, 648, 181 L.Ed.2d 619 (2012) (reiterating this conclusion). Section 2255(e) sets a firm limit, to be sure, but not one that Congress has added to the jurisdictional ranks. The court has "adjudicatory authority" (*Gonzalez,* 132 S.Ct. at 648) to determine *whether* § 2255 is inadequate or ineffective in a given situation; no more is necessary for subject-matter jurisdiction.

*Williams* concludes that § 2255(e) is jurisdictional, nevertheless, because it uses mandatory language. An application "shall not be entertained" unless a condition is met. The Eleventh Circuit wrote that it found the limit jurisdictional "[b]ased on the text alone, which speaks in imperative terms". 713 F.3d at 1338. Yet the Supreme Court has held that mandatory rules are not automatically jurisdictional. *Gonzalez* is one illustration. It holds that 28 U.S.C. § 2253(c)(3) is not jurisdictional even though it includes the word "shall". The Court continued: "calling a rule nonjurisdictional does not mean that it is not mandatory or that a timely objection can be ignored.... This Court ... has long 'rejected the notion that "all mandatory prescriptions, however emphatic, are ... properly typed jurisdictional." ' " 132 S.Ct. at 651, quoting from *Henderson v. Shinseki,* —— U.S. ——, 131 S.Ct. 1197, 1205, 179 L.Ed.2d 159 (2011), and citing *Dolan v. United States,* 560 U.S. 605, 611–12, 130 S.Ct. 2533, 177 L.Ed.2d 108 (2010).

The Court in *Gonzalez* also cited *Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010), which like *Henderson* and *Dolan* declined to equate mandatory rules with jurisdictional ones. *Reed Elsevier* concerned a portion of the Copyright Act that made registration essential to litigation. A court of appeals held that the mandatory nature of that condition on judicial review made it jurisdictional; the Justices unanimously disagreed.

We reached a similar conclusion in *Minn–Chem, Inc. v. Agrium, Inc.,* 683 F.3d 845 (7th Cir.2012) (en banc), about language in the Foreign Trade Antitrust Improvements Act providing that some parts of the Sherman Antitrust Act "shall not apply" to certain international events. That language stated a question on the merits, we held, and did not contract subject-matter jurisdiction. See also *Morrison v. National Australia Bank Ltd.,* 561 U.S. 247, 253–54, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010).

Two more examples of mandatory but non-jurisdictional rules. A bankruptcy court can extend the time for objection to discharge if and only if the motion for additional time is filed within 60 days of the creditors' meeting. A court of appeals treated the mandatory nature of this rule **\*770** as a jurisdictional limit; the Supreme Court held otherwise. *Kontrick v. Ryan,* 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004). Our other example is *Eberhart v. United States,* 546 U.S. 12, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005). Criminal defendants are entitled to move for new trials, but the time available to do so is limited—and at the time that limit could not be extended. Fed.R.Crim.P. 33, 45(b)(2). The Supreme Court twice treated the mandatory nature of this rule as a jurisdictional restriction. *United States v. Robinson,* 361 U.S. 220, 229, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960); *United States v. Smith,* 331 U.S. 469, 474 & n. 2, 67 S.Ct. 1330, 91 L.Ed. 1610 (1947). But *Eberhart* disapproves *Robinson* and *Smith* to the extent that they equate "mandatory" rules with "jurisdictional" ones. *Eberhart* classified the time limits as among the many claims-processing rules that shape the course of litigation but can be waived or forfeited.

The United States Code is jam-packed with imperative language. Rules of law tell litigants, and courts, what must be done. These rules are enforced when their beneficiaries invoke them. If they are also treated as jurisdictional, however, then courts must raise the subject on their own, even when litigants choose to waive or forfeit their rights. Declaring a rule to be "jurisdictional" not only makes extra work for judges but also creates a prospect that the time and energy invested in a case will prove to be wasted, when an appellate court dismisses the suit or directs the litigants to start over. Curtailing the need for judges to resolve issues on their own initiative, and the risk that both private and judicial efforts will be squandered, are the principal reasons why the Supreme Court has insisted in recent years that very few rules

Case: 19-2683      Document: 13      Filed: 11/14/2019      Pages: 115

be treated as jurisdictional. See, e.g., *Gonzalez,* 132 S.Ct. at 647–48.

The text of § 2255(e) does not suggest to us that Congress set out to prevent the Attorney General from consenting to collateral review under § 2241, if the Executive Branch thinks that necessary to avert an injustice. We conclude, accordingly, that § 2255(e) does not contract subject-matter jurisdiction—which means that its benefits can be waived or forfeited. But in this case the Attorney General has invoked his right to say "enough is enough" and to prevent an additional round of collateral review. The district court had jurisdiction and entered the proper kind of judgment.

AFFIRMED

**All Citations**

761 F.3d 764

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

784 F.3d 1123
United States Court of Appeals,
Seventh Circuit.

Bruce Carneil WEBSTER, Petitioner–Appellant,
v.
Charles A. DANIELS, Warden, United States
Penitentiary, Terre Haute, Respondent–Appellee.

No. 14–1049.
|
Argued Jan. 7, 2015.
|
Decided May 1, 2015.

**Synopsis**
**Background:** After his federal convictions for kidnapping resulting in death and related offenses and his death sentence were affirmed on direct appeal, 162 F.3d 308, petitioner sought habeas relief. The United States District Court for the Southern District of Indiana, William T. Lawrence, J., 2013 WL 6007593, denied the petition. Petitioner appealed. The Court of Appeals, Easterbrook, Circuit Judge, 761 F.3d 764, affirmed.

**Holdings:** On rehearing en banc, the Court of Appeals, Wood, Chief Judge, held that:

there is no categorical bar against use of savings clause to allow a petitioner to bring a petition for habeas relief in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty, and

hearing was required in order to determine whether proffered newly discovered evidence was available at time of trial.

Reversed and remanded.

Easterbrook, Circuit Judge, with whom Bauer, Kanne, Sykes, and Tinder, Circuit Judges, joined, filed dissenting opinion.

**Attorneys and Law Firms**

 **\*1124** Steven J. Wells, Timothy J. Droske, Kirsten E. Schubert, Dorsey & Whitney, Minneapolis, MN, for Petitioner–Appellant.

James Wesley Hendrix, Office of the United States Attorney, Dallas, TX, for Respondent–Appellee.

Before WOOD, Chief Judge, and BAUER, POSNER, FLAUM, EASTERBROOK, KANNE, ROVNER, WILLIAMS, SYKES, TINDER, and HAMILTON, Circuit Judges.

**Opinion**

WOOD, Chief Judge.

Since 1948, federal prisoners who contend that they were convicted or sentenced in violation of the Constitution or laws of the United States have been required in most cases to present that claim through a motion under 28 U.S.C. § 2255. The motion must be filed in the district of conviction. As a rule, the remedy afforded by section 2255 functions as an effective substitute for the writ of habeas corpus that it largely replaced. See 28 U.S.C. § 2241; *United States v. Hayman,* 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952). But Congress recognized that there might be occasional cases in which "the remedy by motion is inadequate or ineffective to test the legality of [the applicant's] detention." 28 U.S.C. § 2255(e). The question before us is whether petitioner Bruce Webster has presented such a case. If so, then he may proceed to the merits of his petition; if not, then his case must be dismissed at the threshold.

Webster was convicted in the Northern District of Texas of the federal crimes of kidnapping resulting in death, conspiring to commit kidnapping, and using and carrying a firearm during a crime of violence. *United States v. Webster,* 162 F.3d 308 (5th Cir.1998) (*Webster I* ). He was sentenced to death on the first count, after the district court rejected his argument  **\*1125**  that he was ineligible for the death penalty on account of mental retardation (now termed "intellectual disability" by the Supreme Court, see *Hall v. Florida,* —— U.S. ——, 134 S.Ct. 1986, 1990, 188 L.Ed.2d 1007 (2014)). The Fifth Circuit later rejected Webster's motion for relief under section 2255, *United States v. Webster,* 421 F.3d 308 (5th Cir.2005) ( *Webster II* ), and his application for an order authorizing a

successive 2255 proceeding. *In re Webster,* 605 F.3d 256 (5th Cir.2010) (*Webster III* ).

Webster is now seeking the opportunity to present newly discovered evidence that would demonstrate that he is categorically and constitutionally ineligible for the death penalty under the Supreme Court's decisions in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and *Hall.* A panel of this court concluded that new evidence can never satisfy the demanding standard of section 2255(e) and thus that Webster cannot be heard. *Webster v. Caraway,* 761 F.3d 764 (7th Cir.2014) (*Webster IV* ). In light of the importance of the question, the full court decided to rehear the case *en banc.* We conclude that there is no such absolute bar to the use of the safety valve found in section 2255(e) for new evidence that would demonstrate categorical ineligibility for the death penalty. We therefore reverse the district court's judgment and remand for further proceedings.

## I. Background Facts and Proceedings

### A. Facts

There is no doubt that Webster and his co-defendants committed a horrible crime. We take our account of the underlying facts from the Fifth Circuit's opinion in *Webster I.* Those facts are largely undisputed at this stage; the only question is what they show, or do not show, about Webster's intellectual functioning.

Webster, along with Orlando Hall and Marvin Holloway, ran a marijuana business in Pine Bluff, Arkansas, a city of approximately 50,000 that lies about 45 miles south of Little Rock and 330 miles east of Dallas, Texas. The group used suppliers in the Dallas/Fort Worth area with the help of a local contact, Steven Beckley.

On September 21, 1994, Holloway drove Hall from Pine Bluff to the Little Rock airport, and Hall flew to Dallas; Beckley and Hall's brother Demetrius picked Hall up at the other end. Later that day, Hall and Beckley met two local dealers, Stanfield Vitalis and Neil Rene, at a car wash and gave them $4,700 as payment in advance for some marijuana. Beckley and Demetrius then returned to the car wash, but Vitalis and Rene never appeared. Hall phoned them to find out what happened, and they told him that both the car they had been driving and the money had been stolen from them. Hall figured out that the telephone number he had used was associated with the Polo Run apartments in Arlington, Texas (a Dallas suburb).

Hall, Demetrius, and Beckley began watching the apartment. When they spotted Vitalis and Rene in the supposedly stolen car, they concluded that the story about the stolen money was also false.

Three days later, Hall contacted Holloway and told him to arrange for Webster to fly to Dallas. Webster complied with Holloway's instructions. That evening, Hall, Demetrius, Beckley, and Webster went to the Polo Run apartments in a Cadillac owned by Hall's sister, Cassandra Ross. Hall and Webster were armed with handguns; Demetrius had a small souvenir baseball bat; and Beckley had duct tape and a jug of gasoline. So equipped, the group approached the apartment they had **\*1126** seen Vitalis and Rene use, and they knocked on the door. The occupant, Lisa Rene (the 16–year–old sister of Neil Rene), refused to let them in and called her sister and the police emergency number. Webster unsuccessfully tried to kick in the door. When that did not work, he and Demetrius looked through a sliding glass door and saw Lisa on the telephone. Demetrius shattered the door with the bat, and Webster entered the apartment, seized Lisa, and dragged her to the car.

In the meantime, Hall and Beckley had returned to the car. Webster, with Lisa in tow, met them there. He forced Lisa onto the floorboard and the group drove to Ross's apartment nearby. Once there, they left the Cadillac and shoved Lisa into the back seat of Beckley's car. Hall climbed into the back seat with her, and Webster sat in the front passenger seat. Beckley drove around looking for a secluded spot; while he did so, Hall raped Lisa and forced her to perform oral sex on him.

