**No. 19-2683**

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

BRUCE CARNEIL WEBSTER,

Petitioner - Appellee,

v.

T.J. WATSON, WARDEN,

Respondent - Appellant.

---

On Appeal from the United States District Court
For the Southern District of Indiana, No. 2:12-cv-00086-WTL-WGH
Hon.William T. Lawrence, District Judge

---

**BRIEF OF APPELLEE**

---

## THIS IS A DEATH PENALTY CASE

Dorsey & Whitney LLP
Steven J. Wells
Kirsten E. Schubert
Kathryn A. Johnson
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

Indiana Federal Community
Defender
Monica Foster, Executive Director
F. Italia Patti
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
(317) 383-3520

*Attorneys for Appellee Bruce
Webster*

## RULE 26.1 DISCLOSURE STATEMENT

(1)     The full name of every party that the attorney represents in this case:

Bruce Carneil Webster.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Dorsey & Whitney LLP; Indiana Federal Community Defender, Inc.

(3)     If the party or amicus is a corporation:

    i.   Identify all its parent corporations, if any: N/A

    ii.  List any publicly held company that owns 10% or more of the party's or amicus' stock: N/A.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ....................................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ....................................................2

INTRODUCTION .......................................................................................................3

STATEMENT OF THE CASE...........................................................................................3

I.    Procedural Background.........................................................................................3

      A.    Webster is Convicted and Sentenced to Death ..........................................................3

      B.    Webster Uncovers New Evidence of Intellectual Disability From SSA
            Files.........................................................................................................................5

      C.    Webster's Request to File a Successive §2255 Motion is Denied..........................6

      D.    Webster Files the §2241 Petition ...........................................................................7

II.   The District Court's 2018 and 2019 Hearings Following This Court's Order ...................9

      A.    The District Court Finds that Trial Counsel Exercised Due Diligence ...................9

            1.    Moore's Credentials and Experience Prosecuting Capital Cases ................9

            2.    Intellectual Disability Defense at Trial......................................................10

                  (a)    Expert Consultation ....................................................... 10

                  (b)    Evidence Collection ....................................................... 10

                  (c)    Webster's Request for Records from the SSA............................. 11

                  (d)    The SSA Told Moore that No Records for Webster Existed........ 16

            3.    The District Court Finds Webster's Trial Counsel Exercised Due
                  Diligence and the SSA Records Were Unavailable to Him.......................18

      B.    The District Court Finds Webster is Intellectually Disabled, Grants the
            Writ, and Vacates His Death Sentence .................................................................18

            1.    Expert Testimony as to Intellectual Disability.........................................19

            2.    Criteria for the Diagnosis of Intellectual Disability.................................21

      C.    Reschly and Fabian Conclude that Webster is Intellectually Disabled .................25

i

1.    Intelligence Testing..................................................................................25

2.    Observations of Adaptive Deficits by Testifying Experts.......................27

    (a)    Standardized Testing..................................................... 27

    (b)    Clinical Impressions...................................................... 29

3.    Evidence of Intellectual Disability in the SSA Records...........................30

    (a)    SSA Doctors' Observations of Webster's Functioning ............... 31

    (b)    SSA Benefits Application............................................. 32

    (c)    Evidence that Webster was Enrolled in Special Education
    Classes.......................................................................... 34

4.    School Records .......................................................................................35

5.    Observations of People Who Knew Webster at a Young Age ..................36

6.    Observations of Prison Staff ...................................................................37

7.    Crime Facts.............................................................................................38

8.    Risk Factors that Could Increase the Likelihood of Developing
Intellectual Disability...............................................................................38

SUMMARY OF THE ARGUMENT .......................................................................40

ARGUMENT...........................................................................................................41

I.    Standard of Review.......................................................................................41

II.    The District Court's Finding that Trial Counsel Was Reasonably Diligent and that
the SSA Records Were Not Available to Him Was Not Clearly Erroneous .....................42

    A.    The District Court Did Not Clearly Err in Crediting Moore's Testimony
that He Vigorously Sought the SSA Records ........................................43

    B.    The Government's Arguments are Meritless and Fail Under the
Deferential Clear Error Standard ..........................................................44

        1.    Moore's Testimony Is Consistent.............................................45

        2.    Dorsey's Efforts Are Irrelevant to the Determination of Trial
Counsel's Diligence and, in Any Event, Demonstrate the Difficulty
of Obtaining Webster's SSA Records........................................48

  3.  The District Court Did Not Clearly Err in Crediting Moore's Testimony Regarding the Existence of Documents in the Trial File.........49

III. The District Court's Determination that Webster is Constitutionally Ineligible for the Death Penalty Was Not Clearly Erroneous....................................................50

  A. It is Unconstitutional to Execute an Intellectually Disabled Person......................51

  B. Webster is Intellectually Disabled .........................................................52

    1.  Webster Has Demonstrated Significant Deficits in Intellectual Functioning ...............................................................................52

    2.  The District Court Did Not Clearly Err in Finding Webster Demonstrated Adaptive Deficits.............................................................53

      (a)  Webster's Deficits in Conceptual, Practical, and Social Domains ...........................................................................53

      (b)  Webster's "Strengths" Are Not Inconsistent with Intellectual Disability......................................................56

      (c)  The District Court's Treatment of Evidence of Prison Conduct was Not Clear Error...........................................58

      (d)  The District Court Did Not Clearly Err in its Treatment of Crime Facts ..............................................................59

CONCLUSION.....................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Bessemer City, N.C.,*
   470 U.S. 564 (1985) ....................................................................................... 41

*Atkins v. Virginia,*
   536 U.S. 304 (2002) .................................................................................... 6, 51

*Brumfield v. Cain,*
   808 F.3d 1041 (5th Cir. 2015) ...................................................................... 52

*Hall v. Florida,*
   572 U.S. 701 (2014) ....................................................................................... 51

*Maus United States v. Reicin,*
   497 F.2d 563 (7th Cir. 1974) ......................................................................... 47

*Moore v. Knight,*
   368 F.3d 936 (7th Cir. 2004) .................................................................... 43, 60

*Moore v. Texas,*
   139 S. Ct. 666 (Feb. 19, 2019) ...................................................................... 51

*Moore v. Texas,*
   137 S. Ct. 1039 (2017) (*Moore I*) ........................................................ 51, 57, 60

*Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.,*
   866 F.2d 228 (7th Cir. 1988) ......................................................................... 41

*Rompilla v. Beard,*
   545 U.S. 374 (2005) ....................................................................................... 43

*United Sates v. Warner,*
   498 F.3d 666 (7th Cir. 2007) .................................................................... 42, 48

*United States v. Clark,*
   538 F.3d 803 (7th Cir. 2008) .................................................................... 42, 44

*United States v. Davis,*
   611 F. Supp. 2d 472 (D. Md. 2009) ............................................................... 57

*United States v. Feinberg,*
   89 F.3d 333 (7th Cir. 1996) ........................................................................... 53

iv

*United States v. Ritsema,*
  31 F.3d 559 (7th Cir. 1994) ...................................................................... 41

*United States v. Simon,*
  937 F.3d 820 (7th Cir. 2019) .................................................................... 42

*United States v. Webster,*
  162 F.3d 308 (5th Cir. 1998) ................................................................ 3, 60

*United States v. Webster,*
  421 F.3d 308 (5th Cir. 2005), *cert. denied,* 549 U.S. 828 (2006) ............................ 4

*United States v. Whitley,*
  249 F.3d 614 (7th Cir. 2001) .................................................................... 41

*In re Webster,*
  605 F.3d 256 (5th Cir. 2010) ..................................................................... 6

*Webster v. Caraway,*
  716 F.3d 764 (7th Cir. 2014) ..................................................................... 7

*Webster v. Daniels,*
  784 F.3d 1123 (7th Cir. 2015) (*en banc*) ............................................... 4, 5, 7

*Webster v. United States,*
  562 U.S. 1091 (2010) .............................................................................. 7

*Webster v. United States,*
  No. 4:00-CV-1646-Y, 2003 WL 23109787 (N.D. Tex. Sept. 30, 2003).................... 4

**Statutes**

18 U.S.C. §1201(a)(1) ................................................................................ 3

18 U.S.C. §1201(a)(2) ................................................................................ 3

28 U.S.C. §2241 ................................................................................... 7, 44

28 U.S.C. §2255 ..................................................................................... 4, 6

28 U.S.C. §3596(c) ................................................................................ 4, 10

**Other Authorities**

Fed. R. App. P. 28(a)(8)(A) ...................................................................... 53

Fed.R.Evid. 612 ...................................................................................... 47

## JURISDICTIONAL STATEMENT

The jurisdictional summary in the Government's brief is complete and correct.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the district court's finding that Webster exercised due diligence in attempting to obtain Social Security records was, despite the substantial evidence and credibility determinations supporting that finding, clearly erroneous.

2. Whether the district court's finding that Webster is intellectually disabled and therefore categorically ineligible for the death penalty was, despite the substantial evidence and credibility determinations supporting that finding, clearly erroneous.

## INTRODUCTION

On remand from this Court, the district court held separate evidentiary hearings to determine whether trial counsel for Appellee Bruce Webster ("Webster") had used appropriate diligence in seeking Social Security Administration ("SSA") records that the SSA failed to disclose or release until 2009; and to determine whether Webster is intellectually disabled. After conducting an exhaustive review of the substantial supporting evidence presented by Webster on both issues, and making explicit determinations that Webster's witnesses were credible and the Government's witnesses were not, the district court correctly concluded Webster had carried his burden on both issues. The district court's findings were well supported, and because they rely substantially on credibility findings, virtually unassailable. Webster respectfully requests that the district court's judgment be affirmed.

## STATEMENT OF THE CASE

### I.    Procedural Background

#### A.    Webster is Convicted and Sentenced to Death

On November 4, 1994, Webster was indicted on six counts in the U.S. District Court for the Northern District of Texas, including kidnapping in which a death occurred in violation of 18 U.S.C. §§1201(a)(1) and (2), along with various noncapital offenses. Webster was convicted and sentenced to death. *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).

3

Webster's primary defense in the sentencing phase was intellectual disability.[1] Five physicians and psychologists testified that Webster has IQ scores clearly in the range of intellectual disability, suffers significant deficits in adaptive behavior, and is intellectually disabled. *See* June 18, 2018 Hearing Transcript, Dkt. 210 ("2018 Hearing Tr.") at 20:7–21:119; 25:20-28:12; *Webster v. Daniels*, 784 F.3d 1123, 1128 (7th Cir. 2015) (*en banc*). There was also evidence that, prior to the crime, the Southeast Arkansas Mental Health Center evaluated Webster and assessed his IQ to be well within the range of intellectual disability. *Webster*, 784 F.3d at 1127-28. One psychologist and one psychiatrist, neither of whom performed full scale IQ or adaptive deficit tests, testified for the prosecution that Webster faked his IQ scores to escape a capital sentence. *See id.* at 1130–31. The prosecution also argued that Webster had lied about being in special education classes. *Id.* at 1129–30.

The jury found that Webster should receive the death penalty. *See id.* at 1131. The Fifth Circuit affirmed Webster's sentence and conviction on direct appeal. Webster's subsequent petition to vacate his conviction and sentence under 28 U.S.C. §2255 was also denied. *See Webster v. United States*, No. 4:00-CV-1646-Y, 2003 WL 23109787 (N.D. Tex. Sept. 30, 2003); *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005), *cert. denied*, 549 U.S. 828 (2006).

