No. 19-2683

IN THE

# United States Court of Appeals

FOR THE SEVENTH CIRCUIT

BRUCE CARNEIL WEBSTER,

*Petitioner-Appellee,*

v.

T.J. WATSON, WARDEN

*Respondent-Appellant.*

On Appeal from the United States District Court
for the Southern District of Indiana, No. 2:12-CV-086-JPH-MJD
Hon. William T. Lawrence, District Judge

**REPLY BRIEF FOR THE RESPONDENT WARDEN**

ERIN NEALY COX
  *United States Attorney*
  *Northern District of Texas*

JOSH J. MINKLER
  *United States Attorney*
  *Southern District of Indiana*

JAY WEIMER
  *Assistant U.S. Attorney*
  *Northern District of Texas*

  *Special Assistant U.S. Attorney*
  *Southern District of Indiana*
  *10 West Market St., Ste. 2100*
  *Indianapolis, Indiana 46204*
  *(817) 252-5273*

# TABLE OF CONTENTS

Page

TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES..............................iii

ARGUMENT AND AUTHORITIES IN REPLY..........................................................1

I. Larry Moore's testimony about his efforts to locate Social Security records—inconsistent with his previous statements and unsupported by any physical evidence—was "exceedingly improbable," and the district court clearly erred in finding that the records were unavailable. ....................................................................................................3

    a. Moore's testimony contradicted his previous sworn declarations. ..................................................................................3

    b. The Dorsey Firm's experience with the SSA shows that Moore's testimony was incredible .................................................................7

    c. Moore's actions show that he did not consider the SSA records important and decided not to pursue them...................................11

    d. Even if Moore's testimony were credited, his actions did not amount to due diligence ................................................................13

II. The district court clearly erred in finding that Webster was intellectually disabled. ...................................................................................14

    a. Webster lacks significant deficits in any of the three adaptive behavior domains. ..........................................................................14

        i. Conceptual Domain ......................................................................14

        ii. Social Domain ..............................................................................16

        iii. Practical Domain ..........................................................................17

    b. Webster's strengths show an absence of significant deficits........19

c.  The shortcomings that Webster identifies are not related to any deficit in intellectual functioning ......................................................... 20

CONCLUSION ................................................................................................... 22

CERTIFICATE OF COMPLIANCE ................................................................... 23

CERTIFICATE OF SERVICE ............................................................................ 23

## TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES

Page(s)

**Cases**

*In re Webster*, 605 F.3d 256 (5th Cir. 2010)............................................................*passim*

*United States v. Smith*, 576 F.3d 681 (7th Cir. 2009)......................................................12

*United States v. Warner*, 498 F.3d 666 (7th Cir. 2007)..................................................12

*Webster v. Lockett*, No. 2:12-CV-86, 2013 WL 6007593 (N.D. Ind. Nov. 13, 2013).....1

**ARGUMENT AND AUTHORITIES IN REPLY**

In its simplest form, Webster's responsive brief argues that the clear-error standard of review requires this Court to affirm the Indiana district court's rulings—rulings that upended a death sentence imposed by a Fort Worth federal district court almost 25 years ago in a heinous case involving Webster's kidnapping, gang-rape, torture, and murder of a 16-year-old girl, and that was upheld repeatedly by the Fifth Circuit Court of Appeals. But this Court cannot divorce the Indiana district court's rulings from the long history of this case, from the repeated decisions by the Fort Worth district court and Fifth Circuit upholding the sentence, and from indications by the Indiana district court— before it heard any evidence—that it disagreed with the prior rulings.[1] When this Court, en banc, authorized the Indiana district court to take up the claim's merits,

