In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 19-2683

BRUCE CARNEIL WEBSTER,

*Petitioner-Appellee,*

*v.*

T. J. WATSON, Warden,

*Respondent-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:12-cv-86 — **William T. Lawrence**, *Judge.*

———————————

ARGUED AUGUST 5, 2020 — DECIDED SEPTEMBER 22, 2020

———————————

Before KANNE, HAMILTON, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* In 1996 the federal district court in
Fort Worth, Texas sentenced Bruce Webster to death for the
murder two years earlier of a 16-year-old girl. Ever since Web-
ster has sought relief from that sentence on the same ground
he advanced at trial—that he is intellectually disabled. His ef-
forts gained traction in 2009, when his lawyers came upon rec-
ords dating to 1994 from the Social Security Administration
showing that three different doctors found him intellectually

disabled. That development sparked a renewed effort to secure relief in this circuit because Webster is housed in the U.S. Penitentiary in Terre Haute, Indiana. In 2015, sitting *en banc*, we held that Webster was not barred by the limitations imposed on successive requests for post-conviction relief from seeking to show that he is ineligible for the death penalty based on newly discovered evidence. *Webster v. Daniels*, 784 F.3d 1123, 1139–40 (7th Cir. 2015). We remanded to allow the district court to determine whether the Social Security records constituted newly discovered evidence—a question turning on whether the records were "previously existing evidence of [Webster's] intellectual disability that counsel did not uncover despite diligent efforts." *Id.* at 1141.

Following extensive proceedings on remand, the district court found that Webster's defense counsel did not discover the Social Security records despite reasonable diligence at the time of trial. From there the district court held a five-day hearing and determined that Webster had carried his burden of showing by a preponderance of the evidence that he is intellectually disabled. Having taken our own look at the record evidence, we conclude that the district court's findings contain no clear error. We therefore affirm the decision to vacate Webster's death sentence.

## I

Not unlike many capital cases, Bruce Webster's case has traveled a long and complex path in multiple courts. Everything began with Webster's atrocious offense conduct.

### A.  The Murder of Lisa Rene

In the early 1990s Webster ran a marijuana trafficking enterprise with others in Pine Bluff, Arkansas. He and his

associates bought marijuana near Dallas, Texas and transported it back to Arkansas.

In September 1994, Webster, Orlando Hall, Demetrius Hall, and Steven Beckley traveled from Little Rock to the Dallas home of Neil Rene, a local drug dealer, seeking reprisal for a drug deal gone wrong. Neil's 16-year-old sister, Lisa Rene, was home alone at the time. When the men knocked, pretending to be FBI agents, Rene refused to open the door and instead called the police. Before the police could respond, however, Webster and Demetrius broke through the door and dragged her into a nearby car. Webster, Demetrius Hall, and Beckley then drove Rene 330 miles back to Arkansas, repeatedly raping her on the way.

Upon reaching Pine Bluff, the men rented a motel room where they tied Rene to a chair and took turns raping her several more times. Eventually they decided that Rene knew too much and needed to die. Webster and Orlando Hall then drove to a nearby park and dug a grave. In the early hours of September 26, Webster, Orlando Hall, and Beckley took Rene to the park, beat her with a shovel, stripped her naked, poured gasoline on her body, and buried her alive.

Arrests soon followed and resulted in Beckley and Demetrius Hall admitting to their roles in the murder and leading the police to Webster. In time a federal grand jury indicted Webster on six counts related to the kidnapping and murder of Lisa Rene. The government sought the death penalty.

**B.  Webster's Trial, Direct Appeal, and First Motion for Post-Conviction Relief**

Webster proceeded to a jury trial in federal court in Fort Worth, Texas in 1996. Demetrius Hall, Beckley, and others

testified against him. The jury found Webster guilty of kidnapping in which a death occurred (18 U.S.C. § 1201(a)(1)), conspiracy to commit kidnapping (18 U.S.C. § 1201(c)), and using and carrying a firearm during a crime of violence (18 U.S.C. § 924(c)).

The district court then held a sentencing hearing before the same jury. Webster's trial counsel, Larry Moore, argued that Webster was intellectually disabled—or, in the common lexicon of the time, mentally retarded—and therefore statutorily ineligible to receive a death sentence. See 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded."). Note the timing: Webster's sentencing occurred before the Supreme Court's 2002 holding in *Atkins v. Virginia* that the execution of an intellectually disabled person violates the Eighth Amendment's prohibition against cruel and unusual punishment. See 536 U.S. 304.

To show that Webster was intellectually disabled, Moore relied primarily on testimony from three experts: Dr. Raymond Finn, a clinical psychologist; Dr. Dennis Keyes, a professor of special education and a certified school psychologist; and Dr. Robert Fulbright, a clinical neuropsychologist. Each expert offered opinions based in large part on Webster's scores on several intelligence tests (often called Intelligence Quotient or I.Q. tests) used to diagnose intellectual disability. Only one test had been administered before Rene's murder in 1994, however. In 1992, following a report of domestic violence in the family home, Webster had taken a commonly used I.Q. test called the Wechsler Adult Intelligence Scale or the WAIS test. He scored a 48, well below the accepted threshold for intellectual disability. At sentencing the parties agreed

that the 1992 score may not have been accurate because, at the time of testing, evidence showed that Webster was confused, preoccupied, and poorly oriented.

Dr. Finn testified that he administered the WAIS test to Webster twice after the crime, in January 1995 and again in June 1996. Webster scored 59 and 65, indicating that he was "mildly retarded." Dr. Keyes also administered a separate behavioral test and testified that Webster's adaptive functioning was that of a six- to seven-year-old. Along similar lines, Dr. Fulbright evaluated Webster, found him unable to think abstractly or understand complex communications, and concluded that he was "mildly to moderately retarded."

The government strongly contested that Webster is intellectually disabled. First, the government emphasized Webster's intellectual and adaptive strengths by presenting evidence from lay witnesses, including police officers, school teachers, jailers, and a fellow inmate who testified, among other things, that Webster passed his driving test, was "street smart," had the capacity to quote scripture in prison, and scored in the 43rd percentile on a seventh grade national achievement test. The witnesses also denied that Webster was enrolled in special education classes in grade school. One of the government's two expert witnesses, Dr. Richard Coons, found Webster to be well-oriented to time, place, chronology of events, and people, and concluded that his adaptive functioning was inconsistent with intellectual disability.

Second, the government argued that Webster had every incentive to manipulate his intelligence test results—a concept known as malingering—to avoid the death penalty. The government's other expert, Dr. George Parker, administered a truncated WAIS test to Webster, resulting in a full-scale

score of 72. Webster argued that Dr. Parker omitted important subtests that would have lowered the final score. The bottom line for Dr. Parker, though, was that Webster did not exhibit an intellectual disability. He agreed with the government that motivation can modify test results, particularly in the "forensic" setting.