Eventually Beckley drove them back to Ross's apartment. From there, Beckley, Demetrius, and Webster drove Lisa, still a prisoner, the 330 miles to Pine Bluff. En route, Webster and Demetrius took turns raping Lisa. Once they reached Pine Bluff, they rented a motel room, where they tied Lisa to a chair and continued to assault her sexually.

The next morning, September 25, Hall and Holloway showed up at the motel room. They took Lisa into the bathroom for about 20 minutes. When they came out again, Hall told Beckley that "she know too much." Hall, Holloway, and Webster then left the motel. Later that afternoon, Hall and Webster went to a park and dug a grave. That evening, Hall, Beckley, and Webster took Lisa to the park, but they could not find the grave site in the dark and so they returned to the motel room. They shifted Lisa to another room the next morning.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Later that morning, Hall, Beckley, and Webster took Lisa back to the park. They covered her eyes with a mask. Hall and Webster led the way to the grave site, while Beckley guided Lisa along. At the grave site, Hall turned Lisa's back to the grave, placed a sheet over her head, and hit her in the head with a shovel. She tried to run away, but Beckley grabbed her and they both fell down. Beckley hit her twice with the shovel and handed it to Hall. At that point, Webster and Hall took turns hitting her with the shovel. Webster then gagged her, dragged her to the grave, stripped her, poured gasoline on her, pushed her in, and shoveled dirt over her. The record indicates that, although she was unconscious by then, Lisa was probably still breathing when she was buried.

It did not take long for the authorities to find out who was responsible for Lisa's hideous death. Lisa's brothers gave information leading to Demetrius's arrest to the police, and Hall and Beckley surrendered soon thereafter. Beckley confessed to his role in the kidnapping; his confession also implicated Hall and someone he called "B–Love." Beckley also said that he had last seen Lisa at the motel with B–Love, and a security guard at the hotel told the officers that Webster went by that name. When Webster pulled into the motel parking lot early on September 30, he was arrested.

B. Trial and Direct Appeal

In November 1994, Webster (along with Hall, Demetrius, Beckley, and Holloway) was indicted by a federal grand jury on charges of kidnapping in which a death occurred (Count 1, 18 U.S.C. § 1201(a)(1)), conspiracy to commit kidnapping (Count 2, 18 U.S.C. § 1201(c)), traveling in interstate **\*1127** commerce with intent to promote extortion (Count 5, 18 U.S.C. § 1952), and using and carrying a firearm during a crime of violence (Count 6, 18 U.S.C. § 924(c)). In February 1995, the government filed a notice of intent to seek the death penalty against Webster, pursuant to the Federal Death Penalty Act of 1994, 18 U.S.C. § 3593(a) (which had taken effect just 12 days before the murder). Webster's trial later was severed from that of his co-defendants. [1]

The jury returned guilty verdicts on Counts 1, 2, and 6; Count 5 was dismissed on the government's motion. The court conducted a separate sentencing hearing before the same jury, which returned special findings that Webster satisfied the statute's intent requirement, 18 U.S.C. § 3591(a), and that three statutory and two non-statutory aggravating factors

were present. 18 U.S.C. § 3592(c). Varying numbers of jurors found nine mitigating factors, some statutory and some non-statutory. See 18 U.S.C. § 3592(a); *Webster I,* 162 F.3d at 319 & n. 2. The court sentenced Webster to death on Count 1; to life imprisonment on Count 2; and to 60 months' imprisonment on Count 6.

On direct appeal, Webster raised four grounds for reversal that the Fifth Circuit had already rejected in Hall's separate appeal, see *United States v. Hall,* 152 F.3d 381 (5th Cir.1998), and 16 additional grounds, some of which related to his conviction and some to his sentence. Only one of them remains relevant at this stage of the game: point 13, which asserted that the district court "plainly erred and violated Webster's constitutional rights by entering a factual finding that he is not mentally retarded." *Webster I,* 162 F.3d at 321. Before turning to the Fifth Circuit's resolution of that point, it is essential to review the evidence of intellectual disability that was presented at the sentencing phase of the trial; virtually none came in at the guilt phase. Without this background, it is impossible to decide whether the newly discovered evidence would have made a difference. [2]

The defense relied primarily on the testimony of three experts: Dr. Raymond Finn, a clinical psychologist; Dr. Denis Keyes, a professor of special education and a certified school psychologist with expertise in mental retardation; and Dr. Robert Fulbright, a clinical neuropsychologist. At the most general level, those three agreed with the experts for the United States that a finding of mental retardation is appropriate if the person's I.Q. is roughly 70 or below on one of the accepted tests, and if the person has a deficit in at least one of three areas of adaptive functioning (communication, socialization, and daily living skills). (A third criterion— onset before the age of 18—was not contested.) Dr. Finn testified about Webster's I.Q.; Dr. Keyes testified about his adaptive functioning; and Dr. Fulbright testified more specifically about his level of mental functioning.

Before Dr. Finn personally administered an I.Q. test to Webster, he received copies of tests that had been performed in 1992, **\*1128** approximately two years before the murder, at the Southeast Arkansas Mental Health Clinic (the Clinic). Webster had gone there after his brother-in-law stabbed one of his brothers to death. The Clinic gave him the Wechsler Adult Intelligence Scale (WAIS) test, which is widely used. Webster scored 56 on the verbal part of the test, 48 on the

performance part, and received a full-scale I.Q. score of 48. The 1992 results, both defense and prosecution witnesses said, had to be taken with a grain of salt. Dr. Finn reported that the psychologist who conducted the test noted that Webster was confused, preoccupied, and poorly oriented at the time, and so the scores may have been depressed for that reason. The I.Q. tests were also viewed at the time as secondary to the possibility that Webster was suffering from schizophrenia, depression, or some other mental disorder. With that possibility in mind, the Clinic prescribed the anti-psychotic drug Haldol for him, although in the end it did not conclude that he was schizophrenic. A full-scale score of 48, however, easily meets the threshold of an I.Q. of 70 for intellectual disability recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM), both in the DSM–IV (the 4th edition that was in force at the time of trial) and in the current DSM–V (which took effect in 2013). It also meets the standard recognized by the American Association for Mental Retardation, now called the American Association on Intellectual and Developmental Disabilities.

After collecting background information on Webster, Dr. Finn administered the WAIS test to him in January 1995. That test revealed a verbal I.Q. score of 59, a performance I.Q. score of 60, and a full-scale I.Q. of 59, still well below the 70 mark. Dr. Finn explained that this score put Webster in the 0.3 percentile in the country, meaning that 99.7 percent of test-takers would do better. Taking into account Webster's agitation at the time of the 1992 test, Dr. Finn found the results of his test to be consistent with the earlier one, though likely more reliable.

Dr. Finn administered the WAIS test again to Webster in June 1996, just before the trial started. He noted that there is some learning effect from repeated exposure to the same test, and so one would predict a somewhat better performance. And that is what happened. Webster's verbal I.Q. rose to 72; his performance I.Q. dropped one point to 59; and his full-scale I.Q. was now 65, which (like the earlier findings) put Webster in the "mildly retarded" group.

Other aspects of Webster's behavior confirmed this conclusion, in Dr. Finn's view. Among other things, he noted Webster's marginal school achievement (he dropped out in 9th grade), marginal employment history (almost none, apart from one job he lost after a week), lack of independent living (he lived with his mother), and concrete speech patterns (meaning that he was not able to deal with abstract concepts).

Webster did have good knowledge of words, but Dr. Finn thought he was better at speaking than understanding.

On cross-examination, the government urged Dr. Finn to consider whether a person such as Webster, charged with a capital crime, would have a motive to lie or manipulate while being tested. The Assistant U.S. Attorney (AUSA) also suggested that someone might have a motivation to lie if a finding of mental retardation would establish eligibility for various governmental benefits. In addition, the AUSA noted that Dr. Finn had mentioned in a letter he wrote to defense counsel that Webster told him that Webster had been in special education classes through most of his school **\*1129** career. The AUSA then said "you know that's not true now, don't you," and Dr. Finn agreed that he did "know that now." As for the questions about motivation, Dr. Finn rejected the AUSA's suggestion, insisting instead that Webster had put forth a good effort on all of the tests, that an experienced administrator could readily detect an effort to manipulate, and that he saw no such thing.

Dr. Keyes, who was a specialist in mental retardation, also relied on the DSM–IV. He testified about adaptive functioning, which he explained covered "the main areas of adaptive skills ... communication, socialization, and daily living skills...." It is important, he stated, to look at adaptive functioning, because "it is possible for a person to be intellectually retarded but not necessarily adaptively retarded." Both are necessary to meet the definition of mental retardation under the law.

Several important points came up during Dr. Keyes's testimony. The first relates to whether adaptive functioning should be assessed in relation to the world outside institutional walls, or in the prison environment. He argued that the former is what counts, because of the strictures of institutional living. The second point relates to assessment methodology: are accepted psychological tests necessary, or is it acceptable to rely exclusively on anecdotal evidence and perceptions? Dr. Keyes, as well as one of Webster's rebuttal experts (Dr. George Denkowski), took the position that professional testing of this type is critical, because less rigorous measures give one no idea of where a person stands relative to the rest of the population. He accordingly administered the well-known Vineland test, which involved interviews of many people who had known Webster before the age of 18 (the age by which intellectual disability must appear) and in the "real world" as opposed to an institutional setting. He concluded from the results that Webster's verbal

skills somewhat exceeded what one might predict from his I.Q., but that overall his adaptive functioning was at the level of a six- to seven-year-old. Dr. Keyes firmly denied that Webster could have manipulated the results of the several tests that he had administered. Finally, Dr. Keyes recalled that Dr. Finn had told him about Webster's special-education classes. On cross-examination, the AUSA asked whether Dr. Finn had ever mentioned that Webster had lied when he said he was in special education classes; Dr. Keyes had no memory of such a comment.

Next, Dr. Fulbright, the clinical neuropsychologist, discussed the tests he had performed to evaluate Webster's attention, memory, problem-solving abilities, and general mental functioning. He too administered standardized tests. Those tests did not include an I.Q. test, because by that time Webster had already undergone multiple I.Q. tests while he was in the detention facility. The tests Dr. Fulbright administered included ones for attention and concentration, memory, information-processing speed, distractibility, visual and verbal memory, abstract reasoning, and logical analysis.

Webster performed poorly on many of these tests. He was unable to learn even the basics of an auditory addition test (thinking speed); he was very distractible; he did very badly on a visual memory test, but better on the verbal test; and his performance was severely impaired on higher-level thinking, problem-solving, and logical analysis tests. Dr. Fulbright found, consistently with a comment Dr. Finn made, that Webster is "extremely concrete" and not able to think abstractly. Yet, as others had also noted, his verbal fluency was surprisingly good. Even there, however, the testing revealed problems. **\*1130** In a test where he was read sentences of increasing length and complexity and asked to say them back, Webster could manage only fairly short sentences. He was unable to listen to long complex communications and understand fully what was being said. Finally, Webster's lawyer asked Dr. Fulbright whether someone could fake results in the tests that had been described. Dr. Fulbright's response was "not convincingly," because the tests are somewhat redundant, the subject would not know how to fake the results, and inconsistencies would be evident if someone were trying to manipulate them. He concluded that Webster's testing revealed him to be a person who is mildly to moderately retarded. On cross-examination, he reiterated that faking is "quite easy" to detect on the tests he gave.