---

[1] The federal death penalty statute went into effect shortly before Webster's trial, creating a statutory ban on the execution of people with intellectual disability. *See* 28 U.S.C. §3596(c). Webster was one of the first to be sentenced under §3596. *See* 2018 Hearing Tr. 22:23–25.

4

**B.     Webster Uncovers New Evidence of Intellectual Disability From SSA Files**

In 2009, more than 15 years after Webster was sentenced to death, his newly-retained counsel, Dorsey & Whitney LLP ("Dorsey"), uncovered previously undisclosed records in the SSA's possession bearing directly on Webster's intellectual functioning. *Webster*, 784 F.3d at 1133; 2018 Hearing Tr. at 155:15–19. These records show that in September 1993, a year before the crime, when he was 20 years old, Webster applied for Social Security benefits for sinus problems and headaches. Pet'r Ex. 45 at 19.[2] These SSA records contain significant evidence of Webster's intellectual and behavioral deficits, including opinions from three SSA doctors who diagnosed him with intellectual disability. *See infra* § II(C)(3)(b).

These records were produced for the first time in 2009, only after multiple requests from Dorsey. Dorsey sent its first request letter, with a signed release and request to expedite production, in October 2008. Pet'r Ex. 3. Over a month later, when Dorsey had not yet received a response, Dorsey called the SSA to follow-up on its request. 2018 Hearing Tr. at 152:9–25. An SSA manager informed Dorsey that Webster must submit a different (but substantially similar) release form. *Id.* at 153:1–5. Dorsey promptly sent a second written request with a new release in December 2008. Pet'r Ex. 4.

In February 2009, the SSA sent some—but not all—of Webster's files to Dorsey. 2018 Hearing Tr. at 155:15–19. The records Dorsey received (which are the

---

[2] Exhibits from the June 2018 hearing are designated as "Pet'r Ex." or "Resp't Ex." Exhibits from the April 2019 hearing are designated as "Ex."

SSA records at issue in these proceedings) contained a list of exhibits, many of which were not in the file. *Id.* at 164:6–25; 165:1–6. Accordingly, in October 2009, Dorsey sent a third written request, specifically for the missing records. Pet'r Ex. 5.

In October 2009, an SSA representative informed Dorsey that it *never* should have received *any* records. 2018 Hearing Tr. at 167:2–8. According to the representative, "normal procedures were not followed" when the SSA sent records to Dorsey in February. *Id.* One week later, the Pine Bluff SSA office denied Dorsey's third record request. Pet'r Ex. 6.

Dorsey sent a fourth request to the Terre Haute SSA office in November 2009. Pet'r Ex. 7. However, in December 2009, the SSA informed Dorsey that, after Dorsey had requested the remaining records—explicitly in connection with Webster's death penalty litigation—the SSA inexplicably destroyed all of Webster's records, contrary to law and agency policy. Pet'r Ex. 8. The Government took no steps to ensure the SSA retained these highly relevant records, despite the pendency of these habeas proceedings. Dkt. 85-1, at 3.

**C.     Webster's Request to File a Successive §2255 Motion is Denied**

On the basis of the records that the SSA did not destroy, Webster moved the Fifth Circuit for authorization to file a successive motion to vacate his death sentence under §2255(h)(1) as unconstitutional under *Atkins* ("2255 Successor Motion"). The Fifth Circuit denied Webster's motion on procedural grounds. *See In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010). In a concurring opinion, Judge Weiner noted that if the SSA records were ever presented in court, "it is virtually guaranteed that he would be found to be [intellectually disabled]." *Id.* at 259.

6

Webster's petition for writ of certiorari was denied. *Webster v. United States*, 562 U.S. 1091 (2010).

### D.     Webster Files the §2241 Petition

On April 6, 2012, Webster filed his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. §2241, seeking to challenge his death sentence based on the previously undisclosed SSA records ("2241 Petition"). The district court denied the 2241 Petition. A panel of this Court affirmed on appeal. *Webster v. Caraway*, 716 F.3d 764 (7th Cir. 2014).

Webster's petition for rehearing *en banc* was granted, and the panel decision was vacated. On May 1, 2015, this Court sitting *en banc* reversed the district court's decision and remanded for further proceedings. *Webster v. Daniels,* 784 F.3d 1123 (7th Cir. 2015) (*en banc*). This Court instructed the district court to:

> hold a hearing for the purpose of deciding whether the Social Security records were indeed unavailable to Webster and his counsel at the time of the trial. In considering that question, the district court must also evaluate trial counsel's diligence. If the court concludes, as Webster's lawyers urge, that the records were unavailable and all due diligence was exercised, and that Webster has them now only because of a fluke, then it must turn to the merits of the petition: is Webster so intellectually disabled that he is categorically ineligible for the death penalty under *Atkins* and *Hall*?

*Id.* at 1146.

The district court convened a one-day evidentiary hearing on June 18, 2018 (the "2018 Hearing") on the first remand question: whether Webster's counsel was duly diligent in seeking records from the SSA. The district court heard testimony from Webster's trial counsel and a Dorsey paralegal (the Government called no

7

witnesses). After considering all the evidence, the district court held that trial counsel exercised all due diligence in his attempts to obtain the records, and, as a result, the records were unavailable to Webster for trial. Appendix at 14.[3]

The district court held a second evidentiary hearing from April 1–5, 2019 (the "2019 Hearing") on the ultimate question: whether Webster is intellectually disabled and thus categorically ineligible for the death penalty. After the five-day hearing, which included testimony from four expert witnesses and three lay witnesses, and the submission of significant documentary evidence (including the entire trial record), the district court granted the writ, and issued a final order and judgment, concluding that "Webster has met his burden and shown by a preponderance of the evidence that he is intellectually disabled, as he meets all three prongs of intellectual disability: 1) Webster has intellectual-functioning deficits; 2) Webster has adaptive deficits; and 3) the onset of these deficits was when Webster was a minor." Appendix at 35. "In making this ruling, the Court has carefully considered the totality of the evidence and weighed the testimony in accordance with its credibility assessment of each witness." *Id.* The Government appealed.

---

[3] Citations to "Appendix" are to the Attached Appendix included with the Government's brief.

## II. The District Court's 2018 and 2019 Hearings Following This Court's Order

### A. The District Court Finds that Trial Counsel Exercised Due Diligence

At the 2018 Hearing on whether Webster's trial counsel was duly diligent in seeking the SSA records, the district court heard testimony from Larry Moore ("Moore"), Webster's trial lawyer[4], and Kristen LeRoux ("LeRoux"), a Dorsey paralegal who helped uncover the previously-undisclosed SSA records in 2009. Together, these witnesses testified that (1) Webster's trial team requested any records relating to Webster from the SSA in preparation for the 1996 trial; (2) the SSA informed Webster's team twice—once in person and once over the phone—that no records relating to Webster existed; (3) Webster's trial counsel reasonably believed the SSA when it said no records existed; (4) no records were ever produced by the SSA to Webster's trial counsel; and (5) the SSA obstructed production and eventually destroyed the SSA records after Dorsey's request identified their importance to death penalty litigation.

### 1. Moore's Credentials and Experience Prosecuting Capital Cases

Moore has practiced criminal law for over 41 years. He is the Chief of the Criminal Division of the Tarrant County District Attorney's Office in Fort Worth, Texas. 2018 Hearing Tr. 12:10-13:8. When he was appointed to represent Webster, Moore already had extensive experience litigating capital cases as both a prosecutor

---

[4] Webster was represented at trial by Moore and Alan Butcher, who were appointed to represent him in 1994. 2018 Hearing Tr. 15:5-7; 20:16; 50:12. Moore was the lead attorney on the penalty phase. *Id.* 50:13-51:1; 85:17-86:5.

and defense lawyer. *Id.* 16:1-12; 17:3-13. As a prosecutor, Moore had tried three death penalty cases; in the two cases that went to the jury, Moore asked the jury to impose the death sentence. *Id.* 16:13-24. In one of those cases, the jury returned a death verdict, and the defendant was executed. *Id.* 16:13-17:2; 18:5-11.

### 2.    Intellectual Disability Defense at Trial

Moore came to believe, soon after being appointed, that Webster suffered from a cognitive disability, and went to unprecedented lengths to present a strong intellectual disability defense. *Id.* 18:12-20:2, 28:13-21.

### (a)    Expert Consultation

Because the federal death penalty statute did not specify the standard for intellectual disability, Moore and his trial team retained or consulted with at least ten experts specializing in intellectual disability and special education. In addition to the five experts who testified that Webster is intellectually disabled at trial, Moore consulted with five experts with death penalty experience concerning the role of intellectual disability in Webster's case, including the primary author of the intellectual disability exclusion in §3596(c).[5] *Id.* 21:17-19; 25:20-28:12.

### (b)    Evidence Collection

The trial team also unearthed substantial evidence of Webster's intellectual disability. Moore sought every medical, school, and benefits record he thought could be available, and talked to every person he could find who knew Webster growing up to develop information about Webster's intellect and functioning as a minor. *Id.*

---

[5] Moore and Butcher were so committed to the intellectual disability defense that they paid a portion the expert expenses out of their own pockets. 2018 Hearing Tr. 20:7-21:16.

10

30:8-19, 27:5-9. On expert advice that there is a higher incidence of intellectual disability within families, Moore even collected medical records for Webster's family members. *Id.* 33:20-34:16.

It was during his trial preparation, on a trip to interview Webster's friends and family in Pine Bluff, Arkansas, where Webster grew up, that Moore learned from Webster's mother that Webster may have been evaluated for Social Security benefits. *Id.* 34:17–35:4. Beatrice Webster, who was herself intellectually disabled, informed Moore during the last week of February 1996 that she had taken Webster to the SSA office to apply for benefits years earlier, before his arrest, and that Webster had undergone unknown testing. *Id.* 35:5–24. Mrs. Webster told Moore the basis for Webster's benefits claim was a physical ailment, and never mentioned intellectual disability. *Id.* 34:17-36:2.

### (c)     Webster's Request for Records from the SSA

Moore considered this information to be "critically important." *Id.* 37:20–22. Intellectual disability was the single biggest issue in the case and, given the emerging evidence, Moore suspected that SSA "testing," if it existed, may have related to Webster's intellectual functioning and could eliminate the Government's claims of malingering. *Id.* 37:17–39:11.

As soon as he learned that Webster may have applied for benefits, Moore asked his paralegal, Kim Whitehead, to contact the SSA to determine how to obtain copies of Webster's benefits application and records. *Id.* 37:8-16. Moore wrote a note to Whitehead instructing her to call the SSA office in Pine Bluff. The note read: "In about 1992, Bruce Webster applied for Soc. Security disability benefits at Pine Bluff

11

office of Soc. Security Admin. Please call that office to find out what we need to get

copies of those records? Will a release from Bruce be sufficient?" Pet'r Ex. 20. Moore

emphasized the importance of this request, stating, "[Webster] never received

benefits, but I think that he did go through the testing – I need test results!"



*Id.*; 2018 Hearing Tr. 39:23-40:22.

A second note in the file reinforces the urgency and import of Moore's

request. Moore wrote, "Kim—we need to know how to get Bruce's records re: Appl.

for disability benefits (any testing?)." "Call Pine Bluff off. 1st!"