---

[1] For example, in its 2013 opinion finding that Section 2241 did not allow it to consider the merits of Webster's claim, the court twice emphasized that such an outcome was "unfortunate." *See Webster v. Lockett*, No. 2:12-CV-86, 2013 WL 6007593, at *8 (N.D. Ind. Nov. 13, 2013) ("Accordingly, and unfortunately, the Court is unable to consider the merits of Webster's petition."); *id*. at *6 n.10 ("Unfortunately, it is now too late to present this evidence."). The district court, in the same opinion, also highlighted a single-judge concurrence from a prior Fifth Circuit opinion denying Webster's successive Section 2255 motion that had expressed sympathy for Webster: "[O]ne concurring judge wrote that the [Fifth Circuit]'s holding, although legally correct, was absurd and 'Kafkaesque.' He believed that if Webster were allowed to present the newly discovered evidence 'to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded,' and thus, ineligible for the death penalty.'" *Id*. at *4 n.9 (quoting *In re Webster*, 605 F.3d 256, 259 (5th Cir. 2010) (Wiener, J., concurring)).

1

the district court decided—after a single witness, Larry Moore, testified—that Moore had exercised due diligence but the SSA records were nevertheless unavailable. It did so despite the fact that Moore's testimony contradicted his prior sworn statements and was unsupported by any documents or corroborating testimony. The district court then went on to find, based on selective reliance on certain evidence, that Webster was intellectually disabled and thus ineligible for the death penalty.

Viewing the Indiana district court's rulings through the lens of this history leads to only one conclusion: the district court clearly erred in its determinations that (a) Moore exercised due diligence, (b) the SSA records were unavailable, and (c) Webster is intellectually disabled. If this Court finds clear error with regard to *any one* of these, it is bound to reverse the Indiana district court's determination and reinstate the sentence carefully and thoughtfully imposed by the Fort Worth district court so long ago. As explained in this Reply, it should, in fact, find clear error with regard to *all* of these points.

I.    Larry Moore's testimony about his efforts to locate Social Security records—inconsistent with his previous statements and unsupported by any physical evidence—was "exceedingly improbable," and the district court clearly erred in finding that the records were unavailable.

a.   Moore's testimony contradicted his previous sworn declarations.

Moore's testimony at the June hearing was remarkable for Moore's ability to recall specific details of events that occurred almost 25 years earlier. It was all the more remarkable for the fact that Moore had been unable to recall these events at all when making earlier sworn declarations in support of Webster's post-conviction litigation. And Moore's explanation for his sudden ability to remember distant events—that he carefully reviewed his notes—only adds to the mystery, as Moore's notes contain no mention whatsoever of the SSA's alleged response that he testified about. Moore's testimony is not only "exceedingly improbable," it is wholly implausible.

Over the years, Moore has provided several sworn statements in support of Webster's post-conviction litigation. To say that Moore's account of his efforts to locate the SSA records evolved over time would be generous. In each iteration, Moore's recollection becomes clearer despite being more distant in time from the events in question. And each version of Moore's story, unsurprisingly, becomes more favorable to Webster.

3

In September of 2000, Moore prepared an affidavit about his representation of Webster. June Hr. Gov. Ex. 5; Jun Hr. Tr. at 89. In it, Moore declared that he recognized early on that Webster might be mentally retarded and hired Annette Lammoreaux, "an experienced mitigation specialist," to assist in the investigation. June Hr. Gov. Ex. 5 at 1. Moore explained that he was dissatisfied with Lammoreaux's work and was forced instead to rely on "'fact' investigators (who were not skilled in mitigation investigation) to attempt to locate and interview witnesses we thought we might need as punishment witnesses." *Id*. Moore went on to explain that despite his concerns about his investigative team's abilities, he was confident in the strength of his case because "we were able to put on extensive testimony from defense experts, who testified that in their opinion, Mr. Webster was mentally retarded." *Id*. at 2. Moore was so confident in his expert testimony that he was "surprised" when the court found that Webster was not mentally retarded. *Id*. Critically, in his entire 2000 affidavit, Moore made no mention whatsoever of any effort to locate SSA records. *Id*. at 1-2.