The sentencing hearing concluded with a majority of jurors finding that Webster was not intellectually disabled. Because the operative sentencing statute, 18 U.S.C. § 3596(c), does not specify whether a judge or jury should make this determination, the district court entered its own finding that Webster was not intellectually disabled and sentenced him to death. See *United States v. Webster*, 162 F.3d 308, 352 (5th Cir. 1998) (rejecting Webster's challenge to the court's separate finding because "[t]he statutory scheme simply does not answer who decides this issue"). The Fifth Circuit affirmed the sentence on direct review, and the Supreme Court denied certiorari. See *Webster v. United States*, 528 U.S. 829 (1999).

In 2000 Webster invoked 28 U.S.C. § 2255 and began his pursuit of post-conviction relief. Recognizing the potential impact of the Supreme Court's intervening decision in *Atkins*, Webster amended his petition in 2002. The district court rejected all 16 of Webster's grounds for relief, but granted a certificate of appealability on two issues—whether "the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded" and whether Webster's "alleged retardation renders him ineligible for a death sentence." *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005). The Fifth Circuit denied the § 2255 motion, reasoning that Webster's petition was "nothing more than an attempt to re-litigate the question" of his mental capacity. *Id.*

at 314. The Supreme Court again denied review. See *Webster v. United States*, 549 U.S. 828 (2006).

### C. Discovery of New Evidence

A significant development occurred in 2009 that ultimately paved the way to this appeal. One year earlier, the law firm of Dorsey & Whitney took over from Webster's original post-conviction counsel. Dorsey & Whitney soon uncovered evidence that revived Webster's efforts to vacate his death sentence: Social Security Administration records dating to 1993—before the murder of Lisa Rene—showing that three doctors had diagnosed Webster as "mentally retarded." Because these records predated the murder, Webster's new legal team saw the records as exceptionally important, as the evidence would be immune from attack on the ground that Webster manipulated the diagnosis by malingering.

The efforts Webster's attorney Larry Moore made to obtain these Social Security records before trial became a major issue in Webster's pursuit of relief from his death sentence. For now, though, what is important is understanding the information revealed in the records.

The Social Security records showed that Webster, with his mother's help, had applied for disability benefits in 1993 on the basis of headaches and sinus issues. In the course of evaluating his application, two psychologists and one physician examined Webster's intellectual capacity. The records contained these findings and opinions:

- Dr. Charles Spellmann, a clinical psychologist, found that Webster's "ideation was sparse," he could not register and repeat three objects or complete simple calculations, and he did not understand basic expressions. Dr. Spellmann observed that Webster's functioning seemed limited as he was "idle around the house and on the streets." Dr. Spellmann estimated that Webster's I.Q. was around 69 and diagnosed him with "mental retardation" and "antisocial personality by history."

- A second psychologist, Dr. Edward Hackett, administered the WAIS intelligence test to Webster and calculated a score of 59. Dr. Hackett also diagnosed Webster with "mild mental retardation" and "antisocial personality disorder."

- A general physician, Dr. C.M. Rittelmeyer, gave Webster a standard physical examination. In reporting his findings, Dr. Rittelmeyer diagnosed Webster with "mental retardation."

In the course of reviewing the Social Security records, the Dorsey & Whitney team also came upon a letter from Webster's grade school, dated November 8, 1993, referring to records regarding special education classes. The letter bore the signature of the Special Education Supervisor of Watson Chapel Schools and stated (with express reference to Webster) that "[t]he above student's Special Education records were destroyed in 1988." The letter then added that "[a] letter was mailed to parents at the last known address, telling them they could have the records if they wanted them. There was no response to the letter." Dorsey & Whitney believed that Webster's enrollment in special education classes would help establish an intellectual disability.

### D.  Webster's Renewed Efforts to Vacate His Death Sentence

Relying on the findings of intellectual disability embodied in the newly obtained Social Security records, and pointing again to the Supreme Court's decision in *Atkins*, Webster returned to federal court with renewed requests to vacate his death sentence. He first asked for permission to file a new motion for post-conviction relief under 28 U.S.C. § 2255. The Fifth Circuit denied the request, determining that Webster failed to meet the stringent limitations Congress imposed on second or successive motions for post-conviction relief. See 28 U.S.C. § 2255(h) (permitting a second or successive motion only if it relies on either (1) newly discovered evidence showing by clear and convincing evidence that no reasonable jury would have found the applicant guilty of the offense, or (2) a new rule of constitutional law previously unavailable that the Supreme Court has made retroactive to cases on collateral review). Applying § 2255(h), the Fifth Circuit reasoned that not only was *Atkins* available to Webster at the time of his first amended § 2255 motion, but, even more, the Social Security records in no way undermined the jury's finding of guilt for the kidnapping resulting in death offense for which he received a capital sentence. See *In re: Webster*, 605 F.3d 256, 258 (5th Cir. 2010).

Unable to pursue relief under § 2255, Webster turned to 28 U.S.C. § 2241, once again relied on *Atkins*, and sought anew to vacate his sentence in the Southern District of Indiana—the location of the U.S. Penitentiary in Terre Haute, where he was housed on death row. See *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) (explaining that a § 2241 petitioner "should name his

warden as respondent and file the petition in the district of confinement").

Whether Webster could pursue relief under § 2241 was itself a vigorously contested issue, one that touched off its own round of litigation that culminated in our 2015 *en banc* decision answering in the affirmative. See *Webster*, 784 F.3d at 1125. The issue turned on whether Webster's *Atkins* claim fit within the so-called savings clause of § 2255(e)—a question of substantial complexity. In the end, we held that "there is no such absolute bar to the use of the safety valve found in section 2255(e) for new evidence that would demonstrate categorical ineligibility for the death penalty [under the Eighth Amendment]." *Id.*

In resolving the legal question in Webster's favor, we remanded to allow the district court to determine whether he could meet the "new evidence" standard. We provided clear and precise direction for the remand proceedings and that instruction frames much of our review in this new appeal:

> The district court must hold a hearing for the purpose of deciding whether the Social Security records were indeed unavailable to Webster and his counsel at the time of the trial. In considering that question, the district court must also evaluate trial counsel's diligence. If the court concludes, as Webster's lawyers urge, that the records were unavailable and all due diligence was exercised, and that Webster has them now only because of a fluke, then it must turn to the merits of the petition: is Webster so intellectually disabled that he is categorically ineligible for the death penalty under *Atkins* and *Hall?*

> Both the government and Webster would be en-
> titled at a hearing to offer evidence relevant to
> that determination; if Webster is not limited to
> the record before the original trial court, there is
> no reason to impose such a limit on the govern-
> ment. Webster, as the petitioner, bears the bur-
> den of proving intellectual disability. If he gets
> this far, what this will be as a practical matter is
> a partial new sentencing hearing. At this later
> stage, the proper burden of proof is a prepon-
> derance of the evidence, not "clear and convinc-
> ing" evidence.