The government followed two strategies on rebuttal: first, it called a large number of lay witnesses (police officers, school administrators, school teachers, an employer, jailers) who all testified that Webster did not seem mentally retarded to them; second, it offered two experts, Dr. George Parker and Dr. Richard Coons, to rebut Webster's experts. When the topic of special education came up, the government's witnesses all denied that Webster had been in those classes. We will not review all of the lay testimony, other than to note a number of points that some or all of the witnesses made. Webster had managed to pass his Arkansas driving test with an almost perfect score (though other testimony indicated that he had done so by cheating). Several noted that Webster was "street smart." Both teachers said that he did not seem to be mentally retarded, though Pat Drewett, one of them, said, "[He] performed at a slower level. He did read slower. On the days that he did perform, which most of the days he did sleep. He didn't perform a lot. He could read. He could do. He chose not to do on a lot of days. He did sleep a lot." School counselor E.C. Turner reported that in the 7th grade, Webster scored in the 43rd percentile of a national achievement test known as the M.A.T. 6 Survey. On cross-examination, Turner admitted that Webster's grades began to fall off between the 6th and 7th grades. Tom McHan, a general contractor for whom Webster worked about a week, testified that he saw nothing to indicate that Webster was mentally impaired, but that he fired Webster from his job on a clean-up crew after one week for sleeping on the job.

The government also presented, as evidence of Webster's functional capabilities, several facts about his life in prison. An inmate testified that he and Webster would communicate in "pig Latin" and that Webster was capable of quoting large portions of scripture. He described Webster as having a "photographic" memory for the Bible. Other testimony, consistent with Webster's penchant for bragging about his sexual prowess, recounted Webster's successful effort to crawl through "the bean chute" in the jail to get to the women's area. Finally, witnesses reported that Webster visited the law library, obtained books from it, and on one occasion spotted that the commissary had given him the wrong change for a purchase.

Dr. Parker, a psychologist with a general practice, was the government's first expert witness. At the government's request, he evaluated Webster and gave him a truncated version of the WAIS I.Q. test. His results showed a verbal I.Q. estimate of 77, a performance I.Q. of 67, with a full-scale I.Q. of 72. He agreed with the AUSA that motivation

plays a significant role in the results, and that this would be a particular problem in a "forensic" setting. Dr. Parker did not attempt formally to assess Webster's adaptive functioning, either through the Vineland test or otherwise. **\*1131** He challenged the utility of the Vineland test, based on the fact that Webster (then age 23) had been incarcerated for five years since the age of 15. He agreed with the AUSA that Webster was able to communicate effectively, to speak in full sentences, to read simple stories aloud, and to keep his cell clean and tidy.

On cross-examination, defense counsel brought out the fact that the WAIS test has 11 parts, all of which must be administered to obtain a valid result, but that Dr. Parker had deliberately omitted some. He gave Webster four of the sub-tests in the verbal area, and three of the sub-tests in the performance area, omitting two in each. Worse than that, counsel suggested, the tests that he omitted (arithmetic and information) are traditionally the ones in which the intellectually disabled do the worst. Dr. Parker claimed ignorance of that fact (although on surrebuttal a defense expert supported Webster's counsel's assertion). What Dr. Parker did instead was to assign an average score, based on the tests that were administered, to the omitted sub-tests. This created an upward bias, counsel charged. Thus, for instance, when Dr. Finn administered the information sub-test, Webster scored a 2; Dr. Parker's average assigned a score of 6. Dr. Parker also acknowledged that the DSM–IV and the American Association on Mental Retardation recommend using a recognized instrument like the Vineland test for adaptive functioning, but that he had chosen not to do so. Finally, Dr. Parker administered a test called the Schretlen Malingering Scale, and he admitted that the results did not support a finding of malingering.

The government's final expert was Dr. Coons, a forensic psychiatrist whose practice focused on assessments of competency to stand trial, but who occasionally looked at questions of intellectual disability. Upon a personal examination, he found that Webster was well oriented to time, place, and person, and that he could give a detailed chronological account of events. Relying on the accounts of Webster's day-to-day life, Dr. Coons concluded that his adaptive functioning was not consistent with a finding of mental retardation.

After entering the sentence of death on the verdict, the district court filed a separate document entitled "Factual Finding Regarding Mental Retardation." It concluded that "Webster is

not mentally retarded and ... he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty."

Webster challenged this finding on direct appeal, but the Fifth Circuit "conclude[d] that the court took proper action, and the finding was supported by the evidence." *Webster I,* 162 F.3d at 351. It applied plain error review, because Webster had failed to object to the factual finding in a timely way. Given how recent the statute was at the time of Webster's trial, the court found no reversible error in the procedures the district court followed in carrying out its responsibilities. It rejected in particular Webster's argument that the issue of mental retardation should have been decided by the jury, not the court. With respect to the sufficiency of the evidence on intellectual disability, the court had almost nothing to say; we reproduce its discussion in its entirety:

> Webster contends that the finding that he is not mentally retarded is against the greater weight and credibility of the evidence. The standard of review for a finding that a defendant is not mentally retarded under § 3596 presents an issue of first impression. Because it is a factual **\*1132** finding, we adopt the clearly erroneous standard.
>
> The government presented substantial evidence to support the finding. Furthermore, only four of the twelve jurors found that Webster is or may be mentally retarded and that he suffers from low intellectual functioning.[3] We cannot say the court clearly erred in deciding that Webster is not mentally retarded.

*Id.* at 352–53 (footnote omitted). Based on the information then available to Webster, this marked the end of Webster's direct appeal on the issue of intellectual disability.

C. First Motion under Section 2255

At that point, Webster filed a motion for post-conviction relief under 28 U.S.C. § 2255. Webster's counsel had sought additional discovery on the question of mental retardation, but two days before *Atkins* was decided and well before it decided the motion, the district court denied the request for additional discovery and required Webster's motion to be filed within 60 days. *Webster III,* 605 F.3d at 259 n. 1 (Wiener, J., concurring). Webster's motion raised 16 grounds for relief, but the district court rejected all of them. Seconded by the Fifth Circuit,

it granted a certificate of appealability on only two claims: "first, that the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and second, that his alleged retardation renders him ineligible for a death sentence." *Webster II,* 421 F.3d at 310.

Although the court of appeals had briefly considered these points on direct appeal, it agreed with Webster that a fresh look was warranted, in light of the Supreme Court's intervening decision in *Atkins,* which held that the Eighth Amendment—not just a statute—prohibits the execution of the intellectually disabled. The Fifth Circuit saw little difference between the governing standards under the Constitution and section 3596(c), however, and so it was not persuaded that *Atkins* required a different result. It was willing to accept that Webster had a low I.Q., but it found that the government's evidence of his adaptive functioning had effectively countered those numbers. The Vineland test that Dr. Keyes had conducted was all well and good, the court of appeals thought, but it accepted the "direct evidence" of adaptive functioning that the government had proffered. *Id.* at 313. It therefore affirmed the district court's judgment denying Webster's motion under section 2255.

D. Application for Successive Relief under Section 2255
After losing that round, nothing of legal significance happened for four years. Some 13 years after Webster's conviction, and four years after his section 2255 motion was denied, new counsel uncovered previously undisclosed evidence revealing that Webster had been diagnosed as mentally retarded a year before the commission of the crime. With those records in hand, counsel filed an application with the Fifth Circuit for permission to file a successive motion under section 2255; the proposed motion was directed exclusively at the death sentence. Before turning to the Fifth Circuit's disposition of that application, we describe the new evidence and why it had not come to light earlier.

Among many other things that they did, Webster's trial counsel had submitted a **\*1133** request to the Social Security Administration for any records that it might have. There had been hints in the record that he, or he and his mother, had sought some kind of benefit, and counsel were following up on that clue. (The government challenges Webster's contention that defense counsel actually tried to locate the records, either before the trial, when the government contends Webster must have known they existed, or for the original 2255 motion. But the facts about these old

records are contested, to say the least.) The Social Security Administration produced nothing. Webster's new lawyers contend that trial counsel, having hit a dead end, reasonably dropped the inquiry at that point. They also stress that when most of the records were produced in response to their own request, it was by mistake. Equally troubling is the fact that the remainder of the records were destroyed.

The newly produced records, which Webster's current lawyers received on February 9, 2009, showed that Webster applied for Social Security benefits based on a sinus condition when he was 20 years old, approximately a year before the crime. The agency's attention was evidently quickly redirected to Webster's mental capacity. Two psychologists and one physician examined him. On December 22, 1993, Dr. Charles Spellman, a psychologist, evaluated him for the purpose of ascertaining his eligibility for Social Security benefits. He noted that "[i]deation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness." Dr. Spellman also observed that Webster's intellectual functioning was quite limited: he could not register three objects (meaning that he could not remember three objects a short time after they were shown to him); he could not do simple calculations; and he did not know what common sayings meant. With respect to adaptive functioning, Dr. Spellman stated that Webster lived with his mother; that he watched television, listened to the radio, and went walking; that he did no chores around the house; and that he was idle both in the house and on the streets. Taking into account both his estimate that Webster's I.Q. was 69 or lower and his assessment of adaptive functioning, Dr. Spellman concluded that Webster was mentally retarded and antisocial. He found no evidence of exaggeration or malingering.

A few months earlier, in October 1993, Dr. Edward Hackett conducted a full-scale WAIS I.Q. test on Webster. He came up with a verbal I.Q. of 71, a performance I.Q. of 49, and a full-scale I.Q. of 59. He evaluated Webster as "mildly retarded, but ... also antisocial." Pertinent to the central question of adaptive functioning, Dr. Hackett noted in a later report that "[Webster] was viewed as a somewhat mild[ly] retarded con man, but very street wise.... [H]e could not be functional in a community setting.... He would also not function well in the work place." Dr. Hackett did not believe that Webster was capable of managing his own benefits. He found Webster's behavior somewhat bizarre. Finally, he commented that on the I.Q. tests, Webster's performance was estimated to be lower than his verbal score, and that some organic function might be involved.

The last professional to examine Webster in conjunction with the 1993 Social Security application was Dr. C.M. Rittelmeyer, a physician. Dr. Rittelmeyer found Webster's physical health to be fine, but he also had this to say: "Mental retardation. Flat feet. Chronic sinus problems and allergies by history."

The Social Security records included an intriguing letter that strongly suggested that Webster in fact had been in special **\*1134** education classes. It was dated November 8, 1993, and had been written by Lou Jackson, the Special Education Supervisor for the school system Webster had attended, Watson Chapel Schools. Jackson's letter explained that Webster's special education records had been destroyed in 1988, after the family did not respond to a letter "telling them they could have the records if they wanted them."

The Social Security records also provide some direct evidence about Webster's abilities. The form Webster completed, for example, is rife with errors in syntax, spelling, punctuation, grammar, and thought. In response to a question asking him to describe his pain or other symptoms, Webster wrote "it causEs mE to gEt up sEt Easily hEadhurtsdiffiErnt of brEdth." When asked about the side effects of his medication, he wrote "Is lEEp bEttEr." When asked about his usual daily activities, Webster wrote (consistently with the comments from his teacher and employer) "I slEEps look at. cartoon." He reported that he "ain't got no chang" in his condition since its onset.