Pet'r Ex. 23; 2018 Hearing Tr. 43:8-45:1.

12

Moore's trial file also contains a handwritten note from Whitehead, dated "2/29/96 at 11:30," reflecting the address of the SSA office in Pine Bluff. It also includes a note that says "Fax – Hal West – 501 535-5381."[6]



Pet'r Ex. 21; 2018 Hearing Tr. 45:2-15.

On March 4, 1996, at 11:50 p.m., Whitehead sent a fax to the Pine Bluff SSA office. 2018 Hearing Tr. 46:14–24. The Fax Transmittal Sheet, which is in Whitehead's handwriting, is dated March 5, 1996 (the date it would be read by the SSA), directed to Mr. Hal West, and consists of four pages.

---

[6] West was the head of the Pine Bluff SSA office and his fax number is 501-535-5381. 2018 Hearing Tr. 45:4–7.

13

# FAX TRANSMITTAL SHEET



DATE: __3-5-96__    FAX NO. (501) __535-5381__

TO: __Mr. Hal West, SS Admin. Office__

FROM: __Kim Whitehead, Paralegal__

RE: __Bruce Webster__

PAGES (INCLUDING COVER SHEET): __4__

Pet'r Ex. 15.

Page 2 of the fax is a typed letter from Whitehead to West, stating:

> Dear Mr. West:
>     Thank you for visiting with me regarding [Webster]. As you requested, I have enclosed a copy of a Business Records Authorization and Release and a Business Records Affidavit. It is my understanding that Mr. Webster applied for disability in 1992 and some testing was done. He did not receive any disability payments. For purposes of trial, we will need to obtain any information relating to his disability claim.
>     Mr. J.W. Strickland of L. Michael Connelly and Associates, will be in Pine Bluff on March 1st through 5th, 1996. He will have in his possession the original authorization signed by Mr. Webster for your files. The Business Records Affidavit will need to be filled out when Mr. Strickland picks up the records.

Pet'r Ex. 16.

14

Page 3 of the fax is a "Business Records Authorization & Release" dated

March 3, 1996. It was drafted for use by the SSA (as opposed to the general form

release that Moore sent to other agencies), signed by Webster during an in-person

meeting, witnessed by Moore, and specifically requested information relating to any

applications or testing, including

> any and all information and records that you may have in
> your possession concerning BRUCE C. WEBSTER with
> respect to any application for benefits made for, or on
> behalf, of BRUCE C. WEBSTER; any testing or
> examinations of any kind or character done in connection
> with such applications for benefits; any review eligibility
> for benefits that may have been done; any benefits
> approved or disapproved in regard to such applications;
> and any and all other records of any kind and character
> that may have been obtained in connection with any
> application for benefits made by, or on behalf of, this
> individual; or any other records in your possession
> pertaining to this individual.

Pet'r Ex. 17. 2018 Hearing Tr. 49:24–54:23. It was also addressed to West.

```
03/04/1996  23:50    8173353500           LARRY MOORE ATTORNEY              PAGE  03
```

**BUSINESS RECORDS AUTHORIZATION & RELEASE**

TO:  Mr. Hal West                                    DATE: 3/3/96
     U.S. Social Security Administration
     Pine Bluff District Office

Pet'r Ex. 17. Page 4 of the fax was the "Business Records Affidavit" that was also

prepared specifically for the SSA. Pet'r Ex. 18; 2018 Hearing Tr. 52:20-53:10.

The file's fax "Transmission Verification Report" shows that, consistent with

the cover sheet, Whitehead's four-page fax was sent to West on March 4, 1996 at

15

11:50 p.m. Pet'r Ex. 27. Separately, a FedEx bill shows that, on March 6, 1996, Moore's office sent a priority letter to West and that the package was delivered the next morning, on March 7, 1996.

| 2656682884 | WEBSTER CASE MOORE, LARRY M, LAW OFC OF 1112 E 1ST ST STE A FORT WORTH,     TX   76102 | MR HAL WEST SOCIAL SECURITY ADMINSTRATION 100 EAST 8TH RM 2522 PINE BLUFF,     AR 71601 AA DELIVERED:03/07/96  09:58 | 1/ | NA | PRIORITY LTR DISCOUNT | 15.50 -2.50 | |
| 06817931 | 1 DROP OFF 03/06/96 | SIGNED: T.BRUNSON | | | | | 13.00 |

Pet'r Ex. 9. Moore testified that, as was his usual practice, he followed-up the March 4 fax by sending the "hard documents themselves" via FedEx. 2018 Hearing Tr. 57:9–25.

At the time Whitehead sent this letter, the SSA had not disclosed whether any records existed. In Moore's experience, the SSA would not have disclosed anything about Webster's records prior to receiving a release. *Id.* 58:20-23; 114:1-115:17.

### (d)  The SSA Told Moore that No Records for Webster Existed

J.W. Strickland, a former FBI agent and the private investigator assisting Webster's defense team, traveled to Pine Bluff in early March 1996 to interview witnesses and gather facts. *Id.* 59:10–15; 64:10–65:1. During that trip, Moore asked Strickland to visit the Pine Bluff SSA office to pick up any records the agency may have had for Webster. *Id.* 59:10–15.

As requested, Strickland visited the Pine Bluff SSA office. Strickland informed Moore that the SSA representative said no records for Webster exist. *Id.* 59:5-17; 60:3-6. After Strickland informed Moore that the SSA had no records for Webster, Moore called the Pine Bluff SSA office himself to follow up. *Id.* 60:3-16.

16

Moore spoke with West, who told Moore that no SSA records for Webster existed. *Id.* 61:11-16. Moore understood this to mean the SSA had no records regarding Webster or any application for benefits. Moore took the SSA at its word. *Id.* 63:24-64:7. When the SSA told Moore there were no records, Moore did not believe there was anything else he could do, because he had no good faith reason to believe that any SSA records existed. *Id.* 64:3-7, 120:19-24.

Moore acknowledged that his file, as it exists today, contains no notes of any discussions between Moore and the SSA, or Strickland and the SSA, nor does it contain a written copy of a denial letter from the SSA. Moore also testified that he cannot be certain as to whether he took notes of his discussion with the SSA, and he believes he may have asked for a letter or written denial from the SSA, but his file has been out of his hands for many years. *Id.* 116:11-117:10.

Moore executed a declaration in 2009 ("2009 Declaration") in support of the 2255 Successor Motion, shortly after the SSA records were discovered, describing his efforts to obtain records from the SSA. Resp't Ex. 3. Moore stated in the 2009 Declaration that he believed in good faith that he was told by the SSA that no records for Webster existed. *Id.* ¶4. Moore subsequently executed a declaration in April 2018 ("2018 Declaration"), shortly before the 2018 Hearing, after he had reviewed a portion of his trial file, expanding upon his collection efforts and confirming that the SSA told him no records for Webster existed. Resp't Ex. 4.

### 3. The District Court Finds Webster's Trial Counsel Exercised Due Diligence and the SSA Records Were Unavailable to Him

Moore's testimony that he diligently sought SSA records was persuasive to the district court. The Government presented no competing evidence, focusing instead on impugning Moore's credibility. In the face of the Government's many attempts to undercut the veteran prosecutor's credibility and motives, the district court ruled, "[h]aving observed the demeanor of Moore during the hearing, the Court finds his testimony to be credible." Appendix at 12. Given Moore's exhaustive efforts, and the SSA's multiple "no records" response, the district court found it was reasonable for Moore to rely upon these representations and not take further action. *Id.*

### B. The District Court Finds Webster is Intellectually Disabled, Grants the Writ, and Vacates His Death Sentence

After it ruled Webster had met his burden to show the SSA records were unavailable at the time of trial, the district court convened an evidentiary hearing to determine whether Webster is intellectually disabled and constitutionally ineligible for the death penalty.

At the 2019 Hearing, the district court heard testimony from three highly-qualified experts presented by Webster; one expert presented by the Government; and three Government-employee fact witnesses who had limited contact with Webster while he has been incarcerated, conducted no intellectual testing, and did not testify as experts. The district court also admitted testimony from other fact witnesses, including Moore, and the entire record from Webster's criminal trial. The

18

district court "carefully considered the totality of the evidence and weighed the testimony in accordance with its credibility assessment of each witness" and found that Webster had "met his burden and shown by a preponderance of the evidence that he is intellectually disabled, as he meets all three prongs of intellectual disability." Appendix at 35.

### 1. Expert Testimony as to Intellectual Disability

Webster first called Dr. Mark Tassé, Ph.D, a licensed psychologist and professor of psychology and psychiatry at the Ohio State University. 2019 Hearing Transcript, Dkt. 189-193 ("2019 Hearing Tr.") 21:24-22:1. Tassé conducts research in the areas of intellectual disability and autism, is a member of several professional organizations, and is a co-author of recent editions of the AAIDD Terminology & Classification Manual, Twelfth Edition ("AAIDD"), which is used by professionals to establish the definition and diagnostic criteria for intellectual disability. *Id.* 23:23-26:17. Tassé presented unrebutted evidence regarding the definition and diagnosis of intellectual disability. The district court found Tassé's testimony regarding the relationship between adaptive behavior deficits and intellectual functioning deficits "persuasive." Appendix at 35 n.27.

Webster next called Dr. Daniel Reschly, Ph.D., a school psychologist and professor emeritus of Education and Psychology at Vanderbilt University, who tested and evaluated Webster for intellectual disability. 2019 Hearing Tr. 114:24-115:4. Reschly regularly trains psychologists on the diagnosis of intellectual disability; has practiced as a school psychologist; regularly speaks to students, practitioners, and the legal community regarding identification of persons with

disabilities; and serves as a consultant to various states and school districts. *Id.* 115:5-9, 117:6-122:5, 124:15-125:3. He has published more than 100 articles, and served as an expert witness in 15 state and 11 federal court proceedings. *Id.* 128:10-13, 129:14-20. The district court credited Reschly's testimony regarding both Webster's IQ and adaptive functioning. Appendix at 25-26, 30.

Finally, Dr. John Fabian testified as an expert in neuropsychology and forensic psychology. 2019 Hearing Tr. 431:17–18. Fabian has a Psy.D. in clinical psychology from the Chicago School of Professional Psychology and a juris doctorate from the Cleveland Marshall College of Law, and is the only person in the country who is board certified in forensic psychology and clinical psychology and fellowship trained in clinical neuropsychology. *Id.* 433:16–434:2, 490:4-7. Fabian has been a staff forensic psychologist at the Minnesota Security Hospital and a consultant for the Federal Bureau of Prisons conducting evaluations for competency, sanity, criminal responsibility, and mitigation or sentencing evaluations. *Id.* 435:15-22. He has worked in private practice with individuals with neurological and developmental disorders, including intellectual disability. *Id.* 435:23-436:5. Fabian currently conducts competency and sanity evaluations for the court system in Travis County, Texas. *Id.* 436:19-22. During his career, he has evaluated several inmates regarding their competency to waive appeals and be executed; in each such case, he has found the inmate competent to waive appeals and be executed. *Id.* 436:23-437:7. Fabian has been engaged in approximately 70-80 *Atkins*-related cases, and in approximately half of such cases, he determined that the individual is

20

not intellectually disabled. *Id.* 438:5-439:7. The district court found Fabian "extremely credible and persuasive" and gave "great weight" to his testimony. Appendix at 24 n.9, 25-26, 30-31, 30 n.20.