In 2009, Moore drafted a declaration at the request of the Dorsey Firm. June Hr. Gov. Ex. 3. In it, Moore wrote for the first time that he "arranged for our defense investigator to retrieve any records which the Social Security Administration might locate during a trip to Pine Bluff, Arkansas, during March of 1996." *Id*. at ¶ 4. But Moore explained that he did not "have any direct recollection of the

response which we received." *Id.* Lacking any recollection, he speculated that "we must have been told that no records regarding Mr. Webster existed, otherwise we would have continued to pursue them by every means available to us." *Id.*

Nine years later, Moore drafted another declaration in preparation for the June hearing in this matter. June Hr. Gov. Ex. 4. Despite the passage of time, Moore's memory was apparently sharper. Moore suddenly recalled that he "personally followed-up with the SSA Pine Bluff Office" about his request for records and "was ultimately informed by the Pine Bluff Office . . . that there were no records in existence regarding Mr. Webster's application for benefits." *Id.* at ¶ 31. Moore claimed that he refreshed his recollection with case notes, but his notes do not contain any mention of these events. June Hr. Tr. at 93-94. Interestingly, Moore was still, at the time he authored this declaration, uncertain about how he came to learn that the SSA had destroyed Webster's records. He wrote that "I am certain that I was told by the SSA that they had no such records regarding Mr. Webster; nevertheless, I am uncertain whether I was told this in person at the Pine Bluff Office, or over the telephone." June Hr. Gov. Ex. 3 at ¶ 35.

During his testimony at the June 2018 hearing, Moore miraculously recalled not only that he had communicated with the SSA by telephone, but also that he spoke to a specific individual whose name he was able to remember, some 25 years after the conversation took place. June Hr. Tr. at 60:3-6. He also recalled that before he

personally telephoned the SSA, his private investigator informed Moore that he had also been told by the SSA that Webster's records had been destroyed. *Id.* at 59:10-17. *Id.* And again, Moore provided this new, enhanced testimony despite the fact that his case notes contain no mention whatsoever of these events. *Id.* at 93-94.

The following table demonstrates the evolution of Moore's statements:

| Issue | 2000 Affidavit | 2009 Declaration | April 2018 Affidavit | June 2018 Testimony |
|---|---|---|---|---|
| *Did Moore exercise due diligence in seeking to obtain the SSA records?* | **No mention of any effort** to obtain the records, and was generally critical of his investigators' efforts. | Said "we" contacted the SSA Pine Bluff office to request the records and arranged for his investigator to obtain the records but **did not "have any direct recollection of the response which we received"** from SSA regarding the records. ¶ 4. | Said that, after his paralegal initially contacted the SSA and sent documents to Hal West at that office, Moore followed up with the office and "**was ultimately informed . . . that there were no records in existence**" but could not "recall whether this was via phone or in person." ¶¶ 31, 34. He did **not provide a name** for the person to whom he spoke. | Said under oath for the first time that, **when investigator Strickland went to pick up the records at the SSA office, he was told there were no such records**. Tr. at 59, 108-09, 127-30. Also said for the first time that **Moore telephoned the SSA the first week in March 1996 and spoke to Hal West**, who told him that Webster's records had been destroyed. Tr. at 60-61, 98, 110-15. |

| Issue | 2000 Affidavit | 2009 Declaration | April 2018 Affidavit | June 2018 Testimony |
|---|---|---|---|---|
| *Did Moore consider the SSA records important at the time of Webster's trial?* | **No mention of importance of SSA records.** Said he put on "extensive testimony" about Webster's mental condition and expressed confidence that the court would find Webster to be intellectually disabled based on that testimony. | Said the records "**could have been important** during the trial." ¶ 5. | Said the records were "**essential** to our defense." ¶ 32. | Said he "thought the [SSA] records were **critical**." Tr. at 59:4. |

As this table demonstrates, Moore's testimony is both inconsistent and implausible. These inconsistencies, coupled with the total lack of any supporting evidence in Webster's trial file related to Moore's supposed responses from the SSA about the records, confirms that the district court should have disregarded Moore's testimony.