*Id.* at 1146.

So Webster's case returned to the district court in Indiana.

## II

### A. The District Court Proceedings on Trial Counsel's Due Diligence

In June 2018 the district court held a hearing to determine whether Webster's trial team was duly diligent in seeking the Social Security records that Dorsey & Whitney later received in 2009. The court heard testimony from two witnesses: lead trial counsel Larry Moore and Kristen LeRoux, one of the Dorsey & Whitney paralegals who helped to retrieve the Social Security records.

Moore testified that he had extensive experience as a prosecutor and a defense attorney by the time the trial court appointed him to represent Webster in 1994. Indeed, Moore had participated in six previous capital cases—three as a prosecutor and three as defense counsel.

Moore explained that his strategy in Webster's case focused on sentencing, as the government had overwhelming evidence of Webster's role in kidnapping and murdering Lisa Rene. So Moore quickly determined that Webster's intellectual capacity would be the "single biggest issue" at trial and devoted considerable energy to pursuing an intellectual disability defense to the death penalty. Moore testified that he had Webster evaluated by five experts and "sought out every medical record that [he] could find, every school record that [he] could find, [and] every person that [he] could find that had known Mr. Webster growing up."

Moore added that he and his team traveled to Little Rock before trial to interview family and other potential witnesses about Webster's intellectual ability. Webster's mother told Moore that sometime in the early 1990's (and thus before the murder of Lisa Rene) she had applied for disability benefits with the Social Security Administration on her son's behalf. Upon learning this information, and drawing on his experience in other cases, Moore thought the Social Security Administration may have records shedding light on Webster's intellectual functioning. He testified that he directed his paralegal Kim Whitehead to request records from the agency.

According to Moore, Whitehead then contacted Hal West of the Social Security office in Pine Bluff, the Little Rock suburb where Webster lived before his arrest. Whitehead learned that to obtain Social Security records, she would have to submit a formal Business Records Authorization request accompanied by a release executed by Webster. Moore testified that Whitehead followed those steps and advised West that the defense team's investigator J.W. Strickland would visit the Pine Bluff office in person to pick up any records.

Webster introduced several documents to corroborate Moore's testimony. The exhibits included two handwritten notes between Moore and Whitehead from his trial file. In one note, written after Moore met with Webster's mother, he directed Whitehead to "call [the Pine Bluff] office to find out what we need to get copies of those records." Moore ended the note by underscoring, "I need test results!" Moore's second note emphasized that the team "need[ed] to know how to get Bruce's records re: Appl. For disability benefits (any testing?)."

Webster further introduced a faxed letter from Whitehead to West at the Pine Bluff Social Security office. The letter was dated February 29, 1996 and bore a transmittal legend of March 4. Signed by Whitehead, the letter stated that "[a]s you requested I have enclosed a copy of a Business Records Authorization and Release," and "[i]t is my understanding that Mr. Webster applied for disability in 1992 and some testing was done." Attached to the letter (and included with the fax) was a records release signed by Webster, with Whitehead's letter further indicating that investigator J.W. Strickland would visit Pine Bluff from March 1–5, 1996 to pick up any records and to deliver the original release form.

Moore also recalled that Strickland had in fact visited Pine Bluff. Moore testified that he remembered receiving a call from Strickland during jury selection, with Strickland telling him that the Pine Bluff Social Security office reported having no records on Webster. Moore added that he followed up by personally calling the office in Pine Bluff to confirm that "they didn't have any record regarding Mr. Webster's application for benefits." At that point, Moore continued, he took the

Social Security office at its word and did not think there was anything else he could do.

At the hearing on diligence, Webster also called Dorsey & Whitney paralegal Kristen LeRoux, who testified about how the firm came to discover the existence of Social Security records after all. According to LeRoux, Dorsey & Whitney started representing Webster in 2008. Drawing upon a diligence checklist used in a different case, a group of paralegals (including LeRoux and Katherine Slaikeu) asked Webster to sign a blanket records release form. They then attached the signed release to records requests to multiple institutions, including the Social Security office in Pine Bluff. When the agency failed to respond, paralegal Slaikeu followed up by phone. Only then, in February 2009, did the firm receive a packet of records from the Pine Bluff office. Upon reviewing the records, LeRoux immediately noticed determinations by three doctors that Webster was "mentally retarded" and conveyed this information to attorneys working on the case.

LeRoux also testified that the Social Security records contained a list of exhibits purportedly included in the package provided by the agency. Some of the referenced documents were missing, though, so she submitted a renewed records request in October 2009. In a subsequent telephone discussion, a member of the Pine Bluff office told LeRoux to contact the Social Security office in Terre Haute, where Webster was detained, with any further records requests. When LeRoux did so, a representative from Terre Haute informed her, by phone and then by letter, that the office could not fulfill her request because Webster's file had been "destroyed."

The record sheds no light on what Social Security documents were destroyed. We have come across no information

(such as an affidavit from a records custodian) from the agency itself on the topic. It troubles us that the agency reported destroying documents in 2010, at a time when Webster's new legal team had received records dating to 1993 showing the prior findings of mental retardation. That development alone made it predictable with certainty that Webster would embark on a new effort to obtain relief from his death sentence. The stakes for Webster—indeed for all—are far too high for records to be destroyed while someone's life is on the line.

In the district court, the government cross-examined Larry Moore and LeRoux and introduced several exhibits designed to show that Moore's account of his diligence in trying to obtain any Social Security records before Webster's trial lacked credibility. These exhibits included three affidavits Moore prepared in the years since Webster's trial—one in 2000, a second in 2009, and a third in 2018 (in advance of the hearing on remand in the district court). The government compared and contrasted the information in Moore's affidavits—focusing specifically on his enhanced and highly particular recollection in 2018—to discredit his account.

On this score, the details become important. Moore prepared and submitted the first affidavit, dated September 26, 2000, as part of Webster's initial § 2255 motion in the Northern District of Texas. The 2000 Affidavit describes the mitigation investigation undertaken by Larry Moore prior to Webster's trial and focuses on the issues that arose with a particular mitigation expert appointed to assist with capital sentencing. The 2000 Affidavit makes no mention of Moore's efforts to obtain Webster's Social Security records.