These records, new counsel urged, raised serious questions about the linchpins of the government's case at trial with respect to intellectual disability. Counsel argued that they strongly refuted the consistent theme that Webster was malingering on the I.Q. tests he took after the crime was committed, since they showed a level consistent with those tests from a time (a) before the crime, and (b) when he was not under the emotional stress that tainted the 1992 tests at the Clinic. They also provided direct evidence of adaptive functioning consistent with the I.Q. test scores—evidence that might have changed the minds of experts had they seen a more complete picture.

The Fifth Circuit, however, concluded that Webster's proposed new evidence did not meet the stringent standards imposed by section 2255(h), which reads as follows:

(h) A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable fact-finder would have found the movant guilty of the offense; or

(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

The *Webster III* judges concluded that a petitioner seeking only to challenge his eligibility for the death penalty cannot do so under section 2255(h)(1), because that section requires evidence that shows that the movant could not be found guilty of *the offense.* [4] Webster's application did not attack his guilt of the offense of murder but instead challenged only his sentence. Section 2255(h)(2) requires a new rule of constitutional law that previously was unavailable, but *Atkins* had already been decided at the time of Webster's initial section 2255 **\*1135** motion, and nothing else came close to satisfying that criterion.

Judge Wiener concurred in that disposition, but he wrote separately "to emphasize the absurdity of its Kafkaesque result: Because Webster seeks to demonstrate only that he is constitutionally ineligible for the death penalty—and not that he is factually innocent of the crime—we must sanction his execution." *Webster III,* 605 F.3d at 259. He went on to say that "[i]f the evidence that Webster attempts to introduce here were ever presented to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded." *Id.* Nevertheless, under section 2255(h) the court was required to "turn a blind eye to this evidence, as it speaks to Webster's constitutional eligibility for the death penalty and not his factual guilt or innocence of the crime." *Id. at 260.* He concluded by expressing his "deep and unsettling conviction" that, under the strictures of section 2255(h), "we today have no choice but to condone ... an unconstitutional punishment." *Id.*

## II. The 2241 Petition

Accepting, as they had to, [5] the Fifth Circuit's conclusion that a successive motion under section 2255 was not available, Webster's counsel filed the current proceeding in the Southern

District of Indiana, where Webster resides on the federal death row in Terre Haute. See 28 U.S.C. §§ 2242, 2243 ¶ 2 (directing the writ to run against the person having custody of the person detained). He argued that he was entitled to do so by virtue of the last sentence of section 2255(e), which permits an application for a writ of habeas corpus under section 2241 by someone who otherwise would be required to use the motion under 2255 and has failed in that effort, if "it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). This is often called the "savings clause"; we will follow that practice.

The district court found that Webster was not entitled to take advantage of the savings clause, because it understood the clause to apply only to changes in the law, not to new facts. It relied for that proposition primarily on *Garza v. Lappin,* 253 F.3d 918 (7th Cir.2001), and *In re Davenport,* 147 F.3d 605 (7th Cir.1998). The court read our cases to hold that section 2255 is "inadequate or ineffective" only when "a structural problem in § 2255 forecloses even one round of effective collateral review—and then only when as in *Davenport* the claim being foreclosed is one of actual innocence." *Taylor v. Gilkey,* 314 F.3d 832, 835 (7th Cir.2002); see also *Unthank v. Jett,* 549 F.3d 534, 536 (7th Cir.2008). The court also commented in a footnote that it was not clear whether Webster's trial counsel had followed up on their request to the Social Security Administration for its files, and that it was too late now to consider those materials. As we noted at the outset, in *Webster IV* a panel of this court affirmed the district court's judgment, but the full court vacated that decision and reset the case for *en banc* consideration.

## III. The Savings Clause and Section 2241

Our most extensive treatment of the relation between 2255's savings clause and **\*1136** section 2241 appears in *Davenport.* There, the petitioner had been convicted of the use of a firearm during the commission of a drug offense, in violation of 18 U.S.C. § 924(c). *Davenport,* 147 F.3d at 607. After he had filed his first motion under section 2255, the Supreme Court held that mere possession of a firearm, under the statute as it then read, did not amount to a prohibited "use." See *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). The Seventh Circuit, as well as its sister circuits, had not construed the term

"use" so restrictively. Like Webster, however, Davenport was barred from filing a successive motion under 2255 because he had neither new evidence of innocence of the offense nor a new Supreme Court *constitutional* ruling. It would have been futile for him to have raised this point in his first section 2255 motion, as the law was squarely against him. We therefore held that section 2255 was inadequate within the meaning of subpart (e) and that Davenport could raise his claim under section 2241. See *Davenport,* 147 F.3d at 610–12. In so doing, we said that whether section 2255 is inadequate or ineffective depends on whether it allows the petitioner "a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Id.* at 609. We also recognized that arguments addressing "the fundamental legality of [a] sentence[ ]" could be entertained, not just those attacking a conviction. *Id.*

Later cases have followed *Davenport,* albeit with somewhat different emphases. Compare *Garza,* 253 F.3d at 918, and *Brown v. Caraway,* 719 F.3d 583 (7th Cir.2013) (both with a broader understanding), with *Unthank,* 549 F.3d at 534, and *Taylor,* 314 F.3d at 832 (inadequacy or ineffectiveness exists only when a petitioner presents a claim of actual innocence and might exist only for claims related to retroactive Supreme Court statutory decisions). All of these decisions hold, nevertheless, that there must be some kind of structural problem with section 2255 before section 2241 becomes available. In other words, something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied. (Our dissenting colleagues would throw the entire line of cases that began with *Davenport* out the window, *post* at 1151–54, but their position essentially reads the savings clause of section 2255(e) out of the statute. We are not willing to take that step.)

In *Garza,* we found that "something more" in the form of an intervening decision of an international tribunal. Juan Garza had been sentenced to death in federal court under 18 U.S.C. § 848(e). After exhausting both his direct appeals and his opportunity for collateral relief under section 2255, Garza filed a petition with the Inter–American Commission on Human Rights. After reviewing the case, the Commission concluded that the introduction of evidence of murders in Mexico—crimes for which Garza had never been charged but which were necessary predicates to his death sentence

—violated Garza's rights under the American Declaration of the Rights and Duties of Man. Shortly after the Commission issued its report, Garza filed a habeas corpus petition under section 2241 in the Southern District of Indiana, the place of his incarceration. He argued in that petition that the United States was bound by treaty to abide by the Commission's decision. Construing Garza's petition as an unauthorized effort to file a successive motion under section 2255, the district court held that it lacked jurisdiction to decide the case and dismissed the action.

Garza appealed that unfavorable ruling to this court. We identified two issues **\*1137** that had to be resolved: first, whether Garza qualified for section 2255's savings clause, thereby enabling him to bring a petition under section 2241; and second, if 2241 was available, whether he was entitled to relief. We began by recognizing that "the mere fact that Garza's petition would be barred as a successive petition under § 2255 ... is not enough to bring the petition under § 2255's savings clause; otherwise, the careful structure Congress has created to avoid repetitive filings would mean little or nothing." *Garza,* 253 F.3d at 921. We concluded, however, that in rare circumstances "the operation of the successive petition rules [would] absolutely prevent[ ] the petitioner from ever having an opportunity to raise a challenge to the legality of his sentence." *Id.* at 922. Garza presented such a case, we concluded. On the merits, we decided that the Commission's report was advisory only and thus did not support the relief Garza sought.

*Garza* thus offers one illustration of a situation in which a petitioner was entitled under the savings clause to use section 2241 to attack a sentence, even though he was not making a claim of actual innocence of the offense. In fact, it would be more difficult for someone making the latter kind of argument, because section 2255(h)(1) expressly addresses guilt or innocence of the offense and sets out the evidentiary standard that a successive petition must meet. That is enough to explain why, in *Unthank* and *Taylor,* we held that the petitioners were not entitled to turn to section 2241. It is true that in describing *Davenport* we used more general language that could be read as an absolute restriction on the savings clause, but in neither of those cases did the court have before it an argument that a particular sentence was *constitutionally* forbidden (either as a matter of law or as a matter of fact), rather than just outside the scope of a statute. We therefore think it best to understand those holdings as

appropriate applications of the law to the facts before the court.

Pointing to some legislative history, the government in this case argues that Congress did not intend to permit the savings clause to be used for anything other than claims of actual innocence of the underlying offense. It is worth noting that this contention is inconsistent with the position that the Solicitor General took in *Persaud v. United States.* See Brief for the United States, *Persaud v. United States,* —— U.S. ——, 134 S.Ct. 1023, 188 L.Ed.2d 117 (2014) (mem.), 2013 WL 7088877. In *Persaud,* the question was whether certain prior felonies qualified as predicates for an enhanced sentence pursuant to 21 U.S.C. § 851(a)(1). As the Solicitor General's brief put it, "The question presented here is whether petitioner is entitled to challenge the sentencing error by way of a petition for a writ of habeas corpus under 28 U.S.C. 2241. The lower courts held that Section 2241 was not available because petitioner was challenging his sentence rather than his conviction. That holding is incorrect." *Id.* at \*13. The Solicitor General noted that the Supreme Court has not spoken on when the motion under section 2255 is "inadequate or ineffective." In the circumstances presented in *Persaud,* the brief continued, the savings clause is available even though the challenge is to the sentence, not to the underlying conviction. *Id.* at \*18–19. Responding to that point, the Supreme Court vacated the judgment and remanded the case to the court of appeals "for further consideration in light of the position asserted by the Solicitor General in his brief for the United States filed on December 20, 2013." *Persaud,* 134 S.Ct. at 1023 (mem.). The Court's action indicates that it does not take as narrow a view of the **\*1138** savings clause as our dissenting colleagues do.

Before this court the government points to House of Representatives Report no. 104–23 (part of AEDPA's legislative history), which discusses a proposal for a provision on stays of execution. The proposal, which was not enacted, stated that a federal court could not issue a stay merely because a state prisoner files a second habeas corpus petition, unless the petition set forth newly discovered facts showing that the petitioner is not guilty of the underlying offense. H.R. REP. NO. 104–23, at 4–5 (1995). It would have barred "claims that go only to the validity of the capital sentence and claims that go only to the petitioner's eligibility for a capital sentence." *Id.* at 16–17.

Putting to one side the fact that the comity concerns that exist with respect to state-court proceedings are not present for federal prosecutions, we do not find this snippet of legislative history to be too helpful. The language of section 2255(h) already makes it clear that Congress was aware of the difference between claims of innocence of the underlying offense and claims relating to a sentence. The problem before us, quite simply, is not one that Congress could have contemplated. At the time AEDPA was under consideration, the Supreme Court had not yet held it unconstitutional to execute either an intellectually disabled person (*Atkins* ) or a minor (*Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)). We thus consider this question to be an open one, both from the standpoint of legislative history and that of Supreme Court rulings.

Several considerations persuade us that in the circumstances presented here the savings clause permits Webster to resort to a petition under section 2241. The first is the language of the statute. Section 2255 motions are available to "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that *the sentence was imposed in violation of the Constitution* or laws of the United States...." 28 U.S.C. § 2255(a) (emphasis added). The language we have highlighted does not distinguish between a sentence that is unlawful because of a flaw in the underlying conviction and a sentence that is unlawful because of a constitutional or statutory rule pertaining to sentences. Moving down to the savings clause, we see that it applies when "the remedy by motion is inadequate or ineffective to test the legality of [the prisoner's] *detention.*" *Id.* § 2255(e) (emphasis added). Once again, the statute focuses on the detention as a whole, not on the underlying offense. Only when one reaches section 2255(h)(1) does Congress single out the underlying offense. It was certainly free to do so, but there would have been no need for the specification if the rest of section 2255 (including subpart (e)) were already so limited.