The Government's sole expert witness was Dr. Robert Denney. Denney practices clinical and forensic psychology and neuropsychology, and spent the majority of his career as a forensic psychologist and neuropsychologist for the Federal Bureau of Prisons. 2019 Hearing Tr. 501:17-21, 503:17-21. Denney has been engaged as an expert in seven capital cases involving intellectual disability, each time by the government. *Id.* 666:13-667:22. The district court gave Denney's testimony little weight, finding that "[a]s a whole, Dr. Denney focused on evidence that supported his conclusions while ignoring, disregarding, or minimizing evidence that called his conclusions into question," and that "some of Dr. Denney's testimony is demonstrably incorrect or appears to reveal biases." Appendix at 25-26 n.13.

### 2.    Criteria for the Diagnosis of Intellectual Disability

The four experts largely agreed to the diagnostic and evaluative criteria for intellectual disability. Intellectual disability is diagnosed in accordance with two texts, the AAIDD and the APA Diagnostic and Statistical Manual for Mental Disorders, Fifth Edition ("DSM-V"). 2019 Hearing Tr. 31:1-14, 143:1-7, 439:24-441:5, 521:5-16. Under both the AAIDD and DSM-V, a person is intellectually disabled if he displays significant limitations in intellectual functioning (Prong 1), significant limitations in adaptive behavior (Prong 2), with onset before the end of the developmental period (Prong 3). *Id.* 31:18–32:5, 39:15–21; 133:14-134:4, 439:24-440:16, 521:5-19.

21

**Prong 1: Significant Limitations in Intellectual Functioning**

Intellectual functioning includes "reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding." DSM-V at 37. Intellectual functioning is typically measured with individually administered, comprehensive, tests of intelligence, including the WAIS, Stanford-Binet, or Woodcock-Johnson Cognitive tests. DSM-V at 37; 2019 Hearing Tr. 50:24-51:14. Prong 1 is satisfied if a person's IQ is 75 or below. 2019 Hearing Tr. 34:3-25. "Clinical training and judgment are required to interpret test results and assess intellectual performance." DSM-V at 37. Practitioners also consider risk factors that could stunt a person's neuro-development, a person's genetic history, and behavioral impressions that could reflect deficiencies in a person's development. 2019 Hearing Tr. 49:24-50:23, 443:25-445:12.

**Prong 2: Significant Limitations in Adaptive Behavior**

Adaptive behavior is "the collection of conceptual, social, and practical skills that are learned and performed by people in their everyday lives." AAIDD-11 at 15; *see also* 2019 Hearing Tr. 31:15-24. These skills include language, academics, money management, interpersonal skills, responsibility, naïveté, and activities of daily living. 2019 Hearing Tr. 59:10-60:2. To satisfy Prong 2, a person's adaptive functioning in at least one domain (conceptual, social, or practical) must be "sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." DSM-V at 38; 2019 Hearing Tr. 61:15-19. A person need only

22

demonstrate deficits in one of these three domains to satisfy Prong 2. 2019 Hearing Tr. 35:1–4.

Practitioners measure adaptive limitations using standardized tests, including the Adaptive Behavior Assessment System ("ABAS"), Vineland Adaptive Behavior Scales ("Vineland"), and Independent Living Skills ("ILS"), which are performed on the individual and close family or friends. *Id.* 61:24-62:8. Practitioners also obtain corroborating information from other sources, including school records, SSA records, and social and family history. *Id.* 64:8-24.

Practitioners must measure typical—not maximal—behavior, focusing on what a person does, not what he can do, *id.* 33:8–10, and must focus on a person's deficits, not his strengths, which often coexist with limitations. *Id.* 35:21–37:3, 108:15–21, 203:10-21. Evidence of adaptive functioning in a restrictive setting like prison is highly suspect and should not be relied upon. *See, e.g.*, *id.* 46:9–15, 47:13–21.

Intellectually disabled people are ordinarily physically indistinguishable from adults without intellectual disability. People with intellectual disability can achieve academic skills commensurate with sixth graders, can use a computer, have musical talent, and can usually live independently with appropriate supports. *Id.* 70:23-8, 81:12–17, 82:5–8. It is a common misconception that people with ID walk oddly, look or act "retarded," use only simple words, have poor hygiene, cannot use the toilet, do not know right from wrong, cannot read or learn, and cannot drive. *See* Ex. 40 at 57-58; 2019 Hearing Tr. 69: 23-71:8. In one study of young adults with mild

intellectual disability, 39% percent of the individuals surveyed had a driver's license or learner's permit; 35–40% had a high school diploma; 76% had a job; and roughly eight years after graduating from high school, about 25% had a child. 2019 Hearing Tr. 75:12–16, 79:6–80:2, 81:19–24. Even experienced clinicians cannot tell if someone has mild intellectual disability simply by looking at him or talking to him; diagnosing intellectual disability requires clinical judgment. *Id. 28*:13–23; Tr. 35:24–25, 42:19-3, 83:15–20.

The diagnostic criteria require that "the deficits in adaptive functioning must be directly related to the intellectual impairments described in [the first prong]," DSM-5 at 38, but do not require proof of causation; such proof would be clinically impossible. *See id*. 47:22-48:16, 110:15-111:9, 112:8-17; Appendix at 35 n.27. The criteria are not intended to require causality between Prong 1 and Prong 2. 2019 Hearing Tr. 111:19-112:17.

### Prong 3: Onset Before Age 18

Under Prong 3, the deficits in intellectual functioning and adaptive behavior must manifest prior to age 18; intellectual disability need not be diagnosed by 18.[7]

---

[7] The Government does not dispute that, if Prongs 1 and 2 are satisfied, Prong 3 is also met. Nevertheless, Fabian testified that Webster meets prong 3, based on Webster's failing first grade and his placement in special education, indicating Webster suffered from intellectual and adaptive deficits at a young age. 2019 Hearing Tr. 289:22-290:8, 459:11–13.

### C.    Reschly and Fabian Conclude that Webster is Intellectually Disabled

Reschly, Fabian, and Denney evaluated Webster for intellectual disability for the 2019 Hearing. Reschly and Fabian conducted extensive testing and review, and each determined Webster has intellectual disability.

### 1.    Intelligence Testing

As set forth below, Webster has been given nine IQ tests in the last 27 years, by seven professionals, and each fell within the range of intellectual disability (a score of under 75). 2019 Hearing Tr. 172:21–22, 182:2–183:11, 447:12-448:17.

| Webster's IQ Scores[8] | | | |
|---|---|---|---|
| 1992 | Dr. Patrick Caffey<br>Southeast Arkansas Medical Center | WAIS-R | 48 |
| 1995 | Dr. Raymond Keyes<br>Trial expert (Webster) | Stanford-Binet | 51 |
| 2019 | Dr. Daniel Reschly<br>§2241 expert (Webster) | WJ-IV<br>(Cognitive GIA) | 53 |
| 1996 | Dr. Raymond Keyes<br>Trial expert (Webster) | KAIT | 55 |
| 1993 | Dr. Edward Hackett<br>SSA doctor | WAIS-R | 59 |
| 1995 | Dr. Dennis Finn<br>Trial expert (Webster) | WAIS-R | 59 |
| 2018 | Dr. Robert Denney<br>§2241 expert (Government) | WAIS-R | 61 |
| 1996 | Dr. Dennis Finn<br>Trial expert (Webster) | WAIS-R | 65 |
| 1996 | Dr. George Parker<br>Trial expert (Government) | Partial WAIS-R | 72 (67?)[9] |

Considering all available testing, both Fabian and Reschly opined that

Webster's scores were consistent and reflected "mild" intellectual disability. 2019

Hearing Tr. 447:14–24, Tr. 811:1–8, 812:3–4, 837:18–21. The Government does not

challenge the validity of these scores on appeal.

---

[8] *See* Ex. 2 at 2-3 (Caffey); 2019 Hearing Tr. 170:5-13 (Reschly); *id.* 164:7-16 (Hackett); *id.* 169:18-21 (Denney); Ex. 32 at 25-26, 34-35 (Keyes); Ex. 33 at 17, 22 (Finn). Further, Finn stated that Webster's intelligence is in the lowest 0.3 percentile, and Keyes putt Webster's IQ in the lowest 0.2-0.3 percent of the population. Ex. 32 at 19-20, 34-35; Ex. 33 at 17.

[9] Parker administered a partial WAIS-R and arrived at a score of 72; had Parker not omitted select subtests the score would have been 67. 2019 Hearing Tr. 167:8–168:25.

### 2.　　Observations of Adaptive Deficits by Testifying Experts

Reschly and Fabian testified that Webster demonstrated significant adaptive deficits in all three domains—conceptual, social, and practical. Reschly stated that "has many deficits in social, conceptual, and practical competencies," and Fabian agreed. 2019 Hearing Tr. 289:16-21, 451:23-455:24. In making this assessment, Reschly and Fabian considered Webster's standardized behavioral testing, their clinical impressions, records, and observations from Webster's family and friends. They also considered evidence of Webster's functioning in prison, as well as his participation in the crime, but gave it little weight.

### (a)　　Standardized Testing

Drs. Keyes, Fulbright, Reschly, Fabian, and Denney performed standardized adaptive behavior assessments on Webster. These tests reflect the following:

| Standardized Behavioral Assessments[10] | | |
|---|---|---|
| **Doctor** | **Test** | **Findings** |
| Keyes | Vineland | - Scored well below average<br>- Results consistent with intellectually disability<br>- Not able to live on his own and function in the real world; not able to communicate regarding abstract thoughts<br>- Functions at 7-year old level |
| Fulbright | Neuro-test Battery | - Significant impairments in intellectual capacity and reasoning abilities<br>- Limited language and memory capabilities |
| Reschly | ILS | - Scored extremely low<br>- Results consistent with intellectual disability<br>- Unable to find a number in a phone book, balance a checking account, make change, or pay electric bill |
| Fabian | Neuro-test Battery | - Tested general reasoning, auditory comprehension, and vocabulary<br>- Results consistent with results of IQ tests and indicate intellectual disability.<br>- Significant impairments on bill payment tests<br>- Mild impairments on visual spatial map reading task<br>- Severely impaired on tasks measuring social impairment and judgment, and verbal abstract reading skills. |
| Denney | Self-assessment ABAS | - Scored 72<br>- According to Fabian, consistent with intellectual disability |

Denney also administered the ABAS to two of Webster's former teachers, Linda Monk and Patricia Drewett, and one ex-girlfriend, Sylvia Clark, based on their pre-crime recollections of Webster. 2019 Hearing Tr. 605:18-25. Denney disregarded the results of his own tests of Monk and Drewett. *Id.* 607:6-21, 609:22-

---

[10] 2019 Hearing Tr. 205:24–207:5 (Keyes); Exhibit 41 at 13 (Fulbright); Tr. 213:16-214:22 (Reschly); 449:2-452:20 (Fabian); 619:5-9 (Denney).

610:24, 613:16-615:6. The ABAS administered to Clark[11] yielded a score of 80, which falls in the 9th percentile – 91% of the general population would obtain a higher score. *Id.* 356:25-357:10, 617:3-17. Fabian concluded that the assessments administered by Denney were consistent with significant limitations in adaptive functioning. *Id.* 453:4–454:2.