> b. The Dorsey Firm's experience with the SSA shows that Moore's testimony was incredible.

The relative ease with which the Dorsey Firm obtained Webster's SSA records undermines Moore's claim that he made a diligent attempt to procure the records in 1996. In his Response Brief, Webster attempts to characterize Dorsey's procurement of the records as the product of Herculean efforts by an army of

attorneys and staff that a mere criminal defense lawyer could never be expected to duplicate. Response at 42. But Webster's recitation of Dorsey's efforts obscures the sequence of events.

Dorsey paralegal Kristen LeRoux sent a letter to the SSA office in Pine Bluff, Arkansas, requesting Webster's records on October 27, 2008. On December 4, 2008, one of her colleagues followed up with a phone call to the SSA and learned that Dorsey needed to submit a specific form in order to obtain the records. June Hr. Tr. at 186; Resp't's Ex. 1 at 2. On December 15, 2008, Dorsey submitted the required form and, less than two months later, received SSA records for Webster. June Hr. Tr. at 186. LeRoux and Dorsey continued to communicate with the SSA after receiving Webster's records in an effort to obtain additional documents. *Id.* at 186-87. But it took only one letter, one phone call, and the submission of a request form to obtain the records that are the subject of this litigation. *Id.* at 186. Accordingly, more than 25 years after the records were created, Dorsey obtained the documents with only three communications with the SSA. Moore, operating just two years after the records were created, would have gotten the records had he diligently pursued them.

Moreover, Webster neglects to mention that even when Dorsey was unsuccessful in its efforts to obtain additional SSA records, the SSA provided written responses to the requests. For instance, when LeRoux made a phone call

8

to the Pine Bluff SSA in October 2009, she was told that she should direct her requests to the Indiana office, where Webster was then living. Resp't's Ex. 2 at 2-3; June Hr. Tr. at 186. But even though the phone call was directed to the wrong office, on October 22, 2009, the SSA sent a letter to Dorsey documenting the telephone conversation and explaining the proper procedures for making the request. *Id*. The following month, Dorsey sent a letter to the Terre Haute SSA Office asking for additional records. Resp't's Ex. 2 at 3-4; June Hr. Tr. at 186-87. LeRoux then called the Terre Haute SSA Office on December 4, 2009, and was told that the requested records had been destroyed and that SSA had already mailed a letter to Dorsey documenting the destruction of the records. *Id*. On December 7, 2009, Dorsey received the letter from SSA. Resp't's Ex. 2 at 5; June Hr. Tr. at 186-87.

Dorsey had communications with SSA on three occasions: (1) when it requested and obtained records from the Pine Bluff office; (2) eight months later when it requested additional records from the Pine Bluff office and was told to direct its request to the Terre Haute office; and (3) when it made its request to the Terre Haute office and was informed that the records it sought had been destroyed. In each case, Dorsey received written documentation from the SSA confirming its request and the SSA's response. June Hr. Gov. Ex. 2 at 5; June Hr. Tr. at 186-87. In contrast, although Moore testified that he recalled requesting a written response from the SSA, he could not produce any such document. June Hr. Tr. at 116. In

9

fact, despite taking copious notes about his other efforts to defend Webster, Moore did not record even a single mention of his purported call to SSA in his file. *Id*. at 85-86, 116.

Webster's responsive brief illustrates this glaring absence quite well: It includes photos and excerpts of several documents cataloguing Moore's SSA records request but includes no photos of any note, letter, fax, or anything else suggesting that Moore or someone else on his team ever received a response—because *no such evidence exists*. Response at 12-17. The fact that Moore's file (and Webster's brief) contains all of these items but no proof of any response to Moore's request leads only to one conclusion: there was no response. *Cf. Webster*, 784 F.3d at 1151 (en banc) (Easterbrook, J., dissenting) (reasoning that the "sensible inference" is that Moore or his investigator "simply did not follow through" on obtaining the records).