Moore prepared his second affidavit (actually a declaration) in October 2009, shortly after Dorsey & Whitney had received Webster's Social Security records. In the 2009 Affidavit, Moore described how he thought Webster's "mental retardation was going to be a critical issue" at trial, so he "made every effort" to secure evidence related to that issue. Moore explained that his team contacted the Social Security office in Pine Bluff, requested records, and arranged for investigator Strickland to retrieve them in March 1996. Moore then added that, "While I do not currently have any direct recollection of the response which we received [from the Social Security Administration], it is my good faith belief that we must have been told that no records regarding Mr. Webster existed, otherwise we would have continued to pursue them by every means available to us." Moore further stated that he prepared the 2009 Affidavit based on his best recollection of past events but without the benefit of an opportunity to review his case file from trial.

Moore authored the third affidavit in April 2018, following our 2015 *en banc* decision and in connection with the remand proceedings in the district court. He did so after reviewing portions of his trial file, which he received from the Dorsey & Whitney team. Explaining that the case file had refreshed his memory, Moore updated and expanded upon his original account of the records request to the Pine Bluff Social Security office before trial. More specifically, he stated in the 2018 Affidavit that he spoke to a representative in the Pine Bluff office before trial and was told "there were no records in existence."

At the hearing in the district court, Moore emphasized the importance of receiving (portions of) his case file to refreshing his memory:

Q. How did [the case file] refresh your recollection?

A. Well, in a number of ways. I had not looked at that file since I gave it up in the late 1990's, and it was able to help me in terms of various dates and the things that we were doing. Like I did not recall that we had begin—that we had begun jury selection the first week of March. And by reviewing the file, I was able to determine that's exactly when it all occurred.

Reviewing his file proved particularly useful, Moore continued, because he had tried "[p]robably more than a hundred" cases since he handled Webster's case in 1996.

The government urged the district court to find that Moore's enhanced and changed account of events dating to 1995 and 1996 lacked credibility. It was implausible, the government argued, that Moore—some 25 years later—would come to have such a detailed recollection of past events that conveniently aligned with Webster's renewed request for relief.

After considering the evidence, the district court found that Webster had carried his burden of showing that the Social Security records obtained by Dorsey & Whitney in 2009 were unavailable at the time of trial despite diligent efforts by Larry Moore to obtain those records. Several factors weighed heavily in the district court's reasoning:

*First*, the district court found Larry Moore's "testimony to be credible" after "observing [his] demeanor" during the hearing. *Webster v. Lockett*, No. 2:12-cv-86, 2018 WL 4181706, at *6 (S.D. Ind. Aug. 31, 2018). Moore is an accomplished attorney who, at the time of Webster's trial, had substantial experience in criminal cases, including capital cases, on both the

prosecution and defense side. It made sound sense, the district court underscored, that a seasoned criminal lawyer like Moore would have recognized the potential importance of records from the Social Security Administration and sought to obtain them in the ways he described. So, too, did it make good sense, the district court continued, that Moore would have avoided expending additional resources to obtain Social Security records upon learning from investigator J.W. Strickland that a representative of the agency's Pine Bluff office stated that no such records existed. The district court likewise found it credible that Moore took the added step of calling the Pine Bluff office and receiving the same information.

*Second*, the district court found that the documentary evidence introduced at the hearing reinforced Moore's account. The court included in its order scanned copies of the two handwritten notes from Moore as well as the faxed letter from Whitehead to West. This contemporaneous documentary evidence, in the court's view, aligned fully with Moore's testimony of the efforts he made before trial to obtain the Social Security records.

*Third*, the district court found it important that Moore, before preparing his 2018 Affidavit and testifying at the hearing, had received and been able to review his trial file. This opportunity was unavailable to Moore for many years and allowed him to refresh his memory by looking at specific documents, including his own handwritten notes.

Having decided that Webster carried his burden on the threshold issue of diligence, the district court scheduled a hearing to consider the merits of his contention that he is intellectually disabled and therefore ineligible for the death penalty.

### B. The District Court Proceedings on Intellectual Disability

In April 2019, after an additional discovery period, the district court held a week-long hearing on the merits of Webster's *Atkins* claim. The court considered the transcripts and other evidence from Webster's trial while also, and in accord with our remand order, not limiting either party to the trial record alone. Webster and the government both presented new evidence on intellectual disability.

Everyone agreed that Webster shouldered the burden of proving intellectual disability by a preponderance of evidence. He had to show three "core elements," each borrowed from the medical community's understanding of intellectual disability. *Moore v. Texas*, 137 S. Ct. 1039, 1045 (2017). As the district court recognized, Webster had to show a deficit in intellectual functioning (indicated by an adjusted-for-error I.Q. score of roughly 70 or below), a deficit in adaptive functioning (indicated by sufficient impairment without support in either the conceptual, social, or practical domains), and the onset of both deficits during his developmental years. See *Atkins*, 536 U.S. at 308 n.3; *Hall v. Florida*, 572 U.S. 701, 710 (2014).

Webster called three expert witnesses—Dr. Mark Tassé, Dr. Daniel Reschly, and Dr. John Fabian. The government relied on the testimony of Dr. Robert Denney and of two Bureau of Prisons employees who have interacted with Webster during his period of incarceration in Terre Haute. The district court also reviewed trial testimony from Webster's friends and family and documentary evidence.

The district court heard first from Dr. Mark Tassé, a psychologist who co-authored the clinical definition of

intellectual disability promulgated by the American Association on Intellectual and Developmental Disabilities. Dr. Tassé did not examine Webster or opine on the question of intellectual disability. Rather, Webster called Dr. Tassé for the limited purpose of educating the district court on the criteria requisite to establish intellectual disability.

Beyond describing the three primary elements of intellectual disability, Dr. Tassé stressed that a disability diagnosis must be the product of clinical judgment, not of a lay person's observations of someone else. He also emphasized that people with intellectual disability can exhibit strengths in particular areas, explaining that it is not unusual for someone intellectually disabled to be able to read, write, drive, or work.

Webster then called the two experts who evaluated him following our 2015 remand and concluded he is intellectually disabled. First up was Dr. Reschly, a retired professor of education and psychology at Vanderbilt University, who evaluated Webster in January 2019. Webster scored below the sixth-grade level on each test that Dr. Reschly administered, save for one subtest. Dr. Reschly concluded that Webster's scores "are consistent with intellectual disability." He also evaluated language performance, concluding that Webster's expressive and receptive language was very low,—"to put it bluntly, [Webster] talks a lot; but there's little structure or content in his language expression." Dr. Reschly noted that Dr. Fulbright, a defense expert who testified at Webster's trial in 1996, "made virtually identical observations about Mr. Webster's language."