Second, the fact that the Supreme Court had not yet decided *Atkins* and *Roper* at the time AEDPA was passed supports the conclusion that the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the statute. In that respect it is similar to the problem we faced in *Davenport,* where we found the remedy under section 2255 to be "inadequate or ineffective" for a case in which the Supreme Court had definitively ruled that the conduct for which the person was convicted and imprisoned was not

an offense under the statute. The provisions of section 2255 permitting successive motions speak exclusively in terms of constitutional problems, and so left someone who wished to show that a new Supreme Court decision clarifying as a matter of statutory interpretation that he had committed **\*1139** no offense without anywhere to turn.

In Webster's case, the problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were below the age of 18 when they committed the crime.[6] In virtually all other situations, Congress has almost unlimited discretion to select the penalty, or the range of penalties, that go along with a particular crime. If Congress selects 20 years, but because of some error that went undetected through direct appeals and an initial motion under section 2255 the defendant receives 25 years, there is no doubt a problem, but it is likely not one of constitutional dimension. Congress could have chosen 25 years to begin with, and the defendant would have had nothing to complain about.

If *Atkins* had never been decided, Webster would have been left with an argument that he now has new evidence that would demonstrate that the statute forbidding the execution of a mentally retarded person would be violated by the implementation of his sentence. See 18 U.S.C. § 3596(c). We can assume that this would not be enough to trigger the savings clause. But *Atkins,* and later *Roper,* were decided by the Supreme Court, and they must guide our understanding of the law. Judge Wiener, in speaking of the unavailability of section 2255 for Webster, spoke powerfully of the "Kafkaesque" nature of a procedural rule that, if construed to be beyond the scope of the savings clause, would (or could) lead to an unconstitutional punishment.

If one were to disagree with our view, stated earlier, that ordinary principles of statutory interpretation lead directly to the result that the savings clause applies here, then the next step would be to take into account the fact that a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence. As Judge Wiener implied, there is no reason to assume that our procedural system is powerless to act in such a case. It is fairly possible to read section 2255(e) as encompassing challenges to both convictions and sentences that as a structural matter cannot be entertained by use of the 2255 motion. To hold otherwise would lead in some cases—perhaps Webster's—to the intolerable result of condoning an execution that violates

the Eighth Amendment. [7] We decline to endorse such a reading of the statute.

### IV. Application to Webster's Case

Having found that there is no categorical bar against resort to 🚩 section 2241 in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty, it remains for us to **\*1140** consider whether Webster has presented a proper case for its use, and if so, how we should proceed from here. For this purpose, it is necessary to go back and compare the evidence he has proffered and decide whether he has shown enough to proceed to the merits of his 2241 petition, or at a minimum to have a hearing to resolve predicate issues of fact.

We have established thus far that a person who proposes to show that he is categorically ineligible for the death penalty, based on newly discovered evidence, may not be barred from doing so by section 2255. But this rule cannot apply to all newly discovered evidence, or else there would never be any finality to capital cases involving either the intellectually disabled or minors. [8] Looking particularly at the intellectually disabled, it would always be possible to conduct more I.Q. and adaptive functioning tests in the prison. Those new scores would have no bearing on the *initial* conviction and sentence, though they would be highly pertinent to the ultimate ability of the government to carry out the sentence. But our concern is with the former, not the latter.

What distinguishes Webster's case from the one we just hypothesized are two facts: first, the newly discovered evidence that current counsel have proffered existed *before* the time of the trial, and is relevant for precisely that reason; second, although the facts are disputed, there is evidence indicating that they were not available during the initial trial as a result of missteps by the Social Security Administration, not Webster's counsel. (We would say "not Webster" too, except that the question whether Webster can be held responsible for those records is intimately tied to the general question of his intellectual abilities. The dissent, *post* at 1150–51, assumes the answer to this question when it states that "Webster has long known" of the missing Social Security evidence. There is no evidence in the record that Webster had any personal awareness of this evidence, much less that he was capable of appreciating its significance.) This limitation answers most of the concerns about creating too large an exception to the exclusivity of section 2255. It will be a rare case where records that *predate* the trial are found much later, despite

diligence on the part of the defense, and where those records bear directly on the constitutionality of the death sentence. [9]

**\*1141** Rare, but not impossible. Suppose, for instance, that the United States tries a man in central Texas for a capital crime. Suppose further that he is convicted and sentenced to death, based on the jury's and court's acceptance of substantial oral testimony confirming that he was 19 years old when he committed the crime. Now imagine that after he has exhausted his first post-conviction motion under section 2255, irrefutable evidence comes to light revealing that he was born in Germany and that his birth certificate confirms that he was actually only 17 years old at the time he committed the crime. (According to the Texas State Historical Association, "[a]fter Anglos, Mexican–Americans and African–Americans, the ethnic group with the largest impact on Texas has been the Germans." See http://www.texasalmanac. com/topics/culture/german/german-texans.) Under the government's view of the relation between section 2255 and 🚩 2241, our hypothetical defendant would be executed despite the plain violation of the Eighth Amendment as described in *Roper.* Under the view we adopt, this defendant is entitled to be heard under 🚩 section 2241. At any such hearing, the government would be entitled to challenge the authenticity of the birth certificate; the defendant would be entitled to support it; and the district court would decide the factual question on which everything hinges: whether the defendant was below the age of 18 at the time of the crime and thus constitutionally ineligible for the death penalty.

Webster's case is no different. At the threshold stage, he has the burden of proffering convincing evidence of intellectual disability to show that he may not, consistently with *Atkins* and *Hall,* be under a sentence of death. In order to relate to the findings at trial, that evidence cannot be newly created; instead, it must be previously existing evidence of his intellectual disability that counsel did not uncover despite diligent efforts. If he succeeds in this *prima facie* showing, then he has satisfied the savings clause and may proceed with a 🚩 section 2241 petition. At a hearing on the merits, he would need to introduce the evidence and allow the government to refute it. The government here has indicated that it would challenge the diligence of counsel; that it would argue that the allegedly new evidence is actually just cumulative; that it would review the earlier evidence; and that even with the new evidence Webster's adaptive functioning is high enough that it negates his low I.Q. scores (an extremely

rare and largely untested scenario, as far as we can tell from post-*Atkins* cases). Webster would respond to those points. In the end, the district court would decide whether, as a matter of fact, Webster is constitutionally ineligible for the death penalty.

Although we do not want to prejudge the district court's disposition of this matter, a few observations are in order. First, we reiterate that the question whether the evidence we described earlier in Part I.D of our opinion qualifies as newly discovered is contested. Both Webster and the government have a right to be heard on this point. The record presently before us is inconclusive about what happened at the Social Security Administration. **\*1142** Webster's trial counsel provided an affidavit stating that he requested records from the agency but that to the best of his recollection he never received them. We do not know at this juncture whether counsel never followed up, whether there was a technical problem with his request, or if the agency deliberately or accidentally informed counsel that the records did not exist. Webster's current legal team requested and received some of the records in 2009. It later realized that the file was incomplete and sent another request for the missing records. A representative from the agency told them that it would not provide any more records and that "normal procedures" had not been followed when the partial records had been sent earlier that year. Webster's attorneys interpret that statement as an admission that the records were produced by accident; other evidence indicates that the representative may have been speaking only about a supposed failure to pay (contested again by Webster's lawyers) or a lack of specificity. In any event, Webster's current lawyers followed up with a new request, only to be told, mysteriously, that Webster's remaining records had been destroyed. If the agency was aware that active efforts were underway to obtain them, this is troublesome indeed. But our main point here is that we do not know important details. [10]

Another issue that the court will need to explore is the significance of the records. As Part I.B of our opinion reviews in detail, there was a good deal of evidence about intellectual disability at the trial: Drs. Finn, Keyes, and Fulbright for the defense, and Drs. Parker and Coons for the government. That evidence, however, included only one I.Q. test that had been performed on Webster before the crime—the 1992 test done at the Southeast Arkansas Mental Health Clinic. Webster's full-scale score was then just 48, but Webster's own experts agreed that he had been under severe stress at the time that test was administered and so the score

was unreliable. Although other tests were performed (two by Dr. Finn, showing full-scale I.Q.'s of 59 and 65, and an incomplete one by Dr. Parker, showing a full-scale I.Q. of 72), the government argued strongly that Webster was motivated to underperform on the later tests because of the risk of the death penalty. The tests and estimates from the Social Security Administration records, however, were immune from that argument about manipulation. Webster scored 59 on Dr. Hackett's test; Dr. Spellman estimated his I.Q. to be 69 or lower; and Dr. Rittelmeyer commented that Webster was "mentally retarded." It is significant in this respect that Webster was not trying to obtain Social Security benefits on the basis of his intellectual disability, and so an argument about manipulation for purposes of benefits would have been weak. He asserted instead that he was disabled from a sinus condition. In short, had the I.Q. tests and opinions from the Social Security file been available to the experts at the trial, to the jury, and to the district court, their assessments of Webster may have been different.

Equally importantly, the Social Security records shed additional light on Webster's adaptive functioning. New counsel found evidence that contradicted everyone's assumption at the trial that Webster had been lying when he said that he was in special education classes. If it had been clear that he was telling the truth, or even if objective evidence had supported his **\*1143** assertion, the jury and the district court may have viewed Webster's poor school performance, sleeping in class, and dropping out in the 9th grade in a different light.

At a more general level, the government treated this case as the reverse of the one the Supreme Court discussed in *Hall v. Florida.* In *Hall,* the defendant's I.Q. score was 71, but the Florida courts refused to allow him to introduce evidence of adaptive functioning that would have shown him to be intellectually disabled. In Webster's case, virtually all of the I.Q. scores put him in the range of mild to moderate intellectual disability, but the government argued strongly (and both the court and the jury were persuaded) that his adaptive functioning was good enough to demonstrate that he was not, in fact, so disabled. (It is of some interest that the evidence of adaptive functioning that the Supreme Court criticized in *Hall* looks very much like the evidence that the government used here. Although there was substantial evidence that Hall had been mentally retarded his entire life, the trial court was suspicious because "[n]othing of which the experts testified could explain how a psychotic, mentally-retarded, brain-damaged, learning-disabled, speech-impaired

person could formulate a plan whereby a car was stolen and a convenience store was robbed." *Hall,* 134 S.Ct. at 1991.)

Looking at the trial evidence of adaptive functioning solely for the purpose of assessing how much of a difference the new evidence might make, we note that there was some consensus at the outset. All agreed that Webster's verbal abilities were relatively strong, at least in terms of his spoken communications. His written work was more questionable, and the Social Security records reveal a person who is barely literate. And there were other problems as well with the government's evidence of adaptive functioning. Some of the government's evidence came straight from laypersons, who more or less said "he seemed fine to me." It also used experts, but neither of its experts administered any kind of accepted adaptive functioning test before reaching his opinion.