### (b)    Clinical Impressions

The experts agree that clinical assessment is important to identifying intellectual disability. Fabian testified that his clinical impression of Webster is consistent with intellectual disability——that Webster is a concrete thinker; and that although he was quite verbal, his speech lacks depth and substance. 2019 Hearing Tr. 804:16–21. This is consistent with Webster's responses on the SSA records, *id.* 815:23–25, and with Moore's observations that Webster was talkative, but that he communicated on a superficial level, talking mostly about girls and cartoons. Deposition of Larry Moore ("Moore Dep.), Dkt. 164, at 14:14-20.

Reschly made similar observations, noting that overall, Webster was verbose, repetitive and rambling, and that much of his conversation was focused on bragging. 2019 Hearing Tr. 256:5-9. Reschly explained that this bragging behavior is consistent with how individuals with intellectual disability hide limitations. *Id.* 266:11-18.

---

[11] Clark's reports were suspect because her feelings toward Webster were not neutral: She claimed that Webster was violent towards her.  2019 Hearing Tr. 265:25-266:10.

Denney claimed that he based his assessment of Webster on his impression of Webster during his prison clinical interview, during which, Denney claimed, Webster presented "normally" with good attention and concentration, speed of mental processing, and ability to carry on a conversation. *Id.* 549:1-14.[12]

Finn testified at trial that Webster is better at speaking than understanding, and that concepts have to be simplified in order for Webster to understand them. Ex. 33 at 24. Finn also noted that Webster's speech patterns, "marginal" school achievement, "marginal" employment history, and his inability to live on his own, supported the diagnosis of intellectual disability. *Id.* at 23.

### 3.    Evidence of Intellectual Disability in the SSA Records

Reschly, Fabian and Denney also reviewed the records produced by the SSA in 2009. Besides the IQ test results, the SSA records contain evidence of adaptive behavior, clinical impressions, school records, and diagnoses of intellectual disability. In the end, all three SSA doctors who examined Webster diagnosed him as intellectually disabled. After examining Webster, Hackett concluded that Webster was "mildly retarded." Ex. 21 at 22.[13] Spellman also diagnosed Webster with mental retardation, noting that "[i]deation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness." Ex. 21

---

[12] Denney also claimed that Webster "failed" a test that he claimed could detect persons who fake IQ tests. Although there was extensive testimony on this subject at trial rebutting Denney's claim, the evidence is not reviewed here because the Government has abandoned and waived any argument relating to Webster's IQ tests, which all present within the range of intellectual disability.

[13] Exhibit 21 constitutes the SSA Records received by Dorsey.

30

at 25-27. And, providing his diagnoses of Webster, Dr. Rittlemeyer wrote "mental retardation." Ex. 21 at 46.

### (a)    SSA Doctors' Observations of Webster's Functioning

The SSA doctors noted examples of Webster's adaptive behavior deficits in their reports. Spellman wrote that, in adaptive testing, Webster "was not able to register three objects…. He was not able to do simple calculations. He did not know what the sayings meant." Ex. 21 at 26. Spellman also noted that Webster "lives with his mother. He watches television, listens to the radio and goes walking…. He does no chores around the house. Mostly he seems to be idle around the house and on the streets." *Id.* at 27. Hackett wrote that Webster "was viewed as a somewhat mild[ly] retarded con man, but very street wise…. [H]e could not be functional in a community setting…. He also could not function well in the work place." Ex. 21 at 22. Hackett "did not feel that [Webster] could manage his own benefits." *Id.*

Hackett and Spellman also noted their clinical impressions of Webster. Hackett thought Webster's behavior was "somewhat bazaar [sic]," and believed that some "organic function may be involved" in Webster's intellectual disability. Ex. 22 at 22. Likewise, Spellman noted that Webster's "[i]deation was sparse," which "appeared to be more of a function of his lower cognitive ability than of any mental illness. He came across as a slow fellow who did not know much and did not know how to communicate well." Ex. 21 at 26. Spellman also stated there was "no evidence of exaggeration or malingering" and that "[Webster] will not get any better." *Id.* at 27.

**(b)    SSA Benefits Application**

Webster's benefits application provides clear examples of his adaptive deficits in reading, writing, comprehension, and language skills. The application form is riddled with errors in spelling, punctuation, grammar, and demonstrates Webster's inability to answer a question or write a sentence, his poor penmanship, and examples of concrete thinking. For example, in response to the prompt "Describe what you do on an average day. Tell what you usually do in the mornings, what takes most of your time during the day, etc.," Webster wrote "I sleeps look at cartoon."

> 1.A.  Describe what you do on an average day. Tell what you usually do in the mornings, what takes most of your time during the day, etc..
>
> I sleeps look at cartoon

Ex. 21 at 16. Similarly, in response to the question "How many hours do you usually sleep each night," Webster wrote "don't sleep to good at night wakes up sneesing, couhing."

> 2.A.  How many hours do you usually sleep each night?
>
> don't sleep to good at night wakes up sneesing, couhing.

*Id.* Webster answered the prompt "Describe any changes in social activities since your condition began," with "I don't social much."

> D.  Describe any changes in social activities since your condition began:
>
> I don't social mush
>
> -5-

32

*Id.* at 20. In response to questions regarding what household maintenance tasks Webster engaged in, Webster wrote "make my room;" in response to the follow up question regarding whether he needs help, Webster wrote "Nope I just make my room;" and, apparently growing frustrated with the question "Describe any changes in household maintenance since your condition began," Webster states, "I told you I make my room".

> Do you clean your house, launder clothes, or do any other work around the house?
> [✓] Yes  [_] No
>
> If yes, describe which of these things you do: _makE my rooM_
>
> Do you need help doing these things? Explain: _NopE I Just makE my room_
>
> How much time do you spend to do these? _I doi't know_
>
> If no, describe why not: _I doi't know_
>
> Describe any changes in household maintenance since your condition began: _I told you I makE my room_

*Id.* at 18. Finally, in response to the inquiry "Do you do any shopping," Webster checked "Yes," and wrote that he shops for "potato ships, pops, kookies;" when asked how often he shops, he responded "Not much"; when asked how long it takes, he responded "hours"; and when asked whether he needs help shopping, Webster responded "every once a while it taks hours".

33

*Id.* These excerpts offer just a few examples of the deficiencies in handwriting, comprehension, and language skills clear from Webster's application.

### (c)    Evidence that Webster was Enrolled in Special Education Classes

The records also include a letter from Watson Chapel Schools indicating that Webster was in special education in elementary school. It states that Webster's "Special Education records were destroyed in 1988. A letter was mailed to his parents at the last known address, telling them they could have the records if they wanted them. There was no response to the letter." Ex. 21 at 28. Reschly explained that it would not be typical for a student not in special education to have special education records, 2019 Hearing Tr. 221:18-20, and that special education "cannot be delivered to students unless they meet the criteria for a disability." *Id.* 160:13–17. Reschly testified that this letter indicates that Webster was in special education classes. *Id.* 259:12-260:7.

34

### 4.     School Records

The experts also considered information from school records that had not been destroyed. Webster's grade reports showed he failed, and had to repeat, first grade. Ex. 4 at 1. Reschly testified this is a critical indicator of slow development in Webster's early years. 2019 Hearing Tr. 221:25–222:11. Fabian also considered Webster failing first grade to be critical evidence of intellectual disability. *Id.* 455:3–8. Denney testified that Monk told him Webster was reading at a third to fifth grade level. *Id.* 735:16-736:11.

Records also included test results from a Metropolitan Achievement Test ("MAT-6") administered in seventh grade and an Adult Basic Learning Exam ("ABLE") administered while Webster was imprisoned. Reschly and Fabian testified that these group tests are less instructive than the IQ and standardized behavioral tests administered individually to Webster; and, with respect to the ABLE, that test is out-of-print and has been criticized for poor normative standards and inaccurate grade equivalent scores. 2019 Hearing Tr. 223:13-227:14. Fabian and Reschly testified that while Webster's scores on these exams, standing alone, were not consistent with a finding of intellectual disability, these results did not preclude a finding of intellectual disability, considering the whole body of evidence. *Id.* 227:15-228:20, 484:13-17, 490:14-16. Fabian explained that there are strengths and weaknesses in every case, but one must "look at the case in its totality and come up with your clinical judgment and overall opinion…." *Id.* 814:2-6.

35

### 5. Observations of People Who Knew Webster at a Young Age

All three experts considered observations of people who knew Webster during the developmental period. Webster's close family and friends, including his sister, two sisters-in-law, his niece, an ex-girlfriend, and his brothers, testified or informed Reschly during interviews that Webster was "slow," and "immature for his age," and could not do a variety of everyday tasks, including that he had trouble following the plot of television programs; had difficulty playing card games because he could not distinguish between clubs and spades; could not understand the jokes teenagers told each other or follow normal peer conversations; could not tie his shoes at eight years old; could not tell time at 13 years old; could not handle a construction job, could not manage his own money, and never lived alone. 2019 Hearing Tr. 196:25–198:2, 394:20–395:6; Ex. 26 at 27.

Similarly, Moore testified he did not believe Webster understood what the trial meant, or what the result would be. Webster did not express interest in the case, and was "just kind of there." Moore Dep. at 9:21–11:20. The trial "was something that was happening to Bruce, not something that he was involved in." *Id.* at 12:13–15.

Webster's friends and family testified that classmates helped Webster with his homework and on exams; Webster was never able to live away from his mother's home, and only received income from welfare, food stamps, family members, and girlfriends; and that Webster may have been able to write letters, but his

36

handwriting was illegible. *See, e.g.*, Ex. 29 at 75:18-76:4; Ex. 30 at 102:20-25, Ex. 31 at 145:13-24.

### 6.      Observations of Prison Staff

Denney relied heavily on information from prison staff about Webster's adaptive functioning in prison. *See, e.g.*, 2019 Hearing Tr. 585:14–25, 587:3–588:3.

Tassé, Reschly, and Fabian testified, however, that behavioral evidence from prison should be given little weight in determining intellectual disability. Tassé testified that both the DSM-5 and AAIDD caution against using information from a restrictive setting like prison, because behavior in that context does not indicate behavior in an everyday community setting, and the constraints placed on individuals in such situations may alter their behavior. *Id.* 45:23-47:3. Reschly testified that persons with mild intellectual disability function best in highly structured environments such as prison, and that environment's restrictive nature—in which inmates make few decisions and have few responsibilities that someone living outside of prison would have—must be taken into account when assessing adaptive behavior. *Id.* 271:24-273:4. Fabian expressed similar concerns about relying on prison behavior. *Id.* 458:5-17.

The Government offered two psychologists as fact witnesses to testify to Webster's functioning in prison. Dr. Blessinger, a former prison psychologist, acknowledged that she spent less than an hour with Webster, total. Blessinger Dep. at 92:4-93:7. Dr. Conner, also a prison psychologist, did not know the diagnostic criteria for intellectual disability prior to looking it up to prepare for her testimony, and could not identify the three domains of adaptive functioning, despite looking it

37

up before testifying. 2019 Hearing Tr. 892:1-893:20. Conner testified that most of her interactions with Webster took place during the monthly "SCU review," during which Conner would speak with all 58 inmates of the SCU in an approximately 2-hour period. *Id.* 858:3-11, 899:3-21. Conner acknowledged that she had few specific memories of her interactions with Webster, that she did not know how long many of the interactions lasted, and that many of the interactions may have been approximately 30 seconds in length. *Id.* 901:4-910:8, 918:15-919:14. The district court concluded that "[n]either the quantity nor depth of their interactions with Webster would lead the Court to find their testimony more persuasive than that of Drs. Fabian and Reschly." Appendix at 34.