Moore's only explanation for the absence of notes or records documenting his call to the SSA is that they must have been removed from his files. June Hr. Tr. at 87-88, 93-94. But neither Moore nor anyone else with access to the file ever claimed that anything was missing prior to Moore's testimony in the June hearing. And LeRoux testified that Dorsey went to great lengths to preserve Moore's case file, implementing strict procedures to ensure that no documents were lost or separated from the file. *Id*. at 143-48. Moore's claim that notes and records were

missing from his file—specifically and exclusively those notes and records that would corroborate the story that he told for the first time at the June hearing—is ludicrous on its face. The only reasonable conclusion is that such evidence does not exist because the events Moore described did not happen. Moore never called the SSA to request the records and was never told the records were destroyed.

      c.  Moore's actions show that he did not consider the SSA records important and decided not to pursue them.

The lack of notes in Moore's file and absence of a written response from the SSA lead inexorably to the conclusion that Moore's testimony about calling the SSA was false. His behavior at Webster's trial shows that he concluded that the SSA records were unimportant in light of his other evidence and decided not to pursue them.

Moore testified that he believed he had "compiled an overwhelming amount of evidence to support a finding of mental retardation." June Hr. Tr. at 118. It makes sense, then, that Moore put little effort into pursuing Webster's SSA records as additional potential evidence. And his behavior at trial further illustrates that he regarded the SSA records as insignificant. If Moore had, in fact, been told by the SSA that important records had been destroyed, he certainly would have sought to put that evidence before the jury. Moore could have called Webster's family to testify that the SSA had evaluated Webster. He did not do so. Moore

11

could have filed a spoliation motion asking that the jury be permitted to draw negative inferences due to the SSA's destruction of the records. He did not do so. Instead, Moore, believing that he had "compiled an overwhelming amount of evidence" to prove that Webster was intellectually disabled, ignored the SSA evaluation entirely. *Id.* Moore's decision not to procure the SSA records was a strategic one made with confidence that his other evidence of intellectual disability would carry the day. And his strategic decision also explains why there are no notes in his file regarding communications from the SSA about the destruction of records, nor any correspondence from the SSA about requests for those records. Moore never had the communications with the SSA that he testified about because he decided that the records would be at best superfluous and were not worth pursuing.

Taken together, these facts demonstrate that the district court clearly erred in crediting Moore's testimony. Although a district court's credibility decisions are given great deference, this Court will reverse if the district court "has chosen to credit exceedingly improbable testimony." *United States v. Warner*, 498 F.3d 666, 678 (7th Cir. 2007). Moore's testimony is "implausible on its face" and "internally inconsistent." *United States v. Smith*, 576 F.3d 681, 687 (7th Cir. 2009). It was, therefore, "exceedingly improbable," and the district court erred in relying on it. *Id.*

12

d.  Even if Moore's testimony were credited, his actions did not amount to due diligence.

Webster characterizes Moore's efforts to obtain his SSA records as "exhaustive." Response at 43. Moore's efforts were anything but exhaustive. Even according to his testimony, Moore abandoned his efforts to obtain Webster's SSA records after a single phone call in which he was told that the records had been destroyed. June Hr. Tr. at 120. By his own account, he made no further effort to obtain the records, despite testifying that he was surprised to hear that Webster's "relatively recent" records had been destroyed. *Id.* at 36-38, 119-20. Moore made no effort to research the SSA's document-retention policies, nor did he ask any other member of his defense team to do so. *Id.* at 119-21. Moore did not attempt to contact the Office of General Counsel at SSA or speak to anyone else at SSA to confirm that the documents had been destroyed or ask whether copies of the records might be retained outside Pine Bluff. *Id.* at 118-20. And Moore did not seek a subpoena or ask the court to get involved in the procurement of records. *Id.* at 120-21. Nor did he request a spoliation instruction or otherwise attempt to put evidence of the SSA testing before the jury.