Dr. Reschly also conveyed information he received during interviews of friends and family who knew Webster before he entered prison. These individuals described practical ways in

which Webster exhibited limitations—for example, being unable to track the plot of television programs, to follow jokes, or to distinguish between spades and clubs in card games. Portions of Webster's Social Security application also stood out to Dr. Reschly. For example, in response to a question whether the candidate contributes around the house, Webster wrote "make my room." The application then asks follow-up questions like do you need help with chores and how much time do you spend on chores, Webster twice wrote "I don't know" and then added "I told you I make my room."

Dr. Reschly opined that Webster's intellectual functioning is "significantly subaverage," he "displayed deficits in the three domains of adaptive behavior," and these "significant limitations in intellectual functioning [and] in adaptive behavior emerged during the developmental period." He ultimately opined that "Webster is a person with intellectual disability and should be so regarded."

The district court then heard from Dr. Fabian, a clinical psychologist with experience evaluating inmates' competency, including in 70 to 80 *Atkins* cases. Dr. Fabian explained that his opinions in past cases have been mixed, finding about half of the inmates intellectually disabled and the other half not. Based on his evaluation of Webster and analysis of Webster's history and records, Dr. Fabian found that Webster suffers from serious intellectual and adaptive deficits. Foremost emphasizing Webster's many low I.Q. scores over many years, Dr. Fabian then drew on observations from his examination, highlighting, for example, that Webster's intellectual and adaptive shortcomings manifested themselves when he struggled to answer simple questions about daily life like "why would you want to tell a doctor that you're taking

medication from another doctor," or "why would you not want to use a blow dryer in a bathtub?" Nor was it surprising that Webster was unable to group photos of six people into smaller groups based on their place of birth or job even after Dr. Fabian explained the task to him a few times. Dr. Fabian also testified that Webster's exhibiting certain strengths while incarcerated did not change his conclusion because the prison environment is not conducive to sound analysis of adaptive deficits. The totality of these findings led Dr. Fabian to conclude that Webster is intellectually disabled.

Drs. Reschly and Fabian both noted that the severe emotional, physical, and sexual abuse Webster suffered throughout childhood is a risk factor toward the development of intellectual disability. Both experts likewise reviewed (and the district court considered) other evidence, including the Social Security records retrieved by Dorsey & Whitney in 2009. Those records showed that all three agency doctors who evaluated Webster in connection with his Social Security application found him mentally retarded.

Drs. Reschly and Fabian also placed emphasis on the special education letter dating to November 1993 and included in the Social Security file. Dr. Reschly further noted that Webster "readily admitted that he was in special education," and that it would be odd for the parents of someone not in special education to receive such a letter. The experts likewise considered the fact that Webster failed the first grade, with Dr. Fabian finding this evidence "critical," as first grade is "the foundation" for skills like "reading, writing, [and] spelling."

For its part, the government presented testimony from clinical psychologist Dr. Robert Denney, who evaluated Webster for 11-plus hours over two days following our 2015

remand. He testified that "none" of the other cognitive testing Webster completed is "a valid reflection of his genuine cognitive abilities," as each test result was the product of substantial malingering by Webster. Malingering must have been present, in Dr. Denney's view, because Webster's real-world functioning was "strikingly inconsistent" with all prior test results. A person with scores similar to Webster's would not be able to play the guitar or drive a car—"it just can't happen." Dr. Denney concluded that "life choices of criminal misconduct" and "maladaptive personality style" describe Webster—factors "not related to intellectual disability."

The government also called several lay witnesses. Dr. Erin Conner, a licensed psychologist working at Terre Haute, has observed Webster (and other death row inmates) on a monthly basis for three years. Without offering any expert opinion (or even being disclosed or qualified as an expert witness), Dr. Conner testified that she has never "observed anything that would cause [her] concern about Mr. Webster's intellectual functioning." On cross-examination, Dr. Conner acknowledged that her interactions with Webster ranged from about 30 seconds in length to 10 minutes at most. The district court also admitted into evidence and reviewed the deposition testimony of Dr. Jacqueline Blessinger, who met with Webster as the lead psychologist of the Special Confinement Unit at Terre Haute. Dr. Blessinger likewise testified as a lay witness, stating that she was impressed by Webster's capacity to express frustration, control his emotions, and speak appropriately. Dr. Blessinger stated that she based her views on spending about one hour with Webster over the course of approximately ten months, but concluded that "throughout [her] observations, there was nothing to clinically indicate a need for further testing."

Finally, the government relied on trial testimony from Webster's ex-girlfriends, who described him as sweet, fun to be around, and someone able to do the "normal things couples do." The government also highlighted certain adaptive functioning strengths by drawing upon Dr. Reschly's testimony that Webster "certainly mastered the basic fundamental daily living skills of eating, toileting, dressing, [and] things of that nature," and the fact that he played guitar in prison and passed a driving test.

In the end, the district court found that Webster met all three criteria to qualify as intellectually disabled. See *Webster v. Lockett*, No. 2:12-cv-86-WTL-MJD, 2019 WL 2514833, at *11 (S.D. Ind. June 18, 2019). The court rooted its finding in the three criteria for intellectual disability.

- *Onset Before Age 18.* The government did not dispute (nor did the district court find any reason to question) that Webster's deficits arose prior to age 18.

- *Intellectual Functioning.* The district court began with Webster's intellectual functioning, giving weight to his many low I.Q. test scores:

No. 19-2683                                                    25

| Year | Psychologist | Score |
|---|---|---|
| 1992 | Dr. Patrick Caffey (Arkansas Department of Mental Health) | 48 (Full scale) 56 (Verbal) 48 (Performance) |
| 1993 | Dr. Edward Hackett (Social Security Administration) | 59 (Full scale) 71 (Verbal) 49 (Performance) |
| 1995 | Dr. Raymond Finn (Webster trial expert) | 59 (Full scale) 59 (Verbal) 60 (Performance) |
| 1995 | Dr. Dennis Keyes (Webster trial expert) | 55 (Composite) 67 (Crystalized) 46 (Fluid) |
| 1996 | Dr. Raymond Finn (Webster trial expert) | 65 (Full scale) 72 (Verbal) 59 (Performance) |
| 1996 | Dr. Dennis Keyes (Webster trial expert) | 51 (Full scale) N/A (Verbal) N/A (Performance) |
| 1996 | Dr. George Parker (Government trial expert) | 72 (Full scale) 77 (Verbal) 67 (Performance) |
| 2018 | Dr. Robert Denney (Government expert) | 61 (Full scale) 63 (Verbal) 69 (Performance) |
| 2018 | Dr. Daniel Reschly (Webster expert) | 53 (Full scale) N/A (Verbal) N/A (Performance) |