We have often pointed out the dangers of relying on "common sense" when social science reveals that common assumptions are wrong. As we noted in *United States v. Williams,* 522 F.3d 809 (7th Cir.2008), in the context of a discussion of eyewitness identification, "[t]he problem with 'common sense' is that experience tells us what leads to *confidence* about whether we have seen a given person before but does not provide reliable ways to test whether that confidence is justified. People confuse certitude with accuracy and so are led astray. Psychologists have established that certitude often is unwarranted. It takes data rather than intuition to answer questions such as 'can non-uniform footgear in a lineup lead to misidentification?' " *Id.* at 811; see also *United States v. Bartlett,* 567 F.3d 901, 906 (7th Cir.2009) ("That jurors have beliefs about [the fallibility of memory] does not make expert evidence irrelevant; to the contrary, it may make such evidence vital."); *Murillo v. Frank,* 402 F.3d 786, 792 (7th Cir.2005) (no social science verification of the proposition that emotionality enhances the reliability of a statement). That principle applies here as well. It is one thing to describe what Webster did and to believe, as a layperson, that these acts revealed that his I.Q. tests understated his intellectual functioning; it is quite another for a qualified professional to test whether such a discrepancy exists.

There was no testimony at trial correlating Webster's day-to-day skills with the intellectual age that his I.Q. tests suggested. Counsel for the government, at oral **\*1144** argument, pointed to Webster's ability to come to the Dallas area, to lie about being an F.B.I. agent at Lisa's door, to travel back to Pine Bluff, to dig the grave in advance, and to kill and bury her, as evidence of his competence. But as we have just pointed out, that is a lay opinion. Dr. Finn put Webster's mental age at somewhere between six and seven. Common experience shows that children of that age can do quite a few things: they can lie; they can plan an immediate event; they can carry out instructions. Dr. Keyes testified that the results of the Vineland test he performed showed that Webster's adaptive functioning level was consistent with his low I.Q. scores. The government's experts offered conclusions, but little in the way of reasons for their conclusions.

The government also relied on the fact that Webster complained on one occasion that he received the wrong change from the commissary. But studies indicate that adults with mild retardation can learn the essentials of paying bills. See GEORGE S. BAROFF WITH J. GREGORY OLLEY, MENTAL RETARDATION: NATURE, CAUSE, AND MANAGEMENT 308–09 (3d ed.1999) (citing John LaCampagne & Ennio Cipani, *Training Adults with Mental Retardation to Pay Bills,* 25 MENTAL RETARDATION 293 (1987)). Webster's ability to squirm through the bean chute to reach the women's section of the detention center also may or may not be consistent with the behavior of a seven-year-old child. The government's experts did not use any recognized methodology to connect those dots. And that is not because there are no measurement tools. Several well-accepted adaptive-functioning tests are available: the Vineland Adaptive Behavior Scales that Dr. Keyes used, which is for primary caregivers and others familiar with the person, rather than for the person; the Diagnostic Adaptive Behavior Scale, which measures adaptive behavior skills in the three main categories of conceptual, social, and practical life skills; and the Supports Intensity Scale, which is used to determine what a person needs to live independently.

This evidence may or may not carry the day for Webster, but we believe that it does qualify as the kind of "clear and convincing" evidence that would be required to earn a hearing if we were evaluating new factual evidence of guilt or innocence under section 2255(h)(1). We therefore do not need to decide whether that is the correct standard, or if a lesser showing would suffice.

### V. Concluding Observations

Webster filed his section 2241 petition in the district where he is incarcerated, as 28 U.S.C. §§ 2242 and 2243 require. The Supreme Court held in *Rumsfeld v. Padilla,* 542 U.S.

426, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004), that this is the one and only proper venue:

> The federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is "the person who has custody over [the petitioner]." 28 U.S.C. § 2242; see also § 2243 ("The writ, or order to show cause shall be directed to the person having custody of the person detained"). The consistent use of the definite article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas petition. This custodian, moreover, is "the person" with the ability to produce the prisoner's body before the habeas court. *Ibid.*

*Id.* at 434–35, 124 S.Ct. 2711. Webster's custodian is Charles A. Daniels, the warden of the United States Penitentiary in Terre Haute, Indiana. Terre Haute lies within the Southern District of Indiana, **\*1145** and so Webster's petition under section 2241 was properly filed in that district.

There are obviously costs in requiring a new court to delve into the question of Webster's intellectual disability (or lack thereof), although after 21 years the comparative advantage of the district court in the Northern District of Texas has inevitably faded. But whatever costs remain are nothing more than the price of the limitations on relief by motion under section 2255. When that statute was passed, Congress not only relieved the district courts where the major federal prisons were located from a heavy load of petitions for collateral relief; it also enhanced the efficiency of the system by assigning these cases to the judges who were familiar with the records. Nonetheless, the Fifth Circuit has decided that Webster's current action falls outside the scope of section 2255(h), and we have no quarrel with that assessment. That means, for better or for worse, that the remaining work on Webster's case must be conducted by the district court for the Southern District of Indiana.

We say "must," because we understand *Padilla* to hold that the *only* proper district is the one containing the prisoner's immediate custodian. That is why, despite the fact that Padilla was initially detained in the Southern District of New York, once the President had him moved to South Carolina, the only district in which his habeas corpus petition could be brought was the District of South Carolina. *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), is not to the contrary. It dealt

with a situation in which the petitioner (then incarcerated in Alabama) wanted to challenge a future detainer issued by Kentucky. In that situation, the Court held, the effective custodian was Kentucky, because it was the source of the detainer. Webster, however, is not challenging his detention by anyone other than the warden at Terre Haute, and so it follows that the only permissible respondent is Warden Daniels.

This also means that there is no other judicial district, from a venue standpoint, in which the claim "might have been brought," as that term is used in the general venue statute, 28 U.S.C. § 1404(a). The district court thus has no power under that statute to transfer the case either on its own initiative or upon the motion of either party. (Section 1406(a) is also inapplicable, because there is nothing wrong with the district in which Webster is proceeding.) If both Webster and Warden Daniels were to consent to a transfer to another district, they might have an enforceable agreement that the court could implement, by analogy to choice-of-forum agreements. See

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas,* ––– U.S. ––––, 134 S.Ct. 568, 187 L.Ed.2d 487 (2013). The only thing that seems clear is that in the absence of any such consent, the case must stay in Indiana. That result also avoids knotty problems that could arise if there is another appeal. We have no authority over the district court in the Northern District of Texas, which lies within the Fifth Circuit. 28 U.S.C. § 41. That court would be put in an awkward position, to say the least, if it were responsible for carrying out a Seventh Circuit mandate with any appeals going to the Fifth Circuit. In contrast, if the case stays in Indiana (as we believe it must), should there be a new appeal, it will be a straightforward matter for this court to decide whether the district court has properly carried out our mandate.

In summary, therefore, we hold that Webster is not barred as a matter of law from seeking relief under section 2241. Further proceedings are necessary, however, **\*1146** before the district court can reach the merits of his habeas corpus petition. The district court must hold a hearing for the purpose of deciding whether the Social Security records were indeed unavailable to Webster and his counsel at the time of the trial. In considering that question, the district court must also evaluate trial counsel's diligence. If the court concludes, as Webster's lawyers urge, that the records were unavailable and all due diligence was exercised, and that Webster has them now only because of a fluke, then it must turn to the merits of the petition: is Webster so intellectually disabled that he is

categorically ineligible for the death penalty under *Atkins* and *Hall?*

Both the government and Webster would be entitled at a hearing to offer evidence relevant to that determination; if Webster is not limited to the record before the original trial court, there is no reason to impose such a limit on the government. Webster, as the petitioner, bears the burden of proving intellectual disability. If he gets this far, what this will be as a practical matter is a partial new sentencing hearing. At this later stage, the proper burden of proof is a preponderance of the evidence, not "clear and convincing" evidence. (The latter standard serves as a gateway to the hearing; it would be wrong to apply it twice.) Finally, our mandate does not extend to any other issue that Webster has raised over the years. In particular, we have found no reason to revive the question of the abuse he suffered as a child.

If the district court concludes that Webster meets the requirements of *Atkins* and *Hall,* then it should issue the writ stating that Webster is entitled to relief from the death penalty. This is the relief that Webster requested in his section 2241 petition. [11] As happens with writs issued on behalf of state prisoners under 28 U.S.C. § 2254, the writ should give the prosecutor (here, the Attorney General) a reasonable period within which to take appropriate action in light of the writ. Any such action, including correction of the judgment, would properly occur in the court that entered the judgment and sentence (the Northern District of Texas), which would be responsible for further sentencing proceedings in line with both this opinion and the district court's order. If, on the other hand, Webster fails to show that he has met the *Atkins* and *Hall* requirements in the Indiana proceedings, then the writ should be denied.

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

EASTERBROOK, Circuit Judge, with whom BAUER, KANNE, SYKES, and TINDER, Circuit Judges, join, dissenting.

Bruce Webster led a group that perpetrated a horrific kidnapping and murder. The opinion affirming his conviction and death sentence provides details. *United States v. Webster,* 162 F.3d 308 (5th Cir.1998). See also *United States*

*v. Webster,* 392 F.3d 787 (5th Cir.2004) (denying a motion to expand the issues reviewable on appeal under 28 U.S.C. § 2255); *United States v. Webster,* 421 F.3d 308 (5th Cir.2005) (affirming a decision denying relief under § 2255); *In re Webster,* 605 F.3d 256 (5th Cir.2010) (denying application for **\*1147** permission to pursue a second collateral attack).

### I

Although Webster's guilt, and the appropriateness of capital punishment for his crime, are undisputed, "[a] sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person." 18 U.S.C. § 3596(c). That statute was in effect when Webster was tried and sentenced. The Supreme Court later held that the Constitution establishes the same rule, see *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *Hall v. Florida,* ––– U.S. ––––, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), but these decisions are no more favorable to Webster than the statute, so the controlling law is unchanged.

Whether Webster is "retarded" was the principal issue at his trial and sentencing. He raised his mental shortcomings as a mitigating factor, and four jurors found that they mitigate his culpability, but the jury still voted unanimously for capital punishment. The sentencing hearing spanned 29 days, with abundant evidence. The district judge found that Webster is not retarded within the meaning of § 3596(c) and sentenced him to death. The Fifth Circuit affirmed on the merits and later affirmed a district court's decision denying a petition under § 2255 addressed to retardation. *If* Webster is retarded, he is ineligible for the death penalty. *Whether* he is retarded has been determined after a hearing, collateral review under § 2255, and multiple appeals. What Webster now wants is still another opportunity to litigate that question. The majority gives Webster that opportunity in a new district court and a new circuit, setting up a conflict among federal judges. Section 2255 is designed to prevent that, and prudential considerations also militate against one circuit's disagreeing with another in the same case. See *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

Case: 19-2683     Document: 13     Filed: 11/14/2019     Pages: 115

According to my colleagues, 28 U.S.C. § 2241, the general habeas-corpus statute, entitles Webster to a new hearing despite the fact that his mental condition has been adjudicated already. Until 1948, when Congress enacted § 2255, litigation under § 2241 would have been permissible, provided it was not an abuse of the writ. (That Webster's new lawyers rely on new evidence means that this proceeding would not have been classified as an abuse of the writ under pre–1996 law. See *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).) But § 2241 cases proceed where the prisoner is confined, see *Rumsfeld v. Padilla,* 542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004), which creates a risk of inconsistent outcomes as well as a high probability of litigation in multiple courts (most federal prisoners are confined outside the sentencing district). That's why Congress enacted § 2255, whose principal function is to put all post-conviction litigation in the district court that tried the case, which not only matches the litigation to the court possessing the record but also ensures that only one court of appeals will be involved. See *United States v. Hayman,* 342 U.S. 205, 214–19, 72 S.Ct. 263, 96 L.Ed. 232 (1952); John J. Parker, *Limiting the Abuse of Habeas Corpus,* 8 F.R.D. 171 (1949). (Judge Parker chaired the committee that drafted the proposal enacted as § 2255.) A principal goal of the 1948 enactment was to prevent exactly what the majority today authorizes: **\*1148** "the unseemly spectacle of federal district courts trying the regularity of proceedings had in courts of coordinate jurisdiction". Parker, 8 F.R.D. at 172–73. See also Alexander Holtzoff, *Collateral Review of Convictions in Federal Courts,* 25 B.U. L.Rev. 26, 55 (1945).