### 7.    Crime Facts

Denney also relied upon the facts from the crime as evidence that Webster is not intellectually disabled. Fabian testified that crime facts are not used to diagnose intellectual disability. 2019 Hearing Tr. 457:9-25. Furthermore, Reschly testified that the facts here actually indicated adaptive deficits. *See, e.g.*, *id.* at 374:14-376:3.

### 8.    Risk Factors that Could Increase the Likelihood of Developing Intellectual Disability

Tassé, Fabian and Reschly testified that factors such as childhood abuse/trauma and genetics are risk factors that increased the likelihood Webster would develop intellectual disability. *See* 2019 Hearing Tr. 49:24-50:18; 147:24-148:14; 443:25-445:12.

There is substantial evidence of abuse Webster suffered as a child, delivered in a noncontingent (that is, unrelated to his behavior) fashion. He and his siblings

38

were beaten with hoses, extension cords, and boards; were forced to lick a cat's anus and to drink urine or eat feces from a slop bucket; saw their father severely beating and holding a gun to their mother's head; and were subjected to sexual abuse. 2019 Hearing Tr. 148:12–151:16. Fabian testified this abuse constitutes a complex, developmental trauma that essentially acted as a virus in Webster's brain, compromising his emotional processing and executive functioning capabilities at a young age, and putting him at heightened risk of developing intellectual disability. 2019 Hearing Tr. 444:4-446:12.

Fabian also testified there is a genetic component to low intelligence. 2019 Hearing Tr. 446:13–20. Many of Webster's immediate relatives were likely intellectually disabled, including his mother and brothers Mark and Tony. 2018 Hearing Tr. 37:2-7. Tony Webster testified at trial that he received social security benefits for "slowness in school," and that he was in resource classes in school. Ex. 27 at 35:20-36:11. Mark Webster testified that "all the boys" in the family were in special education, and that he understood that he had been diagnosed with intellectual disability. Ex. 26 at 19:12-20:6. This family history may also have left Webster more vulnerable to developing intellectual disability.

Considering the evidence of the two prongs in turn, the district court found that Webster had demonstrated deficits in intellectual functioning and adaptive behaviors, crediting the testimony of Webster's experts and largely discounting the testimony of the Government's, deeming the Government's expert testimony "not credible," "demonstrably incorrect," and "biase[d]." Appendix at 25-26 n.13.

## SUMMARY OF THE ARGUMENT

The Government challenges, as clearly erroneous, the district court's findings (1) that Moore was duly diligent in seeking the SSA records, and (2) that Webster is intellectually disabled. Both arguments are meritless.

First, with no witnesses or evidence to rely upon, the Government attempts to undermine Moore's account of his dealings with the SSA by attacking his credibility—manufacturing supposed "inconsistencies" in his statements that are, actually, entirely consistent; and characterizing his statements that he refreshed his recollection as "implausible," when, in fact, there is nothing remotely implausible given Moore's ability to review his file for the first time in two decades prior to the 2018 Hearing. Second, while the Government does not contest the validity of the multiple IQ scores administered over 27 years clearly reflecting Webster's intellectual disability, the Government emphasizes a handful of adaptive "strengths"—ignoring both the diagnostic criteria (which analyzes deficits, not strengths) and the undisputed testimony by Webster's experts that these alleged "strengths" are not inconsistent with a diagnosis of intellectual disability.

These arguments fail. In both instances, the court's findings were based on its determination of witness credibility and the weight of the evidence, decisions virtually unassailable on appeal. No clear error exists.

In the end, the Government baldly asserts that "[i]t is simply nonsensical for Webster's case . . . to end this way." Gov't. Br. 52. But the Government's contention that "stability, reliability, and predictability" in criminal jurisprudence should trump a defendant's constitutional due process rights, or the Supreme Court's

mandate that an intellectually disabled person is categorically barred from execution, is not before this Court. *See id.* That issue was already litigated, the Government lost before this Court *en banc*, and here, the district court did precisely what this Court, in its *en banc* opinion, ordered. Critically, on the sole issues actually before this Court on appeal—the district court's findings at the hearings ordered by this Court—the Government has made no arguments that undermine, under the clearly erroneous standard that the Government concedes applies, the district court's credibility determinations or findings. Affirmance is compelled.

## ARGUMENT

### I.    Standard of Review

This Court will not reverse a district court's findings based on factual determinations unless those determinations were clearly erroneous, as the Government concedes. *United States v. Ritsema*, 31 F.3d 559, 564 (7th Cir. 1994) (citing *United States v. Gio*, 7 F.3d 1279, 1289 (7th Cir. 1993)); Gov't Br. 25. "Clear error" exists only when, upon a review of the entire record, there is "a definite and firm conviction" that a mistake has been made. *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) (citations and quotation omitted). This is a demanding standard: A factual determination will not be reversed for clear error unless it "strike[s] us as wrong with the force of a 5-week-old, unrefrigerated dead fish." *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988).

Where, as here, credibility determinations are essential to the Court's factual findings, those findings are virtually unassailable. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). "A district court's determination of witness

41

credibility is entitled to great deference and can virtually never be clear error." *United States v. Clark*, 538 F.3d 803, 813 (7th Cir. 2008) (citations and quotation omitted). "Credibility findings are 'binding on appeal unless the district judge has chosen to credit *exceedingly* improbable testimony.'" *United Sates v. Warner*, 498 F.3d 666, 678 (7th Cir. 2007) (emphasis in original) (citations and quotation omitted). "The district judge, after all, listened to the testimony directly and observed the demeanor of the witnesses." *United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019) (citing *United States v. Garrett*, 757 F.3d 560, 568 (7th Cir. 2014)). "The district judge is in a much better position to evaluate credibility than we are. His credibility determinations are entitled to special deference." *Id.*

## II.    The District Court's Finding that Trial Counsel Was Reasonably Diligent and that the SSA Records Were Not Available to Him Was Not Clearly Erroneous

The district court's first task was to determine whether the SSA records were unavailable to Webster at the time of trial. Both parties agree that the SSA records existed at the time of trial and were not produced, even though they were requested by Moore. The question, therefore, facing the district court was whether Moore, as lead trial lawyer, was duly diligent in his attempts to obtain the records. The district court found, by a preponderance of the evidence,[14] that he was.

---

[14] The Government agreed on the record that the appropriate evidentiary standard is preponderance of the evidence. Appendix at 14 n.6; 2018 Hearing Tr. 4:19-22. Any contrary argument raised now by the Government for the first time is waived. In any event, the district court noted that, while the parties agreed on the preponderance of evidence standard, Webster also satisfied a "clear and convincing" evidentiary standard. Appendix at 14 n.6.

### A.     The District Court Did Not Clearly Err in Crediting Moore's Testimony that He Vigorously Sought the SSA Records

The district court found that Moore's explanation of his exhaustive attempts to obtain Webster's records from the SSA was credible. Appendix at 12. The district court carefully considered "whether Moore was duly diligent when, after Moore's investigator reported that the SSA had told him that no records existed and Moore himself was told by someone from the SSA that no records existed, Moore relied on those representations and did not take further action." *Id.* at 12.

As the district court noted, Moore was not required to exercise "'the maximum feasible diligence' but only 'due, or reasonable diligence.'" *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004) (quoting *Wims v. United States*, 225 F.3d 186, 190 n.4 (2d Cir. 2000)). And "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Moore satisfied this standard. An experienced and well-known death penalty lawyer, Moore zealously pursued the intellectual disability defense: he consulted with at least ten experts; gathered every document he could find that may bear on Webster's intellectual functioning; and talked to every person he could find who knew Webster when he was young. 2018 Hearing Tr. 25:20-28:12; 30:8-19. When he learned of the possible existence of SSA records that may relate to a key issue in the case, he immediately directed his paralegal to contact the SSA, obtained a special release, followed the agency's instructions for making the record request, and

43

instructed his investigator to pick them up. *Id.* 37:8-16; 59:10–15. When the SSA told Moore's investigator, a former FBI agent, who visited the SSA office in person, that no records existed, Moore did not take "no" for an answer. He took time out of *voir dire* to call the SSA himself and ask for records. Having been told a second time that no records existed, Moore reasonably turned his attention to the trial. *Id.* 58:17-61:10, 63:24-64:7, 86:6-20, 115:18-116:10.

The district court held that "[g]iven this response from the SSA, Moore's failure to take further action was reasonable." Appendix at 13. The Government agrees that it was "understandable," under these circumstances, that Moore would end his search for the SSA records having been told none existed. Gov't Br. at 38. "Moore made diligent efforts to obtain any evidence based on the information he had been provided at the time. Accordingly, the SSA records were unavailable for trial, and Webster has satisfied the savings clause and may proceed to his section 2241 petition." Appendix at 13.

Thus, the district court observed Moore as a witness, considered the Government's arguments, expressly ruled that Moore was credible, and accepted his testimony as truth. This finding is entitled to special deference and cannot be overturned. *See Clark*, 538 F.3d at 813.

## B. The Government's Arguments are Meritless and Fail Under the Deferential Clear Error Standard

Without any evidence to contradict Moore's account of his extensive efforts to obtain the records, the Government proffers the outlandish and unfounded theory that Moore, a Texas prosecutor who has actively sought the death penalty for

44

multiple defendants over his 41-year career, was lying at the 2018 Hearing. The Government presented no evidence whatsoever to support this theory, presenting instead failed arguments that (1) it is implausible that Moore's memory has firmed over time, even as Moore has reflected on the case and reviewed his file, Gov't Br. 27, (2) if Dorsey could obtain the records, Moore could have, too, *id.* at 34, and (3) Moore's file does not contain notes of the SSA's response to his request, *id.* at 31.

### 1.    Moore's Testimony Is Consistent

The Government argues that Moore's credibility is undermined because his testimony in his 2009 Declaration, 2018 Declaration, and at the hearing is somehow inconsistent. Gov't Br. 27-31. The district court expressly considered and rejected this argument, finding Moore's explanation credible.

Moore executed the 2009 Declaration shortly after the SSA records were discovered. In that Declaration, Moore stated that his office contacted the Pine Bluff SSA office and requested copies of all records relating to Webster, and "arranged for our defense investigator to retrieve any records" during his trip to Pine Bluff in March 1996. Resp't Ex. 3, ¶4. Moore declared he believed in good faith that he was told by the SSA that no records existed, but did not "currently have any direct recollection of the [SSA's] response." *Id.* He expressly qualified that statement, though, recognizing that his file may shed additional light. He stated, "I have not had access to my case file," and "I have been unable to review any notes which I may have made, or which may have been provided to me by our investigator" regarding the SSA request. *Id.* Moore further testified that this declaration was based on his memory at the time he executed it. 2018 Hearing Tr. 105:11–106:6.

On April 23, 2018, shortly before the 2018 Hearing, Moore executed the 2018 Declaration. Resp't Ex. 4. Moore explained he was able to provide additional information regarding his collection efforts because he had "spent hours reviewing relevant portions of [his] trial file and the trial transcript," which "helped [his] recollection about what was done and what [he] was told at the time." Resp. Ex. 4, ¶34. He testified that following Whitehead's request, he "personally followed-up with the SSA Pine Bluff Office" and "was ultimately informed…that there were no records in existence regarding Mr. Webster's application for benefits." *Id.* ¶31. He said: "In 2009, I believed that I had been told no documents existed. Today, after reviewing my file and considering this matter in depth, I am certain that I was personally told that such records did not exist, although I cannot actually recall whether this was via phone or in person." *Id.* ¶34.