Moore himself admitted that if he had done further research on the SSA's document-retention policies, he might have decided to seek a court order. But instead, he opted not to conduct this basic research and made no attempt to put

13

the SSA evidence before the jury in any form. *Id*. Instead, by his own account, after a single phone call, Moore gave up on obtaining Webster's records. Even if Moore's account of his efforts were true, it does not describe an exercise of due diligence. The district court erred in crediting Moore, and it also erred in finding that Moore exercised due diligence in attempting to obtain Webster's SSA records.

II.   The district court clearly erred in finding that Webster was intellectually disabled.

   a. Webster lacks significant deficits in any of the three adaptive behavior domains.

      i. Conceptual Domain

Webster has no significant deficits in the conceptual domain. This fact is demonstrated most clearly by his test results on standardized academic tests such at the MAT6 and ABLE. And while Webster claims in his response that Drs. Reschly and Fabian "explained [that] such tests are entitled to little or no weight in the overall diagnosis of intellectual disability," that is a mischaracterization of their testimony. Response at 57. Dr. Reschly testified at the hearing that if Webster's "scores [on the ABLE test] are accurate, [those scores] would not be consistent overall with a diagnosis of intellectual disability." Apr. Hr. Tr. at 227:17-19. And Dr. Fabian agreed that Webster's scores on the MAT 6 and ABLE tests were "inconsistent with a finding of [intellectual disability]." *Id*. at 484:18-20. Thus,

14

both experts agreed that the scores Webster produced would not be possible from someone with intellectual disability.

Webster's experts discounted Webster's scores only on the assumption that he cheated on the tests. *Id.* at 224:17-225:5. Webster, however, produced no evidence whatsoever that he cheated on either test. Nor did he offer any theory for why he would have wanted to cheat on academic tests that had no practical consequences for him. And the government offered evidence from witnesses that protocols were in place that would have made it extremely difficult for Webster to cheat on the tests. *See* Apr. Hr. Ex. 138 at 1146-50 (trial testimony explaining that teachers monitored test-takers during the MAT 6); *id.* at 1150 (trial testimony explaining that the chances that Webster would have been able to cheat on the MAT 6 are "very, very slim"); Apr. Hr. Tr. at 975:24-976:5 (testimony from FCC Terre Haute supervisor of education Phillip Woolston that ABLE test-takers are given different versions of the test so they cannot copy off one another); Apr. Hr. Tr. at 979:18-24 (testimony from Phillip Woolston that the ABLE test is supervised by prison staff).

Accordingly, there is no evidence that Webster cheated, and ample evidence that he could not have done so. The district court, then, should have treated his standardized test scores as legitimate and credited the testimony that those scores were inconsistent with intellectual disability.

15

ii.  Social Domain

Webster did not lack social skills. Although he has been in prison since he was 21 and spent a significant amount of time in prison prior to his arrest for raping and murdering Lisa Rene, Webster managed to have long-term romantic relationships with three different women. Apr. Hr. Ex. 121 at 807-08, 845-46; Ex. 130 at 1013-16; Apr. Hr. Tr. at 367:17-368:1. Webster had children with two of them and was able to convince one to continue dating him even after he was arrested for Lisa Rene's murder. *Id*. Indeed, despite his arrest for a heinous crime, all three of his ex-girlfriends had positive things to say about Webster at his trial.

Of course, Webster has been in prison for the majority of his life. But even there, Webster has impressed the people he met as socially adept. Two prison psychologists, Dr. Erin Conner and Dr. Jacqueline Blessinger, testified that Webster was a good conversationalist, picked up on social cues, had a good sense of humor, and expressed emotion appropriately. Apr. Hr. Tr. at 860-90; Blessinger Depo. at 86-112. Both psychologists testified that they saw no signs of intellectual disability during their interactions with him. Apr. Hr. Tr. at 889:15-22; Blessinger Depo. at 124:24-125:13. The district court erroneously disregarded the testimony of these two professional psychologists, but their observations merely corroborate what was already clear: Webster has no significant deficits in the social domain.