In emphasizing these low I.Q. scores, the district court determined that the evidence did not support a finding of malingering, choosing instead to credit Dr. Reschly's testimony that it would be "extremely difficult" to manipulate so many test scores over the course of 27 years. *Webster*, 2019 WL 2514833, at *7. Indeed, the district court found that Dr. Denney's testimony—on the specific point of malingering and even more generally—lacked credibility, giving it little or no weight. In the district court's view Dr. Denney "ignore[d], disregard[ed], or minimize[d] evidence that called his conclusions into question." *Id.* at *7 n.13. For example, the article Dr. Denney cited for the proposition that malingering is easy actually reached the conclusion that "faking low on the WAIS-R is a difficult endeavor." *Id.* The district court also highlighted that Webster, in 1993 and thus before the murder of Lisa Rene, sought benefits from the Social Security Administration due to sinus symptoms and not due to any intellectual disability. That three separate agency doctors diagnosed Webster as mentally retarded at a time when he had no incentive to manipulate his I.Q. test results only further undermined Dr. Denney's conclusion that Webster had exhibited malingering during prior tests.

- *Adaptive Functioning.* Accepting Dr. Fabian's contention that the prison environment is too structured to yield the most accurate information on adaptive abilities, the district court focused on evidence from Webster's life outside of prison. The Social Security records, the district court reasoned, showed Webster is "barely literate." While the government pointed to evidence about Webster's strengths, including his musical

ability, hygiene, and conversational ability, the district court focused its adaptive functioning analysis on deficits rather than strengths. The district court noted that Dr. Fabian and Dr. Reschly spent substantial time with Webster, with family and friends, and reviewing the school and Social Security records. On the other hand, the court gave little weight to the lay testimony of Dr. Conner and Dr. Blessinger because "[n]either the quantity nor depth of their interactions with Webster would lead the Court to find their testimony to be more persuasive than that of Drs. Fabian and Reschly." Weighing the evidence, the district court found that Webster has adaptive functioning deficits.

The government now appeals.

### III

The government challenges the district court's findings on defense counsel's diligence in pursuit of the Social Security records before trial, and, in turn, Webster's intellectual disability. The same clear error standard applies to both. We can reverse only if we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985); see also FED. R. CIV. P. 52(a)(6). A reviewing court may not set aside factual findings "simply because it is convinced that it would have decided the case differently." *Anderson*, 470 U.S. at 573. Rather, reversal is warranted only if the district court's finding was "so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it." *Id.* at 575; see also *Greyer v. Illinois Dep't of Corr.*, 933 F.3d 871 (7th Cir. 2019) (reversing a finding of fraud because the district court never explained its reasoning and the record contained directly contradictory evidence).

Credibility determinations are entitled to "even greater deference" because "only the trial judge can be aware of the variations in demeanor and tone of voice." *Anderson*, 470 U.S. at 575; see also *United States v. Austin*, 806 F.3d 425, 431 (7th Cir. 2015) (noting that credibility findings "can virtually never be clear error" (quoting *United States v. Longstreet*, 669 F.3d 834, 837 (7th Cir. 2012))).

### A.  Diligence of Webster's Trial Counsel Larry Moore

We begin with the government's challenge to the finding that Larry Moore was diligent in his pretrial pursuit of the Social Security records ultimately received in 2009 by Dorsey & Whitney. Due diligence, we have explained, means "reasonable diligence," not "the maximum feasible diligence." *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004). "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 525 (2003)). Where counsel travels a path of particular inquiry and encounters information suggesting that "further investigation would [be] fruitless," limiting the investigation is reasonable. *Wiggins*, 539 U.S. at 525. To proceed with his § 2241 petition, Webster had to show by clear and convincing evidence that Moore exercised reasonable diligence. See *Webster*, 784 F.3d at 1146.

During the 2018 hearing, Webster presented the district court with meaningful evidence of Moore's pretrial efforts back in 1996. The most compelling evidence came from Moore's own pen—from notes in his trial file. Webster presented the district court with contemporaneous handwritten

notes from Moore to his paralegal Kimberly Whitehead. Those notes—the authenticity of which nobody has questioned—show that Moore recognized the importance of any Social Security records *and* directed Whitehead before trial began to request any such records from the agency's Pine Bluff office. Moore's trial file also contained, and the district court reviewed, the letter Whitehead faxed to the agency requesting any records they might have on Webster.

At the hearing, Moore then walked the district court step-by-step through the process he and Whitehead went through before Strickland traveled to Pine Bluff to pick up the Social Security records. Upon being told by the Social Security office that no records existed, Moore ended the inquiry and turned his attention to other aspects of Webster's defense. Against this evidentiary showing, the district court concluded that Moore was duly diligent, and we see no clear error in that finding.

The government begs to differ, insisting that Moore's account—root and branch—is implausible. What most troubles the government is that Moore's account of his own diligence has grown in clarity and detail despite the passage of substantial time—a result at odds with the workings of human memory, at least as the government would have it. But the district court heard and considered the government's position and responded with findings that are plenty reasonable and reflect no clear error.

The government points first to Moore's improved recollection between the 2009 Affidavit and the 2018 Affidavit he submitted to the district court. In 2009 Moore stated that it was his "good faith belief that we must have been told that no records regarding Mr. Webster existed," but in 2018 Moore

stated that "I am certain that I was personally told that such records did not exist, although I cannot actually recall whether this was via phone or in person." The government also highlights that Moore's inconsistencies continued even after he spent meaningful time with Webster's trial file. In his 2018 Affidavit, Moore could not recall whether the Social Security employee told him no records existed "via phone or in person." During the hearing on diligence later that year, however, Moore testified definitively that the conversation was via phone. In the government's view, this detail came out of thin air.

To be sure, Moore added to his account during the remand proceedings. But that reality was not lost on the district court. To the contrary, the district court listened to Moore's account of the newfound detail, observed the government's cross examination, and chose in the end to credit Moore's explanation. As the district court emphasized, Moore explained that when he executed the 2009 Affidavit he had not yet had the opportunity to review his file. In contrast, before executing the 2018 Affidavit, Moore noted that he "spent hours reviewing relevant portions of [his] trial file and the trial transcript," and "consider[ed] this matter in depth." Recall that between Webster's 1996 trial and the 2018 hearing on diligence, Moore estimated that he tried "[p]robably more than a hundred" cases. A number of these cases were death penalty cases, like Webster's. The district court plausibly reasoned that the lines between the many cases Moore tried could blur over time, and that reviewing the Webster case file (indeed reviewing his own handwritten notes) could provide needed clarity. See *Webster*, 2018 WL 4181706, at *5 n.2.