As part of the new approach, Congress enacted language now codified at § 2255(e): "An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention."

When is § 2255 "inadequate or ineffective to test the legality" of a sentence? The majority concludes that § 2255 is "inadequate or ineffective" because it does not allow Webster to present the particular argument he now wants to make. After discovering three mental evaluations in the Social Security Administration's files, Webster asked the Fifth Circuit for permission to mount another collateral attack. It said no, because § 2255(h), which was enacted in 1996 as part of the Antiterrorism and Effective Death Penalty Act (AEDPA), limits to one the number of collateral attacks a prisoner may present, unless conditions in 28 U.S.C. § 2244 and § 2255(h) can be satisfied.

The Fifth Circuit concluded that the statutory conditions have not been satisfied. Substantive law has not changed, so § 2255(h)(2) does not authorize another proceeding, and the three reports are similar in nature to other evidence presented at the hearing, which means that they do not "establish by clear and convincing evidence that no reasonable fact-finder would have found" Webster death-eligible. [1] Reasonable judges could disagree about what effect the three reports might have had—though even Judge Wiener, whose concurring opinion expressed reservations, thought the court's application of § 2255(h)(1) correct—but it does not matter whether the Fifth Circuit is right, because § 2244(b)(3)(E) provides that "[t]he grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari." That can't be avoided by asking a different circuit to revisit the issue.

The majority in this circuit concludes that *because* the Fifth Circuit held that the statutory conditions for another review under **\*1149** § 2255 are unmet, § 2255 is "inadequate or ineffective" and Webster can proceed under § 2241. If this is so, then the 1996 amendments have undone the basic structure established in 1948 and allowed successive litigation all over the country. Instead of reducing the number of post-conviction proceedings, as Congress set out to do, the 1996 changes have opened the door to any proceedings that do not abuse the writ—the pre–1996 standard. See *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). Webster's lawyer was explicit about this at argument before the panel, even though one principal goal of the 1996 amendments was to replace *Sanders* with a closed list of conditions that allow further collateral review. At the argument en banc, Webster's lawyer contended that new proceedings under § 2241 are permissible whenever "law and justice require." That language comes from 28 U.S.C. § 2243 ¶ 8 and has nothing to do with the number and location of allowable collateral attacks; instead it tells courts how to proceed when crafting relief after a petitioner has prevailed on the merits.

My colleagues deny that they are going so far, but that's what their decision means. They stress the particulars of Webster's situation, which are unusual, but every case is unique in its own way. We must begin not with facts but with law. The statutory rule is that a successive collateral attack is permissible only when the conditions of § 2255(h) are met. By using § 2255(e) to authorize more collateral review *because those conditions are not met,* the majority has reversed the legislative decision of 1996—indeed has made things worse and reversed the legislative decision of 1948, because until 1996 a successive collateral attack would have been in the original district court and circuit, see *Sanders,* while after today's decision the successive collateral attack will be in a different district court and circuit.

The reason Webster, in particular, can't meet § 2255(h) should not matter; the next petitioner will have a different, case-specific reason why § 2255(h) does not allow another petition, and under the majority's logic that prisoner too can resort to § 2241. Consider: My colleagues say that Webster's case is especially strong because the evidence he now wants to present existed before his trial and sentencing (op. 1140–41). But wouldn't his claim be even stronger if the evidence about his mental condition post-dated the sentencing? New evidence of a *changed* condition better justifies a new hearing than old evidence of an unchanged condition—for a condition that predated the trial could have been litigated at trial and through a § 2255 petition filed within a year, while a change of mental condition could not have been litigated earlier. And a new argument based on newly created evidence of an unchanged condition (for example, a new test and analysis by an independent expert) also would be stronger, for by definition it could not have been presented at trial no matter how good the accused's lawyer.

Using the majority's template, any creative judge can find a reason for turning to § 2241 whenever a court of appeals decides that § 2255(h) blocks a successive motion under that statute. And because the only federal prison holding prisoners under sentence of death is in Indiana, this circuit is effectively claiming the final say about the propriety of every federal death sentence. Section 2255 was enacted in 1948 in part to prevent the district court in which prisoners are held from reviewing the decisions of the district court and circuit where the prosecution occurred. Parker, *Limiting the Abuse of Habeas Corpus,* 8 F.R.D. at 172–73. Today's decision **\*1150**

reverts the law of collateral review to the multi-jurisdictional mess that § 2255 was designed to eliminate.

Treating the 1996 limits on second or successive proceedings as making § 2255 inadequate, and thus authorizing proceedings under § 2241, is a path this court has been pursuing since *In re Davenport,* 147 F.3d 605 (7th Cir.1998). See also, e.g., *Garza v. Lappin,* 253 F.3d 918 (7th Cir.2001); *Brown v. Caraway,* 719 F.3d 583 (7th Cir.2013). Today's decision extends those cases from changes of law to newly discovered evidence—in other words, from § 2255(h)(2) to § 2255(h)(1), treating *both* parts of § 2255(h) as making § 2255 as a whole inadequate or ineffective. Webster's case has attributes that the majority emphasizes (op. 1140–41 n. 9), but as an extension of *Davenport, Garza*, and *Brown* the opinion cannot be treated as a ticket good for Webster's train only.

*Davenport* and its successors discuss circumstances that may justify a federal prisoner's use of § 2241 to test the validity of his conviction or sentence. These decisions hold that when a change of law, retroactively applicable, shows that the prisoner did not commit a crime or has received an illegally high sentence, § 2241 is available if it otherwise would be impossible to implement the Supreme Court's intervening ruling. Congress did not appear to contemplate the possibility of retroactive statutory decisions that show a prisoner's innocence (§ 2255(h)(2) being limited to new rules of constitutional law). That's what *Davenport* treats as justification for invoking § 2241.

*Davenport* and its successors conclude that § 2241 is available to provide the full retroactive effect contemplated by the Supreme Court. But Webster is not the beneficiary of a retroactive decision that cannot be implemented except through § 2241. Section 3596(c) predates his crime and trial; its rules remain in force. Nor does Webster contend that his mental condition has changed. Instead he wants to use § 2241 to make a better factual record and to place his arguments before a different circuit, hoping for a better result. These desires, understandable as they are, do not call into question the adequacy or effectiveness of § 2255.

What the majority calls a textual analysis (op. 1138–39) relies not on the text of § 2255(e) but on the text of § 2255(a),

which says that § 2255 as a whole covers sentences as well as convictions. Yet how can this justify using § 2255(e) to escape from § 2255 altogether? Section 2255(a) is why Webster was able to use § 2255 to make (to the district court in Texas and the Fifth Circuit) an argument that he is ineligible for capital punishment. That he made such an argument, and had it resolved on the merits, cannot show that § 2255 is inadequate or ineffective; it shows, to the contrary, that the statute is comprehensive. The majority's position would be stronger if § 2255(a) *excluded* attacks on sentences; then a prisoner would indeed need to use 🚩 § 2241 to pursue effective collateral review. But that's not how § 2255 works.

The majority repeatedly invokes *Atkins* and *Hall* but does not explain why they justify a successive collateral attack. Webster does not contend that they enlarge the set of persons ineligible for capital punishment, so it is hard to see why the majority states, op. 1138–39 & n. 6, that they make a difference for the purpose of § 2255(e). True, the Supreme Court has held that the rule of 🚩 § 3596(c) is part of the Constitution as well as the United States Code. But *Atkins* and *Hall* do not alter the substantive standard. Section 2255 enforces statutes as well as the Constitution. See 🚩 **\*1151** *Davis v. United States,* 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). That's why Webster could, and did, obtain review of his ineligibility argument under § 2255. There's no basis for another round of collateral review *when the substantive rule is unchanged.* How can § 2255 be "inadequate or ineffective" to present a line of argument that Webster actually presented, and on which he received a decision on the merits?

What is more, the evidence that Webster wants to introduce cannot helpfully be called "newly discovered." Webster has long known of it. It concerns his own application for Social Security disability benefits. He knew about that application; he knew that his mental condition had been tested as part of that application; his lawyer at trial knew these things too (as did his mother, who mentioned the subject during her testimony); and it would have been possible to retrieve the records in time for use during the trial and § 2255 proceeding.

Webster's current legal team asserts that his former lawyer was stonewalled when trying to obtain these records, but that is not what the former lawyer himself said. He related that he asked the Social Security Administration for Webster's records but lacks any memory of a response and therefore *assumes* that he must have been denied access. Yet that assumption is unfounded. Former counsel did not produce his file (he says that he no longer has it) and therefore did not have any records about the request (if any) and response (if any); he has only a lack of recollection to go on. That's pretty weak. One sensible inference would be that former counsel, or an investigator on his behalf, simply did not follow through. Current counsel obtained the records less than four months after asking, even though the disability case is an old one and many records had been sent to long-term storage. None of the difficulties (if there were any) that original counsel encountered can be blamed on § 2255.

Nor would the Social Security records facilitate a new line of defense. Webster's trial counsel had, and introduced, other medical records in which physicians diagnosed retardation before the murder. These records enabled him to ask the jury to infer that he had not started trying to deceive examiners after the prosecution began. The prosecutor could and did reply that there were reasons other than a desire to avoid the death penalty why Webster had done poorly on some IQ tests. Trying to obtain disability benefits would have been one such reason, so the evidence that current counsel now wants to use could have been subject to much the same response as the prosecutor made to the records introduced at sentencing.

But we need not decide what effect the SSA records might have had in the hands of a top-notch lawyer; it is enough to conclude that the to-and-fro between the government and Webster's current legal team does not hint at a structural problem in § 2255. The problem, if any, lies in how Webster's former legal team searched for evidence—yet no one contends that § 2255 is inadequate to resolve a claim of ineffective assistance, or for that matter a claim that material evidence has been withheld in violation of 🚩 *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Courts hear and resolve those contentions under § 2255 daily. Webster can't *make* § 2255 ineffective by recasting an ineffective-assistance or *Brady* claim as one about the sufficiency of the evidence. That trial counsel had not obtained whatever records the SSA held was known in time to present an ineffective-assistance or *Brady* claim during the one § 2255 proceeding allowed as of right.

**\*1152  II**

Instead of extending *Davenport,* we should reexamine its premises. *Davenport* treats § 2255 as inadequate only because § 2255(h) blocks multiple rounds of post-judgment litigation.

*Davenport* thought that a prisoner should be entitled to one round of litigation per issue, and if the time-and-number limits enacted in 1996 prevent every issue from having its own opportunity for collateral review after the Supreme Court reinterprets a criminal statute, this demonstrates the statute's inadequacy. Then *Brown* allowed resort to § 2241 when the Supreme Court announces a new understanding of the Sentencing Guidelines. *Davenport* has some support in other circuits;[2] *Brown* has none;[3] and the majority does not contend that today's extension of those two decisions to situations in which there has been no change of law has any support elsewhere.