Finally, at the 2018 Hearing, Moore testified that between April 23, 2018, when he executed the 2018 Declaration, and the 2018 Hearing, he reviewed additional documents from the trial file, which refreshed his memory further. 2018 Hearing Tr. 109:23–112:15. He stated that while he did not previously recall whether his conversation with the SSA happened in person or over the phone, he could now state with certainty, based on that subsequent file review, the SSA told his investigator in person that the records did not exist, and the SSA repeated that message to Moore over the phone. *Id.* 60:3-25; 79:2-81:14.

In weighing Moore's account of these events, the district court stated:

> The Government argues that the Court should find Moore's hearing testimony was not credible because it was far more

46

specific and detailed than a declaration he made in 2009. However, the Court credits Moore's explanation that reviewing his trial file, portions of the transcript of Webster's trial, and some of the trial exhibits—which he had not done before making the 2009 declaration— refreshed his recollection about the attempts to obtain any records pertaining to Webster that were in the possession of the SSA. Moore's additional review of the file, which he did after making the 2018 declaration and before the hearing, further helped Moore recall the events, as he remembered that his direct contact with the SSA took place during voir dire.

Appendix at 11 n.2. The court concluded: "Having observed the demeanor of Moore during the hearing, the Court finds his testimony to be credible." *Id.* at 12.

The Government's claim that Moore's testimony is inherently unreliable because it is based on refreshed memories is not supported by fact or law. *See* Gov't Br. at 26. The law has long recognized that witnesses may review documents, even during trial (*see* Fed.R.Evid. 612) to jog their memories—and that the factfinder may decide whether the witness "was fabricating or whether he was testifying with recollection refreshed." *See Maus United States v. Reicin*, 497 F.2d 563, 570-71 (7th Cir. 1974). While the Government may consider it "improbable" or "implausible" that Moore refreshed his recollection of these events, the district court did not, and that credibility determination is unassailable.[15]

Likewise, Moore's testimony at the 2018 Hearing should not be discounted simply because it was "more specific" than his written testimony. Gov't Br. 23-24.

---

[15] The Government's alternative reading of the facts, taken from the *dissenting* opinion of this Court's *en banc* decision, ignores, among other things, that the district court's decision was based on live testimony and documentary evidence not presented on the *en banc* appeal.

47

The Government does not cite a single case holding that a witness is somehow required to include all salient facts in a declaration, such that he would be precluded from testifying in court to additional, consistent facts that supplement—not contradict—the sworn statement.

Moore's testimony was credible, reasonable, and persuasive, not "*exceedingly improbable,*" *Warner*, 498 F.3d at 678 (emphasis added), and the district's court's decision to credit it cannot be overturned.

### 2. Dorsey's Efforts Are Irrelevant to the Determination of Trial Counsel's Diligence and, in Any Event, Demonstrate the Difficulty of Obtaining Webster's SSA Records

The Government argues that Dorsey's ability to obtain the records from the SSA with "ease" proves that they were available to Moore. Gov't Br. at 34-37. The district court found that what SSA administrators told Dorsey, or how they acted, in 2009 is irrelevant to what the administrators told Moore in 1996. Appendix at 12 n.5. And the record shows that, in any event, the SSA obstructed and delayed producing records to Dorsey and destroyed records even after the SSA had been informed that they were sought for a death penalty case. LeRoux described her attempts to obtain any records from the SSA as "the most difficult records collection I've done in my career." 2018 Hearing Tr. 175:18-22. Where trial counsel had two attorneys, one full-time paralegal, and a private investigator trying to collect records, during *voir dire* in a federal capital case, Dorsey's team of ten spent more than a year trying to get records from the SSA. 2018 Hearing Tr. 190:3-7; Pet'r Exs. 3-8. Over the course of 13 months, four different Dorsey representatives made four written requests for Webster's records to two separate offices, with three separate

release forms, and spoke to SSA representatives at least four times. Petr's Exs. 3-5, 7; 2018 Hearing Tr. 152:9-25; 155:3-14; 166:1-11, 173:1-13. But after Dorsey was told that the SSA had no remaining files for Webster, Dorsey stopped its search, just as Moore did in 1996, because there was no reason to continue. 2018 Hearing Tr. 175:4-17.

Finally, the Government cites no law or standard of practice which would require Moore to get a subpoena for records he had no good faith basis to believe even existed.

The district court correctly found that Moore was justified in terminating his collection efforts when his team was told, both in-person and over the phone, that no records existed, and that Dorsey's success after extraordinary efforts in obtaining some of the SSA records in 2009 is not relevant to whether Moore exercised diligence in 1996. Appendix at 12 n.5, 13.

### 3. The District Court Did Not Clearly Err in Crediting Moore's Testimony Regarding the Existence of Documents in the Trial File

Finally, the Government argues that Moore's testimony is unreliable because the existing trial file does not contain notes documenting the results of his discussions with the SSA, which, the Government claims, is "powerful circumstantial evidence proving that no follow-up was done and no response received." Gov't Br. at 32. But the district court expressly considered the Government's argument, and rejected it. There was no dispute that Moore turned over his files to 2255 counsel after the direct appeal, and had no control over the file

49

since that time.[16] Further, the court credited Moore's testimony that "he did not

recall whether he had, in fact, [made any documentation] regarding what he had

learned from the SSA," Appendix at 11 n.3, and still found Moore "duly diligent."

The Government cites no case construing "reasonable diligence" to impose such a

stringent duty-to-document.

In sum, the district court's decision is supported by ample evidence provided

by experienced legal professionals, who testified honestly and credibly about their

dealings with the SSA, without a shred of contradictory evidence from the

Government. The district court, which was in the best position to observe Moore and

evaluate the credibility of his hearing testimony, carefully considered—and

rejected—the Government's arguments. The ruling cannot be overturned here, and

this Court should affirm the district court's decision finding the SSA records were

unavailable for trial.

### III.    The District Court's Determination that Webster is Constitutionally Ineligible for the Death Penalty Was Not Clearly Erroneous

The district court determined Webster "has satisfied his burden of proving

his intellectual disability by a preponderance of the evidence and is thus ineligible

for the death penalty." Appendix at 15. It did not clearly err in rendering this

decision. The district court applied the standard agreed-to by the parties

(preponderance of the evidence) and the intellectual disability definition adopted by

---

[16] The trial file was in the possession of Webster's first post-conviction counsel from 1998 until 2008, when it was transferred to Dorsey and catalogued. That ten-year period would have provided ample opportunity for the "many notes from the investigation and trial [that Moore noted] were no longer in the file" to be lost. *See* Appendix at 11 n.3. 2018 Hearing Tr. 75:7–19; 90:8–20; 142:9–21.

the medical community and the courts. *Id.* at 18-22. The district court credited the testimony of Reschly and Fabian that Webster is intellectually disabled, and discredited the testimony of Denney that he is not. *Id.* at 24-26. It highlighted the vivid picture of Webster's functioning as a young man reflected in the SSA records as particularly persuasive, *id.* at 30-32, and appropriately gave little weight to the evidence of Webster's functioning in prison and the facts of Webster's participation in the crime, neither of which is considered acceptable proof of adaptive deficits under the law, *id.* at 33-34. And the district court appropriately considered Webster's deficits, rather than his strengths in evaluating his adaptive behaviors, *id.* at 19, and accepted his IQ as well within the range of intellectual disability—a finding that the Government does not now challenge, *id.* at 22. The court's opinion comports in every way with the facts and law and must be affirmed

### A.    It is Unconstitutional to Execute an Intellectually Disabled Person

The Supreme Court first held it unconstitutional to execute intellectually disabled persons in *Atkins v. Virginia*, 536 U.S. 304 (2002), and has reaffirmed that decision multiple times. *See Hall v. Florida,* 572 U.S. 701 (2014), *Moore v. Texas*, 137 S. Ct. 1039 (2017) (*Moore I*), *Moore v. Texas*, 139 S. Ct. 666 (Feb. 19, 2019) (*Moore II*). The Government does not contest the clinical definition applied by the district court which, consistent with the Supreme Court and the expert testimony at the 2019 Hearing, requires a showing of deficits in intellectual functioning, deficits in adaptive behavior, with the onset before age 18. Appendix at 18; *see Moore II*, 139 S. Ct. at 668 (quoting DSM-5 at 37; citing DSM-5 at 37–38); *Moore I,* 137 S. Ct. at

1045, 1048 (the standards are "the most recent (and still current) versions of the leading diagnostic manuals—the DSM-5 and AAIDD-11"); *see* § II(B)(1), *supra*.

### B.      Webster is Intellectually Disabled

The district court found Webster demonstrated significant deficits in intellectual functioning (Prong 1) and adaptive behavior (Prong 2), which onset before age 18 (Prong 3). That finding was firmly supported by the evidence, as explained below. The Government's arguments alleging clear error fail.

### 1.      Webster Has Demonstrated Significant Deficits in Intellectual Functioning

As the Government recognizes, "intellectual functioning is typically measured with intelligence quotient (IQ) tests." Gov't Br. 40. "Consistent scores across multiple tests over multiple years ruled out malingering" and present an accurate picture of an individual's intellectual functioning. *Brumfield v. Cain*, 808 F.3d 1041, 1060 (5th Cir. 2015).

The district court did not clearly err in finding Webster met the standard for Prong 1. The district court made a factual finding, based on the evidence as a whole, that the scores on all valid IQ tests taken by Webster, over the course of 27 years, fall within the range of mild intellectual disability. Appendix at 24. According to the district court, Webster demonstrated these IQ scores were valid, and "Webster has shown by a preponderance of the evidence that he has deficits in intellectual functioning." *Id.* at 26.

Indeed, the Government does not argue the district court erred in finding that Webster demonstrated significant deficits in intellectual functioning. *See* Gov't

Br. Argument, Section II (focusing solely on adaptive behavior deficits). Any challenge to the district court's finding as to intellectual functioning is waived. *See* Fed. R. App. P. 28(a)(8)(A); *United States v. Feinberg*, 89 F.3d 333, 340 (7th Cir. 1996). Accordingly, this Court must affirm the district court's ruling Webster has met Prong 1.

### 2. The District Court Did Not Clearly Err in Finding Webster Demonstrated Adaptive Deficits

Adaptive behavior is "the collection of conceptual, social, and practical skills that are learned and performed by people in their everyday lives." AAIDD at 43. To meet the diagnostic criteria, an individual must show deficits (as opposed to disproving strengths) in one of these three domains. 2019 Hearing Tr. 276:12-14; *see also* DSM-5 at 38. Practitioners must assess an individual's typical behavior, rather than maximal behavior. The question is not whether a person *can* do something, but what they typically *do*. 2019 Hearing Tr. 33:4-17.

Considering all the evidence, the district court found that "Webster proved by a preponderance of the evidence that he has significant limitations in adaptive functioning and satisfies the second prong of the intellectual disability definition." Appendix at 29-30.