16

### iii.   Practical Domain

Webster is particularly strong in the practical domain. Indeed, Webster's expert Dr. Reschly conceded that Webster "certainly mastered the basic fundamental daily living skills of eating, toileting, dressing, [and] things of that nature." Apr. Hr. Tr. at 279:11-13. Webster was able to drive a car. Apr. Hr. Ex. 102 at 51. And Webster was an excellent musician; as a youth, he played drums in his church choir and was later hired to play drums at gospel concerts. Apr. Hr. Ex. 101 at 7; Ex. 129 at 998. Webster even taught himself to play guitar while in prison. Blessinger Depo. at 108; Apr. Hr. Tr. at 878:4-11.

Webster is also literate. Despite his efforts to claim otherwise, the evidence is quite clear that he can read and write. For instance, John Edwards, a correctional counselor who interacted with Webster on a daily basis, testified that he saw Webster typing emails "numerous times." April Hr. Tr. at 933:15-21. Webster wrote his emails without assistance. Webster often used the computer in the prison law library to draft and read emails, and he was always by himself when he did so. *Id*. at 947:24-948:2. Edwards also testified that he had received emails from Webster and that the emails were well written, with good grammar, spelling, and punctuation. *Id*. at 935:13-21. Edwards never had any trouble understanding the content of Webster's emails. *Id*. Webster, despite his claims to the contrary, has no trouble expressing himself in writing.

17

Webster further argues that he displayed deficits in the practical domain because he "never lived alone, never had a bank account, [and] got money from his mother." Response at 54. But Webster did, in fact, live outside his parents' home with his girlfriend Gwen Alexander. Apr. Hr. Ex. 130 at 1016; Apr. Hr. Tr. at 367:17-368:1. Webster and Alexander had a child together and continued their romantic relationship even after Webster was arrested for the rape and murder of Lisa Rene. *Id.*

And while Webster may not have had his own bank account, he was able to manage money. Dr. Reschly gave Webster full credit during a test of his ability to count money. Apr. Hr. Tr. at 364:9-18. Webster's ex-girlfriend, Sylvia Henry, agreed that Webster had no problems counting his money and testified that he would sometimes help her with her bills. Apr. Hr. Ex. 121 at 819. Webster also earned his own money by playing drums at gospel concerts and by selling drugs. Apr. Hr. Ex. 101 at 7.

Webster was, therefore, quite capable of living on his own and providing for himself. And even if he did not attain the sort of full independence that one would expect of a mature adult, it was because he was imprisoned at age 21 for the rape and murder of Lisa Rene after having spent a significant portion of his earlier life in jail for other offenses. Having spent most of his life since age 15 in prison, Webster never had the chance to fully establish his own finances and live as an

18

independent adult because he was already in prison by the time most other people his age were beginning to do these things. Webster failed to demonstrate any significant impairments in the practical domain.

        b. Webster's strengths show an absence of significant deficits.

Webster contends in his response that the government's appeal "relies on a few supposed 'strengths' that, it claims, outweigh [Webster's] weaknesses." Response at 56. This mischaracterizes the government's argument. The government does not contend that strengths in one area can outweigh weaknesses in another. An individual with significant deficits in one domain of adaptive functioning cannot be denied a diagnosis of intellectual disability simply because he has strengths in another domain. But, as the government made clear in its brief, strengths in one domain *can* demonstrate the absence of significant deficits in that same domain. And these strengths are precisely what the district court ignored.

For instance, Webster displayed many strengths in the practical domain. As discussed above, he was an excellent musician, had mastered daily-living skills, and could drive a car. These strengths in the practical domain would not trump significant deficits in another domain, if Webster had any such deficits. But these strengths do prove that Webster does not have significant deficits in the practical domain of adaptive functioning. To the contrary, he performs extremely well in

that domain. And his strengths in the other two domains likewise demonstrate that he lacks significant deficits in those categories.