We also see no clear error in the district court's finding that "Moore's additional review of the file … further helped Moore recall the events, as he remembered that his direct contact with the [Social Security Administration] took place during *voir dire*." Reviewing this finding with the knowledge that credibility determinations can "virtually never be clear error," *Austin*, 806 F.3d at 431, it is plausible that a second review of the trial file jogged Moore's memory about *voir dire* scheduling. At bottom, the district court heard and credited Moore's testimony over the government's vigorous cross-examination. We see Moore's account as entirely plausible, and, regardless, it was up to the district court to weigh and evaluate the government's attacks on credibility. See *id.* ("The district court is best situated to make credibility determinations in light of the totality of the evidence."). And that is especially so in light of the undeniable fact that contemporaneous records from Moore's case file so tightly reinforced the testimony he provided in the district court.

Finally, the government argues that even if we find no error in the district court's crediting of Moore's testimony, he should have kept pushing to obtain the Social Security records even after "he was initially told that the records were destroyed." But the government's description of Moore's testimony is inaccurate. At no point did Moore state (in his 2009 Affidavit, 2018 Affidavit, or otherwise) that the Pine Bluff office told him before trial that the records had been destroyed. To the contrary, Moore explained that the agency told him no records existed. The two are not synonymous, for no records existing meant there was nothing to continue requesting. And that understanding left Moore with no reason to believe anything had been destroyed. As Moore explained—and the district court credited—he did not think "there was a basis to

issue a court order" because he "had no good faith belief that the records existed at that point." A lawyer in Moore's circumstances ought to be able to take the government at its word when it says no records exist.

The district court found that Moore pushed far enough, and we are not "left with the definite and firm conviction" that this finding reflects any clear error. *Anderson*, 470 U.S. at 573. The documentary evidence from Moore's trial file further establishes that Moore focused on the possible existence of Social Security records and repeatedly communicated with Whitehead about requesting them.

Because the district court's findings—that Moore's testimony was credible and supported by contemporaneous documentary evidence—are not "internally inconsistent or implausible," we will not upset them. *Anderson*, 470 F.3d at 575.

## B. Webster's Intellectual Disability

This brings us to the government's challenge to the finding that Webster is intellectually disabled. All agree that the district court applied the proper criteria for finding intellectual disability. The standard comes from the 11th edition of the AMERICAN ASSOCIATION ON INTELLECTUAL AND DEVELOPMENTAL DISABILITIES DEFINITION MANUAL (AAIDD-11) and the 5th edition of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-5). See *Moore*, 137 S. Ct. at 1048–49 (recognizing these exact standards).

Recall that three criteria must be present for a person to be intellectually disabled. Two of these criteria—onset by the age of 18 and the presence of intellectual deficits—are not contested here. Right to it, the parties dispute only whether Webster suffers from adaptive deficits.

As a general matter, adaptive deficits are present when someone cannot "learn basic skills and adjust behavior to changing circumstances." *Hall*, 572 U.S. at 710. The adaptive functioning analysis considers whether a person is "sufficiently impaired" such that "ongoing support is needed in order for the person to perform adequately" in one of three domains:

- *The conceptual (academic) domain*, which "involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others;"

- *The social domain*, which "involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others;"

- *The practical domain*, which "involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others."

DSM-5 at 33, 37–38; see also AAIDD-11 at 44. A deficit in adaptive functioning requires showing sufficient impairment in "at least one domain"—but not all three. DSM-5 at 38; see also AAIDD-11 at 27. No matter the affected domain, the adaptive deficit "must be directly related to the intellectual impairments described in [the first criteria]." DSM-5 at 38.

The DSM-5 and AAIDD-11 provide additional guidance for assessing adaptive functioning. The AAIDD-11 emphasizes that demonstrating strengths in one area does not

preclude a finding of intellectual disability. See AAIDD-11 at 47. As Dr. Fabian testified, many people with intellectual disabilities "can live independently, especially with support, can get a job, can work, [and can] find employment." Nor is it unusual for people with intellectual disabilities to have unique skills, from "musical talents" to "artistic talents [like] drawing [or] painting." The AAIDD puts the point even more directly, explaining that "significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." AAIDD at 47.

The DSM-5 and AAIDD-11 likewise emphasize that adaptive skills are best measured not within the structured prison environment but "within the context of ordinary community environments typical of the person's age peers and tied to the person's individualized needs for support." AAIDD at 16; see also DSM-5 at 38 ("Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained."). And the operative focus should be on "what the person typically does, rather than what the individual can do or could do." AAIDD at 47.

### 1. *Intellectual Functioning*

Because adaptive deficits must be tied to intellectual impairments, we owe a few words on Webster's intellectual functioning. This analysis focuses primarily on I.Q. scores. See AAIDD-11 at 31 ("Although far from perfect, intellectual functioning is currently best represented by IQ scores when they are obtained from appropriate, standardized and individually administered assessment instruments."); DSM-5 at 37 ("Intellectual functioning is typically measured with

individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence.").

We see no clear error in the district court's finding that Webster suffers from intellectual deficits. Even a cursory review of the I.Q. tests lays bare Webster's intellectual shortcomings. "Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean," which translate to "a score of 65–75." DSM-5 at 37. This is not a case where Webster has one or two low I.Q. scores sitting alongside many higher scores. To the contrary, every one of Webster's nine I.Q. scores over 27 years falls below 75—with many falling well below that number.

The district court found no evidence of malingering on any of these tests—before or after Webster's murder of Lisa Rene. We start with the full-scale I.Q. scores of 48 from 1992 (though recall that the parties agree this score may not have been accurate because Webster was preoccupied) and 59 from the 1993 Social Security records. Setting aside the 1992 score, the 1993 score was the product of an intellectual assessment performed in connection with the agency's evaluation of Webster's application for disability benefits. This occurred a year before the murder, at a time when Webster had no incentive to malinger.

As for the I.Q. tests administered after the murder, Webster undeniably had an incentive to malinger. The government pressed this precise point, and the district court assessed the evidence with care. We have no reason to disturb the district court's decision to credit testimony that it would have been challenging to malinger on so many additional I.Q. tests over the course of decades. Nor will we second guess the

decision to give little or no weight to Dr. Denney's testimony about malingering. As the district court explained, "Dr. Denney focused on evidence that supported his conclusions," and some of his testimony was "demonstrably incorrect or appears to reveal biases." *Webster*, 2019 WL 2514833, at *7 n.13. For example, Dr. Denney would have rejected the results of the Test of Malingering Memory Dr. Reschly administered to Webster because Dr. Reschly did not administer the whole test. As the district court found, though, this rejection was improper as Dr. Reschly did administer all three portions of the test—all of which Webster completed. See *id.*

On this record, the district court committed no error in determining that Webster demonstrated deficits in intellectual functioning. Perhaps owing to the weight of the I.Q. evidence, the government, to its credit, conceded the same conclusion during oral argument.