We should step back and ask what function § 2255(e) serves. Is it to ensure an unlimited number of rounds of post-conviction review, as long as each round presents a new question (or new light on an old question), or does it serve a different function? According to the Supreme Court, it serves a different function—a *very* different function.

When § 2255 was proposed, some people objected that moving all collateral litigation to the sentencing court, and creating some limits on relitigation (even the 1948 version of § 2255 did that, as did the common law discussed in *Sanders*), would violate the Suspension Clause of the Constitution (Art. I § 9 cl. 2): "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." The first time a claim under § 2255 reached the Supreme Court, it was on review from a court of appeals' decision holding just that. The court of appeals had instructed the district court to ignore § 2255 and proceed under § 2241. But *Hayman* reversed and directed all federal judges to use § 2255. Along the way, the Court concluded that § 2255 did not pose a serious problem under the Suspension Clause. It also treated the language now found in § 2255(e) as a safety valve: if some application of § 2255 would conflict with the Suspension Clause, a district court could proceed under § 2241 without any need to hold § 2255 unconstitutional. 342 U.S. at 223, 72 S.Ct. 263.

The Supreme Court has never held that § 2255 is "inadequate or ineffective" under any circumstances. Since *Hayman* it has had only one occasion to discuss § 2255(e). Congress enacted, for litigation in the District of Columbia's local courts, a provision similar to § 2255(e) that blocked not only use of habeas corpus but also resort to the federal judiciary (other than the Supreme Court of the United States). A prisoner

attacked this legislation as a violation of the Suspension Clause because it relegated prisoners to courts staffed by judges who **\*1153** lack tenure under Article III, and a court of appeals held that a federal court remains entitled to issue writs of habeas corpus under § 2241. As in *Hayman,* the Supreme Court reversed, sustaining the new procedure for collateral attacks. *Swain v. Pressley,* 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977). And, as in *Hayman,* the Justices saw the "inadequate or ineffective" escape hatch as designed to ensure that the remedy does not violate the Constitution. 430 U.S. at 381, 97 S.Ct. 1224.

The question we need to face, therefore, is whether the 1996 amendments to § 2255 violate the Suspension Clause by limiting the circumstances under which successive collateral attacks are proper. That is not a difficult question, because this circuit resolved it almost 20 years ago. After tracing the history of the writ of habeas corpus, we held that the Suspension Clause protects only the "Great Writ"—that is, the writ used to contest pretrial detention by the Executive Branch. Collateral review following conviction by a court of competent jurisdiction did not exist until the Twentieth Century, and we held that Congress is free to limit the extent to which federal courts can provide post-conviction collateral remedies. *Lindh v. Murphy,* 96 F.3d 856, 867–68 (7th Cir.1996) (en banc), reversed on other grounds, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Although *Lindh* dealt with the 1996 amendments to § 2254 for state prisoners, its reasoning is equally applicable to the 1996 changes to § 2255.

My colleagues in the majority say that this understanding "essentially reads the savings clause ... out of the statute" (op. 1136). Not at all. It just confines § 2255(e) to its function: saving § 2255 from any potential problem under the Suspension Clause. That it has served its purpose as insurance does not imply that we should give it new work to do. My colleagues do not say that my reading of the origin and scope of § 2255(e) is wrong; instead they choose not to discuss the subsection's genesis, function, and treatment by the Supreme Court.

The majority maintains that it is construing § 2255(e) according to the principle "that a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence" (op. 1139–40). But Webster had an opportunity at trial, and another on review under § 2255, to

contend that his sentence is invalid. Multiple litigation used to be authorized, when it did not abuse the writ, but with the enactment of § 2255(h) in 1996 it is no longer a "core" (or any) function of collateral review to offer extra opportunities to litigate subjects that have already been addressed.

Webster's argument is fundamentally that the jury, the trial judge, and the Fifth Circuit got the facts wrong, and that he should be allowed an opportunity to relitigate with more evidence. "Getting the facts wrong" is not a ground of collateral relief under either § 2241 or § 2255. See, e.g., *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). And given the holding of *Lindh* that the Constitution does not entitle a prisoner to multiple rounds of post-conviction review, there cannot be a serious constitutional objection to § 2255(h). [4]

Webster wants us to cut § 2255(e) loose from its linguistic and historical contexts and use it to perpetuate the approach of

*Sanders,* under which successive collateral **\*1154** litigation is permissible whenever it does not "abuse the writ", even though Congress has concluded that *Sanders* gave insufficient weight to society's interest in the finality of judgments. My colleagues treat the 1996 amendments as self-defeating, so that § 2241 becomes available to present new contentions (or new evidence) that cannot meet the conditions in § 2255(h) for second or successive motions under § 2255. Undoing the decisions of 1948 (to centralize post-conviction litigation in the sentencing court) and of 1996 (to limit the sort of contentions that allow multiple rounds of collateral review), even though § 2255 as amended does not violate the Suspension Clause, is unwarranted, and it places this court in a minority of one among the circuits at the same time as we assert final say over all federal capital cases.

**All Citations**

784 F.3d 1123

Footnotes

1    Hall went to trial, was convicted, and was also sentenced to death. See *United States v. Hall,* 152 F.3d 381 (5th Cir.1998). Like Webster, he is currently housed at the U.S. Penitentiary in Terre Haute. Demetrius Hall, Steven Beckley, and Marvin Holloway all pleaded guilty and testified at Webster's trial; they received varying sentences for terms of years.

2    Although our account may seem detailed, it is only a summary of more than 600 pages of trial transcript. We have attempted to hit the high points, without mentioning every time someone said something of interest.

3    As this comment illustrates, the court took the position that the jury did not need to be unanimous on the question of mental retardation. Webster has not separately attacked this ruling in his section 2241 petition.

4    Our dissenting colleagues disagree with this aspect of the Fifth Circuit's ruling. See *post* at 1148 n. 1. They argue that the rule of *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), recognizing that a person can be "innocent of the death penalty," survived the enactment four years later of the Antiterrorism and Effective Death Penalty Act (AEDPA). They acknowledge, however, that this was not the Fifth Circuit's view. Since the Fifth Circuit panel in *Webster III* unanimously found that only factual innocence of the crime would do, the majority did not express any opinion on whether Webster's new evidence undermined the findings underpinning his death sentence.

5    The dissent appears to agree with the position that Webster's lawyers were required to accept the Fifth Circuit's ruling that section 2255 addresses only innocence of the underlying crime; they note that section 2244(b)(3)(E) cuts off any right to further review of such a ruling. See *post* at 1148. We have treated this ruling as part of the law of the case, both in recognition of its unreviewability and out of respect for our sister circuit.

6    The dissent takes the position that *Atkins* and *Hall* add nothing to the protection against the death penalty in 18 U.S.C. § 3596(c). With respect, we disagree. Collateral relief is primarily used for constitutional violations, not violations of federal law that could and should be raised on direct appeal. The dissent paints a picture of the floodgates opening up as a result of our decision, but, as we explain in more detail below, that cannot happen.

7    The dissent suggests that the savings clause is available only when the application of section 2255 would conflict with the Suspension Clause. See *post* at 1152–54. We have never contended that denying Webster the right to use section 2241 would violate the Suspension Clause. But this is precisely the point: we do not have to reach this constitutional

issue because Congress included section 2255(e) in the statutory framework, thus allowing us to resolve the question of the availability of section 2241 on statutory—rather than constitutional—grounds.

In fact, given the rule in *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), which holds that "[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane," *id. at 410, 106 S.Ct. 2595*, there will always be some lack of finality for a person whose mental condition "prevents him from comprehending the reasons for the penalty or its implications." *Id. at 417, 106 S.Ct. 2595.* Both parties have assumed, however, that the *Ford* standard is higher than the one imposed in *Atkins* and *Hall.* We assume for present purposes that this is correct.

The dissent is concerned that, contrary to Congress's intention in enacting AEDPA, our interpretation of section 2255 returns us to the pre-AEDPA standard for successive habeas corpus petitions. See *post* at 1148–49 (the majority's interpretation "open[s] the door to any proceedings that do not abuse the writ—the pre–1996 standard"). In so contending, however, it disregards the array of limitations, both legal and factual, on which our ruling depends. We have highlighted at least three principal reasons why our finding that the savings clause is available here will have a limited effect on future habeas corpus proceedings. First, the evidence sought to be presented must have existed at the time of the original proceedings. (A free-standing claim that an execution would violate *Ford v. Wainwright* might involve later-acquired evidence, but such a claim is quite different from the one now before us.) Second, the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it. Third, and most importantly, the evidence must show that the petitioner is constitutionally ineligible for the penalty he received. Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense. These three limitations are more than adequate to prevent the dissent's feared flood of section 2241 petitions, and they in no way represent a return to the abuse of the writ standard.

The dissent's discussion of these points, *post* at 1150–51, rests on factual assumptions that are contested. It merely highlights the need for the evidentiary hearing we contemplate.

This does not create a conflict with the Fifth Circuit. That court ruled that it could not even consider Webster's new evidence, because of the limitations in section 2255(h). If Webster wins relief in the district court in Indiana, and if any such ruling is upheld on appeal in this court, then the mandate will give the sentencing court clear and uncontradicted instructions for moving forward.

Section 2255(h)(1) reads, in full, "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense". I do not think that "the offense" limits authorization to new evidence about guilt. It has that effect in non-capital cases, *Hope v. United States,* 108 F.3d 119 (7th Cir.1997), but in *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), the Supreme Court held that a person can be "innocent of the death penalty" independently of innocence of the crime. *Sawyer* predates the AEDPA, so it is most sensible to understand § 2255(h)(1) as authorizing a successive petition when newly discovered evidence shows, clearly and convincingly, that no rational trier of fact could have thought a given person death-eligible. The Fifth Circuit disagreed with that understanding, 605 F.3d 256, and held that *Hope* applies to capital litigation too. Although the majority opinion states Webster's evidence meets the "clear and convincing" standard (op. 1144–45), which if so should have led to permission for a second collateral attack under § 2255, § 2244(b)(3)(E) forbids that kind of review by another court. (And for reasons I set out later, I do not think that Webster's evidence is "clear and convincing".)

Compare *In re Jones,* 226 F.3d 328, 333–34 (4th Cir.2000); *Reyes–Requena v. United States,* 243 F.3d 893, 904 (5th Cir.2001); and *In re Smith,* 285 F.3d 6, 8 (D.C.Cir.2002) (all following *Davenport* ); with *Prost v. Anderson,* 636 F.3d 578, 588 (10th Cir.2011) (disapproving *Davenport* ).

*Brown* itself acknowledged that it was going against two other circuits. 719 F.3d at 588. See also *id. at 596–600* (opinion concurring in the denial of rehearing en banc). Every other circuit that has considered the issue in *Brown* has disapproved of this circuit's position. See *Garcia v. Warden,* 2014 U.S.App. LEXIS 23114 (3d Cir. Dec. 9, 2014); *Selby v. Scism,* 453 Fed.Appx. 266, 268 (3d Cir.2011); *Bradford v. Warden,* 660 F.3d 226, 230 (5th Cir.2011); *Gilbert v. United States,* 640 F.3d 1293, 1311–12 (11th Cir.2011) (en banc).

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-2683     Document: 13     Filed: 11/14/2019     Pages: 115

4       Webster contends that § 2255 would violate the Suspension Clause if understood to block all new post-conviction evidence. That contention cannot be reconciled with *Lindh,* and at all events it is not what § 2255(h) does. See footnote 1, discussing § 2255(h)(1).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.