### (a) Webster's Deficits in Conceptual, Practical, and Social Domains

Webster demonstrated deficits in all three domains. For the conceptual domain, Webster presented, and the district court credited, evidence of deficiencies in language, functional academics, self-direction, money management, and time concepts. For example, Webster failed first grade, and was in special education

classes; had severe limitations in reading, writing, and comprehension; and performed within the range of intellectual disability on standardized behavioral skill tests. *Supra* § II(C). Webster's friends and family confirmed these deficits: he could not tell time, hold a job, or manage money; he could not follow the plot of television programs, and had difficulty playing cards because he could not distinguish between clubs and spades; and he did not comprehend the consequences of his capital trial. *Id.*

Webster also presented ample evidence of significant deficits in the practical domain—daily living, occupational skills, safety, health care, and travel. Webster never lived alone, never had his own bank account, got money from his mother, could not hold a job, and, at eight-years old, he could not tie his shoes. *Id.* He also scored within the range of intellectual disability on the Vineland and ILS tests. *Supra* § II(C)(2). Furthermore, Webster demonstrated deficits in the social domain, which considers interpersonal skills, responsibility, self-esteem, wariness and naiveté, the ability to follow rules, etiquette, and social problem solving. Reschly testified that Webster lacks interpersonal skills, including failing to understand how his bragging and exaggerated claims come across to others, was a follower who was easily influenced, failed to follow rules and laws, and lacked social problem solving skills, including knowledge of how to behave properly during a funeral. 2019 Hearing Tr. 265:18-24, 268:14-274:12.

In finding this evidence satisfied Prong 2, the court credited the testimony of Webster's experts that he had significant deficits in all three domains, and largely rejected the Government's evidence. Appendix at 34-35.

Fabian, who found that Webster showed significant and severe impairments on tests measuring social impairment and judgment, and verbal abstract reasoning skills, and considered assessments of other psychologists, spent "a great deal of time interviewing Webster," and reviewed numerous records, ultimately testified that Webster demonstrated significant deficits and meets Prong 2. 2019 Hearing Tr. 451:23-455:24. The court gave "great weight" to Fabian's testimony, which it found to be "extremely credible and persuasive." Appendix at 24 n.9. "Dr. Fabian's explanation of why he gave weight to some evidence while giving little weight to other evidence was especially persuasive. In particular, the Court found Dr. Fabian's explanation of why he gave little weight to Webster's adaptive functioning in prison to be very convincing." *Id.* at 15-16.

The court similarly credited Reschly's testimony "that Webster has deficits in the conceptual, social, and practical domains." Appendix at 30. Reschly testified that, after reviewing a wide array of information, "Webster has many adaptive deficits in social, conceptual, and practical competencies. He could not live independently, and he was not socially responsible. I believe the evidence is convincing that he had significant deficits in adaptive behavior, thus, meeting the second prong of the intellectual disability diagnosis." 2019 Hearing Tr. 289:16-20. In

55

making its ruling, the district court also noted the strength of the SSA records, which show that Webster is "barely literate." Appendix at 30-32.

Meanwhile, the district court rejected Denney's testimony that Webster did not suffer deficits in *any* domain as not credible. "[T]he Court gives little weight to the testimony of Denney that Webster does not have significant deficits in the conceptual domain, social domain, and practical domain. The Court has looked at the evidence pointed to by Denney in support of his conclusion and does not find Dr. Denney's explanation as to the conclusions that he has drawn to be persuasive." *Id.* at 19 n.21. This is consistent with the district court's general opinion on Denney's testimony. It stated: "The Court finds the testimony of Dr. Denney…overall to be not credible and thus gives it little or no weight. As a whole, Dr. Denney focused on evidence that supported his conclusions while ignoring, disregarding, or minimizing evidence that called his conclusions into question."[17] *Id.* at 11 n.13.  The district court likewise found—based on both Reschly's and Fabian's testimony—that evidence of an individual's functioning in prison is not a reliable measure of adaptive behavior. Appendix at 29-30, 32-33.

> **(b)     Webster's "Strengths" Are Not Inconsistent with Intellectual Disability**

The Government relies on a few supposed "strengths" that, it claims, outweigh these weaknesses. Gov't Br. § II. However, the district court did not

---

[17] The district court gave specific examples of Denney's "troubling" testimony, including that Denney mischaracterized the findings of an important study; criticized Reschly for not being licensed in Indiana, when Denney himself was not licensed; gave testimony that was demonstrably incorrect or reveals biases; and refused to acknowledge a weakness in his opinion, even when confronted with evidence that contradicted it. Appendix at 25-26 n.13.

clearly err in its treatment of Webster's abilities, because the assessment of adaptive behavior "focuses on weaknesses, rather than strengths, and isolated achievements cannot 'trump' broad deficits." *United States v. Davis*, 611 F. Supp. 2d 472, 500 (D. Md. 2009). "[T]he medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Moore I*, 137 S. Ct. at 1050. Because the diagnosis requires impairment in only one of three adaptive functioning domains, "persons with [ID] can have the capacity to manage a number of areas of their lives." *Davis*, 611 F. Supp. 2d at 501. "[I]ntellectually disabled persons may have strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation." *Moore I*, 137 S. Ct. at 1050 (alteration in original) (internal quotation marks omitted).

The Government's reliance on two test results (the MAT and ABLE), Gov't Br. 42-44, is misplaced since, in addition to the fact that no one testified to the circumstances or appropriateness of the administration of those tests, both Reschly and Fabian explained such tests are entitled to little or no weight in the overall diagnosis of intellectual disability, and are not reflective of the totality of the evidence pointing to intellectual disability. Supra § II(C)(4).

Further, regarding the Government's arguments about certain of Webster's alleged practical and social domain "strengths," Govt' Br. 44-50, the district court credited Tassé's testimony that the Government's antiquated stereotypes—that people with intellectual disability are "gullible victims" who cannot communicate,

play music, have relationships, or take pride in themselves—are misconceptions that have no basis in science. *See* 2019 Hearing Tr. 69:23-84:5. As Tassé explained without contradiction, intellectually disabled people can reach the academic skill level of sixth graders, can use a computer, drive, graduate high school, have musical talent, and can usually live independently with appropriate supports (*e.g.*, the structured prison environment). Supra § II(B). Even experienced clinicians cannot tell if someone has mild intellectual disability simply by looking at him or talking to him; diagnosing intellectual disability requires clinical judgment. *See* Tr. 28:13–23; Tr. 35:24–25, 83:15–20.

The district court considered all the Government's "strengths," weighed those strengths against the substantial evidence of deficits and the opinions of the experts, and credited Fabian, Reschly, and Tassé's testimony that these alleged "strengths" intellectual disability, and do not outweigh the overwhelming evidence of adaptive deficits.

### (c)    The District Court's Treatment of Evidence of Prison Conduct was Not Clear Error

The district court did not clearly err in giving "little weight" to the Government's evidence of Webster's prison conduct, including the testimony of Conner and Blessinger, who the Government did not designate or qualify to testify as experts,[18] and who, the evidence, showed, had highly limited interactions with Webster. As the district court correctly found, "[n]either the quantity nor depth of

---

[18] Conner acknowledged that she did not know how to diagnose intellectual disability. 2019 Hearing Tr. 891:19-893:20.

their interactions with Webster would lead the Court to find their testimony to be more persuasive than that of Drs. Fabian and Reschly"—who testified at length as to the reasons why the structured setting of prison conduct is given little or no weight in the diagnosis of ID by medical professionals. Appendix at 34. It also correctly noted that both *Moore I* and the AAIDD caution against relying on such evidence. The district court did not clearly err in following the guidance from two qualified and credible experts and the medical community in weighing the evidence of Webster's functioning in prison.

### (d)    The District Court Did Not Clearly Err in its Treatment of Crime Facts

At the 2019 Hearing, the Government argued that facts surrounding the crime were evidence that Webster is not intellectually disabled, 2019 Hearing Tr. 498:17–19, 499:9–13, and while the Government does not raise the issue directly for review, it does indirectly present crime facts in arguing for reversal. *See* Gov't Br. at 20. However, the district court considered the facts of the crime and concluded that those facts did not undermine a diagnosis of intellectual disability. The court explained, "Over Webster's objection, the Court has considered evidence about the facts of the crime and has viewed those facts in the light that most favorably supports the Government's argument." Appendix at 33 n.22; *see also id.* at 15 n.19. "Weighing the evidence as a whole, the Court finds that Webster does have deficits in his adaptive functioning." *Id.* at 20.[19]

---

[19] Many of the crime facts actually demonstrate Webster's adaptive deficits. For instance, when Webster was preparing to travel to Dallas, a co-defendant had to walk Webster into

Besides crediting Fabian's testimony that he rarely considers crime facts when assessing someone for intellectual disability, *see* 2019 Hearing Tr. 455:25-456:3, 457:9-25, over that of Denney, the district court cited the Supreme Court's *Moore* decision cautioning against using crime facts to disprove intellectual disability. *See Moore*, 137 S. Ct. at 1047, 1050. The district court's determination about the weight of the crime facts is supported by ample evidence from credible experts and well-established Supreme Court precedent. *See also Webster*, 784 F.3d at 1143–44. Appendix at 34.

The district court did not clearly err in relying upon exhaustive testimony from medical professionals the court found to be credible. There is no dispute now that Webster suffers significant deficits in intellectual functioning, and the few so-called adaptive "strengths," cherry-picked by an expert the court strongly disbelieved, do not undermine the overwhelming evidence of deficits in each adaptive behavior domain. The Court should affirm the district court's well-reasoned opinion, based on thorough factual findings based on the weight of the evidence and express determinations of witness credibility, that Webster is intellectually disabled and ineligible for the death penalty.

---

the airport and purchase his ticket for him. *See* Ex. 116 at 141:4-18. When Webster was provided an 8-page typed version of his police statement to review, it took Webster 30-40 minutes to read the statement, and he did not identify 38 spelling errors in the statement—including his own middle name, which is misspelled twice. Ex. 110 at 71:4-72:18, 73:6-15, 75:17-25

## CONCLUSION

For the reasons stated above and upon the evidence presented at the 2018 and 2019 Hearings, Webster respectfully requests that the district court's judgment be affirmed.

DATED:  January 15, 2020

DORSEY & WHITNEY LLP

By: /s/ Steven J. Wells
    Steven J. Wells
    wells.steve@dorsey.com

    Kirsten E. Schubert
    schubert.kirsten@dorsey.com

    Kathryn A. Johnson
    johnson.kate@dorsey.com

Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Monica Foster (No. 8368-49)
F. Italia Patti (No. 34725-02)
INDIANA FEDERAL COMMUNITY
DEFENDERS, INC.
111 Monument Circle, Suite 2150
Indianapolis, IN 46204
Telephone: (317) 383-3520
Facsimile: (317) 383-3535

*Attorneys for Petitioner Bruce Carneil Webster*

61

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and (a)(6), as modified by Cir. R. 32(b), because I have prepared this brief in proportionally spaced typeface using Microsoft Word 2016 in 12-point (body) and 11-point (footnotes) Century Schoolbook font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by Cir. R. 32(c), in that it contains 13,956 words.

/s/ Steven J. Wells
Steven J. Wells
*Attorney for Appellee Bruce Carneil Webster*

**CERTIFICATE OF SERVICE**

I certify that on January 15, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Steven J. Wells
Steven J. Wells
*Attorney for Appellee Bruce Carneil Webster*