Accordingly, while the district court was right to ask whether Webster had significant deficits in any of the adaptive functioning domains, it was wrong to ignore evidence of his strengths because that evidence bears on whether he has such deficits. The government does not contend that some quantum of strengths in one area would trump or outweigh significant deficits in another. But the district court erroneously ignored Webster's strengths when those strengths demonstrated that he lacked significant deficits within an adaptive functioning domain.

      c.  The shortcomings that Webster identifies are not related to any deficit in intellectual functioning.

Relying largely on the testimony of his own family members, Webster claims that he has several skill deficits and shortcomings. But even if these highly biased accounts were credited, Webster fails to demonstrate that his alleged shortcomings are the product of an intellectual impairment. "[T]o meet the diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in [the intellectual functioning criterion]." DSM-5 at 38. Thus, deficits in adaptive functioning caused by something other than intellectual impairment cannot be relied upon to diagnose

intellectual disability. In Webster's case, any alleged shortcomings are the product of antisocial personality disorder, economic disadvantages, and the fact that he has spent nearly his entire adult life in prison.

For instance, Webster relies on Dr. Reschly's conclusion that he was "not socially responsible." Response at 55. But he does not even attempt to disentangle this observation from Webster's repeated diagnoses of antisocial personality disorder. *See* Apr. Hr. Ex. 101 at 48 (Dr. Denney diagnosed Webster with antisocial personality disorder); Ex. 102 at 52 (Dr. Hackett diagnosed Webster with antisocial personality disorder); April Hr. Tr. at 481:3-8 (Dr. Fabian diagnosed Webster with antisocial personality disorder). Webster must show that his deficits are the result of an intellectual impairment, not the lack of opportunity nor some other psychological condition. He failed to do so.

The district court wrongly ignored the causation requirement and selectively discounted evidence of Webster's abilities. Absent this error, it could not have concluded that Webster met his burden of establishing that he was intellectually disabled.

* * * *

In sum, the district court clearly erred in its findings—findings which had enormous repercussions as they created "a conflict among federal judges," allowing "a new district court [in] a new circuit" to sweep away Webster's original

21

sentencing proceedings. *See Webster*, 784 F.3d at 1147 (Easterbrook, J., dissenting). The jury heard a mountain of evidence and overwhelmingly found that Webster was not intellectually disabled, as did the Fort Worth district court. The Indiana district court's decision to substitute its judgment for these bodies rested on clearly erroneous factual findings, and it cannot stand.

## CONCLUSION

This Court should reverse the district court's judgment and reinstate Webster's death sentence.

Respectfully submitted,

ERIN NEALY COX
  *United States Attorney*
  *Northern District of Texas*

JOSH J. MINKLER
  *United States Attorney*
  *Southern District of Indiana*

By:  /s/ JAY WEIMER
  *Assistant U.S. Attorney*
  *Northern District of Texas*

  *Special Assistant U.S. Attorney*
  *Southern District of Indiana*
  *10 West Market St., Ste. 2100*
  *Indianapolis, Indiana 46204*
  *(817) 252-5273*

**CERTIFICATE OF COMPLIANCE**

I certify that this reply brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and (a)(6), as modified by Cir. R. 32(b), because I have prepared this brief in proportionally spaced typeface using Microsoft Word 2016 in 13-point (body) and 12-point (footnotes) Book Antiqua font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by Cir. R. 32(c), in that it contains 5,155 words.

/s/ JAY WEIMER
*Assistant U.S. Attorney*

**CERTIFICATE OF SERVICE**

I certify that on February 5, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. The United States will also mail a paper copy to Webster's counsel, Ms. Kathryn Johnson, 50 S. Sixth St., Ste. 1500, Minneapolis, MN 55402.

/s/ JAY WEIMER
*Assistant U.S. Attorney*