2. *Adaptive Functioning*

The government does challenge the district court's finding that Webster demonstrated deficiencies in each of the three adaptive functioning domains—conceptual, social, and practical. But Webster need only exhibit a deficiency in one domain (not all three)—a point the government agrees with—and the district court's conclusion that he did so is not clearly wrong.

Webster's adaptive deficits show most clearly in the conceptual domain. Because this domain considers language, reading, and writing skills, along with math reasoning and problem solving, there is meaningful overlap between the evidence of intellectual deficits (measured by intelligence tests) and the evidence of deficits in the conceptual domain. See

DSM-5 at 37 ("The conceptual (academic) domain involves competency in memory, language, reading, writing, [and] math reasoning" skills); AAIDD-11 at 44 (noting that conceptual skills include "language; reading and writing").

The record amassed on remand shows that Webster has substantial limitations with language, reading, writing, problem-solving, and judgment. Dr. Reschly testified that Webster's speech is "imprecise, rambling, and disorganized." On Webster's own account, he "struggle[ed] in school," and had "difficulty learning and keeping up with other students." He failed the first grade, and "readily admitted that he was in special education"—a fact the district court found amply corroborated by the November 8, 1993 letter from the Special Education Supervisor of the Watson Chapel Schools in Pine Bluff, Arkansas. See *Webster*, 2019 WL 2514833, at *2.

We likewise find no error in the district court's reliance on information in Webster's 1993 application for Social Security benefits as indicating a deficit in conceptual functioning. Webster's answers to application questions, the district court observed, revealed an inability to write or reason coherently. See *id.* at *9. Dr. Reschly saw the responses this exact way, testifying that the Social Security application "related to the conceptual domain of adaptive behavior," and pointed to answers like "I sleeps look at cartoon," and "don't sleep to good at night wakes up sneezing" as examples of literary deficiencies.

On appeal, the government argues that Webster does not have deficits in the conceptual domain because he "performed well on two standardized tests of academic ability." Webster scored in the 43rd percentile on a grade school test called the MAT6, and after his conviction he scored at the freshman college level on two subjects of the Adult Basic

Learning Exam. No question this evidence points in a different direction. As the government points out, Webster's own experts acknowledged on cross examination that these test scores, when viewed in isolation, are not consistent with a finding of intellectual disability. But Dr. Reschly took care in his testimony to explain that the Adult Basic Learning Exam is unreliable and indeed "no longer available" because it employs "poor normative standards and [yields] inaccurate grade equivalent scores." And importantly, "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." See *Moore*, 137 S. Ct. at 1050.

The district court reasoned that the deficits chronicled by Drs. Reschly and Fabian (and further corroborated by Webster's special education records, academic history, and Social Security application) are not offset by two academic test scores. The resultant finding that Webster suffers from deficits in the conceptual domain does not reflect clear error.

Whether Webster possesses deficits in the practical and social domains presents a more challenging question. But Webster did not need to convince anyone one way or the other. We will not disturb the district court's finding that Webster exhibits adaptive deficits in one of the three adaptive domains, and that finding is all that is needed for the adaptive functioning analysis.

Having demonstrated substantial deficits in intellectual functioning and adaptive functioning (at the very least in the conceptual domain) as well as an onset of the deficiencies before the age of 18, Webster has carried his burden of proving that he is intellectually disabled and therefore constitutionally ineligible to remain under a death sentence.

Case: 19-2683    Document: 45    Filed: 09/22/2020    Pages: 40

No. 19-2683                                                  39

**IV**

There runs through the government's position on appeal a stream of frustration over Webster receiving relief in federal court in Indiana after years of proceedings that had seemed to reach finality in federal court in Texas. At one level the government's position is well-founded, for there is no question the litigation path has been long, defined by an unexpected turn, and laden with great investments of resources by all involved. At another level, though, the government's position is not well-received, for much of the frustration seems aimed at registering disagreement with our 2015 *en banc* decision holding that Webster had made a sufficient showing to satisfy the safety valve in 28 U.S.C. § 2255(h)(1) to pursue the prospect of relief in the district court in Indianapolis. But now is not the time to relitigate our *en banc* decision. We consider it—as we must—law of the case for purposes of this appeal. See *Dobbs v. DePuy Orthopaedics, Inc.*, 885 F.3d 455, 458 (7th Cir. 2018) ("'Once an appellate court either expressly or by necessary implication decides an issue, the decision is binding upon all subsequent proceedings in the same case' under the law-of-the-case doctrine." (quoting *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991))).

Nor do we agree that the remand proceedings in the district court "all but swept away the nearly month-long trial and sentencing proceedings involving 50-plus sentencing witnesses and detailed jury findings on Webster's intellectual functioning that took place in the Fort Worth trial court." Remember the reason for the remand: the government, in particular the Social Security Administration, failed to produce documents pre-dating the murder showing that Webster was mentally retarded. But even more, the evidence from the

Texas proceeding was before the district court in Indiana. But so too was substantial other evidence developed by the parties on remand. If particular aspects of the Texas evidence undermined Webster's showing on remand, the government should have so argued—not at a high level of generality (like we see with many points on appeal), but rather at a high level of specificity. At this stage, we cannot decide this appeal in any way other than by focusing on evidentiary details.

Above all else, the record shows that the district court proceeded with great care on remand. Over the course of many years leading to the 2018 and 2019 hearings, the district court held status conferences, sought discovery briefing, reviewed exhibit and witness lists, solicited findings of fact and conclusions of law, and ruled on motions. It then held extensive hearings on whether Webster exercised reasonable diligence pursuing the Social Security records before trial and, in turn, whether, based on those records and other evidence, he carried his burden of proving that he is intellectually disabled. Both parties had full and fair opportunities to assemble their evidence and present it to the district court. And from there the district court made detailed findings of fact and ultimately determinations on the questions presented. There is no way to read the transcripts of the proceedings below and not walk away impressed with the care taken by Judge Lawrence.

Our role is limited. Weighty though the obligation, the question before us is whether the evidence presented on remand leaves us with the definite and firm conviction that the district court's findings reflect clear error. Having taken our own detailed look at all aspects of the proceedings on remand, we see no clear error anywhere. We therefore AFFIRM the district court's judgment vacating Webster's capital sentence.